UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

SCOTTSDALE CAPITAL ADVISORS
CORPORATION and ALPINE
SECURITIES CORPORATION,

        Case No.: 8:22-cv-2347-MSS-TGW

    Plaintiffs,

v.

FINANCIAL INDUSTRY
REGULATORY AUTHORITY, INC.,

    Defendant.

_____/

**SECOND AMENDED COMPLAINT FOR
DECLARATORY AND INJUNCTIVE RELIEF**

Plaintiffs, Scottsdale Capital Advisors Corporation ("SCA") and Alpine

Securities Corporation ("Alpine") (collectively, "Plaintiffs"), sue Financial Industry

Regulatory Authority, Inc. ("FINRA") and allege as follows:

**INTRODUCTION**

1.     In this action, Plaintiffs challenge the unconstitutional operation and

structure of FINRA.

2.     Despite purporting to be a private corporation and self-regulatory

organization, FINRA wields massive governmental power and authority over the

securities broker-dealer industry and the financial markets while simultaneously

denying that it has any obligation to exercise its power in accordance with the United

States Constitution.

3.    Based on its characteristics and conduct, and notwithstanding FINRA's purported status as a private corporation, FINRA is a governmental entity and state actor subject to the limits of the Constitution.

4.    FINRA's current structure and operations contravene the separation of powers, violate the Appointments Clause, and constitute an impermissible delegation of powers. Because it purports to be a private entity, FINRA is unaccountable to the President of the United States, lacks transparency, and operates in contravention of the authority under which it was formed. Moreover, FINRA utilizes in-house tribunals in a manner contrary to Article III and the Fifth and Seventh Amendments, thereby depriving entities and individuals of property without due process of law.

5.    These constitutional violations are compounded by the fact that, although the legislation providing for the establishment of self-regulatory organizations ("SRO") expressly envisioned multiple and voluntary associations, Congress decades later dictated that membership is mandatory. So now, to participate as a broker or dealer in this country, a firm or individual is required to join FINRA and thereby sacrifice essential constitutional rights. As a result, any firm or individual can be stripped of their livelihood and property without adherence to due process of law.

6.    Since the filing of the initial complaint in this action, FINRA has taken apparently retaliatory action against not just one but both of these Plaintiffs.

7.      Most recently, on April 19, 2023, FINRA filed a new proceeding against Alpine (the "New Alpine Proceeding"). The New Alpine Proceeding vividly illustrates the fundamental unfairness of FINRA's purported proceedings and tribunals.

8.      In the New Alpine Proceeding, FINRA seeks to impose severe sanctions against Alpine based on Alpine's alleged failure to comply with an order contained in an Initial Hearing Panel Decision that was issued in a prior lengthy FINRA action.

9.      However, an Initial Hearing Panel Decision does not become final or effective unless and until it is affirmed by FINRA's appellate tribunal, the National Adjudicatory Council ("NAC"). And that has not occurred.

10.      Alpine appealed the Initial Hearing Panel Decision and argued its appeal six months ago but no decision has issued. Nonetheless, through the New Alpine Proceeding, FINRA is attempting to obtain the corporate death penalty—expulsion of the firm from the industry—through machinations that deprive Alpine of *any appellate review*.

11.      A decision in the New Alpine Proceeding would issue on an expedited basis and would become effective immediately, regardless of whether the Initial Hearing Panel Decision has been affirmed and regardless of whether Alpine appeals any decision in the New Alpine Proceeding. Thus, FINRA has manufactured a procedure by which it can obtain the closure of the firm through a decision issued on an expedited basis by a single Hearing Officer employed and paid by FINRA even while the underlying decision remains on appeal.

## JURISDICTION AND VENUE

12.     This Court has subject-matter jurisdiction over this case pursuant to 28 U.S.C. §§ 1331 and 2201, and 15 U.S.C. §78aa.

13.     FINRA is prosecuting the New Alpine Proceeding via remote video and not restricted to any specific venue or situs.

14.     Pursuant to *Axon Enterprise Inc. v. FTC*, 143 S.Ct. 890 (2023) and 15 U.S.C. §78aa, the constitutional attack on FINRA places it in the same place as the Securities and Exchange Commission ("SEC"). Thus, personal jurisdiction and venue are appropriate in this Court or in any other district Court in the United States.

15.     Further, this Court has personal jurisdiction over FINRA pursuant to section 48.193, Florida Statutes because FINRA operates, conducts, engages in, and carries on business in the state, has an office in this state, is registered to do business and has a registered agent in this state, was served with process in this state, and is engaged in substantial and not isolated activity within this state.

16.     FINRA—and its predecessor entity—have been registered to do business, have maintained an office and/or registered agent, and have engaged in business in the state of Florida for more than 25 years.

17.     FINRA regulates numerous broker-dealer firms, capital acquisition broker firms, and funding portals that are located in the state of Florida.

18.     FINRA leases real property in the state of Florida and maintains offices in this state.

19. FINRA's operations include 19 offices, 69 hearing venues, and 3600 employees throughout the country. This vast operation is divided and managed by primary offices in just four regions, one of which—FINRA's Southeast Region Office—is located in Florida. The remaining regional offices are located in major metropolitan cities: Chicago, Los Angeles, and New York.

20. The Southeast Region Office is responsible for overseeing and operating a significant portion of FINRA's business, including at least 18 FINRA hearing venues in the southeastern United States, including multiple locations in the state of Florida. FINRA also maintains dispute resolution service offices throughout the state.

21. FINRA employs multiple individuals that reside in Florida and work from the Southeast Regional Office and from FINRA's other Florida offices.

22. FINRA's operations include administering and overseeing FINRA disputes, a significant percentage of where based in Florida. In 2022 alone, there were close to 500 FINRA cases in Florida, many of which were presided over by arbitrators that live in Florida and were administered with the assistance of FINRA employees who live and work in this state.

23. FINRA recruits, pays, trains, and oversees arbitrators and mediators who live in Florida and preside over FINRA arbitrations and mediations.

24. FINRA offers compliance seminars out of its Florida offices. As described on FINRA's website: "[d]esigned for compliance and legal professionals at FINRA member firms, these events offer an opportunity to hear about current

regulatory issues while engaging in a direct dialogue with FINRA District Office staff."

25. FINRA's Board of Governors (the "Board" or "FINRA's Board") has held meetings in Florida, during which they discussed FINRA's finances, technology and capital initiatives, and rulemaking items.

