UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

SCOTTSDALE CAPITAL ADVISORS
CORPORATION and ALPINE
SECURITIES CORPORATION,

    Plaintiffs,

Case No.: 8:22-cv-2347-MSS-TGW

v.

FINANCIAL INDUSTRY
REGULATORY AUTHORITY, INC.,

    Defendant.

UNITED STATES OF AMERICA,

    Intervenor Defendant.

_____/

## EMERGENCY MOTION FOR PRELIMINARY INJUNCTION

Pursuant to Federal Rule of Civil Procedure 65 and Middle District of Florida Local Rule 6.02, Plaintiff, Alpine Securities Corporation ("Alpine"), moves this Court for entry of a preliminary injunction against Defendant, Financial Industry Regulatory Authority, Inc. ("FINRA"), enjoining FINRA from continuing its enforcement proceeding against Alpine pending resolution of Alpine's claims challenging the constitutionality of FINRA's structure and operations.

## EMERGENCY NATURE OF RELIEF SOUGHT

On April 19, 2023, FINRA filed a new enforcement proceeding against Alpine (the "Expedited Proceeding") that seeks to impose, on an accelerated timetable, a

$4 million fine and the corporate death penalty: expulsion from the industry.[1]
Declaration of Maranda Fritz [Doc. 46] ("Fritz Declaration"), ¶ 4.  The Expedited
Proceeding hearing was originally set twelve days after the proceeding was initiated,
but Alpine obtained an adjournment and the hearing is now scheduled for May 31,
2023.[2] *Id.* at ¶ 5. As explained herein, an expulsion order against Alpine would become
effective immediately and force the closure of the business. *Id.* at ¶ 7. Based on the
foregoing and pursuant to the requirements of Local Rule 3.01(e), Plaintiff respectfully
requests a ruling from the Court on this motion by no later than May 17, 2023.

<u>**INTRODUCTION**</u>

FINRA's use of its expedited procedures to shut down Alpine, under these
circumstances, constitutes a striking example of deprivation of property without due
process of law. The deprivation of property is obvious: FINRA seeks not to regulate
or penalize but *to close* an entire business. That it would occur without due process is
equally clear. First, FINRA often declares that it is *not* bound by the Constitution and
so it is not obligated to provide due process of law.  Second, the Expedited Proceeding
lacks even the pretense of process that exists in FINRA's normal disciplinary
proceedings. It will consist of a single FINRA Hearing Officer (whose appointment is
arguably unconstitutional) acting to enforce an "obey the law" injunction. Further, the
Expedited Proceedings will be conducted remotely with limited discovery, little or no
adherence to any rules of evidence, no rights of cross examination, and no right to

---

[1] *See Department of Enforcement v. Alpine Securities Corporation,* Proceeding No. 2019061232603.
[2] Prehearing submissions must be filed on May 23, 2023 and May 28, 2023.

review before an expulsion order would become effective.

Moreover, FINRA has deployed the Expedited Proceeding while the appeal from the underlying decision is still pending, enabling it to deprive Alpine of any meaningful review of its actions: it will terminate Alpine without a decision on *either* Alpine's appeal from the underlying decision or an appeal from the decision issued in the new Expedited Proceeding. If, as occurred in FINRA's prior case against Plaintiff Scottsdale Capital Advisors Corporation ("Scottsdale"), all findings and sanctions of the Hearing Panel end up being *reversed* on appeal,[3] Alpine will have already been destroyed. Ironically, the Expedited Proceeding serves as a perfect exemplar of FINRA's unconstitutional existence—both in the structure which enables FINRA's unchecked power and the application of those powers.

In light of the clear and imminent irreparable harm to Alpine, a preliminary injunction is necessary to preserve the status quo while Alpine's constitutional claims against FINRA are considered by this Court. An injunction will cause no harm or prejudice to FINRA and will serve the public interest. Moreover, Plaintiffs have a substantial likelihood of success on the merits of their claims because FINRA: (i) is a state actor; (ii) appoints and deploys unconstitutional hearing officers, *see Lucia v. S.E.C.,* 138 S.Ct. 2044 (2018); (iii) maintains a structure and operates in a manner that violate the Separation of Powers, *see Free Enterprise Fund, LLP v. Pub. Co. Accounting Oversight Bd.,* 561 U.S. 477 (2012), *Seila Law v. Consumer Financial Protection Bureau*, 140

---

[3] *Financial Industry Regulatory Authority v. Scottsdale Capital Advisors*, Exchange Act Release No. 93052 (Sept. 17, 2021).

S.Ct. 2183 (2020), and *Collins v. Yellen*, 141 S.Ct. 1761 (2021); and (iv) disclaims an obligation to and, in fact, fails to provide due process of law. Alpine now seeks to enjoin FINRA from prosecuting its unconstitutional Expedited Proceeding pending the outcome of this litigation.

