**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

SCOTTSDALE CAPITAL ADVISORS
CORPORATION and ALPINE
SECURITIES CORPORATION,

       Plaintiffs,

v.

FINANCIAL INDUSTRY REGULATORY
AUTHORITY, INC.,

       Defendant,

UNITED STATES OF AMERICA,

       Intervenor Defendant.

_____/

Case No.: 1:23-cv-1506-BAH

## RENEWED EMERGENCY MOTION FOR PRELIMINARY INJUNCTION AND TEMPORARY RESTRAINING ORDER

Pursuant to Federal Rule of Civil Procedure 65 and District of Columbia Local Rule 65.1, Plaintiff Alpine Securities Corporation ("Alpine"), moves this Court for entry of a temporary restraining order and preliminary injunction against Defendant, Financial Industry Regulatory Authority, Inc. ("FINRA"), enjoining FINRA from continuing its enforcement proceeding against Alpine pending resolution of Alpine's claims challenging the constitutionality of FINRA's structure and operations.

### EMERGENCY NATURE OF RELIEF SOUGHT

On April 19, 2023, FINRA filed a new enforcement proceeding against Alpine (the "Expedited Proceeding") that seeks to impose, on an accelerated timetable, a $4 million fine and the corporate death penalty: expulsion from the industry.[1] Declaration of Maranda Fritz

---

[1] *See Department of Enforcement v. Alpine Securities Corporation,* Proceeding No. 2019061232603.

[Doc. 46] ("Fritz Declaration"), ¶ 4. The Expedited Proceeding hearing was originally set for May 1, 2023, but Alpine obtained an adjournment and the hearing is now scheduled for May 31, 2023. *Id.* at ¶ 5. As explained herein, an expulsion order against Alpine would become effective immediately and force the closure of the business. *Id.* at ¶ 7. Based on the foregoing, Alpine respectfully requests that the Court consider this motion on an expedited basis.

<u>**INTRODUCTION**</u>

The Expedited Proceeding threatens to shut down Alpine and irrevocably damage its business relationships before the SEC can even review FINRA's actions. It is difficult to imagine a clearer illustration of how the structure of this unaccountable "quasi-governmental" entity is utterly incompatible with the system of limited and separated powers envisioned by the Framers. FINRA seeks to impose this most severe possible sanction on Alpine without the SEC's prior blessing and based upon Alpine's alleged violation of an earlier underlying FINRA sanctions order that the SEC has likewise not yet reviewed. The sum of it is this: FINRA is deploying the Expedited Proceeding while Alpine's appeal from the underlying decision is still pending in an effort to deprive Alpine of any meaningful review of its actions. Absent prompt injunctive relief from this Court, FINRA will succeed in terminating Alpine without a decision by the SEC on *either* Alpine's appeal from the underlying decision or an appeal from the decision issued in the new Expedited Proceeding. Simply stated, FINRA, through the Expedited Proceeding, is acting as prosecutor, jury, judge and executioner, and this Court provides the only possible protection from its unconstitutional deployment of the vast powers afforded to it by the SEC and Congress through the Exchange Act. If, as occurred in FINRA's prior case against Plaintiff Scottsdale Capital Advisors Corporation ("Scottsdale"), all findings and sanctions of the Hearing Panel end up being *reversed* by the

SEC,[2] Alpine will have already been destroyed. Ironically, the Expedited Proceeding serves as a perfect exemplar of FINRA's unconstitutional existence—both in the structure which enables FINRA's unchecked power and the arbitrary application of those powers.

In light of the clear and imminent irreparable harm to Alpine, a temporary restraining order and preliminary injunction are necessary to preserve the status quo while Alpine's constitutional claims against FINRA are considered by this Court. An injunction will cause no harm or prejudice to FINRA and will serve the public interest. Moreover, Alpine has a substantial likelihood of success on the merits of their claims because FINRA: (i) is a state actor; (ii) appoints and deploys unconstitutional hearing officers, *see Lucia v. S.E.C.,* 138 S.Ct. 2044 (2018); (iii) maintains a structure and operates in a manner that violate the Separation of Powers, *see Free Enterprise Fund, LLP v. Pub. Co. Accounting Oversight Bd.,* 561 U.S. 477 (2012), *Seila Law v. Consumer Financial Protection Bureau*, 140 S.Ct. 2183 (2020), and *Collins v. Yellen*, 141 S.Ct. 1761 (2021); and (iv) disclaims an obligation to provide due process of law. And even if FINRA was not deemed a state actor, it is a private entity that exercises governmental power in violation of the private the nondelegation doctrine. *See Carter v. Carter Coal Co.*, 298 U.S. 238, 311 (1936); *Ass'n of Am. R.R.s v. U.S. Dep't of Trasp.*, 721 F.3d 666, 670–74 (D.C. Cir. 2013), *vacated on other grounds*, 575 U.S. 43 (2015). Alpine now seeks to enjoin FINRA from prosecuting its unconstitutional Expedited Proceeding pending the outcome of this litigation.

---

[2] *Financial Industry Regulatory Authority v. Scottsdale Capital Advisors*, Exchange Act Release No. 93052 (Sept. 17, 2021).

