UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| SCOTTSDALE CAPITAL ADVISORS CORP. *et al.*,<br><br>Plaintiffs,<br><br>v.<br><br>FINANCIAL INDUSTRY REGULATORY AUTHORITY, INC.,<br><br>Defendant,<br><br>UNITED STATES OF AMERICA,<br><br>Defendant-Intervenor. | Case No. 1:23-cv-1506-BAH |

**SUPPLEMENTAL BRIEF OF THE UNITED STATES OF AMERICA
IN RESPONSE TO THE COURT'S JUNE 1, 2023 MINUTE ORDER**

For the reasons stated at yesterday's hearing and in Tuesday's merits brief of the United States, ECF No. 68, this Court should hold that Plaintiffs are unlikely to succeed on the merits of any of their claims. In short, the Financial Industry Regulatory Authority (FINRA) "is a Delaware not-for-profit corporation," Second Am. Compl. ¶ 31, ECF No. 43, and "a private self-regulatory organization [SRO]," *Saad v. SEC*, 980 F.3d 103, 104 (D.C Cir. 2020), which "function[s] subordinately," *Sunshine Anthracite Coal Co. v. Adkins*, 310 U.S. 381, 399 (1940), to the Securities and Exchange Commission (SEC) in overseeing securities markets. As ordered by the Court, the United States now submits this supplemental memorandum on the topics identified by the Court in its June 1, 2023 Minute Order.

**Topic 1: The consequences of holding that FINRA is a state actor**

This topic arguably raises two distinct sets of concerns: (a) the consequences of holding that FINRA is part of the federal government for constitutional purposes, *see Lebron v. Nat'l*

*R.R. Passenger Corp.*, 513 U.S. 374 (1995), and (b) the consequences of holding that FINRA, although a private entity, engages in "state action" within the meaning of the state-action doctrine.  The United States will briefly address both.

**a.**  Holding that FINRA "is part of the Government," *id.* at 399, would suggest, at a minimum, that FINRA is subject to the Appointments Clause and that tenure protections for certain FINRA officials might be subject to separation-of-powers challenges.  *See generally Free Enterprise Fund v. Public Co. Accounting Oversight Board*, 561 U.S. 477 (2010).  Currently, because FINRA's officials are employees of a private, non-profit Delaware corporation, rather than "Officers of the United States," U.S. Const. art. II, § 2, cl. 2, no FINRA official is appointed in a manner that is consistent with the Appointments Clause (because the Appointments Clause is not applicable to a private corporation like FINRA).  As a result, disrupting this understanding by holding that FINRA is part of the government could expose FINRA's rulemaking and enforcement proceedings (among other FINRA activities) to potential constitutional challenges.  *Cf., e.g.*, *Lucia v. SEC*, 138 S. Ct. 2044, 2055 (2018) ("To cure the constitutional error, another ALJ (or the Commission itself) must hold the new hearing to which Lucia is entitled.").

Although the United States still might argue that some or all of those actions were constitutionally valid in the first instance, that they were (or could be) ratified by the SEC, or that there had not been timely objections to those actions, or raise other arguments regarding the nature of an appropriate remedy, the immediate uncertainty and chaos that would likely result from such a holding is hard to overstate.  In addition, such a holding might call into question the constitutional status of some of the many other "private self-regulatory organizations in the securities industry—such as the New York Stock Exchange—that investigate and discipline their own members subject to [SEC] oversight," *Free Enterprise Fund*, 561 U.S. at 484—despite the Supreme Court's efforts to avoid that very result in *Free Enterprise Fund* itself.[1]

---

[1] The SEC's website provides a list of dozens of other self-regulatory organizations: https://www.sec.gov/rules/sro.shtml.

**b.** Holding that FINRA (although a private entity) engages in state action could have similarly far-reaching consequences, although the extent of those consequences would vary significantly depending on the nature of the Court's holding and to which of Plaintiffs' claims the Court applied that holding. *See United States v. Solomon*, 509 F.2d 863, 871 (2d Cir. 1975) (Friendly, J.) ("Analysis of the particular constitutional provision at issue must be among the first, if not the very first, step in the process of sifting facts and weighing circumstances needed to attribute true significance to the nonobvious involvement of the State in private conduct." (internal quotation marks omitted)). But, to be clear, any finding of state action would plainly thwart Congress's judgment to retain this centuries-old system of private self-regulation and "the flexibility and informality of [SRO] decision-making procedures" that it entails. S. Rep. No. 94-75, at 22 (1975).

