IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| Scottsdale Capital Advisors Corporation and Alpine Securities Corporation,<br>        Plaintiffs,<br>   v.<br><br>Financial Industry Regulatory Authority, Inc.,<br>        Defendant,<br><br>United States of America,<br>        Intervenor Defendant. | Case No. 1:23-cv-01506-BAH<br><br>**SUPPLEMENTAL BRIEF IN OPPOSITION TO PLAINTIFF'S RENEWED EMERGENCY MOTION FOR PRELIMINARY INJUNCTION AND TEMPORARY RESTRAINING ORDER** |

In response to this Court's June 1 minute order requesting further briefing, Defendant Financial Industry Regulatory Authority, Inc. ("FINRA") respectfully submits this supplemental brief in opposition to the Renewed Emergency Motion for Preliminary Injunction and Temporary Restraining Order filed by Plaintiff Alpine Securities Corporation ("Alpine" and, together with Scottsdale Capital Advisors Corporation, "Plaintiffs"). As explained below, the Court should deny Alpine's motion because: (i) if accompanied by the issuance of injunctive relief, deeming FINRA to be a state actor would leave Alpine free to continue victimizing its customers through oppressive fees and overbearing practices; (ii) deeming FINRA to be a state actor would eviscerate the private self-regulatory framework that Congress adopted to oversee the securities industry and compel countless closely regulated private companies (both self-regulatory organizations ("SROs") and beyond) to comply with federal constitutional requirements; and (iii) Alpine does not have a First Amendment right to refuse to join FINRA.

I.       ARGUMENT

A.       **An Unprecedented Ruling That FINRA Is A State Actor Would Represent A Seismic Shift In The Law And Inflict Serious Real-World Harms.**

"Courts have repeatedly held that FINRA is a private entity and not a governmental functionary." *McGinn, Smith & Co. v. FINRA*, 786 F. Supp. 2d 139, 147 (D.D.C. 2011). Departing from that unanimous consensus would have profound practical and jurisprudential consequences. FINRA is charged by Congress with carrying out a critical regulatory mission that ensures that the broker-dealers on which Americans rely to transact trillions of dollars in securities trades each year are conducting themselves honestly, fairly, and in accordance with law. If accepted, Alpine's arguments would upend that regulatory framework—leaving Alpine free to continue betraying the trust of its customers—and subject not only FINRA but also vast swaths of the private economy to federal constitutional requirements.

1.       **A Ruling That FINRA Is A State Actor Would Give Alpine License To Continue Victimizing Its Customers.**

The Securities Exchange Act ("Exchange Act") requires FINRA "to protect investors and the public interest," 15 U.S.C. § 78o-3(b)(6), including by enforcing compliance by its members with the Exchange Act, the Exchange Act's implementing regulations, and FINRA's own rules, *see, e.g.*, *id.* § 78s(g)(1)(B). A ruling that FINRA is a state actor, if accompanied by the injunctive relief Alpine is seeking, would halt FINRA's pending disciplinary proceeding against Alpine and inflict substantial harm on Alpine's customers, who continue to be subject, on an ongoing basis, to Alpine's unreasonable fees and egregious violations of the March 2022 cease-and-desist order.[1]

---

[1] As explained at the June 1 hearing and in the Department of Justice's brief, D.E. 68, a ruling that FINRA is a state actor, standing alone, would not satisfy Alpine's burden to show a substantial likelihood of success on the merits of its claims. While the absence of state action serves as a threshold barrier to all of Alpine's constitutional claims (other than its private nondelegation claim and First Amendment claim), a finding of state action still would not entitle Alpine to injunctive relief because it has not demonstrated that FINRA would violate the Appointments Clause,

FINRA initiated its current enforcement proceeding against Alpine to put a stop to Alpine's serial misconduct.  After a months-long investigation that included multiple witness interviews and document requests, FINRA's Enforcement staff uncovered evidence that Alpine has violated the cease-and-desist order more than 35,000 times and that it is continuing to violate the order on a daily basis by charging unlawful fees and commissions that, to date, total more than $4 million.  *See* D.E. 70-2 at 2-3.  The violations include conduct that was specifically forbidden in the March 2022 order, including charging an "'illiquidity and volatility fee'" that Alpine simply "re-branded" as the Alpine Capital Allocation Charge and that it continues to assess in direct contravention of that order.  *See* D.E. 70-2 at 9-10.  Alpine's onerous fees represent substantial impositions on its customers—on at least 2,622 occasions, they exceeded 5% of the principal amount of a customer's transaction and they have ranged as high as 30% of the principal amount.  D.E. 70-2 at 15-16.

