**UNITED STATES DISTRICT COURT**
**DISTRICT OF COLUMBIA**

SCOTTSDALE CAPITAL ADVISORS
CORPORATION and ALPINE
SECURITIES CORPORATION,

Case No.: 1:23-cv-1506-BAH

     Plaintiffs,

v.

FINANCIAL INDUSTRY
REGULATORY AUTHORITY, INC.,

     Defendant,

UNITED STATES OF AMERICA,

     Intervenor Defendant.

_____

**SUPPLEMENTAL BRIEF IN SUPPORT OF RENEWED EMERGENCY MOTION**
**FOR PRELIMINARY INJUNCTION AND TEMPORARY RESTRAINING ORDER**

Pursuant to this Court's order, Plaintiff Alpine Securities Corporation files this Supplemental Brief addressing (1) the practical consequences should FINRA's Expedited Proceeding be considered state action, and (2) Plaintiff's First Amendment claims.

## I.    The Practical Consequences of this Court's Order Would Be Limited.

The fundamental question upon which this case turns, although extraordinarily significant for Plaintiffs, is a narrow one: Can FINRA exercise its authority to execute the federal securities laws in an adjudicative enforcement proceeding to impose penalties that carry the force of law without following the Constitution's commands? As Plaintiffs have emphasized, it is that *specific* context which governs the central merits question in this case. Broader questions about FINRA's status more generally, or other more difficult factual contexts, are not at issue.

1

In a similar fashion, the practical consequences of this Court's preliminary order would certainly be significant to Alpine—it would not be "subjected to an illegitimate proceeding, led by an illegitimate decisionmaker," *Axon Enter., Inc. v. Fed. Trade Comm'n*, 143 S. Ct. 890, 893 (2023), and would not face the corporate death penalty. But although the relief to Alpine would be broadly felt, the relief itself need not be broad. The Court's preliminary injunction could be narrowly drawn to cover only FINRA's use of it expedited procedures to expel a firm. Such relief would not risk destabilizing effects. That is because this Court's state action determination is necessarily a situation specific question that would be limited not only just to FINRA, but to FINRA's actions *in this case*. And because this case is exceptional, relief here would not undermine ordinary FINRA operations, or even most FINRA enforcement proceedings. After all, FINRA here threatens an extreme act of governmental power, the immediate shuttering of Alpine's business, under a procedural mechanism that eliminates the participation of non-FINRA panelists, invokes a theory of a violation of an obey-the-law injunction that is inconsistent with well-established principals of notice and due process, ignores the pendency of Alpine's appeal on the underlying issue, and permits *no* review by the SEC until *after* Alpine is closed. Under these circumstances, FINRA can be said to exercise state power. The same need not be said for ordinary FINRA enforcement proceedings which do not: (1) impose the most severe sanctions which carry the force of law, while (2) entirely insulating FINRA from any meaningful review by the SEC.

This makes sense. The state action inquiry is a functional one. In every case, the question is whether "*a challenged action . . .* may be fairly treated as that of the State itself." *Jackson v. Metro. Edison Co.*, 419 U.S. 345, 351 (1974) (emphasis added). And whether the Government is behind the "individual face" of the challenged action is "necessarily [a] fact-

2

bound inquiry." *Brentwood Acad. v. Tennessee Secondary Sch. Athletic Ass'n*, 531 U.S. 288, 298 (2001) (internal quotation marks omitted). To that end, the consequences of any state action decision are often limited to the particular circumstances of the challenged action at issue. So too, the nature of government power is tied to the severity of the punishment the agency seeks to impose. Where FINRA seeks to impose a more extreme penalty under its authority to enforce the securities laws, it wields *more* government power over private parties.

