## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| SCOTTSDALE CAPITAL ADVISORS CORPORATION and ALPINE SECURITIES CORPORATION, | Civil Action No. 23-1506 (BAH) |
| Plaintiffs, | Judge Beryl A. Howell |
| v. | |
| FINANCIAL INDUSTRY REGULATORY AUTHORITY, INC., | |
| Defendant, | |
| UNITED STATES OF AMERICA, | |
| Intervenor Defendant. | |

## <u>MEMORANDUM OPINION</u>

Plaintiffs Scottsdale Capital Advisors Corporation ("SCA") and Alpine Securities Corporation ("Alpine") originally filed suit in the Middle District of Florida asserting several constitutional challenges to the operation and structure of the Financial Industry Regulatory Authority, Inc. ("FINRA"), a private corporation responsible for regulating broker-dealers in the securities industry.  As litigation proceeded in that case, FINRA expedited an enforcement action against Alpine, alleging that this company committed thousands of violations of a permanent FINRA order to cease-and-desist certain conduct, which conduct required Alpine's immediate expulsion from FINRA's membership and thus the securities industry.  Alpine coins that punishment "the corporate death penalty" given that such expulsion would necessitate a complete closure of Alpine's business and operations.  Pls.' Second Am. Compl. ("SAC") ¶¶ 10, 129, ECF No. 43.

Weeks before the expedited enforcement action's scheduled hearing before FINRA, Alpine sought an emergency preliminary injunction from the district court in the Middle District of Florida, seeking to halt the expedited enforcement proceeding pending resolution of Alpine's constitutional challenges.  After briefing and oral argument on the motion, however, the case was transferred to this Court for resolution—only two business days before the FINRA hearing.  The day before the scheduled hearing, Alpine then renewed its emergency motion seeking a preliminary injunction or temporary restraining order ("TRO").  Alpine also seeks reconsideration of an earlier order of this Court denying its original emergency motion as filed in the Middle District of Florida.

Upon consideration of Alpine's two pending motions, extensive briefing, oral argument, and the entire record herein, Alpine's motion for reconsideration is granted and its emergency motion for a preliminary injunction or TRO is denied.

## I.    BACKGROUND

The factual background and procedural history of this case is briefly recounted below.

### A.    Legal Landscape

The Securities Exchange Act of 1934 ("the Exchange Act"), as amended in 1938, created a complex statutory regime "of cooperative self-regulation" of so-called over-the-counter securities markets.  *See United States v. NASD*, 422 U.S. 694, 700 n.6 (1975).  That scheme permits private entities, known as self-regulatory organizations ("SROs"), to perform a supervisory role over the securities industry, subject to oversight from the Securities and Exchange Commission ("SEC" or "the Commission").  *See* 15 U.S.C. § 78s (describing the SEC's oversight role over SROs).  Brokers and dealers transacting in the securities industry may not do so without registering with the SEC and joining a national securities association.  *See id.* §

78o(a)(1), (b)(1).  The only national securities association currently registered with the SEC is

defendant FINRA.  *See id.* § 78o-3 (describing the requirement for registration of a national

securities association).

### 1.     *FINRA's Corporate Structure*

FINRA is a Delaware not-for-profit corporation and SEC-registered national securities

association that conducts business in the District of Columbia.  *See* SAC ¶¶ 30–31.  Following its

formation from a 2007 consolidation between its predecessor, the National Association of

Securities Dealers ("NASD"), and the enforcement arm of the New York Stock Exchange

("NYSE"), *id.* ¶ 40; *see also* Order Approving Proposed Rule Change to Amend the By-Laws of

NASD, 72 Fed. Reg. 42,169 (Aug. 1, 2007), FINRA is governed by a board of twenty-two

members, comprised of industry and non-industry members and FINRA's chief executive officer

("CEO"), which board oversees the organization's management and administration, *see* SAC ¶

42–43.  Board members are selected by FINRA's members and are removable only by a majority

vote of FINRA's board or, "in very limited and specific circumstances, the SEC," and thus no

Board member or the CEO is appointed by the SEC, the U.S. President, Congress, or any other

governmental body.  *Id.* ¶¶ 57–58; *see also* 72 Fed. Reg. at 42,170–72.[1]  At the next level of

management, FINRA executives are appointed and removed by the board, *see* SAC ¶ 59, with no

involvement by the SEC or any other government official or body.  FINRA's funding is derived

"almost exclusively" through membership fees as well as fines, penalties, and sanctions, *id.* ¶ 52,

with its budget set "without any constraint or legislative cap" because FINRA receives no

government funding, *id.* ¶ 51.  *See also* FINRA By-Laws art. VI § 1 (Power of the Corporation

---

[1]       More specifically, the SEC may "remove from office or censure" a FINRA officer or director upon a
finding that the individual in question "has willfully violated [applicable statutory provisions], the rules or
regulations thereunder, or the rules of [FINRA], willfully abused his authority, or without reasonable justification or
excuse has failed to enforce compliance" with securities laws.  15 U.S.C. § 78s(h)(4).

to Fix and Levy Assessments), https://www.finra.org/rules-guidance/rulebooks/corporate-organization/power-corporation-fix-and-levy-assessments [https://perma.cc/PB84-KUXL].  Part of that budget includes salaries for FINRA's executives, as determined by the organization itself. *See id.* ¶ 53.

### 2. FINRA's Rules

FINRA's supervisory duties over its membership—including roughly 3,400 brokerage firms, 150,000 branch offices, and 610,000 individual registered securities representatives—is varied.  *See id.* ¶ 41.  While FINRA promulgates its own rules and standards and enforces compliance with those rules through administering sanctions and barring individuals from FINRA membership, *see id.* ¶ 50, this supervisory authority is subject to the SEC's oversight and control, *Turbeville v. FINRA*, 874 F.3d 1268, 1270 (11th Cir. 2017).  For instance, the SEC may limit FINRA's operations or registration if FINRA violates a statute or SEC regulation.  *See* 15 U.S.C. § 78s(h)(1).  Suspension or revocation of that registration is subject to the SEC's opinion that such action "is necessary or appropriate in the public interest, for the protection of investors, or otherwise in furtherance of the purposes of [the Exchange Act]."  *Id.*  The SEC also reviews and approves rules proposed by FINRA, *see id.* § 78s(b)–(c), with SEC approval a prerequisite for the majority of such rules, *see id.* § 78s(b)(1).[2]  At any time and as "deem[ed] necessary or

---

[2]    The Exchange Act permits three avenues for promulgation of a FINRA rule without the SEC's express approval: (i) a rule designated by FINRA "as . . . constituting a stated policy, practice, or interpretation with respect to the meaning, administration, or enforcement of an existing [FINRA] rule[;] . . .  establishing or changing a due, fee, or other charge imposed by [FINRA;] . . . [or] concerned solely with the administration of [FINRA] or other matters[,]" 15 U.S.C. § 78s(b)(3)(A); (ii) a rule that "appears to the Commission . . . is necessary for the protection of investors, the maintenance of fair and orderly markets, or the safeguarding of securities or funds[,]" *id.* § 78s(b)(3)(B); and (iii) a rule on which the SEC does not act within a specified time are "deemed to have been approved[,]" *id.* § 78s(b)(2)(D).  In either of the first two scenarios, within 60 days of the proposed rule's filing, the SEC "summarily may temporarily suspend the change in the rules . . . if it appears to the Commission that such action is necessary or appropriate in the public interest, for the protection of investors, or otherwise in furtherance of the purposes of this chapter."  *Id.* § 78s(b)(3)(C).  In such an instance, the SEC shall hold proceedings to determine whether the proposed rule shall be approved.  *See id.*

appropriate[,]" the SEC may also "abrogate, add to, and delete from" any FINRA rule "to insure the fair administration of the self-regulatory organization, to conform its rules to requirements of [the Exchange Act] and the rules and regulations thereunder applicable to such organization, or otherwise in furtherance of the purposes of [the Act]." *Id.* § 78s(c).