26. Based on the foregoing, FINRA is engaged in substantial and not isolated activity in this state sufficient for this Court to confer personal jurisdiction.

27. Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) and (e).

**PARTIES**

28. SCA is a broker dealer that has a principal office in Scottsdale, Arizona, as well as an office in the Middle District of Florida. SCA is a registered member of and is regulated by FINRA.

29. Alpine is a broker dealer with its principal office in Salt Lake City, Utah. Alpine is a registered member of and is regulated by FINRA.

30. FINRA is a national securities association registered with the SEC pursuant to 15 U.S.C. § 78s and is authorized thereunder to enforce the Securities Exchange Act of 1934 (the "Exchange Act"), the SEC's rules and regulations thereunder, and its own rules (all of which are enforceable only by virtue of the SEC's approval of such rules).

31. FINRA is a Delaware not-for-profit corporation with its principal place of business located at 1735 K Street NW, Washington D.C. FINRA maintains offices and conducts business throughout the United States, including, as alleged above, in

6

the State of Florida and in this District. Notwithstanding, FINRA is an agency and/or establishment and/or instrumentality of the United States.

32.    Plaintiffs have standing to assert these claims because they are regulated parties, have experienced the direct impact of FINRA's unconstitutional operations, and have suffered and will continue to suffer injury and damage as a result of its actions.

33.    The claims asserted in this case challenge the constitutionality of FINRA's structure and operations. As such, Plaintiffs' claims are collateral to any administrative proceeding involving Plaintiffs, any administrative review process, and the administrative review structure set forth in the Section 15A of the Exchange Act. The claims asserting constitutional violations are beyond the expertise of FINRA and are appropriately before this Court.

**GENERAL ALLEGATIONS**

**I.    The history of FINRA**

34.    In 1934, Congress enacted the Exchange Act which required securities firms to register with the SEC if they were a broker or dealer and effected transactions other than on a national securities exchange.

35.    In 1938, Congress passed the Maloney Act adding a new section 15A to the Exchange Act that authorized associations of brokers or dealers meeting certain statutory requirements to register with the SEC as a "national securities association." The Maloney Act's voluntary national securities associations were to be the over-the-

counter ("OTC") market counterparts to the regulatory arms of the exchanges (i.e., self-regulatory organizations).

36.    As the SEC explained shortly after the Maloney Act's passage, the act embodied "the principle of conferring upon regulatory groups from business a primary responsibility for enforcing high standards of business conduct upon their members . . . [by setting] up a system of regulation in the over-the-counter markets through the formation of voluntary associations of investment bankers, dealers and brokers doing business in these markets under appropriate Governmental supervision." SEC, *Fourth Annual Report of the Securities and Exchange Commission: Fiscal Year Ended June 30, 1938* (Washington, D.C., SEC 1938), at 33. Thus, the purpose and intent of the legislation was to rely on "voluntary associations" comprised of those who possess the knowledge and practical experience borne of "doing business in these markets."

37.    A year later, the National Association of Securities Dealers ("NASD") became the first and only registered national securities association. Because no other associations had registered with the SEC, the NASD was the only SRO with "responsibility for enforcing … a system of regulation" for brokers and dealers in the OTC markets.

38.    In 1983, Congress *mandated* that broker-dealers wishing to conduct business in the OTC markets register with the NASD and become subject to the NASD's regulatory powers. Membership was no longer "voluntary."

39.     In addition to the NASD, the New York Stock Exchange ("NYSE") played a significant role as a SRO enforcing securities laws and implementing a regulatory framework through its own rules.

40.     In 2007, the SEC approved a plan that merged the member regulation operations of the NASD and the NYSE. The NASD absorbed the regulatory arm of the NYSE and changed its name to FINRA. Since then, virtually all participants in the securities industry in this country have been required to "join" FINRA and to maintain that membership in order to conduct their business.

## II.     Overview of FINRA's structure and operations

41.     FINRA's day-to-day operations involve overseeing virtually every aspect of and participant in the securities industry. FINRA regulates approximately 3,400 brokerage firms, 150,000 branch offices, and more than 610,000 individual registered securities representatives. Nearly all of FINRA's revenue is derived from its regulatory activities in the form of fees, fines, penalties, and sanctions levied against its members.

42.     FINRA is governed by its Board which is responsible for overseeing the management and administration of FINRA's operations and affairs.

43.     FINRA's Board is comprised of 22 members, less than half of which are "industry governors"—i.e. those that operate within the industry. The remaining Board members are comprised of "public governors"—those who have no material business in the industry—and FINRA's CEO.

44.     FINRA's day-to-day operations are managed by FINRA's executives who are appointed by FINRA's Board.

45.     As part of its purported regulation of broker-dealers, FINRA is responsible for adopting and implementing rules and procedures to discipline its members. To do this, FINRA employs an in-house judicial construct to adjudicate the charges leveled against broker-dealers by FINRA's staff.

46.     FINRA's disciplinary proceedings are managed by the Office of Hearing Officers led by the Chief Hearing Officer who is appointed by FINRA's CEO.

47.     In turn, the Chief Hearing Officer appoints a panel of hearing officers who conduct disciplinary proceedings, issue decisions, and assess fines and sanctions. These hearing officers possess power and authority beyond that of a mere employee or functionary and exercise significant duties and discretion, akin to that of federal trial judges.

48.     Hearing officers' decisions, like those of Administrative Law Judges of the Securities and Exchange Commission, may become final and effective without any further consideration or review.

## III.     FINRA wields expansive and unchecked power in violation of the separation of powers.

49.     FINRA purports to be a private, government-authorized entity responsible for overseeing broker-dealers. In reality, FINRA acts as an extension of the federal government wielding expansive governmental police power, including the power to "enforce compliance" with the Exchange Act and other federal securities

laws, to regulate the conduct of its members through rulemaking and adjudication, to conduct inspections of brokers and dealers, to conduct investigations and disciplinary proceedings, and to impose sanctions and otherwise to enforce compliance with the Exchange Act, FINRA's rules, professional standards, and the securities laws

50.     For example, FINRA has the power and discretion to promulgate rules and standards and the ability to enforce compliance with those rules and standards by levying fines on its members and barring its members from the industry.

51.     FINRA also possesses and deploys improperly and unconstitutionally delegated legislative power, including, but not limited to, its broad power to enact law, its authority to set its own budget without any constraint or legislative cap, and its authority to fund that budget through the imposition of a levy on all persons wishing to conduct business in the OTC markets and, indirectly, on those investors that wish to participate in those markets.