## BACKGROUND

On April 14, 2023, the United States Supreme Court issued its opinion in *Axon Enter., Inc. v. FTC,* 143 S.Ct. 890 (2023) resolving a circuit split regarding whether a district court has jurisdiction to consider motions to enjoin administrative enforcement actions when the Respondent has asserted constitutional claims challenging the structure of the agency, *i.e.*, the Federal Trade Commission or the Securities and Exchange Commission (the "SEC"). The Supreme Court affirmed the decision of the Fifth Circuit Court of Appeals and held that plaintiffs do not have to circumnavigate the protracted administrative review process to have a district court consider claims challenging the constitutionality of an administrative agency and its procedures *Id.*

On April 19, 2023, five days after the *Axon* opinion was published, FINRA filed the Expedited Proceeding against Alpine, rushing to obtain an order expelling Alpine from the industry based on alleged violations of an order contained in a March 2022 Initial Hearing Panel Decision (the "Initial Decision") in a prior FINRA enforcement proceeding.[4] Alpine appealed the Initial Decision to FINRA's in-house appellate tribunal, the National Adjudicatory Council ("NAC") and, under FINRA's rules, the

---

[4] *See Department of Enforcement v. Alpine Securities Corp.*, Disc.Pro.No. 2019061232601.

Initial Decision is not final unless and until it is affirmed by the NAC.[5] No decision has been issued so the underlying decision on which the Expedited Proceeding is based is *not even final*. The Expedited Proceeding should be stayed while the Court considers the substantive issues concerning the unconstitutionality of FINRA's structure and operations, and the lack of due process associated with the Expedited Proceeding.

## MEMORANDUM OF LAW

### I. Legal Standard

This Court has the power to issue a preliminary injunction "upon a showing that (1) Plaintiff has a substantial likelihood of succeeding on the merits; (2) Plaintiff will suffer irreparable harm if the injunction is not granted; (3) the threatened injury to the plaintiff outweighs the harm an injunction may cause the defendant; and (4) granting the injunction would not disserve the public interest." *Everest Nat'l Ins. Co. v. Rockhill Ins. Co.,* 2016 WL 8914545, at \*5 (M.D. Fla. Oct. 5, 2016). The purpose of a preliminary injunction is to protect a party from irreparable injury and to preserve the status quo until the court renders a decision on the merits. *Café 207, Inc. v. St. Johns County*, 989 F.2d 1136, 1137 (11th Cir. 1993). And, as the Supreme Court in *Axon* recently emphasized, subjecting one to an unconstitutional proceeding is a "here-and-now" irreparable injury. *See Axon,* 143 S.Ct. at 903-904.

### II. Argument

---

[5] FINRA Rule 9311 provides that a timely filed notice of appeal of an initial decision of a hearing panel operates as a stay of the decision until a ruling is made by the NAC. Under FINRA Rule 9268(e), where a notice of appeal is filed from an Initial Decision, that decision does not "constitute final disciplinary action of FINRA for purposes of SEA Rule 19d-1(c)(1)."

**A.     Plaintiffs have a substantial likelihood of success on their claims.**

"To demonstrate a substantial likelihood of success on the merits, [the movant] must make a showing of likely or probable, but not certain, success at trial, on one or more claims." *Se. Mech. Serv., Inc. v. Brody*, 2008 WL 4613046, at *10 (M.D. Fla. Oct. 15, 2008).  Plaintiffs need not establish the likelihood of success on all claims; doing so for one claim is enough. *Seacoast Banking Corp. of Fla. v. Diemer,* 2020 WL 1674309 at n. 1 (M.D. Fla. Jan. 17, 2020). The applicable authority, including recent and emerging Supreme Court authority, demonstrates that Plaintiffs are likely to succeed on their constitutional claims against FINRA.

**1.     FINRA is a state actor.**

On the central issue of whether FINRA's structure and operations are unconstitutional, Plaintiff anticipates that FINRA will deny that it has any obligation to comply with constitutional strictures in relation to its governance, its use of its in-house judges or the procedures employed by its tribunals. According to FINRA, it "is a private company, not a government actor subject to constitutional scrutiny."  Doc. 35, p. 17. That contention is unresolved in this jurisdiction: the Eleventh Circuit has expressly recognized that it had "not yet determined whether FINRA is a government actor subject to the [Due Process] Clause's requirements" and acknowledged a circuit split.[6] *Busacca v. S.E.C.*, 449 Fed.Appx. 886, 890 (11th Cir. 2011).  Squarely presented

---

[6] In support of the circuit split, *Busacca* cites *D'Alessio v. S.E.C.*, 380 F.3d 112, 120 n. 12 (2d Cir. 2004) (noting that NASD "is not a state actor subject to due process requirements") and *Rooms v. S.E.C.*, 444 F.3d 1208, 1214 (10th Cir. 2006) (finding that due process requirements apply to the NASD).

to this Court, therefore, is a fundamental issue that impacts those in the securities industry in dramatic fashion every day: whether critical governmental functions, including enforcement of the federal securities laws, can be outsourced to a purportedly private entity that need not abide by the Constitution.[7]

If FINRA is not deemed a state actor, then it may carry out the governmental function of enforcing federal law without regard for a person's or entity's constitutional rights. In fact, FINRA could compel compliance with federal law by intentionally violating the constitutional rights of its members, including core private rights such as the right to property.[8] Neither law nor logic support that troubling result.