## BACKGROUND

On April 14, 2023, the United States Supreme Court issued its opinion in *Axon Enter., Inc. v. FTC,* 143 S.Ct. 890 (2023), resolving a circuit split regarding whether a district court has jurisdiction to consider suits to enjoin administrative enforcement actions when the Respondent has asserted constitutional claims challenging the structure of the agency, *i.e.*, the Federal Trade Commission or the Securities and Exchange Commission (the "SEC"). In *Axon*, the Supreme Court affirmed the decision of the Fifth Circuit Court of Appeals and held that plaintiffs do not have to circumnavigate the protracted administrative review process to have a district court consider claims challenging the constitutionality of an administrative agency and its procedures *Id.*[3]

On April 19, 2023, five days after the *Axon* opinion was published, FINRA filed the Expedited Proceeding against Alpine, rushing to obtain an order expelling Alpine from the industry alleging that Alpine violated a cease-and-desist order issued in March 2022 contained within an Initial Hearing Panel Decision (the "Initial Decision") from a prior FINRA enforcement proceeding.[4] Alpine appealed the Initial Decision to FINRA's in-house appellate tribunal, the National Adjudicatory Council ("NAC") and, under FINRA's rules, the Initial Decision is not final unless and until it is affirmed by the NAC.[5] No decision has been issued so the underlying decision on which the Expedited Proceeding is based is *not even final*. As the

---

[3] The *Axon* decision overrules the District of Columbia Circuit's contrary holding in *Springsteen-Abbott v. SEC,* 989 F.3d 4, 8 (D.C. Cir. 2021).

[4] *See Department of Enforcement v. Alpine Securities Corp.*, Disc.Pro.No. 2019061232601.

[5] FINRA Rule 9311 provides that a timely filed notice of appeal of an initial decision of a hearing panel operates as a stay of the decision until a ruling is made by the NAC. Under FINRA Rule 9268(e), where a notice of appeal is filed from an Initial Decision, that decision does not "constitute final disciplinary action of FINRA for purposes of SEA Rule 19d-1(c)(1)."

Honorable Mary S. Scriven recognized in the Order transferring this case to this district:

> If successful in that Expedited Proceeding, FINRA would essentially sidestep the NAC appeal and terminate Plaintiffs from membership in FINRA, rendering them ineligible to continue to operate in the securities field. While an appeal from the Expedited Proceeding is theoretically possible and could be requested, FINRA has acknowledged that there is no statutory or regulatory authority for automatically staying the effect of the expedited process.

Transfer Order at 5, No. 22-2347 (M.D. Fla. May 24, 2023) (hereinafter "Transfer Order").

Alpine now turns to this Court seeking an injunction to stay the Expedited Proceeding while the Court considers the substantive issues concerning the unconstitutionality of FINRA's structure and operations.

## ARGUMENT

### I.       This Court has subject-matter jurisdiction.

Alpine asserts constitutional challenges to FINRA's structure, operations, and authority. *See* Second Amended Complaint (Doc. 43).  Although there was once a question as to whether such claims could be pursued in a district court prior to exhausting the administrative review process, the Supreme Court has now made clear that such claims are proper in this Court. *See Axon,* 143 S.Ct. 890.

In *Axon,* the Court considered two separate cases arising from constitutional claims made by respondents in administrative enforcement proceedings before the SEC and the Federal Trade Commission. In each case, the respondents brought claims in district court raising constitutional challenges against the respective administrative agencies in an effort to stop the administrative proceeding. *Id.* at 897. The Court explained that "[t]he question presented is whether the district courts have jurisdiction to hear those suits—and so to resolve the parties' constitutional challenges to the Commissions' structure." *Id.* The Court answered

"yes" and explained that "[t]he ordinary statutory review scheme does not preclude a district court from entertaining these extraordinary claims." *Id.*

For the same reasons set forth in *Axon*, this Court has subject-matter jurisdiction over Alpine's claims.

## II.    The Court should enter an order enjoining FINRA from continuing the Expedited Proceeding.

This Court has the power to issue a preliminary injunction upon a showing that (1) the plaintiff is likely to succeed on the merits; (2) the plaintiff is likely to suffer irreparable harm in the absence of preliminary relief; (3) the balance of equities is in the plaintiff's favor; and (4) an injunction is in the public interest. *Turner v. U.S. Agency for Global Media,* 502 F. Supp. 3d 333, 354 (D.D.C. 2020) (citations and quotations omitted). Likewise, "[a] TRO is analyzed using the same factors applicable to preliminary injunctive relief." *Costa v. Bazron,* 456 F. Supp. 3d 126, 133 (D.D.C. 2020) (citations and quotations omitted). "A preliminary injunction is a stopgap measure, generally limited as to time, and intended to maintain a status quo or to preserve the relative positions of the parties until a trial on the merits can be held." *Turner,* 502 F. Supp. 3d at 354 (citations and quotations omitted).

### A.    Alpine has a substantial likelihood of success on their claims.

To demonstrate a substantial likelihood of success on the merits, "Plaintiffs need not establish an absolute certainty of success. It will ordinarily be enough that the plaintiff has raised questions going to the merits so serious, substantial, difficult and doubtful, as to make them a fair ground for litigation and thus for more deliberative investigation." *Booth v. Bowser,* 597 F. Supp. 3d 1, 16 (D.D.C. 2022) (quotations, alterations, and internal citations omitted). "Where multiple causes of action are alleged, plaintiff need only show likelihood of success on one claim to justify injunctive relief." *Kirwa v. United States Dept. of Defense,* 285 F. Supp.