**1.** Solely with respect to Plaintiffs' arguments about procedural due process, the consequences of finding state action should be comparatively muted—because FINRA already provides its members with extensive procedural protections, as required by Congress and the SEC. FINRA is statutorily required to "provide a fair procedure" in its disciplinary actions. 15 U.S.C. § 78o-3(b)(8); *see also In re Robert D. Tucker*, Exchange Act Release No. 68210, 2012 WL 5462896, at *12 (Nov. 9, 2012); FINRA Rules 9000–9870 (FINRA's code of procedure). FINRA must "bring specific charges, notify such member or person of, and give him an opportunity to defend against, such charges, and keep a record." 15 U.S.C. § 78o-3(h)(1). If proposing a sanction, FINRA "shall" provide a supporting statement setting forth the act or practice in which the disciplined person has been found to have engaged; the "specific" legal requirements that the person violated; and the sanction imposed and the reason therefor. *Id.* In the context of procedural-due-process claims, courts have thus held that an inquiry into FINRA's state-actor status is "pointless," in light of FINRA's statutory obligation to provide members "the substance of procedural due process." *Cody v. SEC*, 693 F.3d 251, 257 (1st Cir. 2012).

Beyond FINRA itself, the SEC vigorously enforces these procedural requirements. Indeed, it has vacated a FINRA sanction against Scottsdale's founder and owner John Hurry on

3

the ground that "the NAC's theory of liability was fundamentally different than the one FINRA pursued throughout its proceedings, and that it was unfair for the NAC to impose liability on him under the circumstances." *In re Scottsdale*, Exchange Act Release No. 93052, 2021 WL 4242630, at *8 & n.17 (Sept. 17, 2021) ("[W]e have consistently set aside findings of violations based on uncharged theories of liability."). And if the SEC does not satisfy its review obligations, reviewing courts will reverse. *See, e.g.*, *Saad v. SEC*, 718 F.3d 904 (D.C. Cir. 2013); *PAZ Secs., Inc. v. SEC*, 494 F.3d 1059 (D.C. Cir. 2013).

**2.** Beyond procedural due process, however, finding state action here could have significant and uncertain ramifications for the SEC's oversight role of FINRA and other self-regulatory entities. The focus of Plaintiffs' motion for time-sensitive injunctive relief has been FINRA's disciplinary proceedings, which play an important role in FINRA's efforts to police its own membership, as part of a self-regulatory scheme that dates back to the founding era, and that Congress has endorsed since the 1930s. But, in addition to policing their own members, SROs like FINRA perform a myriad of other critical functions relating to the healthy functioning of securities markets—including, for example, setting listing standards for publicly traded stock, *see Business Roundtable v. SEC*, 905 F.2d 406 (D.C. Cir. 1990); distributing price quotations, orders, and other data among market participants, *see Intercontinental Exchange, Inc. v. SEC*, 23 F.4th 1013 (D.C. Cir. 2022); *Nasdaq Stock Market LLC v. SEC*, 34 F.4th 1105 (D.C. Cir. 2022); *Bloomberg L.P. v. SEC*, 45 F.4th 462 (D.C. Cir. 2022); and providing securities settlement and clearing services that make possible the electronic trading of securities, *see Whistler Investments, Inc. v. Depository Trust and Clearing Corp.*, 539 F.3d 1159 (9th Cir. 2008).

Congress has consistently made the judgment that self-regulation strikes a "mutually beneficial balance between government and securities industry interests." SEC, *Concept Release Concerning Self-Regulation*, Exchange Act Release No. 50700, 2004 WL 2648179, at *4 (Nov. 18, 2004). "[R]ather than adopt [a] purely governmental approach," *id.*, Congress decided it was "distinctly preferable" to rely on "cooperative regulation, in which the task will be largely performed by representative organizations of investment bankers, dealers, and brokers, with the

4

Government exercising appropriate supervision in the public interest, and exercising supplementary powers of direct regulation," *id.* (quoting H.R. Rep. No. 75-2307, at 4).

To be sure, within this framework, the SEC has important oversight responsibilities. *See, e.g., Susquehanna Int'l Gr., LLP v. SEC*, 866 F.3d 442 (D.C. Cir. 2017). It takes those responsibilities seriously. But, under the system that Congress established, when the SEC exercises its supervisory role, it does so against the fundamental background principle that FINRA and other SROs are private entities. Deeming FINRA to be a state actor could change that settled understanding, alter the contours of SEC-SRO relationships in unanticipated and problematic ways, and dramatically upend Congress's judgment for how to best regulate the nation's securities markets—markets that are vital to the health of our economy and to the role of the United States as an economic leader on the world stage.

**Topic 2: Plaintiffs' First Amendment claim**

**a.** Plaintiffs' First Amendment challenge to the statutory requirement to join an SRO like FINRA as a condition of engaging in the broker-dealer industry has no merit absent an allegation that FINRA has engaged in any activity—much less expressive activity—that is not germane to its purpose. The Supreme Court has articulated clearly that when the state compels payment of professional association membership dues, the First Amendment right of association is implicated *only* to the extent that those dues are used to fund activities that are not "reasonably incurred for the purpose of regulating the . . . profession." *Keller v. State Bar*, 496 U.S. 1, 13–14 (1990). In other words, in the context of state bar associations, compelled contributions may be used to fund activities that are "germane to th[e] goals" of "regulating the legal profession and improving the quality of legal services." *Id.*; *see also Braintree Elec. Light Dep't v. FERC*, 550 F.3d 6, 14 (D.C. Cir. 2008) ("Expenditures are germane to an organization's purpose where they are necessarily or reasonably incurred for the purpose of the organization." (internal quotation marks omitted)).