A ruling that FINRA is a state actor and that Alpine is entitled to injunctive relief would enable Alpine to continue charging these unfair, unreasonable, and unlawful fees and preclude FINRA from discharging its regulatory mission of "protect[ing] investors" from Alpine's longstanding, and still ongoing, misconduct.  15 U.S.C. § 78o-3(b)(6).

2. **A Ruling That FINRA Is A State Actor Would Upend Congress's Self-Regulatory Framework For The Securities Industry And Subject Large Sectors Of The Private Economy To Constitutional Constraints.**

If this Court were to break new jurisprudential ground by deeming FINRA to be a state actor, its ruling would critically undermine Congress's "private self-regulatory" framework for the securities industry, *Free Enter. Fund v. Public Co. Accounting Oversight Bd.*, 561 U.S. 477, 487 (2010), and open the door to imposing federal constitutional requirements on closely regulated

---

separation-of-powers requirements, or the Fifth or Seventh Amendments even if deemed to be a state actor.

companies in a vast range of industries, from railroads and airlines to utilities and hospitals.

As an initial matter, while Alpine attempted to cast its claims at the June 1 hearing as a "narrow" challenge to FINRA's disciplinary proceeding against Alpine, that characterization is belied by the allegations in Plaintiffs' Second Amended Complaint. Those allegations make clear that this suit is a facial constitutional challenge to FINRA that "challenge[s] the constitutionality of FINRA's structure and operations" and that is "*collateral* to any administrative proceeding involving Plaintiffs." SAC ¶ 33 (emphasis added). In particular, Plaintiffs seek a declaration from this Court that "FINRA is a state actor" subject to constitutional requirements, a declaration that "FINRA is presently constituted and operating in a manner that violates the constitution," and an order enjoining FINRA from "continuing its unlawful and unconstitutional operation." SAC, Prayer For Relief. Only by demonstrating a substantial likelihood of success on the merits of one or more of its broad, facial challenges to FINRA would Alpine satisfy the first of the four prerequisites to injunctive relief.

The repercussions of endorsing Alpine's far-reaching state-action argument would be profound. When adopting the Exchange Act, Congress concluded that private self-regulation of the securities industry—a model that "preexisted federal regulation," *Bernstein v. Lind-Waldock & Co.*, 738 F.2d 179, 186 (7th Cir. 1984)—should be retained because it struck "a mutually beneficial balance between government and securities industry interests" by allowing for "supervis[ion] by an organization familiar with the nuances of security industry operations" and permitting the government to "benefit[ ] by being able to leverage its resources through its oversight function." SEC Concept Release Regarding Self-Regulation, Securities Exchange Act Release No. 50700, 69 Fed. Reg. 71,256, 71,257 (Dec. 8, 2004); *see also* S. Rep. No. 94-75, at 23 (concluding that the "self-regulatory roles of the exchanges and the NASD have been major elements of the regulatory

scheme of the Exchange Act since 1934 and 1938," and that self-regulation "should be preserved and strengthened"). Pursuant to that congressional plan, FINRA and other SROs have functioned effectively and efficiently for decades as private actors responsible for carrying out frontline regulation of the securities industry, subject to oversight by the federal government. This self-regulatory model enforces "ethical standards beyond those any law can establish," "effective[ly] reach[ing]" areas that "self-government and self-government alone" can monitor. H.R. Rep. No. 88-95, pt. 4, at 695 (1963).