The state action inquiry is not one-size-fits-all. Rather, it is limited to the specific action at issue. For example, in *Marsh v. Alabama*, 326 U.S. 501 (1946), the Supreme Court held "a ruling by those appointed by [a] corporation to manage a company-town," which barred individuals from distributing religious literature, to be unconstitutional state action, *id.* at 504, 509. But this decision did not transform the Gulf Shipbuilding Corporation into a state actor in relation to all of its activities. The corporation only acted as the State when enforcing a speech code on public sidewalks in a company town. Similarly, a private physician "under contract with the State to provide medical services to inmates at a state-prison hospital on a part-time basis" was also a state actor. *West v. Atkins*, 487 U.S. 42, 54 (1988). But when Dr. Atkins worked elsewhere treating other patients, he was no longer functioning as a state actor. In fact, it was irrelevant that he was not a state actor at other times, and it was irrelevant that he was not a "full-time, permanent member of the State prison medical staff" because what mattered was the "function" he performed "*while working* for the State." *Id.* at 56 (emphasis added).

Take another set of examples, the self-regulatory organizations that govern attorneys: bar associations. Sometimes these associations are so organized, so "intertwined" with the government, that their rules or enforcement actions are fairly attributed to the government.

3

*Nat'l Collegiate Athletic Ass'n v. Tarkanian*, 488 U.S. 179, 195 n.14 (1988).[1] But not always. In *Goldfarb v. Virginia State Bar*, 421 U.S. 773 (1975), the Virginia State Bar and Fairfax County Bar were not engaged in state action with respect to advisory fee schedules backed up by "prospective professional discipline," *id.* at 781, 790–91. Although the Virginia State Bar may have been a "state agency for some limited purposes," it was not with respect to the challenged fee schedules. Similarly, the First Circuit held that the Massachusetts Real Estate Bar Association was not a state actor, in part, because it "could not itself determine whether its interpretation" of the governing legal standard "was correct," and it "could not enforce its interpretation." *The Real Estate Bar Ass'n For Mass., Inc. v. Nat'l Real Estate Info. Services*, 608 F.3d 110, 122 (1st Cir. 2010). By contrast, the Arizona State Bar presented a different case. It *was* a state actor with respect to its disciplinary code because it "acts as the agent of the [State Supreme Court] under its continuous supervision." *Bates v. State Bar of Arizona*, 433 U.S. 350, 361 (1977); *see also NB ex rel. Peacock v. Dist. of Columbia*, 794 F.3d 31, 43 (D.C. Cir. 2015) ("The requisite nexus generally exists when a private party acts as an agent of the government in relevant respects."). For this reason, the everyday, core functions of FINRA or other similarly situated agencies—including any enforcement proceedings that do not exercise extraordinary government power (i.e., impose extreme penalties) without any government oversight (i.e., using procedural mechanisms to cut out the SEC) will remain unaffected by any ruling on Alpine's preliminary injunction motion.

---

[1] The cited cases include state action analyses conducted pursuant to § 1983, the Fourteenth Amendment, and the Sherman Act. The Supreme Court has noted these are "somewhat similar," and important for this case is that "[i]n both contexts . . . courts examine whether the rule in question is a rule of the State" and "[t]he degree to which the activities of the state entity and the arguably private entity are intertwined." *Nat'l Collegiate Athletic Ass'n v. Tarkanian*, 488 U.S. 179, 195 n. 14 (1988).

The upshot of state action analyses is that the consequences of any determination that a particular function of a particular entity is state action is limited to *that* particular function of *that* particular entity. Nothing different can be expected with respect to self-regulatory organizations ("SROs"), like FINRA. As scholars have noted, "there is great variety in the [institutional] design choices underlying SRO schemes." Emily Hammond, *Double Deference in Administrative Law*, 116 COLUM. L. REV. 1705, 1766 (2016). In fact, "variety is the hallmark of procedures governing the SRO-agency relationship," and these have differing "constitutional and administrative law implications." *Id.* at 1768–69.

Among SROs, FINRA stands out because of its vast enforcement and adjudicatory authority. Simply put, "[t]he extent of FINRA's authority is enormous." Jonathan Macey & Caroline Novogrod, *Enforcing Self-Regulatory Organization's Penalties and the Nature of Self-Regulation*, 40 HOFSTRA L. REV. 963, 969 (2012). It collects millions in fines each year, has had nearly the same amount of revenue as the SEC, and nearly the same amount of staff. Hammond, *supra*, 116 COLUM. L. REV. at n.1. Given its combined rulemaking and enforcement authority, FINRA is distinct from other nominally private entities that partner with regulating agencies. For example, many industries have influential standards development organizations that "formulate standards" that are in turn adopted by federal agencies. *Id.* at 1711. But the issues presented by this case do not arise in a run-of-the-mill standards development organization because those private organizations "lack the enforcement powers of SROs" like FINRA. *Id.* at 1712. "When standards become federal law, the enforcement power resides *with the promulgating agency*." *Id.* at 1712 n.33 (emphasis added). Here, enforcement is part of FINRA's domain. And, as shown by this case, in extraordinary situations FINRA exercises that domain with extreme power over private

parties with no meaningful opportunity for SEC review. The Court could well limit any eventual merits ruling to that context.