### *3. FINRA's Enforcement Regime*

Enforcement proceedings result from FINRA's investigation into alleged misconduct by its members, and such investigations are done at FINRA's discretion, without any influence from the SEC or other branch of government. *See* SAC ¶ 55; *see also* 15 U.S.C. § 78o-3(b)(8). In fact, "[i]nvolvement by SEC commissioners in this onerous and impactful process occurs only when—and if—a target of an investigation survives the investigation, prosecution, and internal appeal process." SAC ¶ 55. FINRA takes enforcement action against individuals or entities that violate a FINRA rule, SEC regulation, or statutory provision. *See* 15 U.S.C. § 78o-3(b)(7). Enforcement proceedings begin with FINRA filing a complaint against a targeted entity, providing notice to that entity of the specific charges. *See* FINRA Rule 9211 (Aug. 3, 2018), https://www.finra.org/rules-guidance/rulebooks/finra-rules/9211 [https://perma.cc/3RM6-F9MF] (Authorization of Complaint). A FINRA hearing panel then conducts an evidentiary hearing, in which the entity may present arguments over multiple days. *See* 15 U.S.C. § 78o-3(h)(1); *see also id.* § 78o-3(b)(8) (requiring registered national securities associations to employ fair disciplinary procedures); FINRA Rule 9231 (June 4, 2020), https://www.finra.org/rules-guidance/rulebooks/finra-rules/9231 [https://perma.cc/SVL6-8HZ2] (Appointment by the Chief Hearing Officer of Hearing Panel or Extended Hearing Panel or Replacement Hearing Officer). The panel then issues a statement of decision with findings. *See* 15 U.S.C. § 78o-3(h)(1)(A)–(C); *see also* FINRA Rule 9268 (Nov. 2, 2015), https://www.finra.org/rules-

guidance/rulebooks/finra-rules/9268 [https://perma.cc/72SL-T7UW] (Decision of Hearing Panel
or Extended Hearing Panel).

An aggrieved party may appeal that decision to FINRA's National Adjudicatory Council
("NAC"), which "may affirm, dismiss, modify, or reverse with respect to each finding."  FINRA
Rule 9348 (Nov. 2, 2015), https://www.finra.org/rules-guidance/rulebooks/finra-rules/9348
[https://perma.cc/PWN9-TWS6] (Powers of the National Adjudicatory Council on Review).  The
NAC may also review the panel decision *sua sponte*.  *See* FINRA Rule 9312 (Apr. 15, 2021),
https://www.finra.org/rules-guidance/rulebooks/finra-rules/9312 [https://perma.cc/74ZK-Q75W]
(Review Proceeding Initiated by Adjudicatory Council).  Such an appeal operates as a stay of the
panel's decision pending NAC's decision.  *See* FINRA Rule 9311 (Apr. 15, 2021),
https://www.finra.org/rules-guidance/rulebooks/finra-rules/9311 [https://perma.cc/BQ58-TCQT]
(Appeal by Any Party; Cross-Appeal).  A NAC decision may then be appealed to the SEC, *see*
15 U.S.C. § 78s(d)(2), which conducts *de novo* review and may consider evidence not previously
considered by FINRA, *see* Commission Rule of Practice 452, 17 C.F.R. § 201.452.

Final decisions by the SEC are subject to review by a federal appellate court with the
filing of a petition by an aggrieved party, *see* 15 U.S.C. § 78y, but FINRA itself may not seek
judicial review of an SEC decision contrary to a FINRA ruling, *see generally NASD v. SEC*, 431
F.3d 803, 812 (D.C. Cir. 2005).

### B.    FINRA's Enforcement Action Against Plaintiff

Plaintiffs are broker-dealers and registered FINRA members, both owned by the same
parent holding company.  *See* SAC ¶¶ 28–29; Transcript of Hearing (June 1, 2023) ("Hr'g Tr.")
at 9:17–23.[3]  As early as 2019, FINRA received complaints from customers of Alpine alleging

---

[3]      Neither plaintiff is a stranger to FINRA enforcement proceedings.  *See, e.g.*, FINRA's Opp'n to Pl.'s
Renewed Mot. for Preliminary Injunction and Temporary Restraining Order ("FINRA's TRO Opp'n") at 3, ECF

that the firm charged a significant monthly account fee.  *See* FINRA's Opp'n to Pl.'s Renewed

Mot. for Preliminary Injunction and Temporary Restraining Order ("FINRA's TRO Opp'n"), Ex.

A, March 22, 2022 Extended Hearing Panel Decision, *Dep't of Enf't v. Alpine Sec. Corp.*,

FINRA Disciplinary Proceeding No. 2019061232601 ("March 2022 Panel Decision") at 2, ECF

No. 70-1.  On March 22, 2022, a FINRA hearing panel found that Alpine "converted and

misused customer funds and securities, engaged in unauthorized trading, charged and paid

customers unfair prices in securities transactions, charged customers unreasonable and

discriminatory fees, and made an unauthorized capital withdrawal."  March 2022 Panel Decision

at 1.  For Alpine's violations, the panel ordered Alpine's expulsion from FINRA's membership,

payment of restitution in an amount exceeding $4 million, and a "permanent cease and desist

order."  *Id.*  Alpine then appealed that panel decision to the NAC, which appeal had the effect of

staying the expulsion and restitution sanctions but the "permanent cease and desist order" took

immediate effect, in accordance with the explicit use of this term in the panel decision and

governing FINRA rules.  *See* FINRA's TRO Opp'n at 3–4; *see also* FINRA Rule 9311(b) ("Any

such appeal, however, will not stay a decision, or that part of a decision, that imposes a

permanent cease and desist order.").

    During the pendency of the NAC appeal, FINRA discovered that Alpine failed to comply

with the permanent cease-and-desist order that had not been stayed pending Alpine's appeal to

the NAC.  *See* FINRA's TRO Opp'n at 4.  After a months' long investigation, FINRA

determined that Alpine violated the cease-and-desist order "more than 35,000 times by charging

---

No. 70 ("Alpine is a broker-dealer member of FINRA . . . and has been disciplined multiple times for violating
FINRA rules.").  For example, in the complaint, plaintiffs mention an effort by FINRA to SCA "for supposed
violations of Section 5 of the Securities Act."  SAC ¶ 115.  FINRA's investigation into SCA began in March 2015
and concluded in September 2021 when the SEC set aside FINRA's findings and the NAC's affirmance that SCA
violated the charged statutes.  *See id.* ¶¶ 116–119; *see also In the Matter of the Application of Scottsdale Capital
Advisors Corp.*, Release No. 93052, 2021 WL 4242630, at *9 (S.E.C. Sept. 17, 2021).

customers millions of dollars in unreasonable, unfair, and unlawful fees and commissions." *Id.*

Notably, Alpine does not contest that position, but rather counters that its actions were not

improper. *See* SAC ¶ 127. As a result, on April 19, 2023, FINRA initiated an expedited

enforcement proceeding ("Enforcement Proceeding") to expel Alpine from FINRA membership

and stop its continued improper conduct, a punishment characterized by plaintiffs as "the

corporate death penalty." *See* FINRA's TRO Opp'n at 4; SAC ¶¶ 126–129. The Enforcement

Proceeding was scheduled for May 31, 2023. *See* Alpine's Renewed Emergency Mot. for a

Preliminary Injunction & Temporary Restraining Order ("Pl.'s TRO Mot.") at 2, ECF No. 66.

At a hearing before this Court, held on June 1, 2023, Alpine disclosed that the FINRA hearing

officer postponed the Enforcement Proceeding until June 5, 2023, pending resolution of Alpine's

motion for equitable relief, described below. *See* Hr'g Tr. at 7:13–16.

### C.  Procedural History in Federal Court

Plaintiffs filed their initial complaint in the Middle District of Florida on October 12,

2022, *see* Compl., ECF No. 1, then amended that complaint on February 3, 2023, *see* First Am.