52.     Indeed, FINRA's operations are funded almost exclusively from fees, fines, penalties, and sanctions. In 2021, for example, FINRA extracted more than $100 million in fines from its members, most of whom capitulate to FINRA's allegations and penalties precisely because of the enormous and unchecked power that it wields, including, without limitation, its unchecked power to enforce the rules, standards, and laws it enacts or expands in violation of the Constitution as alleged above in paragraphs 42 through 44 and below in paragraphs 48 through 56.

53. FINRA has the authority to use the amounts that it collects to set its own salaries and is incentivized to increase the amounts of penalties it imposes, expending those funds *inter alia* on exorbitant salaries of more than $3,000,000.00 per year to its Chief Executive Officer and over $1,000,000.00 per year to its Chief Financial Officer, Chief Legal Officer, Head of Member Supervision and Chief of Exams.

54. In total, FINRA claimed over $1.3 billion in "operating revenue" in 2021, with total net income exceeding $218 million. Over 60% of its operating revenue—more than $800 million—was used for compensation and benefits for FINRA employees.

55. FINRA also deploys its broad powers to impose burdensome, arbitrary, and ill-defined standards that it requires its members to follow, and it enforces those standards in discriminatory and unfair manner, without consultation with or supervision by any duly appointed constitutional officer. FINRA determines who it will investigate, the tools that it will deploy, and the appropriateness of its unfettered and continuous demands for documents and testimony. FINRA holds this power regardless of whether disciplinary charges will be filed, what evidence will be admitted and considered, or what sanctions will be imposed. Involvement by SEC commissioners in this onerous and impactful process occurs only when—and if—a target of an investigation survives the investigation, prosecution, and internal appeal process.

56. Despite FINRA's vast enforcement and regulatory power, FINRA's powers are largely unchecked.

57.    FINRA, its Board, and its executives and officers are immune from the supervision and control of the President. FINRA's Board and its executives and officers are not appointed or removable by the President or by the head of any Executive Branch department answerable to the President.

58.    FINRA's Board is selected by FINRA's members and can only be removed by a majority vote of FINRA's Board or, in very limited and specific circumstances, the SEC.

59.    FINRA's executives and officers are appointed and can only be removed by the Board.

60.    The SEC provides the only check to FINRA's power; however, the SEC may only remove members of the FINRA Board if they have "willfully violated" applicable laws or regulations, "willfully abused" their authority, or "failed to enforce compliance" with applicable laws and regulations "without reasonable justification or excuse."

61.    And the SEC commissioners cannot be removed by the President except for in limited circumstances.

62.    Thus, because the President cannot remove SEC commissioners without cause, and because the SEC cannot remove FINRA Board members without cause, the Board and its appointed executives and officers are unconstitutionally insulated from Presidential control and oversight.

63.    FINRA's acquisition and deployment of core executive power, immune from Presidential oversight, impermissibly impedes and undermines the President's

13

ability to perform his constitutional duties and prerogatives. As a result, the operation of FINRA, as well as its implementation of responsibilities delegated to it by the SEC and the Maloney Act, violates the separation of powers.

## IV. FINRA's hierarchy and its in-house tribunals violate the Appointments Clause.

64.     Because FINRA is an agency and/or instrumentality of the United States, and because, as described in the preceding paragraphs, its Board exercises significant authority pursuant to the laws of the United States, FINRA's Board members are officers of the United States whose appointments must comply with the Appointments Clause of the United States Constitution.

65.     The Appointments Clause provides in relevant part that the President "shall nominate, and by and with the Advice and Consent of the Senate, shall appoint Ambassadors, other public Ministers and Consuls, Judges of the supreme Court, and all other Officers of the United States, whose Appointments are not herein otherwise provided for, and which shall be established by Law: but the Congress may by Law vest the Appointment of such inferior Officers, as they think proper, in the President alone, in the Courts of Law, or in the Heads of Departments."

66.     By virtue of the discretion, duties, functions, and independence of the FINRA Board, members of the FINRA Board are principal officers whose appointments must be made by the President with the advice and consent of the Senate as is required in relation to other government agencies. Accordingly, the selection of the FINRA Board by its membership violates the Appointments Clause.

67.   In the alternative, the members of the FINRA Board are inferior officers whose appointments must be made by the President, a court of law, or the head of a department. Because FINRA's membership is not a department within the meaning of the Clause, the appointment of the FINRA Board violates the Appointments Clause.

68.   Similarly, FINRA employs executives and officers to operate FINRA and carry-out its essential functions. By virtue of their discretion, duties, functions, and independence, FINRA's executives and officers are principal officers, or alternatively, inferior officers subject to the Appointments Clause.

69.   FINRA also utilizes an in-house judicial construct to adjudicate charges leveled against FINRA members by FINRA's staff. Those who officiate over disciplinary proceedings, officers from FINRA's Office of Hearing Officers, possess power and authority beyond that of a mere employee or functionary and exercise significant duties and discretion, akin to that of federal trial judges.

70.   These hearing officers do not abide by even the most basic procedures and rules that are designed to ensure the fairness of judicial proceedings, and their actions are subject to review by yet another component of the FINRA structure, its own National Adjudicatory Council.

71.   Hearing officers render decisions that can result not only in substantial penalties but also in the closure of an entire firm or the barring of an individual, impacting the property and livelihood of FINRA members.

72.     Hearing officers' decisions, like those of Administrative Law Judges of the SEC, may become final and effective without any further consideration or review.

73.     FINRA hearing officers are therefore "officers of the United States" within the meaning of the Appointments Clause, not mere employees. However, FINRA's hearing officers are chosen by FINRA staff and are not appointed in the manner prescribed by the Appointments Clause. Their actions and decisions are therefore unconstitutional and invalid.

## V.     FINRA no longer functions as a "self" regulatory organization.

74.     15 U.S.C. § 78o-3(b)(4) requires the rules of a registered securities association to "assure a fair representation of its members in the selection of its directors and administration of its affairs."

75.     FINRA's rules do not assure a fair representation of its members in the selection of its directors and administration of its affairs because the rules require the majority of FINRA's Board, as well as critical committees of FINRA and the NAC, *not* to be associated with its members.

76.     The initial SRO and FINRA's predecessor, the NASD, had structure, purpose, authority, and powers focused on self-regulating its *voluntary* members within the narrow rules of conduct established by the SRO.  In sharp contrast, FINRA has transformed into a "for-profit" behemoth controlled by non-members that is incentivized to and does exercise its power in a manner that maximizes its profits while avoiding accountability to its members or to the executive branch.