### i. FINRA is intimately entwined with the federal government.

The applicable principles and analysis are well established. "[A]ctions of private entities can sometimes be regarded as governmental action for constitutional purposes." *Lebron v. Nat'l R.R. Passenger Corp.,* 513 U.S. 374, 378 (1995). A private party may be considered a state actor when "the State had so far insinuated itself into a position of interdependence with the [private parties] that it was a joint participant in the enterprise (nexus/joint action test)." *Rayburn v. Hogue*, 241 F.3d 1341, 1347 (11th Cir. 2001) (citations and quotations omitted). A private actor's actions may also constitute state action "when it is entwined with governmental policies or when

---

[7] See, e.g. William I. Friedman, *The Fourteenth Amendment's Public/private Distinction Among Securities Regulators in the U.S. Marketplace-Revisited*, 23 Ann. Rev. Banking & Fin. L. 727, 758 (2004); Roberta S. Karmel, *Should Securities Industry Self-Regulatory Organizations Be Considered Government Agencies?*, 14 Stanford Journal of Law, Business & Finance 151, 154 (2008).

[8] One scholar's deeply concerning example: "an SRO may bring an enforcement action for a violation of a federal law and coerce compliance by threatening to forever bar a person from their profession for any refusal to cooperate." Benjamin P. Edwards, *Supreme Risk,* 74 Fla. L. Rev. 543, 594 (2022).

government is entwined in its management or control." *Brentwood Acad. v. Tennessee Secondary Sch. Athletic Ass'n*, 531 U.S. 288, 295–96 (2001). To charge a private party with state action under the nexus/joint action test, "the governmental body and private party must be intertwined in a 'symbiotic relationship.'" *Rayburn*, 241 F.3d at 1348 (citations and quotations omitted). "For example, the Eleventh Circuit has held that the nexus/joint action test is satisfied where the state contractually requires a private actor to take certain actions, such that the private actor is acting in accordance with the governmental directive and is effectively the surrogate for the state." *Woods v. Valentino*, 511 F. Supp. 2d 1263, 1273 (M.D. Fla. 2007) (citations omitted).

The close nexus, intimate entwinement, and interdependence between FINRA and the federal government is obvious and indisputable. As the Eleventh Circuit has recognized, FINRA "performs a variety of vital governmental functions" including "adjudicatory, regulatory, and prosecutorial functions." *Gallagher v. Fin. Indus. Regulatory Auth., Inc.*, 2022 WL 1815594, at *2 (11th Cir. June 3, 2022) (quoting *Weissman v. Nat'l Ass'n of Sec. Dealers, Inc.*, 500 F.3d 1293, 1296 (11th Cir. 2007)). In fact, numerous courts—including the Eleventh Circuit—have characterized FINRA as a "quasi-governmental agency." *See, e.g. Gallagher,* 2022 WL 1815594 at * 2; *Nat'l Ass'n of Securities Dealers v. S.E.C.,* 431 F.3d 803, 804 (D.C. Cir. 2005). Courts in other jurisdictions have expressly recognized the intimate entwinement between the SEC and FINRA's predecessor, the National Association of Security Dealers (the "NASD"). *See Standard Inv. Chartered, Inc. v. Nat'l Ass'n of Sec. Dealers*, 637 F.3d 112,

116–17 (2d Cir. 2011) ("[t]he statutory and regulatory framework highlights to us the extent to which an SRO's bylaws are *intimately intertwined* with the regulatory powers delegated to SROs by the SEC." (emphasis added)).

The Eleventh Circuit in *Turbeville v. Financial Industry Regulatory Authority* underscored the entwinement and interdependence between FINRA and the SEC, stating that the Exchange Act "vests [FINRA] with a prominent role in the administration and enforcement of federal securities law." 874 F.3d 1268, 1271 (11th Cir. 2017). In fact, when a FINRA member violates the Exchange Act, FINRA is *required* to "levy sanctions that *carry the force of federal law*." *Id.* (emphasis added). To carry out these tasks, the Exchange Act vests FINRA with "a variety of adjudicatory, regulatory, and prosecutorial functions" that are derivative from, ultimately belong to, and are performed on behalf of the SEC. *Weissman*, 500 F.3d at 1296; *see Gallagher*, 2022 WL 1815594, at *2; *Nat'l Ass'n of Sec. Dealers, Inc.*, 431 F.3d at 806–07.

Further demonstrating the entwinement between FINRA and the federal government is FINRA's ability to create rules that "[o]nce approved by the SEC, . . . have the status of federal law." *Empire Fin. Group, Inc. v. Fin. Indus. Regulatory Auth., Inc.*, 2009 WL 10644856, at *2 (S.D. Fla. Jan. 15, 2009). In addition, the SEC has the power to "abrogate, add to, and delete from" FINRA's rules. *Id.* at *2. As a result, the SEC can craft FINRA's rules in a manner that injects the SEC's policy and agenda without abiding by its own rulemaking process.

Scholars and commenters have concluded that, over time, the Exchange Act has "effectively entwined the SEC and its SROs, making it difficult to characterize the

9

SEC's role as purely oversight."[9] As stated by current SEC Commissioner Pierce, "on the strength of a government mandate and carrying out a regulatory mission using government-like tools, FINRA is difficult to distinguish from its patron agency."[10]

By granting FINRA vast governmental authority to create and enforce federal law, the federal government put itself into a position of interdependence with FINRA and created a symbiotic relationship. *See Rayburn,* 241 F.3d at 1348. At minimum, there is substantial entwinement between FINRA and the government such that FINRA's actions are fairly attributable to the government. *See Brentwood*, 531 U.S. at 296. Accordingly, FINRA is appropriately characterized as a state actor subject to the Constitution.