3d 21 (D.D.C. 2017) (citation and quotation omitted). The applicable authority, including recent and emerging Supreme Court authority, demonstrates that Alpine is likely to succeed on its constitutional claims against FINRA.

1.    **FINRA is a state actor.**

On the central issue of whether FINRA's structure and operations are unconstitutional, Alpine anticipates that FINRA will deny that it has any obligation to comply with constitutional strictures in relation to its governance, its use of its in-house judges or the procedures employed by its tribunals. According to FINRA, it "is a private company, not a government actor subject to constitutional scrutiny." FINRA Motion to Dismiss at 16 (May 12, 2023) (Doc. 51). However, the District of Columbia Circuit court has not decided whether FINRA should be considered a state actor for constitutional purposes. Squarely presented to this Court, therefore, is a fundamental issue that impacts those in the securities industry in dramatic fashion every day: whether critical governmental functions, including enforcement of the federal securities laws, can be outsourced to a purportedly private entity that need not abide by the Constitution.[6]

If FINRA is not deemed a state actor, then it may carry out the governmental function of enforcing federal law without regard for a person's or entity's constitutional rights. In fact, FINRA could compel compliance with federal law by intentionally violating the constitutional rights of its members, including core private rights such as the right to property.

---

*See, e.g.*, William I. Friedman, *The Fourteenth Amendment's Public/private (is there a capital "P" in private?) Distinction Among Securities Regulators in the U.S. Marketplace-Revisited*, 23 Ann. Rev. Banking & Fin. L. 727, 758 (2004); Roberta S. Karmel, *Should Securities Industry Self-Regulatory Organizations Be Considered Government Agencies?*, 14 Stanford Journal of Law, Business & Finance 151, 154 (2008).

One scholar's deeply concerning example: "an SRO may bring an enforcement action for a violation of a federal law and coerce compliance by threatening to forever bar a person from their profession for any refusal to cooperate." Benjamin P. Edwards, *Supreme Risk,* 74 Fla. L. Rev. 543, 594 (2022). Neither law nor logic support that troubling result.

The applicable principles and analysis are well established. "[A]ctions of private entities can sometimes be regarded as governmental action for constitutional purposes." *Lebron v. Nat'l R.R. Passenger Corp.,* 513 U.S. 374, 378 (1995). This occurs when "the conduct allegedly causing the deprivation of a federal right [can] be fairly attributable to the State." *Lugar v. Edmonson Oil Co., Inc.,* 457 U.S. 922, 937 (1982).

The Supreme Court has identified a host of facts that can bear on the fairness of such an attribution. For example, a private party may be considered a state actor when "the State had so far insinuated itself into a position of interdependence with the [private parties] that it was a joint participant in the enterprise." *Jackson v. Metro. Edison Co.,* 419 U.S. 345, 353 (1974). The Supreme Court has also explained that a private actor's actions may constitute state action "when it is entwined with governmental policies or when government is entwined in its management or control." *Brentwood Acad. v. Tennessee Secondary Sch. Athletic Ass'n*, 531 U.S. 288, 295–96 (2001).

Under any scenario, however, "[w]hat is fairly attributable is a matter of normative judgment, and the criteria lack rigid simplicity." *Id.* Further, "it is well-settled that whether an otherwise private entity is deemed a state actor . . . is necessarily a fact-bound inquiry and therefore must be answered on a case-by-case basis." *Doe Through Doe v. District of Columbia,* 2005 WL 8167785 (D.D.C. June 20, 2005).

i.    **FINRA is intimately entwined with the federal government.**

The close nexus, intimate entwinement, and interdependence between FINRA and the federal government is obvious and indisputable. In fact, the D.C. Circuit has characterized FINRA's predecessor, the National Association of Security Dealers ("NASD") as a "quasi-governmental agency" with "quasi-governmental authority to adjudicate actions against members" and "quasi-governmental power to discipline its members." *Nat'l Ass'n of Securities Dealers v. S.E.C.,* 431 F.3d 803, 804-05, 807 (D.C. Cir. 2005). FINRA was created by the 2007 consolidation of the NASD and the member regulation, enforcement, and arbitration operations of the New York Stock Exchange (the "NYSE"), undoubtedly gaining significantly more power to amplify its existing quasi-governmental authority.

The D.C. Circuit's characterization of FINRA as a quasi-governmental agency is likely based on the fact that FINRA performs a variety of vital governmental functions including "adjudicatory, regulatory, and prosecutorial functions, including implementing and effectuating compliance with securities laws." *Weissman v. Nat'l Ass'n of Sec. Dealers, Inc.*, 500 F.3d 1293, 1296 (11th Cir. 2007); *Nat'l Ass'n of Sec. Dealers, Inc.*, 431 F.3d at 805–06. FINRA is not just tasked with enforcing its own rules; rather, it serves as the front-line adjudicator for all violations of the Exchange Act and the SEC's rules and regulations. *Nat'l Ass'n of Sec. Dealers, Inc.*, 431 F.3d at 808. In fact, when a FINRA member violates the Exchange Act, FINRA is *required* to "levy sanctions that ***carry the force of federal law***." *Turbeville,* 874 F.3d at 1271. (emphasis added); *see* 15 U.S.C. §78o-3(b)(6). Further, FINRA is empowered to create its own rules that, once approved by the SEC, have the force of federal law. *Birkelbach v. S.E.C.*, 751 F.3d 472, 475 (7th Cir. 2014); *Domestic Sec., Inc. v. S.E.C.*, 333 F.3d 239, 242 (D.C. Cir. 2003). All of these functions are derivative from, ultimately belong to, and are performed

on behalf of the SEC, and demonstrate the substantial entwinement and symbiotic relationship between FINRA and the federal government. *Nat'l Ass'n of Sec. Dealers, Inc.*, 431 F.3d at 806–07; *In re Series 7 Broker Qualification Exam Scoring Litig.*, 548 F.3d 110, 114 (D.C. Cir. 2008);*Weissman*, 500 F.3d at 1296.