Plaintiffs do not allege that FINRA has engaged in any activity that is not germane to its purpose. *See* Second Am. Compl. ¶¶ 100–10. To the contrary, they complain that FINRA uses

5

dues to fund its "operations," *id.* ¶ 104, including its "enforcement staff, in-house tribunals, and adjudicatory procedures," *id.* ¶ 103, and "executive salaries," *id.* ¶ 109.  These operations are not only germane but are in fact central to FINRA's purpose, including the development of industry rules and standards and self-policing its membership.  *Cf., e.g.*, *Keller*, 496 U.S. at 16 ("Compulsory dues may not be expended to endorse or advance a gun control or nuclear weapons freeze initiative; at the other end of the spectrum petitioners have no valid constitutional objection to their compulsory dues being spent for activities connected with disciplining members of the Bar or proposing ethical codes for the profession.").  Plaintiffs have therefore failed to state a valid First Amendment challenge to the statutory requirement that they join an SRO like FINRA and pay dues as a condition of participating in the industry.[2]

**b.**  There is a strong public interest supporting the requirement that participants in the broker-dealer industry register as members of FINRA.  *See* 15 U.S.C. § 78o(a)(1), (b)(1).  As the D.C. Circuit has emphasized, "[t]he broker-dealer registration requirement serves as the keystone of the entire system of broker-dealer regulation," which serves the important public interest of "protect[ing] prospective purchasers of securities."  *Roth v. SEC*, 22 F.3d 1108, 1109 (D.C. Cir. 1994) (internal quotation marks omitted); *see also Eastside Church of Christ v. Nat'l Plan, Inc.*, 391 F.2d 357, 362 (5th Cir. 1968) ("The requirement that brokers and dealers register is of the utmost importance in effecting the purposes of the [Securities Exchange] Act.").

---

[2] Alpine relies heavily on the First Circuit's decision in *Romero v. Colegio De Abogados De Puerto Rico*, 204 F.3d 291 (1st Cir. 2000), in contending that "the very act of the government compelling Alpine to belong to FINRA implicates and violates Alpine's First Amendment right not to associate." Pl.'s Mot. at 20, ECF No. 66.  But *Romero* does not support Alpine's argument here.  Before the First Circuit, the plaintiff in *Romero* was not challenging "the very act of the government compelling [him] to belong," Pl.'s Renewed Mot. at 20, to the Puerto Rican bar association, *see Romero*, 204 F.3d at 293.  Rather, he challenged the association's requirement that he purchase life insurance, the premium for which constituted 72% of the association dues some years.  *Id.*  The First Circuit applied *Keller*'s germaneness test and held the life-insurance requirement unconstitutional because it was not germane to the purposes of the bar association.  *Id.* at 300–02.  Here, as explained, Alpine has failed to identify any activity by FINRA that is not germane to its purpose.

By registering as members of an SRO, industry actors are subject to "extensive recordkeeping and reporting obligations, fiduciary duties, and special antifraud rules." *In re Registration Requirements for Foreign Broker-Dealers*, Exchange Act Release No. 34-27017, 1989 WL 1097092, at *3–4 (July 11, 1989). The registration requirement and attendant supervision by an SRO "provide important safeguards to investors" by ensuring that those participating in the industry "have the requisite professional training," must "conduct their business according to regulatory standards," are "financially capable of transacting," and treat their customers "fairly," including providing "adequate disclosure." SEC, *Persons Deemed Not to Be Brokers*, Exchange Act Release No. 22172, 1985 WL 634795, at *2 (June 27, 1985). The Act's requirements are thus designed "to ensure that securities are only sold by a salesman who understands and appreciates both the nature of the securities he sells and his responsibilities to the investor to whom he sells." *Roth*, 22 F.3d at 1109 (brackets and internal quotation marks omitted).

In short, registration and oversight are critical to "promot[ing] both investor protection and the integrity of the brokerage community." *Id.*

Dated: June 2, 2023           Respectfully submitted,

                                                        BRIAN M. BOYNTON
Principal Deputy Assistant Attorney General

LESLEY FARBY
CHRISTOPHER HALL
Assistant Branch Directors

*/s/ Stephen M. Pezzi*
STEPHEN M. PEZZI (D.C. Bar No. 995500)
 Senior Trial Counsel
CHRISTINE L. COOGLE (D.C. Bar No. 1738913)
 Trial Attorney
United States Department of Justice
Civil Division
Federal Programs Branch
1100 L Street NW
Washington, D.C. 20005
Telephone: 202-305-8576
Email: stephen.pezzi@usdoj.gov

*Counsel for the United States of America*