A ruling that FINRA is a state actor would impair the effectiveness and efficiency of the private self-regulation that Congress enshrined in the Exchange Act by subjecting FINRA to the same constitutional (and other legal) requirements—from the First Amendment to the Seventh Amendment and beyond—as the federal government. Imposing those constitutional constraints on FINRA would thwart FINRA's investigative and enforcement efforts by imposing unwarranted constitutional roadblocks on its oversight of its broker-dealer members. Because FINRA lacks subpoena power, it relies on its ability to enforce compliance with its rules to obtain the information it needs for inspections, examinations, and enforcement actions. For example, FINRA Rule 8210 requires members and persons associated with members to submit to on-the-record interviews in conjunction with a FINRA investigation or proceeding. If FINRA were determined to be a state actor, however, individuals could nullify those requirements and FINRA's oversight duties by asserting a Fifth Amendment privilege not to testify. *See D.L. Cromwell Invs., Inc. v. NASD Regul., Inc.*, 279 F.3d 155, 156-57, 162 (2d Cir. 2002) (rejecting allegations that NASD Regulation's requirement of on-the-record interviews under NASD Rule 8210 violated Fifth Amendment rights because NASD was not a state actor); *Marchiano v. NASD*, 134 F. Supp. 2d 90, 91-92, 95 (D.D.C. 2001) (concluding that NASD was not a state actor in action seeking to

enjoin disciplinary proceeding and challenging constitutionality of NASD Rule 8210).  Over the years, Congress has specifically sought to avoid transforming SROs into "[g]overnment agencies," S. Rep. No. 94-75, at 28-29 (1975), precisely because "it would be self-defeating to saddle the self-regulatory organizations with the whol[e] panoply of Governmental administrative procedure."  *Id.* at 29.  Congress opted instead for "the flexibility and informality of [SROs'] decision-making procedures" that are the chief virtues of self-regulation.  *Id.*  A ruling treating FINRA as a state actor would override that congressional judgment by constitutionalizing the heretofore private field of broker-dealer regulation.

Moreover, by impairing FINRA's regulatory capabilities, the ruling would dramatically increase the regulatory workload of the SEC, which would no longer be able to depend on FINRA's first-line regulatory oversight of the broker-dealer industry and would instead be required to shoulder many of the regulatory responsibilities that Congress delegated to FINRA in the first instance.  *See* SEC Div. of Mkt. Regul., *Market 2000: An Examination of Current Equity Market Developments* VI-6 (Jan. 1994) ("the resources necessary for the Commission to assume SRO regulatory functions directly and effectively are not realistically attainable"), https://tinyurl.com/2wyzd9wr.  Indeed, the SEC has explained that it "attempted to undertake direct SRO level regulatory duties in the past," but "ultimately requested that Congress terminate [that] program because the Commission could not effectively carry out the detailed responsibilities required."  SEC Concept Release Regarding Self-Regulation, 69 Fed. Reg. at 71,282.  Treating FINRA as a state actor would upend the well-functioning status quo.

The Court's ruling would also sweep in dozens of other SROs responsible for carrying out enforcement functions and other regulatory responsibilities subject to federal government oversight.  Under the Exchange Act, "*[e]very* self-regulatory organization" is required to "enforce

compliance" with "its own rules"—the obligation applies equally to a "registered securities association" like FINRA, to "national securities exchange[s]" like the New York Stock Exchange, The Nasdaq Stock Market LLC, and Cboe Exchange, Inc., and to a "registered clearing agency" like the Depository Trust Company or The Options Clearing Corporation.  15 U.S.C. § 78s(g)(1)(A), (B), (C); *see also*, *e.g.*, *id.* § 78s(h)(1)(A), (B), (C) (providing authority for supervising regulatory agency to suspend or sanction SRO for failure to enforce compliance with its own rules); SEC, Self-Regulatory Organization Rulemaking (identifying dozens of national securities exchanges, registered securities associations, notice registered securities future product exchanges, securities futures associations, registered clearing agencies, and other SROs overseen by the SEC), https://www.sec.gov/rules/sro.shtml.  The Supreme Court was well aware of the role of "private self-regulatory organizations" to "investigate and discipline their own members subject to Commission oversight" when it expressly contrasted those *private* bodies with the "Government-created, Government-appointed" PCAOB.  *Free Enter. Fund*, 561 U.S. at 484-85; *cf.* Reply of Petitioner, *Free Enter. Fund*, 2009 WL 4099526, at *23 (U.S. 2009) (explaining that "the lower courts have uniformly ruled that the SEC's control over SROs' investigative activities is not sufficiently pervasive to render those activities 'state action' subject to the Constitution").