Not only does FINRA engage in enforcement, like that at issue in Alpine's Expedited Proceeding, but FINRA is exceptionally tasked with enforcement of *another* SRO's regulations. The Municipal Securities Rulemaking Board "is the principal regulator of the municipal securities market," claiming to "safeguard[]" the nearly "$4 trillion" market. *The Role and Jurisdiction of the MSRB*, MSRB (Sep. 2022), https://www.msrb.org/sites/default/files/2022-09/Role-and-Jurisdiction-of-MSRB.pdf. The D.C. Circuit has squarely held that MSRB's rules "constitute government action of the purest sort," plainly implicating constitutional protections. *Blount v. S.E.C.*, 61 F.3d 938, 941 (D.C. Cir. 1995) (discussing MSRB Rule G-37). Nevertheless, MSRB "possesses only a fraction of the regulatory might" of FINRA and has "neither investigative nor disciplinary authority." Donna M. Nagy, *Playing Peekaboo with Constitutional Law: The Pcaob and Its Public/private Status*, 80 NOTRE DAME L. REV. 975, 1024 (2005). In fact, it is FINRA, having authority that MSRB lacks, which enforces the rules the MSRB creates. "Municipal Securities," FINRA https://www.finra.org/rules-guidance/key-topics/municipal-securities ("FINRA is responsible for examining FINRA members that are municipal securities dealers or municipal advisors and for enforcing MSRB rules. In addition, FINRA administers the professional qualifications program for the MSRB.").

Given the "fact-bound inquiry" that is part and parcel of all state-action analyses, FINRA's actions as an "agent" of the Government in this particular context, *NB ex rel. Peacock v. D.C.*, 794 F.3d 31, 43 (D.C. Cir. 2015), FINRA's excessive entwinement with the Government, *Brentwood Acad.*, 531 U.S. at 298, and FINRA's combined rulemaking,

investigatory, and enforcement authority that come into play in the challenged Expedited Proceeding, the consequences of a preliminary injunction would be limited to a conclusion that *this* function of FINRA is state-action. Such an order would not directly implicate any other public/private entities or partnerships, which lack authority as exceptional as FINRA's.

Furthermore, any consequences to the Securities and Exchange Commission and securities regulation would not be disruptive. The scope of the remedy that has been provided by the Supreme Court in similar cases has not ground to a halt the regulatory apparatus of the Federal Government. Instead, the Supreme Court has ensured that those exercising governmental authority are properly appointed with that authority.

This Court need look no further than *Lucia v. SEC*, 138 S. Ct. 2044 (2018). There, as here, the Plaintiff asserted   a constitutional claim regarding the authority of those who "preside" over a proceeding involving the enforcement of "the nation's securities laws." *Id.* at 2049. There, as here, the "Commission may itself preside" over enforcement of the securities laws but had not done so. *Id.* There, as here, the question was whether some other entity could constitutionally engage in such enforcement. In *Lucia*, the Supreme Court held that the ALJ had been unconstitutionally appointed. *Id.* at 2051; *see also National Ass'n of Securities Dealers, Inc. v. S.E.C.*, 431 F.3d 803 (D.C. Cir. 2005) (explaining that the "disciplinary process by FINRA's predecessor, the National Association of Security Dealers, "essentially supplants a disciplinary action that might otherwise start with a hearing before an ALJ."). In doing so, securities regulation continued apace, with the Court ordering "a new hearing before a properly appointed official." *Id.* at 2055 (quoting *Ryder v. United States*, 515 U.S. 177, 182–183 (1995)). The same would be true here: an Expedited Proceeding must be presided over by a constitutionally appropriate officer who follows the Constitution's commands in all

7

relevant respects.