Compl., ECF No. 27. The government intervened on February 6, 2023, *see* Notice of

Intervention by the United States of America, ECF No. 28, shortly before FINRA moved to

dismiss the first amended complaint on March 10, 2023, with the government's support, *see*

FINRA's Mot. Dismiss Pls.' Am. Compl., ECF No. 35; Gov't's Mem. of Law in Defense of the

Challenged Provisions of the Federal Securities Law, ECF No. 37. Before FINRA's dismissal

motion was fully briefed, the Supreme Court issued *Axon Enterprise Inc. v. FTC*, 143 S. Ct. 890

(2023), which plaintiffs now claim is relevant to the relief they seek in their complaint.

Five days after *Axon*'s issuance, FINRA initiated the Enforcement Proceeding against

Alpine on April 19, 2023. *See* SAC ¶ 126. Plaintiffs quickly filed the operative second amended

complaint on April 28, 2023, in response to *Axon*, *see* SAC, and then approximately a week later, Alpine filed an emergency motion for a preliminary injunction on May 9, 2023, seeking to halt the Enforcement Proceeding then scheduled for May 31, 2023, *see* Pl.'s Emergency Mot. for Preliminary Injunction, ECF No. 45.  The assigned Judge in the Middle District of Florida held a three-hour hearing on the motion on May 22, 2023, *see* Min. Entry (May 22, 2023), and, two days later, ordered the transfer of this case to this Court, *see* Order, ECF No. 62.  That transfer took effect at approximately noon on Friday, May 26, 2023—two business days before the scheduled Enforcement Proceeding.  *See* Case Transfer, ECF No. 63.

Upon being assigned this case, this Court denied, without prejudice, Alpine's emergency motion for preliminary injunction and FINRA's motion to dismiss because the materials filed relied on out-of-circuit, nonbinding case law mostly from the Fifth and Eleventh Circuits that was unfit for consideration of such extraordinary equitable relief on a truncated timeline.  *See* Min. Order (May 26, 2023).[4]  The parties were directed to propose a briefing schedule by the next business day, Tuesday, May 30, 2023.  *See* Min. Order (May 26, 2023).  On May 30, 2023, Alpine moved for reconsideration of the Order denying, without prejudice, its emergency preliminary injunction motion, ECF No. 65, as well as renewed its emergency motion for a preliminary injunction and temporary restraining order, ECF No. 66, prompting entry of a highly expedited briefing schedule, *see* Min. Order (May 30, 2023), for briefing to be completed by 9 p.m. on May 30, 2023, *see* Gov't's Third Mem. in Defense of the Challenged Provisions of the Federal Securities Laws ("Gov't's Opp'n"), ECF No. 68; FINRA's Opp'n to Pl.'s Mot. for Reconsideration ("FINRA's Reconsideration Opp'n"), ECF No. 69; FINRA's Opp'n to Pl.'s Renewed Mot. for Preliminary Injunction & Temporary Restraining Order ("FINRA's TRO

---

[4]    The Court also signaled to the parties that exhaustion before the SEC may not have been met in this case according to the D.C. Circuit's ruling in *Springsteen-Abbott v. SEC*, 989 F.3d 4, 7–8 (D.C. Cir. 2021).

Opp'n"), ECF No. 70; Pl.'s Reply in Supp. of Mot. for Reconsideration ("Pl.'s Reconsideration Reply"), ECF No. 71; Pl.'s Reply in Supp. of Renewed Emergency Mot. for Preliminary Injunction & Temporary Restraining Order ("Pl.'s TRO Reply"), ECF No. 72, and a hearing scheduled for May 31, 2023, which, at the parties' request, was postponed until June 1, 2023, *see* Min. Order (May 31, 2023), Min. Entry (June 1, 2023).

At the hearing, the parties were directed to submit any supplemental briefs regarding the consequences should FINRA be deemed a state actor, as plaintiffs urged, and the validity of plaintiffs' First Amendment claim. *See* Min. Order (June 1, 2023). Following submission of those memoranda, *see* Gov't's Supp. Br. in Resp. to the Court's June 1, 2023 Min. Order ("Gov't's Supp. Br."), ECF No. 82; FINRA's Supp. Br. in Opp'n to Pl.'s Renewed Emergency Mot. for Preliminary Injunction and Temporary Restraining Order ("FINRA's Supp. Br."), ECF No. 83; Pl.'s Supp. Br. in Supp. of Renewed Emergency Mot. for Preliminary Injunction and Temporary Restraining Order ("Pl.'s Supp. Br."), ECF No. 84; Pl.'s Supp. Resp. Br. in Supp. of Renewed Emergency Mot. for Preliminary Injunction and Temporary Restraining Order ("Pl.'s Supp. Reply"), ECF No. 85; FINRA's Resp. to Supp. Br. of Alpine ("FINRA's Supp. Reply"), ECF No. 86, plaintiff's motions are now ripe for consideration.

## II.   LEGAL STANDARD

A temporary restraining order ("TRO") "is an extraordinary remedy that should be granted only when the party seeking the relief, by a clear showing, carries the burden of persuasion." *Cobell v. Norton*, 391 F.3d 251, 258 (D.C. Cir. 2004). An application for a TRO is analyzed using the same factors applicable to a request for preliminary injunctive relief. *See, e.g., Gordon v. Holder*, 632 F.3d 722, 723–24 (D.C. Cir. 2011) (applying the preliminary injunction standard to a district court decision denying a motion for TRO and preliminary

injunction).  Preliminary injunctive relief is similarly "an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Sherley v. Sebelius*, 644 F.3d 388, 392 (D.C. Cir. 2011) (quoting *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008)); *see also Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (per curiam) ("[A] preliminary injunction is an extraordinary and drastic remedy, one that should not be granted unless the movant, by a clear showing, carries the burden of persuasion." (internal quotation marks omitted)).

A plaintiff seeking preliminary injunctive relief must establish the following four factors: "that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Ramirez v. Collier*, 142 S. Ct. 1264, 1275 (2022) (quoting *Winter*, 555 U.S. at 20); *see also Archdiocese of Wash. v. Wash. Metro. Area Transit Auth.*, 897 F.3d 314, 321 (D.C. Cir. 2018); *Aamer v. Obama*, 742 F.3d 1023, 1038 (D.C. Cir. 2014).  The balance of equities and the public interest factors "merge" when the government is the opposing party. *Karem v. Trump*, 960 F.3d 656, 668 (D.C. Cir. 2020).   When seeking such relief, "the movant has the burden to show that all four factors, taken together, weigh in favor of the injunction." *Abdullah v. Obama*, 753 F.3d 193, 197 (D.C. Cir. 2014) (quoting *Davis v. Pension Benefit Guar. Corp.*, 571 F.3d 1288, 1292 (D.C. Cir. 2009)) (internal quotation marks omitted).[5]

---

[5]     The D.C. Circuit has in the past used a so-called "sliding scale" approach to evaluating the four preliminary injunction and TRO factors such that, "[i]f the movant makes an unusually strong showing on one of the factors, then it does not necessarily have to make as strong a showing on another factor." *Davis v. Pension Benefit Guar. Corp.*, 571 F.3d 1288, 1291–92 (D.C. Cir. 2009).  While acknowledging that this approach is, at a minimum, in tension with current Supreme Court jurisprudence requiring a persuasive showing on all four factors, the D.C. Circuit has not resolved the continuing viability of the sliding-scale approach. *See, e.g.*, *Changji Esquel Textile Co. v. Raimondo*, 40 F.4th 716, 726 (D.C. Cir. 2022) (reserving "the question whether the sliding-scale approach remains valid"); *cf. Davis*, 571 F.3d at 1295–96 (Kavanaugh , J., concurring) (noting that "this Circuit's traditional sliding-scale approach to preliminary injunctions may be difficult to square with the Supreme Court's recent decisions in" *Winter* and *Munaf v. Geren*, 553 U.S. 674 (2008)).