16

77.     FINRA's members have no control over FINRA's operations, have no authority to approve or disapprove of FINRA rule proposals or interpretations, and play no role in the administration of the disciplinary process. Moreover, FINRA has sole discretion in deciding which matters to investigate and prosecute.

78.     FINRA's bylaws have been changed to require that the number of public governors must exceed the number of industry governors and critical committees of FINRA must now be comprised of a majority of non-industry representatives.

79.     Thus, despite being a "self" regulatory organization, FINRA is not controlled by the industry and is inappropriately referred to as an SRO. *See* David R. Burton, *Reforming FINRA*, Backgrounder No. 3181 at 2, Heritage Foundation, Feb. 1, 2017; McLaughlin, *Is FINRA Constitutional?*, 43 Sec. Reg. and L. Rep. 681 (Mar. 28 2011) ("far from being 'members' of FINRA comparable to the former owners of seats in the NYSE and their associates, securities firms are today the functional equivalent of regulated entities with little or no input into FINRA's regulatory policy or corporate governance").

80.     As observed by SEC Commissioner Hester Peirce, "FINRA is not a self-regulator. Its members are not regulating themselves; they are being regulated by FINRA, just as they are regulated by the SEC." Hester Peirce, *The Financial Industry Regulatory Authority: Not Self-Regulation After All,* Mercatus Center of George Mason University at 27 (Jan. 2015).

81.     FINRA's transformation from a true self-regulatory organization into what it has become today has been characterized by—and is particularly unseemly

17

because of—its aggressive posturing to avoid accountability to its membership, the SEC, Congress or the courts. As SEC Commissioner Pierce emphasized, the member firms over which "FINRA exerts meaningful control … given the statutory requirement for membership" have only a limited ability to influence FINRA:

> Broker-dealers in the United States are regulated by the Financial Industry Regulatory Authority (FINRA). Although commonly perceived to be a self-regulator, FINRA is not accountable to the industry in the way a self-regulator would be. Nor is it accountable to the public, Congress, the president, or the courts. FINRA's structure and monopoly status shield it from close oversight.  Consequently, an important part of the securities markets is under the control of a regulator with limited accountability.

Hester Peirce, *The Financial Industry Regulatory Authority: Not Self-Regulation After All,* Mercatus Center of George Mason University, Abstract (Jan. 2015).

82.    Former SEC Commissioner Daniel M. Gallagher expressed similar concerns regarding FINRA's lack of influence from its members in combination with its efforts to compete with the SEC in terms of prosecutorial activity:

> This decrease in the "self" aspect of FINRA's self-regulatory function has been accompanied by an exponential increase in its regulatory output. As FINRA acts more and more like a deputy SEC, concerns about its accountability grow more pronounced.

Burton, *Reforming FINRA*, Backgrounder No. 3181 at note 55; *see* Hammond, *Double Deference in Administrative Law,* 116 Columbia L. Rev. 1705, 1771 (November 2016) ("the combination of oversight agencies' deference to SROs and judicial deference to oversight agencies undermines both the constitutional and regulatory legitimacy of SROs").

83.    As such, it is clear that FINRA is not controlled by the industry and cannot be properly characterized as a "self" regulator. FINRA has been transformed into an agency that is no longer regulated by its members, contrary to its enabling provisions, and that lacks statutory authority for its actions.

## VI.    FINRA is a state actor but denies the obligation to adhere to the Constitution.

84.    While wielding expansive and unchecked governmental powers, FINRA simultaneously eschews any obligation to comply with the Constitution and afford its members the basic protections designed to prevent overzealous government action.  It claims, for example, that it is not obligated to comply with the Fifth Amendment's guarantee of due process of law or the Seventh Amendment's right to jury trial, and it is not required to abide by the Administrative Procedures Act, the Equal Access to Justice Act, the Hyde Amendment and countless other laws applicable to government regulators.

85.    15 U.S.C. § 78o-3(b)(8) requires the rules of a registered securities association to "provide a fair procedure for the disciplining of members and persons associated with members…." However, FINRA's rules provide no such procedure.

86.    In fact, FINRA's rules do not even provide its members and associated persons with basic components of due process of law.

87.    FINRA exercises its sweeping and coercive powers in a discriminatory manner designed to disadvantage market participants who operate in sectors of the

19

markets that FINRA disfavors, particularly those like Plaintiffs whose business focuses on the microcap market.

88.    FINRA wields massive power in the securities industry and pursues actions based on delegated authority from the SEC and yet, insists that it is not subject to governmental obligations like due process of law. Its position impacts and skews the entire breadth of its enforcement activity.

89.    FINRA does not apply the most basic rules of evidence in its proceedings and so, for example, paid FINRA employees are permitted to recount to a hearing panel layer upon layer of hearsay testimony regarding conversations supposedly had with investors and other regulators.

90.    Those who preside over FINRA's enforcement actions are employees of and paid by FINRA or its affiliated entities and the proceedings fail to provide for any right to a trial by a jury in violation of the Seventh Amendment, even where the allegations sound in fraud or other claims for which a jury trial is afforded under the law. Its disciplinary proceedings are conducted by its Office of Hearing Officers so those hearing officers are subject to the inherent pressure and conflict of interest that flows from being employed by one of the two litigants.

91.    Further, FINRA assigns those hearing officers to matters in ways that not only are completely opaque but also fail even to comply with the few protections that are afforded to a respondent under FINRA's own rules.

92.    FINRA also fails to recognize a Fifth Amendment privilege in its proceedings, forcing individuals to answer questions during FINRA proceedings by

threatening to bar them from the industry, i.e., deprive them of their livelihood, thereby creating an untenable and illegal scenario in which one constitutional right must be sacrificed to preserve one's livelihood.

93.    And FINRA's purported review process, which again relies on review by individuals paid by FINRA, is so insubstantial that the SEC passed a rule requiring firms to book adverse FINRA awards as a liability despite the pendency of an appeal because the "grounds for revision on appeal are very limited." *See* NASD Notice to Members 00-63.

94.    FINRA holds seemingly unfettered power over market participants, yet it fails to abide by the basic constraints and protections that serve to limit agency action and preserve the critical and constitutional rights of those subject to its authority.