### ii. The case law in this Circuit further supports a finding that FINRA is a state actor.

Over a decade ago, in *Busacca*, the Eleventh Circuit recognized that it had "not yet determined whether FINRA is a government actor." 449 Fed.Appx. at 890. More recently, the Eleventh Circuit concluded that, when FINRA carries out its functions as the prosecutor in the enforcement of securities laws and implements SEC-approved rules governing disciplinary actions, *"SROs [like FINRA] act under color of federal law as*

---

[9] Edwards, *Supreme Risk*, *supra*; *see also, e.g.*, William A. Birdthistle and M. Todd Henderson, *Becoming a Fifth Branch*, 99 Cornell L. Rev. 1 (2013); Richard L. Stone and Michael A. Perino, *Not Just a Private Club: Self-Regulatory Organizations as State Actors When Enforcing Federal Law*, No. 2:453 Columbia Bus. L. Rev. 453 (1995).

[10] Hester Pierce, *The Financial Industry Regulatory Authority: Not Self-Regulation After All* (Mercatus Ctr., Working Paper 2015).

*deputies of the federal government." Turbeville,* 874 F.3d at 1276 (emphasis added).[11]

The conclusion that FINRA is a state actor accords with a binding Fifth Circuit opinion.[12] In *Intercontinental Indus., Inc. v. Am. Stock Exch.*, 452 F.2d 935, 941 (5th Cir. 1971), the court rejected the American Stock Exchange's (the "Exchange") argument that it was not required to adhere to due process because the Exchange was not a governmental agency. The court concluded that "[t]he intimate involvement of the Exchange with the [SEC] brings it within the purview of the Fifth Amendment controls over governmental due process." *Id.* In support of its finding of "intimate involvement" the court explained that the Exchange must register with the SEC, its rules must be submitted to the SEC and are subject to alteration or supplementation by the SEC, its members are closely regulated by the SEC, a security may not be delisted without application to the SEC, and the Exchange may be suspended or its registration withdrawn by the SEC. *Id.* at n. 9.

The "intimate involvement" between the Exchange and the SEC identified in *Intercontinental* is akin to that between FINRA and the SEC. FINRA must register with the SEC, its rules must be submitted to the SEC for approval, its rules are subject to alteration or supplementation by the SEC, FINRA's members are closely regulated by the SEC, and FINRA may be suspended or have its registration withdrawn by the

---

[11] *See also Crimmins v. Am. Stock Exch., Inc.*, 346 F. Supp. 1256, 1259 (S.D.N.Y. 1972) ("When an exchange conducts such proceedings under the self-regulatory power conferred upon it by the 1934 Act, it is engaged in governmental action, federal in character . . . .").

[12] Fifth Circuit opinions handed down prior to September 31, 1981 are binding on the Eleventh Circuit. *See Bonner v. City of Prichard,* 661 F.2d 1206, 1207 (11th Cir. 1981).

SEC. The decision in *Intercontinental* confirms the "intimate involvement" between FINRA and the SEC, triggering FINRA's obligation to abide by constitutional restraints.[13]

FINRA will likely direct the Court to the various cases from other jurisdictions where courts have stated that FINRA is a private entity and not subject to constitutional restrictions. However, none of the cases on which FINRA may rely are binding on this Court. Further, many of the cases often cited by FINRA rely solely on prior decisions—particularly the decades old decision in *Desiderio v. NASD, Inc.,* 191 F.3d 198 (2d Cir. 1999)—without conducting any analysis or applying the Supreme Court's entwinement test guidance set forth in *Brentwood*. Further, *Desiderio* is outdated; the opinion predates critical changes in FINRA's role and its entwinement with the SEC, and the court failed to consider evolving aspects of FINRA's activities.[14]

Moreover, *Desiderio* and other cases on which FINRA has previously relied focus on narrow and discrete questions related to an administrative proceeding or a FINRA rule, not whether FINRA's operations and structure are unconstitutional. For example, in *Desiderio*, a securities broker argued that the mandatory arbitration provision in Form U-4 violated her constitutional rights. 191 F.3d at 200. The court

---

[13] As acknowledged in *Busacca,* the Tenth Circuit has also recognized that due process requirements apply to the NASD. *See Rooms,* 444 F.3d at 1214.

[14] As one scholar explained, "the Second Circuit rendered its *Desiderio* decision without briefing on the impact of the 1975 amendments to the federal securities laws which gave the SEC the ability to edit an SRO's rules at its will. The court also did not consider the requirements that SRO enforce federal securities laws" and "the way gradual changes have transformed SROs to more closely resemble de facto arms of the government." Edwards, *Supreme Risk*, *supra*, at 594. Further, "older precedents declaring SROs to be private actors may carry less force today after significant amendments to federal law increasing government control over and entanglements with SROs." *Id*. at 593.

recognized that "private entities may be held to constitutional standards if their actions are 'fairly attributable' to the state," and considered whether there was a close nexus between the state and the *specific conduct* of which the plaintiff complained. *Id.* at 206-207. The court concluded that there was no SEC rule or action that encouraged the NASD to compel arbitration, thus the particular conduct was not "fairly attributable" to the state. *Id.* Here, however, Plaintiffs are challenging FINRA's adjudicatory and prosecutorial actions that are vital governmental functions mandated by federal law. *See Gallagher,* 2022 WL 1815594 at * 2. Thus, the narrow conclusion in *Desiderio* is not applicable to this case.