Courts in other jurisdictions have also recognized the intimate entwinement between the SEC and FINRA. *See Standard Inv. Chartered, Inc. v. Nat'l Ass'n of Sec. Dealers*, 637 F.3d 112, 116–17 (2d Cir. 2011) ("[t]he statutory and regulatory framework highlights to us the extent to which an SRO's bylaws are ***intimately intertwined*** with the regulatory powers delegated to SROs by the SEC." (emphasis added)); *Turbeville,* 874 F.3d at 1276 (when FINRA carries out its functions as the prosecutor in the enforcement of securities laws and implements SEC-approved rules governing disciplinary actions, ***"SROs [like FINRA] act under color of federal law as deputies of the federal government."*** (emphasis added)); *Crimmins v. Am. Stock Exch., Inc.*, 346 F. Supp. 1256, 1259 (S.D.N.Y. 1972) ("When an exchange conducts such proceedings under the self-regulatory power conferred upon it by the 1934 Act, it is engaged in governmental action, federal in character . . . .").

In *Intercontinental Indus., Inc. v. Am. Stock Exch.*, 452 F.2d 935, 941 (5th Cir. 1971), the court rejected the American Stock Exchange's (the "Exchange")[7] argument that it was not required to adhere to due process because the Exchange was not a governmental agency. The court concluded that "[t]he intimate involvement of the Exchange with the [SEC] brings it within the purview of the Fifth Amendment controls over governmental due process." *Id.* In

---

[7] The Exchange merged with the NYSE in 1998. Consequently, FINRA arguably possesses the combined power and responsibilities formerly housed in the NASD, the NYSE, and the Exchange, as well as those entities' respective reliance on and entwinement with the SEC.

support of its finding of "intimate involvement" the court explained that the Exchange must register with the SEC, its rules must be submitted to the SEC and are subject to alteration or supplementation by the SEC, its members are closely regulated by the SEC, a security may not be delisted without application to the SEC, and the Exchange may be suspended or its registration withdrawn by the SEC. *Id.* at n. 9.

The "intimate involvement" between the Exchange and the SEC identified in *Intercontinental* is akin to that between FINRA and the SEC. FINRA must register with the SEC, its rules must be submitted to the SEC for approval, its rules are subject to alteration or supplementation by the SEC, FINRA's members are closely regulated by the SEC, and FINRA may be suspended or have its registration withdrawn by the SEC. The decision in *Intercontinental* confirms the "intimate involvement" between FINRA and the SEC, triggering FINRA's obligation to abide by constitutional restraints.

Scholars and commenters have also concluded that, over time, the Exchange Act has "effectively entwined the SEC and its SROs, making it difficult to characterize the SEC's role as purely oversight." Edwards, *Supreme Risk*, *supra*; *see also, e.g.*, William A. Birdthistle and M. Todd Henderson, *Becoming a Fifth Branch*, 99 Cornell L. Rev. 1 (2013); Richard L. Stone and Michael A. Perino, *Not Just a Private Club: Self-Regulatory Organizations as State Actors When Enforcing Federal Law*, No. 2:453 Columbia Bus. L. Rev. 453 (1995). As stated by current SEC Commissioner Hester Pierce, "on the strength of a government mandate and carrying out a regulatory mission using government-like tools, FINRA is difficult to distinguish from its patron agency." Hester Pierce, *The Financial Industry Regulatory Authority: Not Self-Regulation After All* (Mercatus Ctr., Working Paper 2015).

FINRA has vast regulatory, adjudicatory, and prosecutorial authority to enforce and

create federal law. *Nat'l Ass'n of Sec. Dealers, Inc.*, 431 F.3d at 806–07; *Weissman*, 500 F.3d at 1296. FINRA performs vital governmental functions essential to the federal government's regulation of the securities industry. By granting FINRA such vast governmental authority, the federal government has put itself into a position of interdependence and entwined itself with FINRA such that FINRA's actions are fairly attributable to the government. *See Brentwood*, 531 U.S. at 296. Accordingly, FINRA is appropriately characterized as a state actor subject to the Constitution.

ii.   **The immunity to which FINRA claims it is entitled further demonstrates that FINRA is a state actor.**