Because these other SROs have similar regulatory responsibilities and are subject to similar government oversight as FINRA, it would be impossible to cabin a state-action ruling to FINRA alone.  The real-world consequences of opening the door to state-action challenges to these other SROs are underscored by the fact that a number of SROs have been designated as "systemically important" by the Financial Stability Oversight Council, which means that the failure of or disruption to the proper functioning of those entities could create the risk of significant liquidity or credit problems spreading among financial institutions or markets and thereby threaten the stability of

the U.S. financial system.  *See* Financial Stability Oversight Council Makes First Designations in Effort to Protect Against Future Financial Crises (July 18, 2012), https://home.treasury.gov/news/press-releases/tg1645 (announcing designation of eight entities as systemically important, including the Chicago Mercantile Exchange, Inc., the Depository Trust Company, and The Options Clearing Corporation).

Nor would the ramifications of a ruling deeming FINRA to be a state actor be limited to other SROs.  The ruling would also implicate other private companies that carry out regulatory responsibilities that would otherwise be performed by the government.  As Judge Friendly recognized in rejecting a state-action challenge to the New York Stock Exchange, there was "no principled basis" to confine the Fifth Amendment argument raised in that case to "interrogation by stock exchanges" because that is "but one of many instances where the government relies on self-policing by private organizations to effectuate the purposes underlying federal regulating statutes." *United States v. Solomon*, 509 F.2d 863, 869-70 (2d Cir. 1975).

FINRA and other SROs—which are subject to the "formidable oversight power[s]" of the SEC or other federal regulatory agencies, *In re NYSE Specialists Sec. Litig.*, 503 F.3d 89, 101 (2d Cir. 2007)—are also indistinguishable, in that respect, from many other heavily regulated industries.  As a result, deeming FINRA to be a state actor would threaten to federalize "much of the private sector, ranging from hospitals to railroads." *Bernstein*, 738 F.2d at 186 (Chicago Mercantile Exchange not a state actor because "the fact that it is heavily regulated by a federal commission will not do").  That outcome would directly contravene the Supreme Court's repeated rejection of attempts to equate heavy regulation with state action.  As the Court recently reaffirmed, "the 'being heavily regulated makes you a state actor' theory of state action is entirely circular" and "would significantly endanger individual liberty and private enterprise."  *Manhattan Community Access*

*Corp. v. Halleck*, 139 S. Ct. 1921, 1932 (2019); *see Jackson v. Metro. Edison Co.*, 419 U.S. 345, 350 (1974) (the fact that public utilities are subject to "extensive and detailed" regulation does not make them state actors).[2]

For all of these reasons, there is an unbroken line of cases ruling that FINRA and its predecessor NASD are not state actors because "Congress preferred self-regulation by a *private* body over direct involvement of a governmental agency." *First Jersey Sec., Inc. v. Bergen*, 605 F.2d 690, 698 (3d Cir. 1979) (emphasis added); *see also* D.E. 70 at 5-7 & nn.3-4 (collecting cases). As the SEC recently recognized in another state-action case, departing from that unanimous view would "thwart Congress's repeated determination to retain the system of private self-regulation" for the securities industry. SEC Br. 41, *All. for Fair Bd. Recruitment v. SEC*, No. 21-60626, 2022 WL 585351, at *42 (5th Cir. Feb. 18, 2022). Alpine has identified no reason that this Court should take that momentous and deeply destabilizing step.