The injury that *Lucia* addressed is the same weighty and irreparable one that Alpine faces. Nevertheless, it is an injury that can be remedied on a preliminary basis without consequences to securities regulation. Consider the procedural history of *Axon Enter., Inc. v. Fed. Trade Comm'n*, 143 S. Ct. 890, 898 (2023). In that case, petitioner Michelle Cochran sued the SEC in federal district court, alleging that the ALJs were still unconstitutional after *Lucia* because the ALJs had a double layer of removal protection. *Id.* at 898. Accordingly, the ALJs "could not constitutionally exercise power" while that removal protection persisted. *Id.* With an imminent (and in her view unconstitutional) SEC enforcement proceeding about to begin, Cochran sought a preliminary injunction. After the district court denied it, the Fifth Circuit "enjoined the SEC administrative proceedings pending appeal." *Cochran v. U.S. Sec. & Exch. Comm'n*, 20 F.4th 194, 198 (5th Cir. 2021) (en banc). This was the only and correct remedy. As the Supreme Court later explained, "[a] proceeding that has already happened cannot be undone." *Axon*, 143 S. Ct. at 904. A claim of a "here-and-now injury of subjection to an unconstitutionally structured decision-making process" can only be remedied beforehand. *Id.* For Cochran, it was remedied during the pendency of federal court review with an injunction against administrative proceedings. Nonetheless, no one could plausibly claim securities regulation had been materially disrupted in the nearly 4 years since Cochran filed her claims and received her injunction.

The remedy that Alpine seeks is also fully in accord with numerous other Supreme Court precedents in this area. In *Free Enterprise Fund*, the Supreme Court found that the Public Company Accounting Oversight Board was unconstitutionally structured because of "dual for-cause limitations on the removal of Board members," which unconstitutionally insulated

the Board's members from control by the President. 561 U.S. at 492. It was created because "[t]he failure of accounting regulation" was a "pressing national problem." *Id.* at 501. To that end, the Board had extensive authority to "promulgate[] auditing and ethics standards, perform[] routine inspections of all accounting firms, demands documents and testimony, and initiate[] formal investigations and disciplinary proceeding." *Id.* at 485. In issuing relief, regulation of the accounting industry continued. But while the Court did not issue "broad injunctive relief against the Board's continued operations," the Court ensured "that the reporting requirements and auditing standards to which [the Nation's accountants] are subject will be *enforced only by* a constitutional agency accountable to the Executive." *Id.* at 513 (emphasis added).

In a similar vein are the Supreme Court's decisions in *Seila Law LLC v. CFPB*, 140 S. Ct. 2183 (2020) (CFPB); *United States v. Arthrex, Inc.*, 141 S. Ct. 1970, 1972 (2021) (Administrative Patent Judges); and *Collins v. Yellen*, 141 S. Ct. 1761, 1787 (2021) (FHFA). Simply put, consistent with the relief ordered in the Supreme Court's last two decades of separation of powers cases, the consequences of preliminary equitable relief to Alpine would be critical to Alpine but collateral and non-disruptive to the broad sweep of securities regulation.

## II.    Alpine's First Amendment challenge is likely to succeed.

The Court also requested supplemental briefing on two questions related to Plaintiffs' First Amendment claim: "(a) the validity of plaintiffs' claim, absent any allegation regarding 'expressive purpose' to support their challenge to mandatory FINRA membership, and (b) the public interest supporting the federal government's mandate, *see* 15 U.S.C. § 78o(a)(1), (b)(1)." Minute Order. We address both questions in turn. In brief: Plaintiffs need not allege

that the specific activities of FINRA at issue, or Plaintiffs' objection to them, is based on some "expressive purpose"; and whether or not the purposes that purportedly justify mandatory membership in FINRA are sufficiently compelling, that mandatory membership is not sufficiently tailored to advance them.