Preliminary injunctive relief and TROs are not remedies "awarded as of right," but "[a]s a matter of equitable discretion, a preliminary injunction does not [even] follow as a matter of course from a plaintiff's showing of a likelihood of success on the merits." *Benisek v. Lamone*, 138 S. Ct. 1942, 1943–44 (2018). Rather, a court must be persuaded as to all four factors. Moreover, "a party requesting a preliminary injunction must generally show reasonable diligence." *Id.* at 1944.

## III.   DISCUSSION

While the focus of the pending motion for injunctive relief is to stall the pending Enforcement Proceeding against Alpine, plaintiffs' complaint is far more sweeping to challenge the "unconstitutional operation and structure of FINRA." SAC ¶ 1; *accord id.* at 33. Specifically, plaintiffs lodge six claims against FINRA: (1) that "FINRA's wide-ranging exercise of executive power is immune from Presidential supervision or control[,]" namely that FINRA's board "are afforded multi-level protection from removal thus impeding the President's ability to oversee the officers executing the laws of the United States in violation of the Constitution's separations of powers[,]" *id.* ¶¶ 141–151 (Count I); (2) that FINRA's board members are "officers of the United States whose appointments must comply with the Appointments Clause of the United States Constitution" and presently do not, *id.* ¶¶ 152–157 (Count II); (3) that the Exchange Act "improperly and unconstitutionally delegates legislative power to [FINRA] outside the Legislative Branch," regardless of whether this entity functions as a state actor or private entity, *id.* ¶¶ 158–161 (Count III); (4) that the Exchange Act's requirement that firms "join FINRA violates Plaintiffs' First Amendment right not to associate[,]" *id.* ¶¶ 162–171 (Count IV); (5) that "FINRA's disciplinary proceedings are biased, secretive, and fail to implement rules that maintain the integrity [of] the proceedings," in violation of the Due Process

Clause of the Fifth Amendment, *id.* ¶¶ 172–176 (Count V); and (6) that "broker-dealers are not afforded the right to a trial by jury" during FINRA proceedings, in violation of the Seventh Amendment, *id.* ¶¶ 177–180 (Count VI).

Upon review of multiple papers filed by all parties and consideration of the arguments presented at the June 1, 2023, hearing before this Court, plaintiff's motion for reconsideration is granted. As refiled, plaintiff's motion for preliminary injunction and TRO properly cites binding law of this Circuit and correctly queues the issues for this Court's consideration.

Alpine has, however, failed to show a likelihood of success on the merits of plaintiffs' claims because FINRA is likely not a state actor, obviating all but one of plaintiffs' constitutional claims, and their surviving First Amendment claim likely lacks merit. Plaintiffs also likely do not assert a viable nondelegation doctrine claim. In reality, plaintiffs offer a multitude of critiques of FINRA throughout their complaint as disgruntled members of FINRA; however, those criticisms fall far short of amounting to likely sustainable constitutional challenges to the structure and processes of FINRA.

While, if expelled from FINRA, Alpine is sure to suffer from the forced closure of its business, such irreparable harm was of Alpine's own making by apparently viewing the permanent cease-and-desist order issued as part of the March 2022 Panel Decision as stayed pending appeal. *See* SAC ¶¶ 8–10 (acknowledging that the Enforcement Proceeding is "based on Alpine's alleged failure to comply with an order contained in an Initial Hearing Panel Decision that was issued in a prior lengthy FINRA action," but arguing "[h]owever, [such] Decision does not become final or effective unless and until it is affirmed by FINRA's appellate tribunal, the [NAC]. And that has not occurred . . . and no [NAC] decision has issued"). Ignoring the immediate effectiveness of a permanent cease-and-desist order, due to operation of

an explicit FINRA rule, *see* March 2022 Panel Decision (using term "permanent cease and desist order"); FINRA Rule 9311(b), is notable context in assessing the irreparable harm claimed by Alpine.  Further, given Alpine's unlikelihood of success in urging novel constitutional attacks on FINRA's structure and operations, reliance on the "here-and-now injury" of being subject to the Enforcement Proceeding, as defined by *Axon*, simply is insufficient to justify the extraordinary equitable relief requested.  This conclusion is confirmed in assessing the balance of equities, which falls heavily in defendants' favor because the harm of permitting Alpine to continue its allegedly knowing violation of FINRA rules to the detriment of its customers, the securities industry, and the public must be given great weight.

Having failed on all factors for injunctive relief, as detailed below, Alpine's motion is denied.

### A.      Likelihood of Success on the Merits

Plaintiffs' separation of powers, Appointments Clause, Fifth Amendment, and Seventh Amendment claims are unlikely to succeed because FINRA is most likely not a state actor.  That aside, as either a public or private entity, FINRA's structure and processes also likely do not violate the private nondelegation doctrine.  Finally, plaintiffs' First Amendment claim is likely to fail because a compelling interest supports the Exchange Act's FINRA membership mandate and supersedes plaintiffs' right to expressive association.  Thus, plaintiffs' claims are unlikely to succeed on the merits.

### 1.      *FINRA Is Not a State Actor*

"As a matter of substantive constitutional law the state-action requirement reflects judicial recognition of the fact that 'most rights secured by the Constitution are protected only against infringement by governments.'"  *Lugar v. Edmonson Oil Co., Inc.*, 457 U.S. 922, 936

(1982) (quoting *Flagg Bros. Inc. v. Brooks*, 436 U.S. 149, 156 (1978)).  That said, the Supreme

Court has held, "many times, that actions of private entities can sometimes be regarded as

governmental action for constitutional purposes."  *Lebron v. Nat'l R.R. Passenger Corp.*, 513

U.S. 374, 378 (1995) (collecting cases).

Whether an entity is a state actor is largely a "fact-bound inquiry."  *Lugar*, 457 U.S. at

939.  While the Supreme Court "has articulated a number of different factors or tests in different

contexts" to determine state action, *id.*, some key considerations remain consistent.  *Cf.*

*Brentwood Acad. v. Tenn. Secondary Sch. Athletic Ass'n*, 531 U.S. 288, 295 (2001) ("From the

range of circumstances that could point toward the State behind an individual face, no one fact

can function as a necessary condition across the board for finding state action; nor is any set of

circumstances absolutely sufficient[.]").  A court must consider if "there is such a close nexus

between the State and the challenged action that seemingly private behavior may be fairly treated

as that of the State itself."  *NB ex rel. Peacock v. District of Columbia*, 794 F.3d 31, 43 (D.C.

Cir. 2015) (quoting *Brentwood*, 531 U.S. at 295); *accord Jackson v. Metro. Edison Co.*, 419 U.S.

345, 351 (1974) ("[T]he inquiry must be whether there is a sufficiently close nexus between the

State and the challenged action of the regulated entity so that the action of the latter may be fairly

treated as that of the State itself.").

Determining a sufficient nexus involves assessing, among other things, the government's

"exercise of 'coercive power,'" *Brentwood*, 531 U.S. at 296 (quoting *Blum v. Yaretsky*, 457 U.S.