95.    As noted in connection with FINRA's efforts to further expand its authority:

> FINRA's status as a nongovernmental regulator, however, enables it to avoid the scrutiny and procedural requirements to which a government agency performing the same tasks would be subject. Before FINRA succeeds in further expanding its regulatory footprint by taking on additional responsibilities, policymakers should revisit the long-debated questions about whether self-regulation works in its current manifestation and, if not, what should be done about it. One option would be to acknowledge that FINRA looks a lot like the SEC and accordingly fold FINRA into the SEC. Alternatively, FINRA could be remade into an organization that is run by the industry it regulates. In other words, FINRA could become a true self-regulator. Competing SROs might emerge to tailor regulation to a particular group of firms, such as smaller broker-dealers. Another option would be to enhance FINRA's public disclosure and procedural obligations. Procedural requirements should include a clear requirement to conduct and

document economic analysis and greater procedural protections in connection with disciplinary actions.

Hester Pierce, *The Financial Industry Regulatory Authority: Not Self-Regulation After All,* Mercatus Center of George Mason University, at 27-28 (Jan. 2015) (footnotes omitted).

96.     Worse yet, FINRA has achieved this result all the while it enforces federal securities laws and punishes broker-dealers for alleged violations of those laws by, among other things, stripping broker-dealers of their ability to conduct any business.

97.     FINRA's denial of any obligation to adhere to the Constitution, based on the idea that it is not a "state actor," is further undermined by its claim that it is entitled to the *benefits* of governmental immunity.

> Like Schrodinger's cat, simultaneously dead and alive, FINRA is, under current rulings, both a state actor (for purposes of barring liability and for tax purposes) and, generally, not a state actor (for purposes of absolving it of due process and other requirements and for liability purposes).

Burton, *Reforming FINRA*, Backgrounder No. 3181 at 3; *see also* Marianne K. Smythe, "Government Supervised Self-Regulation in the Securities Industry and the Antitrust Laws: Suggestions for an Accommodation," 62 N.C.L. Rev. 475, 483 1984; *Free Enterprise Fund v. Public Company Accounting Oversight Board*, 130 S. Ct. 3138 (2010); McLaughlin, *Is FINRA Constitutional?*, 43 Sec. Reg. and L. Rep. 681 (Mar. 28 2011); *Standard Inv. Chartered, Inc. v. Nat'l Ass'n of Sec. Dealers*, 637 F.3d 112, 114–15 (2d Cir. 2011), cert. denied, 132 S. Ct. 1093 (2012); Richard L. Stone & Michael A. Perino, *Not Just a Private Club: Self-Regulatory Organizations as State Actors When Enforcing Federal*

*Law*, 1995 Colum. Bus. L. R. 453. For a discussion of immunity as it has been applied in the SRO context, see Rohit A. Nafday*, From Sense to Nonsense and Back Again: SRO Immunity, Doctrinal Bait-and-Switch, and a Call for Coherence*, 77 U. Chi. L. Rev. 847, 847-85 (2010); Roberta S. Karmel, *Should Securities Industry Self-Regulatory Organizations Be Considered Government Agencies?*, 14 Stan. J.L. Bus. & Fin. 151, 156 (2008) ("The problem of a delegation by a [government] agency, which is itself exercising statutorily delegated powers, to a private standard setting body like FINRA [for example] further confounds the question of whether the private body either is exercising delegated governmental power or is, indeed, a government entity. Yet, such privatization of governmental functions has become increasingly common." (citing, John J. Dilulio, Jr., *Response Government by Proxy: A Faithful Overview*, 116 Harv. L. Rev. 1271 (2002)); Jody Freeman, *The Private Role in Public Governance*, 75 N.Y.U. L. Rev. 543 (2000); Gillian E. Metzger, *Privatization as Delegation*, 103 Colum. L. Rev. 1367 (2003); Steven J. Schwartz, *Private Ordering*, 97 Nw. U. L. Rev. 319 (2002)); Burton, *Reforming FINRA*, Backgrounder No. 3181 at 2 ("While it serves a governmental function and has coercive power, including the ability to completely bar firms and individuals from the marketplace, it is not subject to any of the normal transparency, regulatory review or due process protections normally associated with government.")

98.     In combination, FINRA's positions lead to a pernicious and destructive result: FINRA is not a regulator who must provide due process protections, but it is also supposedly not a private actor who may be sued for damages. It is unaccountable and immune at every turn.

99.    Where, as here, Congress has sought to outsource governmental powers to (purportedly) private actors who are supposedly not bound by the Constitution, current Supreme Court justices have found the approach impermissible, stating that the Government must remain accountable to the public and "cannot delegate regulatory authority to a private entity." *Texas v. Comm'r of Internal Revenue*, 142 S.Ct. 1308 (2022) (Alito, J., joined by Thomas, J. and Gorsuch J.)

**VII.  Broker-dealers, like Plaintiffs, are forced to join FINRA and subject themselves to violations of their rights und the First, Fifth and Seventh Amendments.**

100.    As described above, FINRA has expansive, unchecked, and unconstitutional regulatory and enforcement powers. However, broker-dealers within the securities industry have no choice but to suffer under FINRA's oversight.

101.    The First Amendment of the United States Constitution protects the freedom of association as well as the freedom not to associate. However, for virtually all broker-dealers within the securities industry, association with FINRA is not optional.

102.    By statute, brokers and dealers are required to register with a registered self-regulatory organization to operate their businesses. FINRA is the sole self-regulatory organization registered with the SEC. As a result, broker-dealers are forced to join FINRA and maintain that membership to participate in the securities industry.

103.    There are significant personal liberty and property implications through this forced association. Broker-dealers are forced to succumb to FINRA's regulations and procedures and subject themselves to FINRA's enforcement staff, in-house

24

tribunals, and adjudicatory procedures that deprive broker-dealers of constitutional protections guaranteed by the First, Fifth and Seventh Amendments to the Constitution.

104.  Not only must a broker-dealer forego constitutional protections when it joins FINRA, it must also fund the organization. Membership with FINRA is costly. FINRA's operations—which generate revenues over $1.3 billion—are derived almost exclusively through obligatory fees, fines, and penalties assessed against FINRA members.

105.  FINRA then uses these funds in a manner that benefits FINRA, and those securities firms that are aligned with and supportive of FINRA's agenda, including its bias against the microcap sector and its desire to strangle that market and participants in it.

106.  In fact, over $1 billion of FINRA's revenues are dedicated to compensation and benefits for FINRA staff and professional and contract services purportedly necessary to finance FINRA's increasingly aggressive operations.