### iii. The immunity to which FINRA claims it is entitled further demonstrates that FINRA is a state actor.

FINRA has repeatedly claimed, and courts have recognized, that FINRA is immune from private tort lawsuits arising from FINRA's prosecutorial, adjudicatory, and enforcement conduct. Entitlement to such immunity derives from the fact—and exists only when—FINRA is performing a governmental function. *See Gallagher*, 2022 WL 1815594, at *2 ("Because they perform a variety of vital governmental functions, but lack the sovereign immunity that governmental agencies enjoy, SROs are protected by absolute immunity when they perform their statutorily delegated adjudicatory, regulatory, and prosecutorial functions" (citations and quotations omitted)). Indeed, "[a]bsolute immunity is not appropriate unless the relevant conduct constitutes a delegated quasi-governmental prosecutorial, regulatory, or disciplinary function." *Weissman*, 500 F.3d at 1297. It is "[o]nly when an SRO is acting under the aegis of the

Exchange Act's delegated authority does it enjoy [the] privilege" of immunity. *Id.*

Because FINRA is only entitled to immunity when it is performing a government function, the only logical conclusion is that it must adhere to constitutional restraints when performing such functions. But FINRA has managed to have it both ways. FINRA maintains that, on the one hand, it is entitled to immunity when it performs the regulatory, adjudicatory, or prosecutorial governmental functions delegated to it under the Exchange Act, but, on the other hand, it is a private actor not subject to constitutional restraints. Accepting FINRA's position would grant FINRA an unprecedented form of immunity which provides *more* protection than that afforded *either* to governmental entities (who may be sued for constitutional violations) and that available to private citizens (who may be sued for private tort claims).

In short, when SROs, like FINRA, are carrying out a federal mandate "they are 'state actors' and the weight of judicial authority has so recognized in affording the same privileges [*i.e.*, absolute immunity] as their SEC counterparts. It is illogical, illegal and unfair for the SROs to decline to afford respondents in their disciplinary proceedings the same constitutional protections they claim for themselves." Peloso and Indek, "A Question of Fairness," *New York Law Journal,* June 21, 2001

### 2. This Court has personal jurisdiction over FINRA.

"When a preliminary injunction is challenged on the basis of jurisdiction, a plaintiff need only establish a reasonable probability of ultimate success upon the question of jurisdiction when the action is tried on the merits." *S.E.C. v. Unique Fin. Concepts, Inc.*, 196 F.3d 1195, 1198 (11th Cir. 1999) (citations and quotations omitted).

Here, personal jurisdiction is appropriate pursuant to 15 U.S.C. §78aa, 28 U.S.C. § 1391(e), and Florida's long-arm statute.

Rule 4(k)(1)(C) provides, "[s]erving a summons or filing a waiver of service establishes personal jurisdiction over a defendant ... when authorized by a federal statute." Section 1391(e)(2) provides for nationwide service of process for claims against an agency of the United States. 28 U.S.C. § 1391(e)(2). Similarly, Section 78aa(a) of the Exchange Act provides for nationwide service of process for claims arising under such section. 15 U.S.C. § 78aa; *SEC v. MintBroker Int'l, Ltd.,* 2022 WL 4204383 at *2 (S.D. Fla. Jan 12, 2022). The statutory authorization of nationwide service of process coupled with Rule 4 allows for personal jurisdiction predicated upon the defendant's contacts with the United States. *See Mintbroker,* 2022 WL 4204383.

Here, Plaintiffs' claims against FINRA "arose under" 15 U.S.C. §78aa. *See Turbeville*, 874 F.3d at 1273 (finding a plaintiff's tort claims against FINRA "arose under" 15 U.S.C. § 78aa). Plaintiffs have also alleged and argued that FINRA acts as an agent and/or is an establishment of the United States. Further, it is indisputable that FINRA has extensive contacts with the United States and with Florida, and that it was served with process in Florida via its registered agent. FINRA is therefore subject to nationwide service of process and personal jurisdiction under both 28 U.S.C. § 1391(e)(2) and 15 U.S.C. § 78aa(a).

This Court also has jurisdiction over FINRA pursuant to Florida's long-arm statute. In relevant part, Section 48.193(2), governs general jurisdiction and states that a nonresident defendant "who is engaged in substantial and not isolated activity within

15

this state, whether such activity is wholly interstate, intrastate, or otherwise, is subject to the jurisdiction of the courts of this state, whether or not the claim arises from that activity." Section 48.193(1)(a) provides that a nonresident defendant is subject to personal jurisdiction in Florida for any cause of action arising from "[o]perating, conducting, engaging in, or carrying on a business or business venture in this state or having an office or agency in this state."