FINRA has repeatedly claimed, and courts have recognized, that FINRA is immune from private tort lawsuits arising from FINRA's prosecutorial, adjudicatory, and enforcement conduct. Entitlement to such immunity derives from the fact that FINRA is engaged in a function that would otherwise be handled by the SEC—an agency which is accorded immunity from all suits for monetary damages. *See In re Series 7 Broker Qualification Exam Scoring Litig.*, 548 F.3d at 114. So when FINRA is performing a governmental function on behalf of the SEC, it is afforded immunity. *Id.*; *Weissman*, 500 F.3d at 1296 ("Because they perform a variety of vital governmental functions, but lack the sovereign immunity that governmental agencies enjoy, SROs are protected by absolute immunity when they perform their statutorily delegated adjudicatory, regulatory, and prosecutorial functions" (citations and quotations omitted)). But when FINRA is not performing such a function, its right to immunity ceases. Indeed, "[a]bsolute immunity is not appropriate unless the relevant conduct constitutes a delegated quasi-governmental prosecutorial, regulatory, or disciplinary function." *Id.* at 1297. It is "[o]nly when an SRO is acting under the aegis of the Exchange Act's delegated authority does it enjoy [the] privilege" of immunity. *Id.*

12

Because FINRA is only entitled to immunity when it is performing a government function, the only logical conclusion is that it must adhere to constitutional restraints when performing such functions. But FINRA has managed to have it both ways.  FINRA maintains that, on the one hand, it is entitled to immunity when it performs the regulatory, adjudicatory, or prosecutorial governmental functions delegated to it under the Exchange Act, but, on the other hand, it is a private actor not subject to constitutional restraints.  Accepting FINRA's position would grant FINRA an unprecedented form of immunity which provides *more* protection than that afforded *either* to governmental entities (who may be sued for constitutional violations) and that available to private citizens (who may be sued for private tort claims).

In short, when SROs, like FINRA, are carrying out a federal mandate "they are 'state actors' and the weight of judicial authority has so recognized in affording the same privileges [*i.e.*, absolute immunity] as their SEC counterparts. It is illogical, illegal and unfair for the SROs to decline to afford respondents in their disciplinary proceedings the same constitutional protections they claim for themselves." Peloso and Indek, "A Question of Fairness," *New York Law Journal,* June 21, 2001

### iii.    The state actor cases upon which FINRA relies are distinguishable.

There is no case from the D.C. Circuit holding that FINRA is not a state actor. FINRA will likely direct the Court to  non-binding precedent in which courts have stated that FINRA is a private entity and not subject to constitutional restrictions. However, none of the cases on which FINRA may rely are binding on this Court. Further, many of the cases often cited by FINRA rely solely on prior decisions—particularly the decades old decision in *Desiderio v. NASD, Inc.,* 191 F.3d 198 (2d Cir. 1999)—without conducting any analysis or applying the

Supreme Court's entwinement test guidance set forth in *Brentwood*. Further, *Desiderio* is outdated; the opinion predates critical changes in FINRA's role and its entwinement with the SEC, and the court failed to consider evolving aspects of FINRA's activities.[8]

Moreover, *Desiderio* and other cases on which FINRA has previously relied focus on narrow and discrete questions related to an administrative proceeding or a FINRA rule, not whether FINRA's operations and structure are unconstitutional. For example, in *Desiderio*, a securities broker argued that the mandatory arbitration provision in Form U-4 violated her constitutional rights. 191 F.3d at 200. The court recognized that "private entities may be held to constitutional standards if their actions are 'fairly attributable' to the state," and considered whether there was a close nexus between the state and the *specific conduct* of which the plaintiff complained. *Id.* at 206-207. The court concluded that there was no SEC rule or action that encouraged the NASD to compel arbitration, thus the particular conduct was not "fairly attributable" to the state. *Id.* Here, however, Alpine is challenging FINRA's adjudicatory and prosecutorial actions that are vital governmental functions mandated by federal law. *See Gallagher,* 2022 WL 1815594 at * 2. Thus, the narrow conclusion in *Desiderio* is not applicable to this case.

---

[8] As one scholar explained, "the Second Circuit rendered its *Desiderio* decision without briefing on the impact of the 1975 amendments to the federal securities laws which gave the SEC the ability to edit an SRO's rules at its will. The court also did not consider the requirements that SRO enforce federal securities laws" and "the way gradual changes have transformed SROs to more closely resemble de facto arms of the government." Edwards, *Supreme Risk*, *supra*, at 594. Further, "older precedents declaring SROs to be private actors may carry less force today after significant amendments to federal law increasing government control over and entanglements with SROs." *Id.* at 593.

2.      **Alpine is likely to succeed on one or more of its claims.**

i.      **Violation of the Separation of Powers**

The Constitution provides that "[t]he executive Power shall be vested in a President of the United States," and that "he shall take Care that the Laws be faithfully executed." U.S. Const. art. II, §§ 1, 3; *see also Free Enterprise Fund,* 561 U.S. at 483. These provisions vest all executive power, including the power to enforce the law, in the President. Because it would be impossible for one person to perform all executive business of the government, the Constitution also provides for principal executive officers to assist in these duties. *Free Enterprise Fund,* 561 U.S. at 483. For such appointments to comply with the Constitution, however, the President must not be restricted in his ability to remove a principal officer, who is in turn restricted in his or her ability to remove an inferior officer. *Id.* at 484. Such multilevel protection from removal violates Article II. *Id.*

In *Free Enterprise Fund,* the Supreme Court evaluated the constitutionality of the PCAOB board which is similar to FINRA's. *Id.* PCAOB and FINRA both govern an entire industry, they are both charged with enforcing securities law, the SEC's rules, and their own rules, and they both can enforce compliance with federal laws through sanctions and disciplinary proceedings. Like FINRA, PCAOB is purportedly a private, nonprofit corporation whose board members were appointed internally and could not be removed by the SEC except for good cause shown. *Id.* at 484-486.