**B.      Alpine's First Amendment Claim Fails As A Matter Of Law Because The Statutory Requirement To Join FINRA Does Not Impair Alpine's First Amendment Rights.**

According to Alpine, "the obligation to join FINRA violates [its] First Amendment right not to associate" because it is forced "to support and fund FINRA, including FINRA's excessive and unnecessary executive and staff salaries, its unfair and biased enforcement process, and its unconstitutional use of its power." SAC ¶¶ 165, 171. Even accepting Alpine's unsubstantiated

---

[2] For the same reasons, the Supreme Court cautioned that "'very few' functions fall into" the category of "traditional, exclusive public function[s]" sufficient to give rise to state action—a standard that the Court has found met only with respect to running elections and operating a company town. *Halleck*, 139 S. Ct. at 1929. Regulation of the securities industry, in contrast, is a historically *private* function undertaken by exchanges and securities associations—not the government. *See* 69 Fed. Reg. at 71,257. That fact decisively distinguishes *NB ex rel. Peacock v. District of Columbia*, 794 F.3d 31 (D.C. Cir. 2015), where a private company was treated as a state actor when it was carrying out the traditional and exclusive government function of administering Medicaid, a federal benefits program, *id.* at 43.

factual allegations as true for present purposes, they are insufficient to state a First Amendment claim.

The Supreme Court has made clear that the First Amendment does not afford members of a regulated profession the right to refuse to join a mandatory professional organization. Reaffirming its earlier decision in *Lathrop v. Donohue*, 367 U.S. 820 (1961), the Court explained in *Keller v. State Bar of California*, 496 U.S. 1 (1990), that "lawyers admitted to practice in [a] State may be required to join and pay dues to the State bar." *Id.* at 4; *see also id.* at 8 ("'a State may constitutionally condition the right to practice law upon membership in an integrated bar association'" (quoting *Lathrop*, 367 U.S. at 849 (Harlan, J., concurring in the judgment)). Those holdings apply with equal force to the provisions of the Exchange Act requiring that broker-dealers join a national securities association. *See* 15 U.S.C. §§ 78o(a)(1), (b)(1). Just as there is no First Amendment right for a lawyer to refuse to join a state bar association, there is no First Amendment right for a broker-dealer to refuse to join FINRA. *See Romero v. Colegio de Abogados de Puerto Rico*, 204 F.3d 291, 296 (1st Cir. 2000) ("It is well settled that conditioning the practice of law on membership in a state bar association does not itself violate the First Amendment.").

Compelled membership in a professional organization infringes First Amendment rights *only* where membership dues are being used for "ideological activities not 'germane' to the purpose for which compelled association was justified." *Keller*, 496 U.S. at 13. Because compelled membership in a state bar association is "justified by the State's interest in regulating the legal profession and improving the quality of legal services," a state bar may "constitutionally fund activities germane to those goals out of the mandatory dues of all members," but "may not . . . fund activities of an ideological nature which fall outside of those areas of activity." *Id.* at 13-14. These principles are not limited to the state-bar context. For instance, in *Menkes v. U.S.*

10

*Department of Homeland Security*, 637 F.3d 319 (D.C. Cir. 2011), the D.C. Circuit affirmed the dismissal of a First Amendment right-of-association challenge to a Coast Guard policy requiring a pilot to become a member of the St. Lawrence Seaway Pilots' Association to be dispatched as a pilot, explaining that there were no allegations that the association "used, or threatened to use, any of [the challenger's] funds for political or ideological activities unrelated to pilotage." *Id.* at 334-35.

Alpine does not allege that FINRA is using its membership dues for *any* "ideological activities"—let alone ideological activities that are not germane to FINRA's regulatory mission of "protect[ing] investors and the public interest." 15 U.S.C. § 78o-3(b)(6). Under *Keller* and *Menkes*, this is fatal to Alpine's First Amendment claim.