### A. Plaintiffs need not allege a political or ideological objection to any particular expressive purpose.

The Supreme Court has "held time and again that freedom of speech includes both the right to speak freely and the right to refrain from speaking at all." *Janus v. American Fed'n of State, Cnty., & Mun. Emps.*, 138 S. Ct. 2448, 2463 (2018) (cleaned up). And because the "right to associate with others" for expressive ends is "implicit in the right to engage in activities protected by the First Amendment," that constitutional provision also protects both the "[f]reedom of association" and the "freedom not to associate," *Roberts v. United States Jaycees*, 468 U.S. 609, 622, 623 (1984). This "cardinal constitutional command" prevents what Jefferson termed the "sinful and tyrannical" practice of "compel[ling] a man to furnish contributions of money for the propagation of opinions which he disbelieves and abhor[s]." *Janus*, 138 S. Ct. at 2463, 2464 (quoting A Bill for Establishing Religious Freedom, in 2 Papers of Thomas Jefferson 545 (J. Boyd ed. 1950)).

To be sure, the freedom of association protected by the First Amendment is association for a particular purpose: engaging in expression. Accordingly, to determine whether "the First Amendment's expressive associational right" applies to a particular group, the Court "must determine whether the group engages in 'expressive association.'" *Boy Scouts of America v. Dale*, 530 U.S. 640, 648 (2000). "The First Amendment's protection of expressive association is not reserved for advocacy groups. But to come within its ambit, a group must engage in

some form of expression, whether it be public or private." *Id.* FINRA plainly "engage[s] in some form of expression" and thus implicates the freedom of expressive association. *Id.*[2]

In addition to promulgating and enforcing rules governing the securities industry, for instance, FINRA "offers compliance seminars" and other educational programs, SAC ¶ 24; *see* FINRA, *Continuing Education*, https://www.finra.org/registration-exams-ce/continuing-education (discussing continuing education requirements and programs); publishes "guidance to firms in the form of podcasts, webinars, FAQs, reports, and more," FINRA, *Guidance*, https://www.finra.org/rules-guidance/guidance; and engages in speech on a variety of ideologically charged topics, including racial justice and diversity, equity, and inclusion, *see* FINRA, *Racial Justice Task Force*, https://www.finra.org/about/responsible-citizenship/racial-justice; FINRA, *Diversity, Equity, and Inclusion (DEI)*, https://www.finra.org/about/diversity-equity-inclusion. These activities and programs are undeniably expressive in nature, and that suffices to trigger the protection of the First Amendment freedom of association. *Dale*, 530 U.S. at 650.

Defendants mistakenly claim that in addition to showing that FINRA engages in expressive activity, Plaintiffs must allege that they object on expressive grounds to specific "activities *of an ideological nature*." FINRA Opp'n, Doc. 70, at 14; *see also* U.S. Opp'n. Doc. 68, at 19. Courts have repeatedly rejected this argument. As the First Circuit has explained in the context of mandatory bar membership, because [t]he very act of the state compelling an employee or an attorney to belong to or pay fees to a union or bar association implicates that person's First Amendment right not to associate," such a person may challenge the

---

[2] FINRA's insistence that it need not adhere to the Constitution is another expressive aspect of the organization with which Plaintiff's disagree and should not be forced to support.

mandatory association's activities on First Amendment grounds *even if* those activities "are non-political and non-ideological." *Romero v. Colegio De Abogados De Puerto Rico*, 204 F.3d 291, 300, 301 (1st Cir. 2000); *accord Kingstand v. State Bar of Wisconsin*, 622 F.3d 708, 716 (7th Cir. 2010) (holding that "in a forced group speech case," First Amendment protections apply regardless of "the political or ideological nature" of the group expenditures at issue).

In *Romero*, the First Circuit thus held that Puerto Rico's mandatory bar association violated the First Amendment by using bar dues to pay for a mandatory life-insurance program, specifically rejecting the Bar's argument that the First Amendment was not implicated because the life-insurance expenditures "do not support political or ideological expression." 204 F.3d at 296. And as *Romero* notes, the Supreme Court has likewise suggested that First Amendment scrutiny applies to a union's expenditure of dues on a mandatory death-benefits program. *Ellis v. Brotherhood of Ry., Airline & S.S. Clerks, Freight Handlers, Exp. & Station Emps.*, 466 U.S. 435, 453–54 (1984). Just as the First Amendment freedom of association protects against the use of mandatory dues to pay for insurance programs even though those expenditures are obviously not "*of an ideological nature*," FINRA Opp'n, Doc. 70, at 14, Plaintiffs here need not allege that they object to specific "ideological activities," *id.*, to prevail on their First Amendment claim.