991, 1004 (1982)), which has been described variously as the government's provision of

"significant encouragement, either overt or covert," *id.* (quoting *Blum*, 457 U.S. at 1004), and the

degree of government control over the entity, *id.* (citing *Pennsylvania v. Bd. of Dirs. of City*

*Trusts of Phila.*, 353 U.S. 230, 231 (1957)), as well as the private entity's "willful" participation

in a joint activity with the government, *id.* (quoting *Lugar*, 457 U.S. at 941), including the extent

to which a public function is delegated to a private entity, *id.*, and how "entwined with

governmental policies" the private entity is or the degree to which the government is "'entwined

in [the private entity's] management or control,'" *id.* (quoting *Evans v. Newton*, 382 U.S. 296,

299, 301 (1966)).  An earlier Supreme Court decision also relied on two considerations for state

action: (1) whether the private entity acted pursuant to "some right or privilege created by the

State or by a rule of conduct imposed by the state or by a person for whom the State is

responsible" and (2) whether the actor is "a person who may fairly be said to be a state actor" or

state official, an individual working with a state official, or an individual whose "conduct is

otherwise chargeable to the State." *Lugar*, 457 U.S. at 937.[6]

Employing all these considerations to the facts at hand, plaintiff has not proven the

likelihood that FINRA is a state actor.  First, the facts of FINRA's creation, operation, and

oversight structure do not indicate state actor status.  FINRA is a private organization

incorporated under the laws of Delaware; neither an act of Congress nor the SEC created

FINRA.  *Cf. Blount v. SEC*, 61 F.3d 938, 941 (D.C. Cir. 1995) (holding that the Municipal

Securities Rulemaking Board was a state actor because, *inter alia*, it was "created by an act of

Congress"); *Lugar*, 457 U.S. 941–42 (holding that respondents acted "under color of state law"

in depriving petitioner of his property pursuant to state law and joint participation with state

---

[6]      Although plaintiff invokes the state action doctrine, plaintiff's argument at the hearing seemed to blend into
the public function test, positing that the focus of whether a private entity is a state actor depends on the entity's
specific role at any particular time.  *See* Hr'g Tr. at 26:23–27:10.  That line of argument is equally unlikely to
succeed according to the Supreme Court's test in *Manhattan Community Access Corp. v. Halleck*, in which the
Court held that, "to qualify as a traditional, exclusive public function within the meaning of our state-action
precedents, the government must have traditionally *and* exclusively performed the function."  139 S. Ct. 1921, 1929
(2019) (emphasis in original).  Nowhere does plaintiff argue that FINRA's adjudicatory role in enforcing its own
rules as an SRO is a traditional or exclusive public function.  On the contrary, plaintiffs' complaint notes that
FINRA is the successor of both the NASD and NYSE, two private entities, and that the role of regulating industry
members has always fallen to those entities, as an initial matter, rather than the SEC.  *See* SAC ¶¶ 36–40.

officials in such deprivation).  No government entity funds FINRA nor plays any role in the

selection of its board members or officers, and those individuals are in no way characterized as

governmental officers.  *Cf. Brentwood*, 531 U.S. at 298–302 (finding that the school athletic

association was a state actor because, *inter alia*, state board members sat on the association's

governing bodies and public-school officials participated in the state retirement system, such that

public institutions and public school officials were sufficiently entwined in the association).

FINRA is self-governing; it creates its own rules and standards, including the setting of salaries

of its officers and penalty amounts unilaterally.  *Cf. Lebron*, 513 U.S. at 394–99 (finding that

Amtrak was a state actor because it had the same objectives as the government, was created by

the government, and functioned under the government's control such that "the corporation is part

of the Government").

FINRA also aims to perform functions that are neither contemplated nor shared by the

SEC, including, to name a few, administering broker qualifications examinations, *see Turbeville*,

874 F.3d at 1271, "conduct[ing] inspections of brokers and dealers," and enforcing compliance

with professional industry standards as well as FINRA's own rules and regulations, SAC ¶ 49.

In FINRA's adjudicative capacity, this SRO alone determines which cases to investigate and

when to file a complaint, and any decision that FINRA makes is not binding on the SEC in any

subsequent review by this federal agency.  In fact, any review by the SEC is *de novo* and the

agency may consider evidence not previously considered by FINRA or the NAC.  *Cf. Peacock*,

794 F.3d at 43 (holding that Xerox is a state actor when performing as an agent of, and thus

acting on behalf, of the District of Columbia to determine individuals' eligibility for prescription

drug coverage under Medicaid).  In essence, FINRA is an independent body that assists the SEC

by funneling referrals to the federal enforcement agency, using rules and procedures approved by

the SEC as sufficient to make the assistance helpful.  *See Graman v. NASD*, No. 97-cv-1556 (JR), 1998 WL 294022, at *2 (D.D.C. Apr. 27, 1998) (employing the same reasoning to hold that FINRA is not a state actor).  Such FINRA functions do not amount to the organization's entwinement with the SEC.

Second, plaintiff concedes that no court has yet to hold that FINRA is a state actor.  *See* Hr'g Tr. 24:15–23 (The Court: "I haven't found any case that's held that FINRA is a state actor or any case that's found either the New York Stock Exchange, which is another SRO, or NASD, the predecessor to FINRA, was a state actor.  Are there any such cases?"  Plaintiff's Counsel: "There is not, to my knowledge, such a case.").  Rather, a multitude of courts nationwide have held the contrary—that FINRA is a private entity wholly separate from the SEC or any other government agency.[7]

The D.C. Circuit is notably not among those courts to have opined on this question. Consequently, both parties attempt to read between the lines of existing Circuit precedent discussing FINRA and its predecessor NASD as controlling, if not persuasive, authority in considering this question.  *Compare* Gov't's TRO Opp'n at 1 (citing *Saad v. SEC*, 980 F.3d 103, 104 (D.C. Cir. 2020) (referring to FINRA as "a private self-regulatory organization")) *and id*. at 16 (citing *Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*, 561 U.S. 477, 484–86 (2010)

---

[7]         *See, e.g., Desiderio v. NASD*, 191 F.3d 198, 206–07 (2d Cir. 1999) ("The NASD is a private actor, not a state actor."); *D.L. Cromwell Invs., Inc. v. NASD Regul., Inc.*, 279 F.3d 155, 162 (2d Cir. 2002) (holding the same); *First Jersey Sec., Inc. v. Bergen*, 605 F.2d 690, 698 (3d Cir. 1979) ("Congress preferred self-regulation by a private body over direct involvement of a governmental agency"); *Jones v. SEC*, 115 F.3d 1173, 1183 (4th Cir. 1997) ("NASD is a private party and not a governmental agent"); *Epstein v. SEC*, 416 F. App'x 142, 148 (3d Cir. 2010) ("Epstein cannot bring a constitutional due process claim against the NASD, because '[t]he NASD is a private actor, not a state actor.'" (citation omitted)); *see also Graman*, 1998 WL 294022, at *3 ("Every court that has considered the question has concluded that NASD is not a governmental actor."); *Marchiano v. NASD*, 134 F. Supp. 2d 90, 95 (D.D.C. 2001) ("The court is aware of no case—and Marchiano has presented none—in which NASD Defendants were found to be state actors either because of their regulatory responsibilities or because of any alleged collusion with criminal prosecutors.  In fact, every court that has addressed those issues has rejected Marchiano's arguments.").

(contrasting defendant, a state actor, with "private self-regulatory organizations" in the securities space, such as FINRA)), *and* FINRA's TRO Opp'n at 8 (citing *Free Enterprise*, 561 U.S. at 484–86), *with* Pl.'s TRO Mot. at 9 (citing *NASD v. SEC*, 431 F.3d 803, 804–05, 807 (D.C. Cir. 2005) (referring to NASD as a "quasi-governmental agency" with "quasi-governmental authority to adjudicate actions against members" and "quasi-governmental power to discipline its members")).  That exercise, while not fruitless, is also neither particularly helpful nor binding— the D.C. Circuit has not provided clear direction and has most recently passed on the opportunity to do so.  *See Springsteen-Abbott v. SEC*, 989 F.3d 4, 7 (D.C. Cir. 2021) (referring only to the "premise that FINRA is a state actor" as "contested").