107.  The employee costs include executive salaries that are exorbitant and grossly disproportionate to the salaries of other executives for non-profit organizations. Notably, FINRA's President and CEO is paid over 10 times more than the CEO of the SEC.

108.  Even more astounding is that, on at least one instance when FINRA has suffered investment losses, it has simply increased membership dues and assessments against its members to recoup these losses.

109.   By virtue of their forced association with FINRA, FINRA members are forced to support and fund FINRA including the excessive salaries of its executives, its unfair and biased enforcement process, and its unconstitutional use of its power.

110.   In short, broker-dealers in the securities industry are forced to join, fund, and support an organization with which they may not agree, that they may not want to be a part of, and that deprives such broker-dealers of certain constitutionally protected rights, all in violation of the First Amendment.

## VIII. By virtue of FINRA's unconstitutional hierarchy and structure, FINRA members and investors have been and will continue to be harmed.

111.   FINRA's failure to abide by fundamental constraints on the delegation and exercise of governmental authority has caused and will continue to cause profound injury to participants in the securities industry, to the markets, and to the investors that FINRA claims to protect.

112.   FINRA's unconstitutional leadership has caused and/or permitted a disintegration of FINRA's self-regulatory status and an escalation of aggressive, arbitrary, and discriminatory actions against certain of its members, resulting in damage to and closure of firms and harm to investors. Under FINRA's unlawful governance, it has targeted and badgered individuals and entities operating in the microcap markets like Plaintiffs to the point where it is choking off one of the few methods of financing for start-up and developing companies. Its investigative and enforcement actions, while purportedly justified by FINRA's claim that it is protecting investors, actually defy the fundamental view that disclosure is the cornerstone of

securities regulation; instead, it assumes that investors are naïfs, incapable of assessing and understanding the risk and potential reward associated with the microcap markets. FINRA is thereby depriving investors of the ability to make their own investment decisions.

## IX.    FINRA stifles competition, harms consumers and has caused and will continue to cause injury to Plaintiffs.

113.    FINRA is required to act in a manner that is not discriminatory and that does not impose any undue burden on competition.

114.    Yet, FINRA's actions in relation to Plaintiffs have been especially prolific, discriminatory, and detrimental to competition, and the events surrounding those proceedings illustrate the skewed and broken enforcement process that exists within FINRA.

115.    For example, beginning in May 2015, FINRA sought to sanction SCA for supposed violations of Section 5 of the Securities Act of 1933 (the "1933 Act").  Its determined enforcement efforts lasted over five years and included an affirmance by FINRA's NAC, before the matter reached the SEC, in September 2021.

116.    In a remarkable rebuke of the approaches used by FINRA and by the NAC to procure and then to affirm the findings of violations, the SEC set aside all findings of violations and all sanctions as against all defendants. With respect to John Hurry, the indirect owner of SCA, the SEC found that the NAC, in the appeal, developed and relied on a new theory of liability that was "untethered from any alleged violation of Section 5." *In the Matter of the Application of Scottsdale Capital Advisors Corp.,*

*et al.*, Exchange Act Release No. 93052, 2021 WL 4242630 at *9. The NAC thereby "*deprived [Mr. Hurry] of a fair opportunity* to rebut the theory under which he was held liable." *Id.* (emphasis added).

117.    Perhaps more concerning, the SEC found that FINRA relied on incorrect legal standards in its assertions of violations of Section 5 and that "the NAC incorrectly applied these legal standards" that should govern the application of that provision. *Id.* at *12. The NAC thereby "failed to discharge its duty to fairly and accurately explain the basis for the finding that Scottsdale committed a violation." *Id.* at *13.

118.    The SEC also concluded that FINRA's findings of supervisory violations by SCA representatives was unsupported by the record evidence and error. The SEC noted, for example, that "the NAC decision states, and FINRA maintains before the Commission" that there was certain testimony relating to Respondent Tim DeBlasi. *Id.* at *14. But there was not; "the evidence shows that another official at the firm" had responsibility for Section 5 compliance. *Id.* at 15.

119.    And finally, while FINRA argued and the NAC found that respondents "failed to supervise properly the firm's microcap liquidation business" (*Id.* at *15), the SEC held that there was extensive testimony concerning the firm's due diligence process and its analysis, confirming that the firm had "a process reasonably designed to ascertain whether an exemption was available." *Id.* at 16. Because FINRA failed to establish that "supervision of the due diligence process was unreasonable," the Commission also set aside findings of claimed violations of Rule 3010. *Id.* at *17.

120.   FINRA, as it pursues disciplinary proceedings, fails to provide due process of law, a neutral arbiter or a right to jury guaranteed by the Seventh Amendment, even where the charges sound in fraud.  And FINRA ignores and fails to apply the few protections that are afforded to respondents in their membership agreement, successfully arguing that members cannot enforce the provisions of the membership agreement or FINRA's own rules.

121.   Plaintiffs' experiences are just examples of how FINRA's unjustified actions have and will continue to result in damage and injury to Plaintiffs and other FINRA members including increased regulatory, compliance and legal costs, substantial loss of business and revenue, reputational damage, and millions of dollars in attorneys' fees. While Plaintiffs have the resources to bear these costs, FINRA's increasingly onerous compliance requirements have driven many small broker-dealers out of business.

122.   FINRA's actions have dramatically ratcheted up the regulatory, compliance, and legal costs associated with operation of a member firm. As a result, member firms are prevented from running their businesses in accordance with critical basic economic principles applicable to pricing and commerce, while the individual rights of market participants are affected as well.

123.   FINRA's failure to adhere to the same constitutional principles and requisites as any other governmental entity is more than just a matter of principle and adherence to law. It is negatively impacting the markets, burdening competition and impinging on the rights of investors and market participants. It has enabled FINRA to

improperly exercise its sweeping authority to constrain and control the operation of securities firms, without regard for fundamental principles of free enterprise, the rights of private parties to enter into contracts, or the prohibition against deprivation of property without due process of law. It has enabled FINRA to create onerous and often ambiguous rules and standards that increase costs for industry members that are often passed on to investors.