Here, Plaintiffs have alleged a litany of facts demonstrating that FINRA is engaged in substantial and not isolated activity in Florida, and that it operates and conducts a business in this state. FINRA has been registered to do business, has maintained an office and a registered agent, and has conducted business in the state of Florida for more than 25 years. Doc. 43, ¶ 16. FINRA's southeast regional office—just one of four such offices—is located in Florida. *Id.* at ¶ 19. FINRA maintains many other offices and hearing venues throughout the state, regulates thousands of individuals and entities in the state, and employs multiple individuals that reside and work in Florida. *Id.* at ¶¶ 20-21. FINRA also administers and adjudicates FINRA disputes in Florida, including over 500 such disputes in 2022 alone. *Id.* at ¶ 22. These allegations are sufficient to show that FINRA carries on business and is engaged in substantial and not isolated activity in this state.

Further, Plaintiffs' claims concern FINRA's unconstitutional operation and structure, including operations that occur in this state. Plaintiffs' claims, therefore, "relate to" FINRA's conduct in this state. *See Del Valle v. Trivago GMBH*, 56 F.4th 1265, 1275 (11th Cir. 2022); *Ford Motor Co. v. Montana Eighth Jud. Dist. Ct.*, 141 S. Ct.

1017, 1026-27 (2021). And it is indisputable that FINRA has purposefully availed itself of the privilege of conducting business activity in this state. As such, the Court has personal jurisdiction over FINRA pursuant to Florida's long-arm statute.

**3.      Plaintiffs have standing to assert their claims.**

To establish Article III standing, a plaintiff must allege that it has "(1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Spokeo, Inc. v. Robins,* 578 U.S. 330, 338 (2016). Just weeks ago, the Supreme Court concluded that a person suffers a "here-and-now injury" by being subjected to unconstitutional agency authority and decision-making process. *Axon,* 143 S.Ct. 890, 903; *see also Seila Law*, 140 S.Ct. at 2196. Indeed, "'there is ordinarily little question' that a regulated individual or entity has standing to challenge an allegedly illegal statute or rule under which it is regulated." *State Nat. Bank of Big Spring v. Lew,* 795 F.3d 48 (D.C. Cir. 2015) (quoting *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 561-62 (1992)).

Here, Plaintiffs are challenging the "unconstitutional operation and structure of FINRA." Doc. 43, ¶ 1. Plaintiffs are FINRA members and are regulated by FINRA. *Id.* at ¶¶ 28-29. Subjecting Plaintiffs to the very regulation that they challenge as unconstitutional is sufficient to establish Plaintiffs' standing. *See Axon,* 143 S.Ct. 890, 903; *State Nat. Bank,* 795 F.3d at 54; *Lujan,* 504 U.S. at 561-62.

**4.      Plaintiffs are likely to succeed on one or more of their claims.**

      **i.      Separation of Powers**

The Constitution provides that "[t]he executive Power shall be vested in a President of the United States," and that "he shall take Care that the Laws be faithfully executed." U.S. Const. art. II, §§ 1, 3; *see also Free Enterprise Fund,* 561 U.S. at 483. These provisions vest all executive power, including the power to enforce the law, in the President. Because it would be impossible for one person to perform all executive business of the government, the Constitution also provides for principal executive officers to assist in these duties. *Free Enterprise Fund,* 561 U.S. at 483. For such appointments to comply with the Constitution, however, the President must not be restricted in his ability to remove a principal officer, who is in turn restricted in his or her ability to remove an inferior officer. *Id.* at 484. Such multilevel protection from removal violates Article II. *Id.*

In *Free Enterprise Fund,* the Supreme Court evaluated the constitutionality of the PCAOB board which is similar to FINRA's. *Id.* PCAOB and FINRA both govern an entire industry, they are both charged with enforcing securities law, the SEC's rules, and their own rules, and they both can enforce compliance with federal laws through sanctions and disciplinary proceedings. Like FINRA, PCAOB is purportedly a private, nonprofit corporation whose board members were appointed internally and could not be removed by the SEC except for good cause shown. *Id.* at 484-486.

The Supreme Court found this structure and the tenured protections provided to the PCAOB board to be unconstitutional. The Court concluded that "the individual members of the Board—like the officers and directors of the self-regulatory organizations—are substantially insulated from the Commission's control." *Id.* at 486.

18

Likewise, SEC Commissioners cannot be removed by the President except in limited circumstances. As such, the PCAOB Board violated the separation of powers because it was insulated from Presidential oversight by dual-for-cause protection. *Id.* at 492

The Supreme Court's decision in *Free Enterprise Fund* applies with equal force to FINRA. FINRA is insulated from the President's and the SEC's supervision or control. The SEC cannot remove FINRA Board members, executives, officers, or other officials at will. *See* 15 U.S.C. §78s(h)(4)(B). Similarly, the President has no authority to remove a FINRA Board member, executive or officer. And, as explained in *Free Enterprise Fund,* the President cannot remove SEC Commissioners—those tasked with overseeing FINRA—except for cause. *Free Enterprise Fund,* 561 U.S. at 486. As a result, FINRA's Board members, executives, and officers, are enshrined in the same dual-layer protection that the Supreme Court held violates the Separation of Powers. Accordingly, Plaintiffs are likely to prevail on their Separation of Powers claim.

### ii. Violation of the Appointments Clause

The Appointments Clause provides that the President shall nominate and appoint "officers of the United States." U.S. Const. art. II, § 2, cl. 2. However, "Congress may by law vest the appointment of such inferior officers, as they think proper, in the President alone, in the courts of law, or in the heads of departments." *Id.* The clause protects the President's right to lead the executive branch and serves the separation of powers by preventing "Congress from dispensing power too freely; it limits the universe of eligible recipients of the power to appoint." *Freytag v. C.I.R.*, 501

19

U.S. 868, 880 (1991).