The Supreme Court found this structure and the tenured protections provided to the PCAOB board to be unconstitutional. The Court concluded that "the individual members of the Board—like the officers and directors of the self-regulatory organizations—are substantially insulated from the Commission's control." *Id.* at 486. Likewise, it is widely

15

assumed that SEC Commissioners cannot be removed by the President except in limited circumstances. As such, the PCAOB Board violated the separation of powers because it was insulated from Presidential oversight by dual-for-cause protection. *Id*. at 492

The Supreme Court's decision in *Free Enterprise Fund* applies with equal force to FINRA. FINRA is insulated from the President's and the SEC's supervision or control. The SEC cannot remove FINRA Board members, executives, officers, or other officials at will. *See* 15 U.S.C. § 78s(h)(4)(B). Similarly, the President has no authority to remove a FINRA Board member, executive or officer. And, as explained in *Free Enterprise Fund*, it is generally understood that the President cannot remove SEC Commissioners—those tasked with overseeing FINRA—except for cause. *Free Enterprise Fund,* 561 U.S. at 486. As a result, FINRA's Board members, executives, and officers, are enshrined in the same dual-layer protection that the Supreme Court held violates the Separation of Powers. Accordingly, Alpine is likely to prevail on its Separation of Powers claim.

### ii.  Violation of the Appointments Clause

The Appointments Clause provides that the President shall nominate and appoint "officers of the United States." U.S. Const. art. II, § 2, cl. 2. "Congress may by law vest the appointment of such inferior officers, as they think proper, in the President alone, in the courts of law, or in the heads of departments." *Id.* The clause protects the President's right to lead the executive branch and serves the separation of powers by preventing "Congress from dispensing power too freely; it limits the universe of eligible recipients of the power to appoint." *Freytag v. C.I.R.*, 501 U.S. 868, 880 (1991).

The United States has previously argued in this case that FINRA does not violate the Appointments Clause because the Appointments Clause only applies to officers of the United

States and FINRA's officials cannot be properly characterized as such. However, this argument ignores the fact that "any appointee exercising significant authority pursuant to the laws of the United States is an 'Officer of the United States,' and must, therefore, be appointed in the manner prescribed by § 2, cl. 2 of Article II." *Freytag,* 501 U.S. at 881.  Thus, one is an officer under the Appointments Clause if the office is established by law and vested with significant authority. *Id.*

Here, there is no question that FINRA's leadership possesses and exercises significant authority pursuant to the laws of the United States, as alleged in the Second Amended Complaint and described above. Although there is not an express statutory provision creating or appointing FINRA, it is, in reality, a creation of the government. Through the Exchange Act, Congress established a system of regulation over the securities industry that relies on a registered national securities association. Since 1939, FINRA, or its predecessors, have been the only registered national securities association in the United States. And, as a result of amendments to the Exchange Act, nearly every broker-dealer in the securities industry is now obligated to join FINRA. Under these circumstances, FINRA can be construed as government-created. Given this relationship with the government and FINRA's expansive power to regulate an entire industry, FINRA's officials are subject to the Appointments Clause.

### iii. Violations of the Fifth and Seventh Amendment

FINRA's procedures violate the Fifth Amendment and Seventh Amendment by, among other things, failing to provide due process of law, failing to adhere to protections against self-incrimination, and failing to recognize a right to a jury trial for claims which are akin to common law fraud.

As argued above, the concerns with FINRA's proceedings are exemplified in the Expedited Proceeding. FINRA's effort to use the Expedited Proceeding, before the NAC (much less the SEC) has reviewed the Initial Decision, not only subverts Alpine's right to review but also will deprive Alpine of due process of law. By way of example:

- FINRA commenced the Expedited Proceeding even though the allegedly "unreasonable" fees at issue were known to FINRA and were discussed and considered by the Hearing Panel in the prior proceeding. While FINRA sought and obtained orders in that matter barring the imposition of certain fees, it neither sought nor obtained an order barring Alpine from charging the fees that FINRA now claims are unreasonable.[9] Instead, *after Alpine filed this case challenging FINRA's constitutionality*, FINRA proceeded to lodge additional claims based on evidence of the same conduct that was presented in that prior case.
- While FINRA ordinarily appoints panels consisting of one FINRA Hearing Officer and two non-FINRA panelists, this proceeding will be conducted by a sole FINRA Hearing Officer. *See* FINRA Rule 9559(d).
- In the Expedited Proceeding, FINRA is claiming violations of "obey the law" provisions of the order, which implicates authority limiting the extent to which the SEC can obtain and enforce such orders.[10] Because that authority is based on violations of Federal Rule of Civil Procedure 65(d)(1) and procedural due process, FINRA will likely insist that it can disregard that law.
- In addition, the decision by the single Hearing Officer, including an order expelling Alpine, will become *immediately* effective without any review. FINRA Rule 9559(c)(1).