In Alpine's preliminary-injunction motion, it cites to a First Circuit decision that extends the First Amendment's protections in the compelled-membership setting beyond "ideological activities not 'germane' to the purpose for which compelled association was justified," *Keller*, 496 U.S. at 13, to *non*-ideological activities that are not "germane" to the organization's purposes. *See Romero*, 204 F.3d at 299 ("there is a germaneness requirement before payment may be compelled for non-ideological expenditures") (footnote omitted); *see also* D.E. 66 (P.I. Mot.) at 19. The D.C. Circuit has never endorsed that expansive reading of *Keller*. But even if this Court were to apply the First Circuit's standard, Alpine's First Amendment claim would still fail as a matter of law because FINRA's challenged uses of Alpine's membership dues—carrying out FINRA's enforcement responsibilities and compensating its employees, SAC ¶¶ 165-67—are all "reasonable and necessary given the purposes of the organization" and thus "germane" to FINRA's purposes. *Romero*, 204 F.3d at 299. Indeed, ensuring members' compliance with the securities laws and FINRA's rules—through the deployment of a robust arsenal of surveillance and enforcement

11

tools—rests at the heart of FINRA's statutorily delegated regulatory mission. *See* 15 U.S.C. § 78o-3(b)(2) ("An association of brokers and dealers shall not be registered as a national securities association unless the Commission determines that [s]uch association is so organized and has the capacity to be able . . . *to enforce compliance by its members and persons associated with its members*, with the provisions of this chapter, the rules and regulations thereunder, . . . and the rules of the association.") (emphasis added).

That regulatory mission—together with the statutory requirement that broker-dealers join a national securities association and subject themselves to its oversight—advances multiple public-interest objectives identified by Congress, including "prevent[ing] fraudulent and manipulative acts and practices," "promot[ing] just and equitable principles of trade," "remov[ing] impediments to and perfect[ing] the mechanism of a free and open market and a national market system," and "protect[ing] investors." 15 U.S.C. § 78o-3(b)(6). Those compelling public-interest considerations—foundational to ensuring the smooth operation of the U.S. securities markets and protecting investors from the types of egregious misconduct Alpine has committed in the past and is continuing to commit today, *see* D.E. 70-1 & D.E. 70-2 (Exs. A & B to Opp. to P.I. Mot.)—are more than sufficient to justify any theoretical imposition on Alpine's First Amendment rights attributable to the statutory requirement to join a national securities association.

At the June 1 preliminary-injunction hearing, Alpine suggested that *Keller*'s First Amendment framework may have been undercut by the Supreme Court's decision in *Janus v. American Federation of State, County & Municipal Employees*, 138 S. Ct. 2448 (2018), which held that public employees cannot be compelled to subsidize a union that they choose not to join, *id.* at 2460. At least five circuits have rejected that argument because lower courts "'must leav[e] to th[e] [Supreme] Court the prerogative of overruling its own decisions.'" *File v. Martin*, 33 F.4th

385, 392 (7th Cir. 2022) (quoting *Agostini v. Felton*, 521 U.S. 203, 237 (1997)); *see also Schell v. Chief Just. & Justs. of the Okla. Sup. Ct.*, 11 F.4th 1178, 1190-91 (10th Cir. 2021) (recognizing that *Keller* remains binding); *Taylor v. Buchanan*, 4 F.4th 406, 409 (6th Cir. 2021) (same); *McDonald v. Longley*, 4 F.4th 229, 243 n.14 (5th Cir. 2021) (same); *Boudreaux v. La. State Bar Ass'n*, 3 F.4th 748, 755 (5th Cir. 2021) (same); *Crowe v. Or. State Bar*, 989 F.3d 714, 725 (9th Cir. 2021) (per curiam) (same). *Keller* remains controlling and dispositive here.

## II.   CONCLUSION

This Court should preserve the "private self-regulatory" framework that Congress established in the Exchange Act, *Free Enter. Fund*, 561 U.S. at 487, and permit FINRA to take the necessary regulatory steps to prevent the ongoing victimization of Alpine's customers.

The Court should deny Alpine's Renewed Emergency Motion for Preliminary Injunction and Temporary Restraining Order.

Dated:   June 2, 2023                                 Respectfully submitted,

 */s Amir C. Tayrani*
Amir C. Tayrani, DC Bar No. 490994
Alex Gesch, DC Bar No. 1012422
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue, N.W.
Washington, D.C.  20036-5306
T: (202) 887-3692
F: (202) 530-9645
ATayrani@gibsondunn.com
AGesch@gibsondunn.com

*Attorneys for Defendant Financial Industry Regulatory Authority, Inc.*