## B. Forced Association with FINRA is not narrowly tailored to serve a compelling state interest.

Because of the "cardinal constitutional command" against forcible association with a group that engages in expressive activity, *Janus*, 138 S. Ct. at 2463, mandatory membership in such an association is "subject to exacting First Amendment scrutiny and cannot be sustained unless" it "serve[s] a compelling state interest that cannot be achieved through means significantly less restrictive of associational freedoms," *Knox v. Service Emps. Int'l Union*,

567 U.S. 298, 310 (2012) (cleaned up). As the Court's supplemental briefing order suggests, Defendants are likely to argue that mandatory membership in FINRA serves "the protection of investors," 15 U.S.C. § 78o(b)(1), and that these interests are sufficiently compelling to justify intrusion on the First Amendment freedom of association. But even if that is so, exacting scrutiny also requires that the means adopted to serve the government's interest be narrowly tailored—that is, that the interest "cannot be achieved through means significantly less restrictive of associational freedoms." *Janus*, 138 S. Ct. at 2465; *cf. McCullen v. Coakley*, 573 U.S. 464, 486 (2014) (even laws subject to only intermediate scrutiny "still must be narrowly tailored" (cleaned up)). And here, a significantly less restrictive means already exists: enforcement actions against broker-dealers *by the SEC*. Since the SEC itself has adequate authority to protect investors *without the need* for mandatory association with an organization like FINRA, there is simply no compelling need to "seriously impinge[ ] on First Amendment rights" by compelling membership in (and subsidization of) that organization, *Janus*, 138 S. Ct. at 2464.

Moreover, it is well settled that a compulsory association also violates the First Amendment if it uses mandatory dues to fund "activities not 'germane' to the purpose for which compelled association was justified." *Keller v. State Bar of California*, 496 U.S. 1, 13 (1990); *accord McDonald v. Longley*, 4 F.4th 229, 246 (5th Cir. 2021); *Romero*, 204 F.3d at 297. Here, that requirement is not met because FINRA uses the mandatory dues it collects to fund activities that are not germane to any investor-protection purpose. For example, "over $1 billion of FINRA's revenues are dedicated to compensation and benefits for FINRA staff and professional and contract services," such as "executive salaries that are exorbitant and grossly disproportionate to the salaries of other executives for non-profit organizations." SAC ¶¶ 106–

07. The First Amendment freedom of association does not allow the government to force individuals to join an association, pay dues to fund its activities, and then sit by while those dues are expended on the non-germane purpose of paying exorbitant salaries to the association's executives.

## CONCLUSION

For the foregoing reasons, the Court should grant Alpine's motion for a preliminary injunction and temporary restraining order and enjoin FINRA from further pursuing the Expedited Proceeding while the Court adjudicates the merits of Alpine's claims.

Dated: June 2, 2023                                   Respectfully submitted,

                                                      /s/     David H. Thompson
Kenneth G. Turkel*                                    David H. Thompson (Bar No. 450503)
Florida Bar No.: 867233                               Brian W. Barnes*
E-mail:  kturkel@tcb-law.com                          Cooper & Kirk, PLLC
David A. Hayes*                                        1523 New Hampshire Ave, N.W.
Florida Bar No.:096657                                Washington, D.C. 20036
E-mail:  dhayes@tcb-law.com                           Phone: (202) 220-9649
TURKEL CUVA BARRIOS, P.A.                              dthompson@cooperkirk.com
100 North Tampa Street, Suite 1900                    bbarnes@cooperkirk.com
Tampa, FL  33602
Phone: (813) 834-9191                                 Maranda E. Fritz*
                                                      maranda@fritzpc.com
                                                      Maranda E. Fritz PC
                                                      521 Fifth Avenue 17th Floor
                                                      New York, New York 10175
                                                      Phone: (646) 584-8231

                        *Attorneys for Plaintiffs*
                        *Admitted pro hac vice*