Third, policy considerations militate strongly against accepting Alpine's invitation to make the first judicial determination that FINRA is a state actor.  If FINRA were deemed a state actor, the ramifications would be significant and far-reaching—or in FINRA's words, would cause a "seismic shift in state action jurisprudence." Hr'g Tr. at 73:23–74:9.[8]  Not only would Alpine be free to continue conduct FINRA previously found harmful to Alpine's customers absent an immediate enforcement action, *see* FINRA's Supp. Br. at 2–3, a finding that FINRA is a state actor would undermine Congress's express intent to establish a private, self-regulatory system in the securities industry, *see id.* at 3–4; Gov't's Supp. Br. at 3.  Relatedly, FINRA would

---

[8]        To elaborate, FINRA posited that finding this entity to be a state actor would amount not only to a departure from the "unanimous consensus" to the contrary, FINRA's Supp. Br. at 2, but also would jeopardize investor safety and market stability.  For instance, subjecting SROs to federal constitutional requirements would impact "a vast range of industries, from railroads and airlines to utilities and hospitals[]" *id.* at 3–4, and would "impos[e] unwarranted constitutional roadblocks on [FINRA's] oversight of its broker-dealer members," potentially including a Fifth Amendment privilege not to testify despite FINRA's lack of subpoena power, *id.* at 5.  Treating FINRA as a state actor would also "upend the well-functioning status quo" between FINRA and the SEC by shifting duties from the former to the latter.  *Id.* at 6.  "[D]ozens of other SROs responsible for carrying out enforcement functions and other regulatory responsibilities" would also be subject to constitutional requirements as state actors. *Id.*  Finally, risking the stability of the current SRO structure in the securities industry "could create the risk of significant liquidity or credit problems among financial institutions or markets and thereby threaten the stability of the U.S. financial system." *Id.* at 7–8.

be exposed to constitutional and administrative challenges from which Congress specifically sought to insulate FINRA, *see* FINRA's Supp. Br. at 5; Gov't's Supp. Br. at 2, as recognized by the Supreme Court, *see Free Enterprise*, 561 U.S. at 484–86 (finding the Public Company Accounting Oversight Board ("PCAOB") to be a state actor and distinguishing this body from SROs in the securities industry, citing that the PCOAB is created by statute, its leadership is government-appointed, and it has "expansive powers to govern an entire industry").  Finally, such a finding could significantly impact the SEC's oversight role of FINRA, which is far more active in regulating aspects of the securities industry that the SEC currently does not touch, resulting in a potentially dramatic increase to the SEC's workload.  *See* FINRA's Supp. Br. at 6; Gov't's Supp. Br. at 4.  Although plaintiff attempts to paint the relief it *now* requests as narrow, *see* Pl.'s Supp. Br. at 1–2, the operative complaint states otherwise and asks for a significant remedy that would declare "that FINRA is a state actor obligated to respect the rights guaranteed under the United States Constitution," SAC, Prayer for Relief ¶ 1, and "that FINRA is presently constituted and operating in a manner that violates the Constitution," *id.* ¶ 2.

In vigorously urging that FINRA be deemed a state actor, plaintiffs make one thing crystal clear: plaintiffs are disgruntled members of FINRA.  *See, e.g.*, SAC ¶¶ 64–73 (criticizing the selection and operation of FINRA's board), 74–83 (disparaging FINRA's independence and supposed lack of industry representation on the board), 87 (accusing FINRA of taking retaliatory action against members of the microcap market such as plaintiffs), 100–110 (lodging complaints about FINRA's fee structure, budget, and board-approved executive salaries), 129 (asserting that the Enforcement Proceeding is FINRA's attempt "to obtain the corporate death penalty" against Alpine).  Unfortunately for plaintiffs, however, their present challenge is not an effective way to file—let alone remedy—their grievances against FINRA.  For instance, the relief they request

would not cure all the deficiencies enumerated in their complaint.  Declaring FINRA to be a state

actor would not necessarily result in restructuring FINRA's board, its executive compensation

structure, or its allegedly retaliatory motives against the microcap industry.  SCA attempted to

assert some of these claims against FINRA in 2019, but the district court dismissed the suit for

lack of subject matter jurisdiction, and the D.C. Circuit affirmed that judgment after finding that

SCA's breach of contract claim required administrative exhaustion prior to judicial review.  *See*

*Scottsdale Cap. Advisors Corp. v. FINRA*, 811 F. App'x 667, 668–69 (D.C. Cir. 2020) (Mem.).

Plaintiffs may not now try to repackage those grievances as constitutional claims to obtain

judicial review under the Supreme Court's recent *Axon* decision.

Since FINRA is unlikely to be a state actor, plaintiff's separation of powers, Appointment

Clause, Fifth Amendment, and Seventh Amendment claims are also likely foreclosed.

### 2.     *FINRA Does Not Violate the Private Nondelegation Doctrine*

Pleaded in the alternative, plaintiffs next argue that the Exchange Act "improperly and

unconstitutionally delegates legislative power to an entity outside the Legislative Branch."  SAC

¶ 160.  Alpine's motion for injunctive relief then focuses on FINRA's alleged violation of the

private nondelegation doctrine, arguing that "Congress and the SEC have managed to delegate

and outsource enforcement of federal securities law to a private entity that can ignore

fundamental constitutional rights."  Pl.'s TRO Mot. at 20.  Defendants counter that no such

violation is present because "FINRA functions subordinately" to the SEC, which maintains

"authority and surveillance over FINRA's activities."  Gov't's Opp'n at 8 (citation omitted);

*accord* FINRA's TRO Opp'n at 11–13.  Defendants are again likely correct.

"Federal agencies may not subdelegate their 'decision-making authority . . . to outside

entities—private or sovereign—absent affirmative evidence of authority to do so.'"  *Louisiana*

*Pub. Serv. Comm'n v. FERC*, 860 F.3d 691, 696 (D.C. Cir. 2017) (*quoting U.S. Telecom Ass'n v. FCC*, 359 F.3d 554, 566 (D.C. Cir. 2004)).  Aside from explicit statutory authority, an agency delegation to a private entity is valid if the agency exercises "authority and surveillance" over the private actor and "law-making remain[s] in the hands of the agency and [is] 'not entrusted to the industry.'"  *Ass'n of Am. R.R. v. U.S. Dep't of Transp.*, 896 F.3d 539, 546 (D.C. Cir. 2018) (quoting *Sunshine Anthracite Coal Co. v. Adkins*, 310 U.S. 381, 399 (1940)).

Congress intended that SROs, like FINRA, would fulfill a supervisory role over the securities industry.  *See* 15 U.S.C. § 78o-3(b) (listing requirements of a broker-dealer association for the SEC to characterize the organization as a national securities association).  Yet SROs' authority is subordinate to the SEC's ultimate control and oversight.  The SEC may suspend or revoke FINRA's registration if "necessary or appropriate in the public interest, for the protection of investors, or otherwise in furtherance of the purposes of [the Exchange Act]."  15 U.S.C. § 78s(h)(1).  While FINRA promulgates its own rules and standards for professional conduct, those rules are reviewed and approved by the SEC with very limited exceptions.  *See Turbeville*, 874 F.3d at 1270 (describing the SEC's oversight duties); 15 U.S.C. § 78s(b)–(c).  The SEC at any time may "abrogate, add to, and delete from" any FINRA rule.  *Id.* § 78s(c).

Although FINRA may take the first step in investigating and disciplining an entity for violation of its rules, an SEC regulation, or a statutory provision, *id.* § 78o-3(b)(7), any adjudication by FINRA is subject to *de novo* and *sua sponte* review by the SEC, *id.* § 78s(d)(2); Commission Rule of Practice 452, 17 C.F.R. § 201.452.  Such structure has resulted in a finding that federal securities laws do not amount to an unconstitutional delegation by every court to consider the issue.  *See, e.g.*, *Oklahoma v. United States*, 62 F.4th 221, 229 (6th Cir. 2023); *Sorrell v. SEC*, 679 F.2d 1323, 1325–26 (9th Cir. 1982); *First Jersey Secs., Inc. v. Bergen*, 605

F.2d 690, 697 (3d Cir. 1979); *Todd & Co. v. SEC*, 557 F.2d 1008, 1012–13 (3d Cir. 1977); *R.H. Johnson v. SEC*, 198 F.2d 690, 695 (2d Cir. 1952).  This Court sees no reason to depart from those findings and as such holds that plaintiffs' private nondelegation doctrine claim is unlikely to succeed on the merits.[9]

### 3.     *Plaintiffs' First Amendment Claim Lacks Merit*

Finally, plaintiffs challenge broker-dealers' "forced" association with FINRA "in order to engage in their chosen profession."  SAC ¶ 164.  Defendants argue that the Exchange Act's requirement that registered broker-dealers join FINRA "does not alone implicate any First Amendment right" and that, because "[p]laintiffs do not assert any 'expressive purpose[]' for which they wish to avoid association with FINRA," plaintiffs' First Amendment claim must fail. Gov't's Opp'n at 19; *accord* FINRA's TRO Opp'n at 13–14.  Again, defendants' arguments have a substantial likelihood of prevailing.