**X.    FINRA retaliates through new proceedings against both Plaintiffs.**

124.    Since the filing of the initial Complaint in this action, FINRA has taken apparently retaliatory action against not just one but both of these Plaintiffs. On February 24, 2023, FINRA advised SCA, through a "Wells Notice," that FINRA's Department of Enforcement ("DOE") intended to recommend a disciplinary proceeding based on alleged failures in its anti-money laundering program during a period beginning October 2019, years earlier (hereinafter referred to as "the new FINRA SCA proceeding"). SCA has since submitted a response to that Wells Notice and the matter remains pending.

125.    Notably, FINRA previously pursued a lengthy case against SCA in which it leveled similar allegations of failures to monitor and identify certain "red flags." After five years of litigation, the SEC reversed all sanctions against SCA and its associated persons based on findings that FINRA and its tribunals had applied an incorrect standard and had engaged in improper tactics.

126.    On April 19, 2023, FINRA commenced an expedited disciplinary proceeding against Alpine (defined *supra* as the "New Alpine Proceeding") based on

conduct of which FINRA has been aware and of which has been the subject of litigation with FINRA for at least the past four years (defined *supra* as "the New Alpine Proceeding").

127.   The New Alpine Proceeding alleges that Alpine violated an order issued as part of an Initial Hearing Panel Decision in March 2022 (the "Underlying Case"). However, the conduct at issue in the New Alpine Proceeding was actually part of the evidence adduced at a hearing that commenced in February 2020, and yet was not included in the specific prohibitions that FINRA had sought in the resulting cease and desist order.   Nonetheless, years later, FINRA now claims that the conduct was improper.

128.   Further, the New Alpine Proceeding vividly illustrates the fundamental unfairness of FINRA's purported proceedings and tribunals. In the Underlying Case, the Initial Hearing Panel Decision does not become final or effective unless and until it is affirmed by FINRA's appellate tribunal, the NAC.   And that has not occurred Alpine appealed from the decision and argued its appeal six months ago but no decision has issued.

129.   Nonetheless, through the New Alpine Proceeding, FINRA is attempting to obtain the corporate death penalty, expulsion of the firm from the industry, through machinations that deprive Alpine of any appellate review.

130.   A decision in the New Alpine Proceeding would issue on an expedited basis and would become effective immediately, regardless of whether Alpine appeals the decision.   Thus, FINRA has found a way to seek and obtain the closure of the

Alpine through a decision issued on an expedited basis by a single FINRA Hearing Officer employed and paid by FINRA even while the underlying decision remains on appeal.

131.    The single FINRA Hearing Officer that is being asked to expel the firm on an expedited basis is not only a FINRA employee but also is improperly insulated from supervision by the President and his actions therefore violate Article III of the Constitution.

132.    FINRA's combination of prosecutorial and adjudicative functions – with FINRA serving as prosecutor, judge, jury and executioner – renders its enforcement actions unconstitutional.

133.    Plaintiffs have a right not to be subjected to unfair and unconstitutional governmental authority including having expulsion ordered on an expedited basis by a single FINRA Hearing Officer who is appointed without adherence to the Constitution and is employed and paid by FINRA.

134.    Plaintiffs will be irreparably harmed if FINRA is able to continue to pursue its expedited effort to close Alpine through its unconstitutional structure and proceedings.

135.    Plaintiff will not have an opportunity to obtain meaningful judicial review of FINRA's actions.

**XI.    A declaration from this Court is the only remedy available to check FINRA's powers.**

136.    Despite its characterization as a "self-regulatory" organization, FINRA is anything but. Indeed, FINRA's members are incapable of exerting any meaningful control of or change to the entity, and FINRA's articles and bylaws—requiring that the majority of its Board be comprised of non-industry members—ensure that it will remain that way.

137.    Nevertheless, this "self-regulatory" organization has expansive power to regulate the entire broker-dealer securities industry subjecting each person and entity in that industry, including Plaintiffs, to FINRA's rules, regulations, obligations, requirements, fines, fees, and enforcement actions.

138.    FINRA's very existence and its exercise of unbridled and unchecked powers violates the Constitution. FINRA's members are powerless to effectuate change within the organization. Thus, the Court is the only forum that affords the opportunity for relief.

139.    All conditions precedent to the bringing and maintenance of this action and the granting of the relief requested have occurred, have been performed, or have been waived.

140.    Plaintiffs have obtained undersigned counsel to represent them in this action and are obligated to pay their attorneys a reasonable fee for the services rendered.

## COUNT I
### (Violation of the Separation of Powers)

141.   Plaintiffs reallege paragraphs 1 through 140.

142.   The Constitution provides that "[t]he executive Power shall be vested in a President of the United States," U.S. Const., art. II, § 1, and that "he shall take Care that the Laws be faithfully executed," U.S. Const., art. II, § 3. These provisions vest all executive power, including the power to enforce the law, in the President of the United States.

143.   Recognizing the impossibility of one person performing all business of the government, the Constitution provides for principal executive officers to assist in these duties.

144.   The President is empowered to keep such principal officers accountable by removing them from office, if necessary.

145.   As set forth above, FINRA exercises wide-ranging executive power, including the power to "enforce compliance" with the Exchange Act and the securities laws, to enact wide-ranging rules and regulations, to conduct inspections of brokers and dealers, to conduct investigations and disciplinary proceedings, and to impose sanctions and otherwise to enforce compliance with the Act, the rules of FINRA, professional standards, and the securities laws.

146.   FINRA's wide-ranging exercise of executive power is immune from Presidential supervision or control.

34

147.    FINRA's Board is not appointed or removable by the President; rather, its members are selected by and can only be removed by a vote of other Board members.

148.    FINRA's executives and officers are also not appointed or removable by the President; rather they are appointed by and can only be removed by the Board.

149.    The SEC is charged with overseeing FINRA, but FINRA's Board, executives, and officers are insulated from the SEC's control. The SEC cannot remove FINRA Board members at will. Instead, the SEC may remove FINRA's Board members only if they have "willfully violated" applicable laws or regulations, "willfully abused" their authority, or "failed to enforce" applicable laws and regulations "without reasonable justification or excuse." 15 U.S.C. § 78s(h)(4)(B). The SEC's other review functions are similarly circumscribed.

150.    The SEC commissioners cannot be removed by the President except for in limited circumstances.

151.    As a result, FINRA's Board members, along with its executives and officers, are afforded multi-level protection from removal thus impeding the President's ability to oversee the officers executing the laws of the United States in violation of the Constitution's separation of powers.

## COUNT II
### (Violation of the Appointments Clause of the U.S. Constitution)

152.    Plaintiffs reallege paragraphs 1 through 140.

153.   FINRA is a public entity and/or an agency and/or an instrumentality of the United States subject to the constraints imposed on the federal government by the Constitution.