Here, there is no question that FINRA possesses and exercises significant authority pursuant to the laws of the United States. FINRA's Board, its executives and its Hearing Officers are principal officers whose appointments must be made in accordance with the Appointments Clause. *See Lucia,* 138 S.Ct. 2044. However, it is indisputable that FINRA's Board and Hearing Officers are chosen and appointed by FINRA itself. That structure fails to comply with the Appointments Clause.

### iii.    Violations of the Fifth and Seventh Amendment

FINRA's procedures violate the Fifth Amendment and Seventh Amendment by, among other things, failing to provide due process of law, failing to adhere to protections against self-incrimination, and failing to recognize a right to a jury trial for claims which are akin to common law fraud.

As argued above, the concerns with FINRA's proceedings are exemplified in the Expedited Proceeding. FINRA's effort to use the Expedited Proceeding, before the NAC has reviewed the Initial Decision, not only subverts Alpine's right to review but also will deprive Alpine of due process of law. By way of example:

- FINRA commenced the Expedited Proceeding even though the allegedly "unreasonable" fees at issue were known to FINRA and were discussed and considered by the Hearing Panel in the prior proceeding. While FINRA sought and obtained orders in that matter barring the imposition of certain fees, it neither sought nor obtained an order barring Alpine from charging the fees that FINRA now claims are unreasonable.[15] Instead, *after Alpine filed this case challenging*

---

[15] See Fritz Declaration at ¶ 6.  The order did include a prohibition on a market making/execution fee but did so in the context of the aggregate of fees that Alpine charged to its own direct customers.  It

*FINRA's constitutionality*, FINRA proceeded to lodge additional claims based on evidence of the same conduct that was presented in that prior case.

- While FINRA ordinarily appoints panels consisting of one FINRA Hearing Officer and two non-FINRA panelists, this proceeding will be conducted by a sole FINRA Hearing Officer. *See* FINRA Rule 9559(d).
- In the Expedited Proceeding, FINRA is claiming violations of "obey the law" provisions of the order, which implicates authority in this jurisdiction limiting the extent to which the SEC can obtain and enforce such orders.[16] Because that authority is based on violations of Federal Rule of Civil Procedure 65(d)(1) and procedural due process, FINRA will likely insist that it can disregard that law.
- In addition, the decision by the single Hearing Officer, including an order expelling Alpine, will become *immediately* effective without any review. FINRA Rule 9559(c)(1).

### iv. Violation of the First Amendment

The First Amendment recognizes a freedom to associate with particular groups as well as a freedom not to associate. *See Mulhall v. Unite Here Local 355,* 618 F.3d 1279, 1287 (11th Cir. 2010). Indeed, Courts have concluded that "[t]he very act of the state compelling an employee or an attorney to belong to or pay fees to a union or bar association implicates that person's First Amendment right not to associate." *Romero v. Colegio De Abogados De Puerto Rico,* 204 F.3d 291, 301 (1st Cir. 2000). This forced association and forced financial contribution is only permissible if there is a strong public interest that justifies the governmental intrusion. *Id.* Where association is compelled or financial support is required for activities wholly unrelated to the public interest, there may be no justification for intruding upon a party's First Amendment

---

did not bar Alpine from collecting a market making fee, just like any other market maker, when it executes trades for an introducing broker.

[16] See, e.g., *SEC v. Goble*, 2012 WL 1918819 (11th Cir. May 29, 2012).

associational interests. *Id.* "Simply stated, that an individual may be compelled to associate and financially contribute for some purposes does not mean she may be compelled to associate and financially contribute for all purposes." *Id.*

To participate in the securities industry, broker-dealers are obligated to join and pay fees to a registered national securities association. *See Turbeville* 874 F.3d at 1270-71. Because FINRA is the only such organization, broker-dealers are forced to become FINRA members. "When federal law compels membership in an SRO, the SRO achieves the functional power to regulate the entire industry." Edwards, *Supreme Risk*, *supra*, at 594. At the time it was implemented, the rationale for this compelled membership consisted of a confluence of concerning considerations. A House Congressional Report recognized that an SRO can do what the SEC could not because it would not have to abide by the Constitution. *See* H.R. Rep. 98-106 (1983); Edwards, *Supreme Risk*, *supra*, at 558 ("An SRO, ostensibly a private organization, may not be bound by constitutional requirements, allowing it to enforce vague and undefined rules" such as FINRA Rule 2010). The legislation was also justified by its proponents because it would save money by relieving the SEC of the need to oversee those members of the industry that had opted not to join FINRA. *Id.*; H.R. Rep. 98-106 (1983). As a result, industry members have since been required to forego the fundamental rights discussed above to participate in the securities industry.