### iv.  Violation of the First Amendment

The First Amendment recognizes a freedom to associate with particular groups as well as a freedom not to associate. *See Mulhall v. Unite Here Local 355,* 618 F.3d 1279, 1287 (11th Cir. 2010). Indeed, Courts have concluded that "[t]he very act of the state compelling an employee or an attorney to belong to or pay fees to a union or bar association implicates that

---

[9] *See* Fritz Declaration at ¶ 6.  The order did include a prohibition on a market making/execution fee but did so in the context of the aggregate of fees that Alpine charged to its own direct customers.  It did not bar Alpine from collecting a market making fee, just like any other market maker, when it executes trades for an introducing broker.
[10] *See, e.g.*, *SEC v. Goble*, 2012 WL 1918819 (11th Cir. May 29, 2012).

person's First Amendment right not to associate." *Romero v. Colegio De Abogados De Puerto Rico,* 204 F.3d 291, 301 (1st Cir. 2000). This forced association and forced financial contribution is only permissible if there is a strong public interest that justifies the governmental intrusion. *Id.* Where association is compelled or financial support is required for activities wholly unrelated to the public interest, there may be no justification for intruding upon a party's First Amendment associational interests. *Id.* "Simply stated, that an individual may be compelled to associate and financially contribute for some purposes does not mean she may be compelled to associate and financially contribute for all purposes." *Id.*

To participate in the securities industry, broker-dealers are obligated to join and pay fees to a registered national securities association. *See Turbeville* 874 F.3d at 1270-71. Because FINRA is the only such organization, broker-dealers are forced to become FINRA members. "When federal law compels membership in an SRO, the SRO achieves the functional power to regulate the entire industry." Edwards, *Supreme Risk*, *supra*, at 594. At the time it was implemented, the rationale for this compelled membership consisted of a confluence of concerning considerations. A House Congressional Report recognized that an SRO can do what the SEC could not because it would not have to abide by the Constitution. *See* H.R. Rep. 98-106 (1983); Edwards, *Supreme Risk*, *supra*, at 558 ("An SRO, ostensibly a private organization, may not be bound by constitutional requirements, allowing it to enforce vague and undefined rules" such as FINRA Rule 2010). The legislation was also justified by its proponents because it would save money by relieving the SEC of the need to oversee those members of the industry that had opted not to join FINRA. *Id.*; H.R. Rep. 98-106 (1983). As a result, industry members have since been required to forgo the fundamental rights discussed above to participate in the securities industry.

The purported justifications for FINRA's governmental intrusion are grossly outweighed by the significant personal liberty and property implications created by FINRA. Broker-dealers are not only forced to be a part of the organization, but they are also required to subject themselves to FINRA's enforcement staff and in-house tribunals and give up the safeguards and protections guaranteed by the Fifth and Seventh Amendments. Moreover, FINRA members are obligated to fund FINRA's operations. FINRA's operations generated over $1.3 billion in revenue—almost all of which is derived through obligatory fees, fines, and penalties assessed against FINRA members. *See* FINRA's 2021 Financial Annual Report.[11] FINRA uses the funds in a manner that benefits FINRA. In fact, over $1 billion of FINRA's revenues are dedicated to compensation and benefits for FINRA staff and professional and contract services. *Id.* It is apparent from FINRA's expenditures that a significant portion of the financial support it extracts from its members is wholly unrelated to the public interest that FINRA purportedly serves.

In short, the very act of the government compelling Alpine to belong to FINRA implicates and violates Alpine's First Amendment right not to associate. *See Romero,* 204 F.3d at 301; *Mulhall,* 618 F.3d at 1287. Alpine is therefore likely to succeed on its claims for violations of the First Amendment.

### v.  Violation of the private nondelegation doctrine

If the Court were to conclude that FINRA is a private entity and not a state actor, then Congress and the SEC have managed to delegate and outsource enforcement of federal securities law to a private entity that can ignore fundamental constitutional rights.  That kind

---

[11]     https://www.finra.org/sites/default/files/2022-06/2021-FINRA-Financial-Annual-Report.pdf

of outsourcing, when conferred on an entity that need not abide by the Constitution, is not only deeply troubling but also impermissible. "Congress cannot delegate regulatory authority to a private entity." *Dep't of Transp. v. Ass'n of Am. Railroads*, 575 U.S. 43, 61 (2015) (Alito, concurring). "Indeed, Congress, vested with enumerated 'legislative Powers,' Art. I, § 1, cannot delegate its 'exclusively legislative' authority at all." *Id.* As Justice Alito explained, "[t]he principle that Congress cannot delegate away its vested powers exists to protect liberty. Our Constitution, by careful design, prescribes a process for making law, and within that process there are many accountability checkpoints. It would dash the whole scheme if Congress could give its power away to an entity that is not constrained by those checkpoints." *Id.* "When it comes to private entities . . . there is not even a fig leaf of constitutional justification." *Id.*; *see also Carter v. Carter Coal Co.*, 298 U.S. 238, 311 (1936); *Ass'n of Am. R.R.s v. U.S. Dep't of Trasp.*, 721 F.3d 666, 670–74 (D.C. Cir. 2013), *vacated on other grounds*, 575 U.S. 43 (2015).