Certainly, the First Amendment's protection of freedom of speech also extends to protect "[t]he right to eschew association for expressive purposes."  *Janus v. Am. Fed'n of State, Cnty., and Mun. Emps., Council 31*, 138 S. Ct. 2448, 2463 (2018); *see Roberts v. U.S. Jaycees*, 468 U.S. 609, 623 (1984) ("Freedom of association . . . plainly presupposes a freedom not to associate.").  Freedom of expressive association, however, is not absolute.  *Boy Scouts of Am. v. Dale*, 530 U.S. 640, 648 (2000).  Rather, the Supreme Court has held that a regulation may

---

[9]     Plaintiffs' complaint alludes to a public nondelegation claim as well.  *See* SAC ¶ 161 ("This delegation is unconstitutional if the FINRA Board is deemed part of the federal government and is even more problematic if the FINRA Board is deemed to be a private entity.").  Although that line of argument was not pursued in plaintiff's motion for injunctive relief, assuming, *arguendo*, that FINRA qualifies as a state actor, no unconstitutional public delegation of unfettered policy-making and enforcement authority is likely displayed because, in describing the duties of SROs, Congress delineated specific objectives that SROs should strive to accomplish, providing an "intelligible principle" under the public nondelegation doctrine.  *See Sanchez v. Off. of State Superintendent of Educ.*, 45 F.4th 388, 401 (D.C. Cir. 2022) (quoting *Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 472 (2001)); *see also* 15 U.S.C. § 78o-3(b)(6) (describing the goals of an SRO's rules to include, *inter alia*, "to prevent fraudulent and manipulative acts and practices, to promote just and equitable principles of trade, . . . [and] to protect investors and the public interest").

override that right when it "serve[s] compelling state interests, unrelated to the suppression of ideas, that cannot be achieved through means significantly less restrictive of associational freedoms." *Id.* (quoting *Roberts*, 468 U.S. at 623).[10]

FINRA articulates a significantly compelling interest embodied in the Exchange Act to justify mandatory FINRA membership.  In permitting securities industry regulation through SROs, Congress intended those entities to "prevent fraudulent and manipulative acts and practices, [] promote just and equitable principles of trade, [] foster cooperation and coordination" among all industry players, "remove impediments to and perfect the mechanism of a free and open market and a national market system, and, in general, to protect investors and the public interest."  15 U.S.C. § 78o-3(b)(6).

Mandatory FINRA membership functions accordingly to ensure that broker-dealers transacting in the securities space all adhere to the same set of professional and industry standards to protect both actual and prospective securities purchasers.  *See* Gov't's Supp. Br. at 6 (citing *Roth v. SEC*, 22 F.3d 1108, 1109 (D.C. Cir. 1994)).  For instance, FINRA sets "recordkeeping and reporting obligations, fiduciary duties, and special antifraud rules[,]" Gov't's Supp. Br. at 7 (quoting *In re Registration Requirements for Foreign Broker-Dealers*, Exchange Act Release No. 34-27017, 1989 WL 1097092, at *3–4 (July 11, 1989)), as well as conducts professional training to assure industry participants that those transacting in the space are "financially capable" of doing so in accordance with regulatory standards and in pursuit of fair and transparent treatment of customers.  Gov't's Supp. Br. at 7 (citing SEC, *Persons Deemed*

---

[10]        The Supreme Court's specific test proceeds as follows.  After determining that the group engages in "expressive association," *Boy Scouts*, 530 U.S. at 648–50, whether forced inclusion "would significantly affect [the association's] ability to advocate public or private viewpoints," *id.* at 650–53, and whether inclusion of a member would significantly burden the association's expression, *id.* at 653–56, a court must then consider whether the restraint "runs afoul" of the expressive association by comparing the burden on expressive association with the state's interest in intruding into that right, *id.* at 656–59.  Although the parties dispute resolution of each consideration, the last factor, as articulated above, *see id.* at 648, is dispositive of this dispute.

*Not to Be Brokers*, Exchange Act Release No. 22172, 1985 WL 634795, at *2 (June 27, 1985)). By joining FINRA, members agree to bind themselves to standards and be held accountable if their conduct falls short—all to the benefit of free-flowing and functioning financial markets and fair treatment towards customers.  Since the compelling interest in statutorily mandated FINRA membership so outweighs any expressive association right, plaintiffs again are unlikely to succeed on their First Amendment claim.[11]

In sum, none of plaintiffs' claims in their operative complaint are likely to succeed on the merits, resulting in this factor weighing against a preliminary injunction or a TRO.

### B.       Irreparable Harm

On the second factor, Alpine argues that resolution of the pending Enforcement Proceeding may include "the corporate death penalty" of expulsion from the industry, Pl.'s TRO Mot. at 1; *accord* SAC ¶¶ 10, 129, and, further, that "subjection to an illegitimate proceeding, led by an illegitimate decision maker constitutes 'a here-and-now injury'" supporting a finding of irreparable harm, Pl.'s TRO Mot. at 22 (citing *Axon*, 143 S. Ct. at 903).  FINRA counters that any harm imposed on Alpine from the Enforcement Proceeding is "overstated" because the outcome of the proceeding would not occur for many days, possibly months, and that such a decision could then be appealed to the SEC and stayed.  *See* FINRA's TRO Opp'n at 15 (citing applicable FINRA rules on appeals of FINRA decisions).  Here, the Supreme Court's *Axon* decision tips this factor in Alpine's favor.

---

[11]       Insofar as plaintiffs frame their First Amendment claim as a challenge to mandatory funding of FINRA, *see* SAC ¶ 165, that claim, too, is unlikely to succeed on the merits.  While plaintiffs strongly criticize FINRA's funding, budget, expenditures, and executive compensation structures, such budgetary considerations and setting competitive executive salaries are part and parcel of a corporation's duties and so plaintiffs have not shown that FINRA uses any of its funding to engage in activity that is not germane to its purpose, rendering these complaints, no matter how meritorious, irrelevant to their First Amendment claim.  *See Keller v. State Bar of Cal.*, 496 U.S. 1, 13–14 (1990).

At the outset, Alpine bluntly states that FINRA's Enforcement Proceeding subjects it to potential expulsion from the industry, an existential threat to its business that would force the company to cease operations, and so the proceeding must be delayed.  *See* Pl.'s TRO Mot. at 22–23.  Yet, Alpine faces precisely the same expulsion penalty under the March 2022 Panel Decision currently on review by the NAC.  *See generally* March 2022 Panel Decision.  Enjoining the NAC review process, however, is not the focus of the injunctive relief Alpine now seeks, despite the fact that expulsion may be inevitable if the March 2022 Panel Decision is upheld.  That consequence does not arise from any lack of due process afforded to Alpine at the original enforcement proceeding leading to the March 2022 Panel Decision now on appeal to the NAC, nor from the ongoing Enforcement Proceeding, nor even from plaintiffs' asserted constitutional claims.  Rather, that consequence appears to be the result of Alpine's failure to comply with FINRA's permanent cease-and-desist order issued as part of the March 2022 Panel Decision.  In the face of that decision, which took immediate effect on March 22, 2022, Alpine is suspected of flouting FINRA's directive to cease harmful conduct by failing to comply with FINRA's permanent cease-and-desist order.  *See* FINRA's TRO Opp'n, Ex. B, Pet. for a Hearing & the Imposition of Sanctions – Preliminary Statement ("Pet. for Enforcement Proceeding") ¶¶ 1–2, ECF No. 70-2 ("FINRA's Department of Enforcement requests a hearing . . . and the imposition of sanctions against Respondent Alpine . . . for violating a March 22, 2022 Permanent Cease and Desist Order . . . .  Alpine disregarded the terms of the [Order], which was intended to prevent the firm from harming customers through ongoing acts of misconduct.").  In allegedly defying the permanent cease-and-desist order—by FINRA's count, more than 35,000 times—FINRA decided that, due to Alpine's chronic recidivism, this SRO had little choice but to take expedited steps to expel the company from the industry even while Alpine's appeal of the March 2022

Panel Decision is pending, a decision, as noted, that also recommended expulsion.  *See* Pet. for
Enforcement Proceeding ¶¶ 5–6.