154.   Because FINRA is an agency and/or instrumentality of the United States, and because, as described in the preceding paragraphs, its Board exercises significant authority pursuant to the laws of the United States and are therefore officers of the United States whose appointments must comply with the Appointments Clause of the United States Constitution.

155.   The Appointments Clause provides in relevant part that the President of the United States "shall nominate, and by and with the Advice and Consent of the Senate, shall appoint Ambassadors, other public Ministers and Consuls, Judges of the supreme Court, and all other Officers of the United States, whose Appointments are not herein otherwise provided for, and which shall be established by Law: but the Congress may by Law vest the Appointment of such inferior Officers, as they think proper, in the President alone, in the Courts of Law, or in the Heads of Departments."

156.   By virtue of their wide-ranging discretion, duties, functions and independence, members of the Board and FINRA's executives and officers are principal officers whose appointments must be made by the President by and with the advice and consent of the Senate. Accordingly, the selection of the FINRA Board by its membership, and the Board's corresponding selection of executives and officers, violates the Appointments Clause.

157.    In the alternative, the members of the FINRA Board and FINRA's executives and officers are inferior officers whose appointments must be made by the President, a court of law, or the head of a department. Because FINRA is not a department within the meaning of the Clause, the appointment of the FINRA Board and FINRA's executives and officers violates the Appointments Clause.

## COUNT III
### (Unconstitutional Delegation)

158.    Plaintiffs reallege paragraphs 1 through 140.

159.    The Constitution provides that "[a]ll legislative Powers herein granted shall be vested in a Congress of the United States." U.S. Const. art. I, § 1.

160.    By virtue of the grant of wide-ranging authority the SEC delegated to the FINRA Board, the Act improperly and unconstitutionally delegates legislative power to an entity outside the Legislative Branch.

161.    This delegation is unconstitutional if the FINRA Board is deemed part of the federal government and is even more problematic if the FINRA Board is deemed to be a private entity.

## COUNT IV
### (Violation of the First Amendment)

162.    Plaintiffs reallege paragraphs 1 through 140.

163.    The First Amendment of the United States Constitution protects the freedom not to associate.

164.    Notwithstanding this protection, broker-dealers in the securities are forced to associate with FINRA in order to engage in their chosen profession.

165. As a result, broker-dealers in the securities industry are forced to support and fund FINRA, including FINRA's excessive and unnecessary executive and staff salaries, its unfair and biased enforcement process, and its unconstitutional use of its power.

166. The excessive compensation FINRA pays to its executives and staff is funded by dues, fees, fines, and penalties assessed against FINRA members.

167. FINRA's payment of excessive executive and staff compensation is not germane to FINRA's stated purpose..

168. In addition, by virtue of the forced membership in FINRA, securities industry participants including broker-dealers are forced to relinquish critical rights guaranteed under the Fifth and Seventh Amendment of the United States Constitution.

169. The obligation for broker-dealers to join FINRA—as the only self-regulatory organization for the securities industry—is contrary to the legislation establishing "voluntary associations" and does not serve a compelling, significant, or legitimate governmental interest.

170. Even if such obligation did serve some sufficient governmental interest, it is neither narrowly tailored nor the least restrictive means to serve that purpose.

171. As such, the obligation to join FINRA violates Plaintiffs' First Amendment right not to associate.

## COUNT V
### (Violation of the Fifth Amendment)

172. Plaintiffs reallege paragraphs 1 through 140.

173. Due Process of Law requires a fair trial in a fair and unbiased tribunal.

174. 15 U.S.C. § 78o-3(b)(8) requires the rules of a registered securities association to "provide a fair procedure for the disciplining of members and persons associated with members…." However, FINRA's rules provide no such procedure.

175. As described above, FINRA's disciplinary proceedings are biased, secretive, and fail to implement rules that maintain the integrity the proceedings.

176. By prosecuting broker-dealers, like Plaintiffs, in such a manner, FINRA is violating the Due Process Clause of the Fifth Amendment to the United States Constitution.

## COUNT VI
### (Violation of the Seventh Amendment)

177. Plaintiffs reallege paragraphs 1 through 140.

178. FINRA prosecutes broker-dealers, like Plaintiffs, in a wide variety of cases including those sounding in fraud and those in which FINRA seeks to impose severe penalties.

179. Nonetheless, broker-dealers are not afforded the right to a trial by jury as guaranteed by the Seventh Amendment.

180. Broker-dealers who wish to participate in the securities industry and engage in their chosen profession are forced to join FINRA and compelled to subject

themselves to FINRA's rules and disciplinary procedures, including foregoing protections derived from the Seventh Amendment.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for the following relief:

1.      An order and judgment pursuant to 28 U.S.C. §§ 2201, 2202 declaring that FINRA is a state actor obligated to respect the rights guaranteed under the United States Constitution;

2.      An order and judgment pursuant to 28 U.S.C. §§ 2201, 2202 declaring that FINRA is presently constituted and operating in a manner that violates the Constitution;

3.      An order and judgment pursuant to 28 U.S.C. §§ 2201, 2202 declaring that FINRA's disciplinary proceedings are unlawful and unconstitutional, specifically including, but not limited to, the New Alpine Proceeding;

4.      An order and judgment enjoining FINRA from maintaining its unconstitutional governance and continuing its unlawful and unconstitutional operation, specifically including, but not limited to, prosecuting the New Alpine Proceeding;

5.      An order and judgment enjoining FINRA from continuing its unlawful and unconstitutional disciplinary proceedings, specifically including, but not limited to, the New Alpine Proceeding;

6.      Costs and attorneys' fees pursuant to any applicable statute or authority; and

7.      Such further relief as this Court deems just and appropriate.

/s/ Kenneth G. Turkel
Kenneth G. Turkel – FBN 867233
E-mail:  kturkel@tcb-law.com
David A. Hayes – FBN 096657
E-mail:  dhayes@tcb-law.com
TURKEL CUVA BARRIOS, P.A.
100 North Tampa Street, Suite 1900
Tampa, FL  33602
Phone: (813) 834-9191
Fax: (813) 443-2193

Maranda E. Fritz*
maranda@fritzpc.com
Maranda E. Fritz PC
521 Fifth Avenue 17th Floor
New York, New York 10175
Phone: (646) 584-8231

*Pro hac vice application forthcoming

*Attorneys for Plaintiffs*

41