The purported justifications for FINRA's governmental intrusion are grossly outweighed by the significant personal liberty and property implications created by FINRA. Broker-dealers are not only forced to be a part of the organization, but they

are also required to subject themselves to FINRA's enforcement staff and in-house tribunals and give up the safeguards and protections guaranteed by the Fifth and Seventh Amendments. Moreover, FINRA members are obligated to fund FINRA's operations. FINRA's operations generated over $1.3 billion in revenue—almost all of which is derived through obligatory fees, fines, and penalties assessed against FINRA members. *See* FINRA's 2021 Financial Annual Report.[17] FINRA uses the funds in a manner that benefits FINRA. In fact, over $1 billion of FINRA's revenues are dedicated to compensation and benefits for FINRA staff and professional and contract services. *Id.* It is apparent from FINRA's expenditures that a significant portion of the financial support it extracts from its members is wholly unrelated to the public interest that FINRA purportedly serves.

In short, the very act of the government compelling Plaintiffs to belong to FINRA implicates and violates Plaintiffs' First Amendment right not to associate. *See Romero,* 204 F.3d at 301; *Mulhall,* 618 F.3d at 1287. Plaintiffs are therefore likely to succeed on their claims for violations of the First Amendment.

### B.    Alpine will suffer irreparable harm absent an injunction.

There is no doubt that Alpine will suffer irreparable harm absent an injunction because it will be subject to an unconstitutional administrative proceeding administered by an unconstitutional administrative agency. As Justice Kagan made clear in *Axon*, subjection to an illegitimate proceeding, led by an illegitimate decision

---

[17] https://www.finra.org/sites/default/files/2022-06/2021-FINRA-Financial-Annual-Report.pdf

maker constitutes "a here-and-now injury." *Axon,* 143 S.Ct. at 903. Justice Kagan's rationale is bolstered by the well-established principle "that the deprivation of constitutional rights unquestionably constitutes irreparable injury." *Gayle v. Meade,* 614 F.Supp.3d 1175, 1205 (S.D. Fla. 2020); *Snipes v. Scott*, 2019 WL 163352, at *5 (N.D. Fla. Jan. 10, 2019) ("When an alleged deprivation of a constitutional right is involved ... most courts hold that no further showing of irreparable injury is necessary").

The threat of irreparable harm is even more significant in this case given the imminency of FINRA's actions and the potential resulting harm to Alpine. The hearing in the Expedited Proceeding is scheduled for May 31, 2023, and an adverse ruling against Alpine would take effect immediately. Under these circumstances, the threat of irreparable harm to Alpine if the injunction is not issued is clear.

### C. FINRA will not suffer any harm if an injunction is issued and the public interest favors injunctive relief.

Here, there is a significant public interest in assuring that Alpine is not subject to unconstitutional treatment at the hands of FINRA. As the Eleventh Circuit has emphasized, "the public interest is served when constitutional rights are protected." *Democratic Exec. Comm. of Fla. v. Lee*, 915 F.3d 1312, 1327 (11th Cir. 2019). Indeed, the "vindication of constitutional rights and the enforcement of a federal statute serve the public interest almost by definition." *Colonel Fin. Mgmt. Officer v. Austin*, 2022 WL 3643512, at *18 (M.D. Fla. Aug. 18, 2022) (quotations omitted).

That public interest in upholding constitutional rights and the substantial harm to Alpine is juxtaposed against the absence of harm that an injunction would cause

FINRA. An adverse ruling in the Expedited Proceeding against Alpine could destroy the company and harm Alpine's customers. FINRA, on the other hand, waited years[18] to assert these claims and would suffer no prejudice from allowing this Court to consider Alpine's Constitutional arguments.

### D. The bond requirement should be waived.

"[W]aiving the bond requirement is particularly appropriate where a plaintiff alleges the infringement of a fundamental constitutional right." *Honeyfund.com, Inc. v. DeSantis*, 2022 WL 3486962, at *15 (N.D. Fla. Aug. 18, 2022) (citations omitted). Given the constitutional rights at issue and the unique circumstances of this case, waiving the bond requirement is appropriate. *See id*.

WHEREFORE, Plaintiff, Alpine Securities Corporation, respectfully requests that the Court grant the Motion and enter the attached proposed preliminary injunction order[19] against Defendant, Financial Industry Regulatory Authority, Inc., and grant such further relief as the Court deems just and proper.

*/s/ Kenneth G. Turkel*
Kenneth G. Turkel – FBN 867233
LEAD COUNSEL
E-mail: kturkel@tcb-law.com
David A. Hayes – FBN 096657
E-mail: dhayes@tcb-law.com
TURKEL CUVA BARRIOS, P.A.
100 North Tampa Street, Suite 1900
Tampa, FL 33602
Phone: (813) 834-9191

and

Maranda E. Fritz*
maranda@fritzpc.com
Maranda E. Fritz PC
521 Fifth Avenue 17th Floor
New York, New York 10175
Phone: (646) 584-8231
*Attorneys for Plaintiffs*
*\*Pro hac vice application pending*

---

[18] It is difficult not to question FINRA's motive in filing the Expedited Proceeding within days of the Supreme Court's decision in *Axon*. The obvious implication is that FINRA wanted to be judge, jury, and executioner before a possible adverse ruling in this case stripped it of its illegal power.

[19] In accordance with Local Rule 6.02(a)(1) and 6.01(a)(5), a proposed order is attached as **Exhibit 1**.

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on May 9, 2023, the foregoing document was filed with the Court's CM/ECF system, which will send electronic notice to all counsel of record.

/s/ *Kenneth G. Turkel*
Attorney