Further, allowing self-interested private groups like FINRA to enforce their will as law on others undermines fundamental fairness. "Liberty requires accountability." *Id.* "When citizens cannot readily identify the source of legislation or regulation that affects their lives, Government officials can wield power without owning up to the consequences." *Id.*

Here, Congress has delegated its authority to create laws that govern the securities industry to FINRA. In fact, once enacted, FINRA's rules have the force and status of federal law. *Birkelbach v. S.E.C.*, 751 F.3d 472, 475 (7th Cir. 2014). Although the SEC has authority to review, modify, amend and approve FINRA rules, there are also circumstances in which a FINRA rule can be approved without such oversight.  For example, the approval process established by 15 U.S.C. § 78s(b)(2) demonstrates that a proposed FINRA rule may be

"deemed to have been approved by the Commission" if the SEC fails to affirmatively approve or disapprove proposed rule. As a result, FINRA has the ability to enact rules that carry the force of federal law that have never been reviewed or approved by the SEC.

FINRA is also improperly delegated enforcement authority, allowing FINRA to investigate and discipline members to enforce compliance with securities laws. While FINRA's adjudicatory and enforcement functions are subject to SEC oversight, the Expedited Proceeding exemplifies that FINRA has the ability to sidestep such oversight. FINRA has created a mechanism where it can expel an entity from the securities industry without any opportunity for meaningful review. So while the SEC maintains a right to review a disciplinary action, the expansive authority delegated to FINRA has allowed FINRA to sidestep, or at least substantially undermine, that right to review. As such, the FINRA's broad enforcement authority violates the private nondelegation doctrine.

**B.    Alpine will suffer irreparable harm absent an injunction.**

There is no doubt that Alpine will suffer irreparable harm absent an injunction because it will be subject to an unconstitutional administrative proceeding administered by an unconstitutional administrative agency. As Justice Kagan made clear in *Axon*, subjection to an illegitimate proceeding, led by an illegitimate decision maker constitutes "a here-and-now injury." *Axon,* 143 S.Ct. at 903. Justice Kagan's rationale is bolstered by the well-established principle "that the loss of constitutional freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Mills v. District of Columbia,* 571 F.3d 1304, 1312 (D.C. Cir. 2009).

The threat of irreparable harm is even more significant in this case given the imminency of FINRA's actions and the potential resulting harm to Alpine. The hearing in

the Expedited Proceeding is scheduled for May 31, 2023, and an adverse ruling against Alpine would take effect immediately. Under these circumstances, the threat of irreparable harm to Alpine if the injunction is not issued is clear.

**C.    FINRA will not suffer any harm if an injunction is issued and the public interest favors injunctive relief.**

Here, there is a significant public interest in assuring that Alpine is not subject to unconstitutional treatment at the hands of FINRA. "It is always in the public interest to prevent violation of a party's constitutional rights." *Simms v. District of Columbia,* 872 F.Supp.2d 90, 105 (D.D.C. 2012).

The public interest in upholding constitutional rights and the substantial harm to Alpine is juxtaposed against the absence of harm that an injunction would cause FINRA.  An adverse ruling in the Expedited Proceeding against Alpine could destroy the company and harm Alpine's customers. FINRA, on the other hand, waited years[12] to assert these claims and would suffer no prejudice from allowing this Court to consider Alpine's constitutional arguments.

**D.    The bond requirement should be waived.**

Alpine recognizes the security requirements set forth in Rule 65(c). But "Courts in this Circuit have found the Rule vests broad discretion in the district court to determine the appropriate amount of an injunction bond, including the discretion to require no bond at all." *Simms*, 872 F. Supp. 2d at 107 (internal citations and quotations omitted)

"[W]aiving the bond requirement is particularly appropriate where a plaintiff alleges

---

[12] It is difficult not to question FINRA's motive in filing the Expedited Proceeding within days of the Supreme Court's decision in *Axon*. The obvious implication is that FINRA wanted to be judge, jury, and executioner before a possible adverse ruling in this case stripped it of its illegal power.

the infringement of a fundamental constitutional right." *Honeyfund.com, Inc. v. DeSantis*, 2022 WL 3486962, at *15 (N.D. Fla. Aug. 18, 2022) (citations omitted). Given the constitutional rights at issue and the unique circumstances of this case, waiving the bond requirement is appropriate. *See id.*

WHEREFORE, Plaintiff, Alpine Securities Corporation, respectfully requests that the Court grant the Motion and enter the attached proposed preliminary injunction order against Defendant, Financial Industry Regulatory Authority, Inc., and grant such further relief as the Court deems just and proper.

Dated: May 30, 2023                          Respectfully submitted,

Kenneth G. Turkel* – FBN 867233              /s/     *David H. Thompson*
E-mail:  kturkel@tcb-law.com                 David H. Thompson
David A. Hayes* – FBN 096657                 (Bar No. 450503)
E-mail:  dhayes@tcb-law.com                  Cooper & Kirk, PLLC
TURKEL CUVA BARRIOS, P.A.        and         1523 New Hampshire Ave, N.W.
100 North Tampa Street, Suite 1900           Washington, D.C. 20036
Tampa, FL  33602                             Phone: (202) 220-9649
Phone: (813) 834-9191                        dthompson@cooperkirk.com

                                             Maranda E. Fritz*
                                             maranda@fritzpc.com
                                             Maranda E. Fritz PC
                                             521 Fifth Avenue 17th Floor
                                             New York, New York 10175
                                             Phone: (646) 584-8231
                                             *Attorneys for Plaintiffs*
                                             *\*Pro hac vice application forthcoming*