In context, Alpine now seeks to employ extraordinary equitable relief to halt FINRA's
continuing enforcement of its own orders, under the cloak of several asserted constitutional
claims so that this Court can save Alpine from harm allegedly due to its own defiance of those
orders.  Granting the requested TRO and consequently delaying the Enforcement Proceeding
would thus sanction Alpine's alleged noncompliant conduct with FINRA's permanent cease-and-
desist order.  Such a ruling would encourage violators to race to district court with constitutional
claims to delay or halt enforcement proceedings, providing a direct mechanism to subvert
FINRA's enforcement of its own orders designed to protect the securities industry.  Nonetheless,
the irreparable harm factor focuses on the harm to the *plaintiff* seeking the relief, though the
source of that harm is noteworthy in weighing these equitable factors.

On that point, Alpine invokes *Axon* to argue that its assertion of constitutional claims
against FINRA and its adjudicatory process subjects the company to a "here-and-now injury"
and automatically triggers a finding of irreparable harm.  *See* Pl.'s TRO Mot. at 22–23 (quoting
*Axon*, 143 S. Ct. at 903).  Indeed, the Supreme Court expressed the view that being subjected to
an adjudicatory process that a plaintiff claims is constitutionally flawed is "impossible to remedy
once the proceeding is over" and a "grievance [for which] the court of appeals can do nothing:
[a] proceeding that has already happened cannot be undone."  *Axon*, 143 S. Ct. at 903–04.
Alpine is right that this strong language in *Axon* must be viewed as a consideration relevant to
irreparable harm, *see* Hr'g Tr. at 63:7–13 (Alpine agreeing that the "here-and-now injury"
language in *Axon* is the Supreme Court "putting its thumb on the scale among the preliminary
injunctive factors for irreparable harm"), and neither FINRA nor the government, as intervenor-

27

defendant, present much argument against this view, *see, e.g.*, Hr'g Tr. at 78:13–80:11 (FINRA arguing only that *Axon* does not alter the preliminary injunction analysis); *id.* at 89:4–90:6 (referencing the government's choice not to take a position on certain preliminary injunction factors before stating that nothing in *Axon* displaces the preliminary injunction factors). Consequently, under the Supreme Court's explicit language, the nature of the constitutional claims asserted here, no matter their unlikelihood of success, suffice to show irreparable harm to Alpine, even though any such harm may stem directly from Alpine's noncompliant actions.[12]

## C.   Balance of Equities and the Public Interest

Finally, the parties contest where other interests lie.  Alpine argues that, FINRA "waited years to assert [its] claims [against Alpine] and would suffer no prejudice" from a delay in the Enforcement Proceeding and that the public has an interest in "assuring that Alpine is not subject to unconstitutional treatment at the hands of FINRA."  Pl.'s TRO Mot. at 23 (footnote omitted).

---

[12]   Although not argued by the parties, *Axon*'s extraordinary language in addressing the "problem . . . stemming from the interaction between the alleged injury and the timing of review," *id*. at 903, raises the question of whether the Supreme Court's comparison of a challenge to the constitutionality of an adjudicative body to the collateral order doctrine, *see Axon*, 143 S. Ct. at 904–06, is intended to ensure that constitutional claims must be given threshold consideration in district court, warranting an automatic stay of the challenged adjudication until resolution of the constitutional issues.  Under that reading of *Axon*, which invokes the collateral order doctrine to propose that a constitutional challenge must be decided first similarly to consideration of "immunity doctrines," *id.* at 904–05, whether any of the preliminary-injunctive factors are met would become beside the point.  On this point, *Axon* applies that reasoning to the facts before the Supreme Court, adding that "certain rights 'not to stand trial' or face other legal processes . . . are 'effectively lost' if review is deferred until after trial. . . . So too here."  *Id.* at 904 (internal citations omitted).  The Supreme Court's recent vacatur of a D.C. Circuit decision, which required a constitutional challenge to the Federal Energy Regulatory Commission ("FERC") to be exhausted before the agency, pursuant to the applicable statutory review scheme, signals that intention to broaden the collateral order doctrine. *See Bohon v. FERC*, No. 22-566, 2023 WL 3046112 (Apr. 24, 2023) (Mem.), *vacating*, 37 F.4th 663 (D.C. Cir. 2022).  The specter, then, of dual-tracked proceedings—one before federal district court and another before a federal agency or adjudicatory body—raises the further question of what procedural mechanism is proper for managing the interaction between those proceedings.  One option is expedited briefing of dispositive motions before the federal district court to resolve the merits of the constitutional challenge quickly, only halting the adjudicatory body's proceeding on a short-term basis.  *See, e.g.*, *Sidak v. U.S. Int'l Trade Comm'n*, No. 23-cv-325 (TNM), 2023 WL 3275635, at *4 n.3, *5–7, *13 (D.D.C. May 5, 2023) (in resolving the expedited motion for summary judgment, in this "unusual" case, carefully applying *Axon* to hold that plaintiff's Appointments Clause challenge to International Trade Commission Administrative Law Judges was ripe for review because, among other things, plaintiff was not a party to the underlying agency enforcement action and "had no obligation (nor opportunity) to earlier raise this claim in federal court").  All that said, because Alpine has not invoked *Axon* beyond the considerations of irreparable harm relevant to its pending motion for equitable relief, this case is no occasion to opine on these lingering questions.

Conversely, FINRA argues that "[a] preliminary injunction would impair FINRA's pursuit of its regulatory mandate and undermine the public interest by barring FINRA" from enforcing its orders, including those against Alpine.  FINRA's TRO Opp'n at 16.  FINRA is correct.

FINRA has an interest in protecting the public from the harms caused by broker-dealers engaging in securities violations.  This is the very mission of this SRO.  That overwhelming interest is especially important in FINRA's case of conducting expedited enforcement actions to halt the imminent risk to the public presented by bad actors potentially resulting in millions of dollars lost from customers, like those that initiated FINRA's investigation against Alpine in 2019.  *See* March 2022 Panel Decision at 2 ("Enforcement's investigation of Alpine Securities began when some of Alpine Securities' customers complained to FINRA about, among other things, the firm's $5,000 monthly account fee.").  The risk of harm to the public from an alleged bad actor openly and repeatedly flouting a remedial cease-and-desist order issued by a FINRA panel, allegedly thousands of times, at the expense of customers, is significant and concrete compared to Alpine's interest in asserting constitutional claims against FINRA that have an unlikelihood of success for the reasons already summarized.  As such, the balance of equities and public interest disfavor any injunctive relief.

* * *

In considering the four factors in total, while irreparable harm tips in Alpine's favor, the other factors strongly weigh against granting plaintiff's request for equitable relief and so such relief is inappropriate here.

## IV.    CONCLUSION

For the foregoing reasons, plaintiffs' Motion for Reconsideration of Minute Order Denying Emergency Preliminary Injunction Motion is granted and plaintiffs' Renewed

Emergency Motion for Preliminary Injunction and Temporary Restraining Order is denied.  An

Order consistent with this Memorandum Opinion will be entered contemporaneously.

    Date:  June 7, 2023

                                      _____

                                      BERYL A. HOWELL
                                      District Judge