## UNITED STATES DISTRICT COURT FOR
## THE DISTRICT OF COLUMBIA

SCOTTSDALE CAPITAL ADVISORS
CORPORATION and ALPINE SECURITIES
CORPORATION,

      *Plaintiffs*,

v.

FINANCIAL INDUSTRY REGULATORY
AUTHORITY, INC.,

      *Defendant*,

UNITED STATES OF AMERICA,

      *Intervenor Defendant*.

Case No.: 1:23-cv-1506-BAH

## THIRD AMENDED COMPLAINT FOR DECLARATORY AND
## INJUNCTIVE RELIEF

Plaintiffs, Scottsdale Capital Advisors Corporation ("SCA") and Alpine Securities

Corporation ("Alpine") (collectively, "Plaintiffs"), sue Financial Industry Regulatory Authority,

Inc. ("FINRA") and allege as follows:

### INTRODUCTION

1.     In this action, Plaintiffs challenge the unconstitutional structure and operations of

FINRA, the purportedly "private" front-line regulator of the American securities industry.

2.     Despite purporting to be a private corporation and self-regulatory organization,

FINRA wields massive governmental power and authority over the securities broker-dealer

industry and the financial markets while simultaneously denying that it has any obligation to

exercise its power in accordance with the United States Constitution.

3.     FINRA investigates, prosecutes, and imposes penalties—including permanent

expulsions from the United States securities industry—for alleged violations not only of FINRA's

own rules but also of the federal securities laws. FINRA's supposed federal government supervisor, the Securities and Exchange Commission ("SEC"), has permitted and even encouraged this development, embracing and expanding a "private" enforcement arm and enabling it to engage in aggressive action unburdened by the dictates of the Constitution or democratic accountability.

4.     FINRA's leadership is not selected by or accountable to anyone in the Executive Branch. FINRA's current structure and exercise of federal power contravene Article II of the United States Constitution, including the Take Care Clause, the Appointments Clause, and the guarantees of presidential supervision and removal.

5.     Because FINRA purports to be a private entity, the President of the United States— the holder of *all* Executive Power under Article II—holds no power over FINRA despite its exercise of significant federal executive power over other private parties and individuals. FINRA's structure and exercise of unsupervised federal power subverts basic principles of representative government and democratic accountability.

6.     FINRA uses its unfettered executive power to dismantle sub-industries and punish disfavored industry actors with whom FINRA disagrees. FINRA exercises its own policymaking judgments through, among other tools, the most classic exercise of federal executive power— prosecutorial discretion.

7.     Further, FINRA wields its prosecutorial and adjudicatory power through in-house tribunals in a manner contrary to the Fifth and Seventh Amendments of the United States Constitution, depriving private parties of liberty and property—including the right to carry on a business in their chosen industry consistent with federal law—without due process of law.

8.     These constitutional violations are compounded by the fact that, although the legislation providing for the establishment of self-regulatory organizations ("SRO") expressly envisioned self-regulation as well as multiple and voluntary associations, Congress decades later

made membership *mandatory*. Now, to participate as a broker or dealer in this country, a firm or individual is required to join FINRA and thereby sacrifice essential constitutional rights. As a result, any firm or individual can be stripped of their livelihood and property by a corporation that is no longer self-regulated and without adherence to due process of law or the Constitution's critical structural protections.

9.    FINRA performs a variety of important federal functions: "adjudicatory, regulatory, and prosecutorial functions, including implementing and effectuating compliance with securities laws[.]" *Weissman v. NASD*, 500 F.3d 1293, 1296 (11th Cir. 2007); *see NASD v. SEC*, 431 F.3d 803, 805–06 (D.C. Cir. 2005).

10.    And FINRA's by-laws further empower it to undertake the full gamut of regulatory responsibilities. The Board of Governors is "the governing body of the Corporation" and is "vested with all powers necessary for the management and administration of the affairs of the Corporation and the promotion of the Corporation's welfare, objects, and purposes." *FINRA By-Laws*, Art. VII, § 1. In the exercise of such powers, the Board has the authority to, *inter alia*, "make such regulations, issue such orders, resolutions, exemptions, interpretations . . . and directions, and make such decisions as it deems necessary or appropriate"; "establish rules and procedures to be followed by members in connection with the distribution of securities"; and "engage in any activities or conduct necessary or appropriate to carry out the Corporation's purposes under . . . the federal securities laws." *Id.* (emphasis added).

11.    FINRA also has rulemaking authority, and its rules carry the force and status of federal law. *See Birkelbach v. SEC*, 751 F.3d 472, 475 n.2 (7th Cir. 2014); *see also* 15 U.S.C. § 78s(b). Indeed, FINRA's rules are so well established as federal law that they preempt contrary state law. *See Whistler Invs., Inc. v. Depository Tr. & Clearing Corp.*, 539 F.3d 1159, 1168 (9th

Cir. 2008). Remarkably, the SEC can even "aid in the enforcement" of FINRA's rules. 15 U.S.C. § 78u(a)(1).

12.    FINRA rules also carry the trappings of federal law; the SEC is directed by statute to publish FINRA's rule changes in the Federal Register. See 15 U.S.C. § 78s(b)(2)(E).

13.    Were there any doubt about the modern FINRA's status as the "private" enforcer of our federal securities laws, the Court may take FINRA's word for it. FINRA has repeatedly claimed in litigation, enforcement proceedings, and public guidance that its rules are federal law. *See, e.g., In re Dep't of Enf't v. Charles Schwab & Co.*, 2014 WL 1665738, at *16 (FINRA Bd. of Govs. Apr. 24, 2014) ("FINRA rules have the force and effect of a federal regulation."); FINRA Regulatory Notice 16-25 at 3 (July 22, 2016) ("FINRA's rules . . . have the force of federal law. FINRA rules are not mere contracts that member firms and associated persons can modify.").

14.    FINRA's structure and exercise of federal power constitutes an impermissible delegation of government power to a private actor.

15.    If FINRA is permitted to exercise federal power at all, it must do so subject to the Constitution's limitations on federal power.

16.    As relevant here, FINRA has wielded its claimed power against the Plaintiffs, and both Plaintiffs are continually harmed by FINRA's unconstitutional structure and exercise of federal power.

## JURISDICTION AND VENUE

17.    This Court has subject-matter jurisdiction over this case pursuant to 28 U.S.C. §§ 1331 and 2201, and 15 U.S.C. §78aa.

18.    This matter was transferred to this District following FINRA's motion for change of venue. Venue is proper in the District of Columbia, FINRA's headquarters and principal place of business.

## PARTIES

19.     SCA is a broker dealer that has a principal office in Scottsdale, Arizona. As required by federal law, SCA is a registered member of and is regulated by FINRA.

20.     Alpine is a broker dealer with its principal office in Salt Lake City, Utah. As required by federal law, Alpine is a registered member of and is regulated by FINRA.

21.     FINRA is a national securities association registered with the SEC pursuant to 15 U.S.C. § 78s and is authorized and directed thereunder to enforce the Securities Exchange Act of 1934 (the "Exchange Act"), the SEC's rules and regulations thereunder, and its own rules, which themselves carry the force of federal law.

22.     FINRA is a Delaware not-for-profit corporation with its principal place of business located at 1735 K Street NW, Washington D.C. FINRA maintains offices and conducts business throughout the United States, including, as alleged above, in this District.

23.     Plaintiffs have standing to assert these claims because they are regulated parties and are required by federal law to become members of FINRA and subject themselves to FINRA's unconstitutional exercise of federal power, including legislative, executive, and adjudicatory power. Further, both Plaintiffs have experienced the direct impact of FINRA's unconstitutional operations through FINRA threats and enforcement actions against them. FINRA's unconstitutional structure and operations have inflicted and will continue to inflict injury and damage to Plaintiffs.

24.     Because Plaintiffs' claims in this case challenge the constitutionality of FINRA's structure and operations, Plaintiffs' claims are collateral to any administrative proceeding involving Plaintiffs, any administrative review process, and the administrative review structure set forth in the Section 15A of the Exchange Act. The claims asserting constitutional violations are appropriately before this Court.

5

## GENERAL ALLEGATIONS

### I.    The History of FINRA

25.    In 1934, Congress enacted the Exchange Act, which required securities firms to register with the SEC to act as a broker or dealer and effect transactions other than on a national securities exchange.

26.    In 1938, Congress passed the Maloney Act, adding a new section 15A to the Exchange Act. Section 15A authorized associations of brokers or dealers meeting certain statutory requirements to register with the SEC as a "national securities association." The Maloney Act's voluntary national securities associations were to be the over-the-counter ("OTC") market counterparts to the regulatory arms of the exchanges (i.e., self-regulatory organizations).

27.    As the SEC explained shortly after the Maloney Act's passage, the Act embodied "the principle of conferring upon regulatory groups from business a primary responsibility for enforcing high standards of business conduct upon their members . . . [by setting] up a system of regulation in the over-the-counter markets through the formation of voluntary associations of investment bankers, dealers and brokers doing business in these markets under appropriate Governmental supervision." SEC, *Fourth Annual Report of the Securities and Exchange Commission: Fiscal Year Ended June 30, 1938* (Washington, D.C., SEC 1938), at 33. Thus, the purpose and intent of the legislation was to rely on "voluntary associations" comprised of those who possess the knowledge and practical experience borne of "doing business in these markets." *Id.*

28.    A year later, the National Association of Securities Dealers ("NASD") became the first and only registered national securities association. Because no other associations had registered with the SEC, the NASD was the only SRO with "responsibility for enforcing … a system of regulation" for brokers and dealers in the OTC markets. *Id.*

29.     In 1983, Congress *mandated* that broker-dealers seeking to conduct business in the OTC markets register with the NASD and become subject to the NASD's regulatory powers. Membership was no longer voluntary.

30.     In addition to the NASD, the New York Stock Exchange ("NYSE") played a significant role as an SRO enforcing securities laws and implementing a regulatory framework through its own rules.

31.     In 2007, the SEC approved a plan that merged the member regulation operations of the NASD and the NYSE. The NASD absorbed the regulatory arm of the NYSE and changed its name to FINRA. Since then, virtually all participants in the securities industry in this country have been required by federal law to "join" FINRA, be subject to its power and enforcement oversight, and maintain FINRA membership in order to conduct business as a broker-dealer in the United States securities markets.

## II.     Overview of FINRA's Structure and Operations

32.     FINRA's day-to-day operations involve overseeing virtually every aspect of and every participant in the American securities industry. FINRA regulates approximately 3,400 brokerage firms, 150,000 branch offices, and more than 610,000 individual registered securities representatives. Nearly all of FINRA's revenue is derived from its regulatory activities in the form of fees, fines, penalties, and sanctions levied against its members.

33.     FINRA is governed by its Board which oversees the management and administration of FINRA's operations and enforcement authority.

34.     FINRA's Board is comprised of 22 members, less than half of which are "industry governors"—i.e. those that operate within the securities industry. The remaining Board members are comprised of "public governors"—those who have no material business in the industry—and FINRA's CEO.

35.    FINRA's day-to-day operations are managed by FINRA's executives, who are in turn appointed by FINRA's Board.

36.    As part of its purported regulation of broker-dealers, FINRA is responsible for adopting and implementing rules and procedures to discipline its members under federal law. To do this, FINRA employs an in-house judicial system to adjudicate the charges leveled against broker-dealers by FINRA's staff.

37.    FINRA's disciplinary proceedings are managed by the Office of Hearing Officers led by the Chief Hearing Officer, who is appointed by FINRA's CEO.

38.    In turn, the Chief Hearing Officer appoints a panel of hearing officers who preside over disciplinary proceedings, issue decisions, and assess fines and sanctions against private parties. These hearing officers possess power and authority beyond that of a mere employee or functionary and exercise significant duties and discretion, akin to that of federal trial judges.

39.    Hearing officers' decisions, like those of Administrative Law Judges of the Securities and Exchange Commission, may become final and effective without any further consideration or review.

## III.    FINRA Wields Expansive and Unchecked Federal Power.

40.    FINRA purports to be a private, government-authorized entity responsible for overseeing broker-dealers in the United States. In reality, FINRA exercises federal government power, wielding expansive executive and judicial power, including the power to "enforce compliance" with the Exchange Act and other federal securities laws, to regulate the conduct of its members through rulemaking and adjudication, to conduct inspections of brokers and dealers, to conduct investigations and disciplinary proceedings, and to impose sanctions and otherwise to enforce compliance with the Exchange Act, FINRA's rules, professional standards, and the securities laws.

41.     FINRA also possesses and deploys improperly and unconstitutionally delegated legislative power, including, but not limited to, its broad power to enact law, its authority to set its own budget without any constraint or legislative cap, and its authority to fund that budget through the imposition of a levy on all persons wishing to conduct business in the OTC markets and, indirectly, on those investors that wish to participate in those markets.

42.     In total, FINRA claimed over $1.6 billion in "operating revenues" in 2024, with total net income exceeding $99 million. Over 67% of its operating revenue—more than $1 billion—was used for compensation and benefits for FINRA employees.

43.     FINRA also deploys its broad powers to impose burdensome, arbitrary, and ill-defined standards that it requires its members to follow, and it enforces those standards in a discriminatory and unfair manner, without consultation with or supervision by any duly appointed constitutional officer. FINRA determines who it will investigate, the tools that it will deploy, and the appropriateness of its unfettered and continuous demands for documents and testimony.

44.     Critically, involvement by SEC commissioners in this onerous and impactful process of prosecution occurs only when—and if—a target of an investigation survives the investigation, prosecution, and internal appeal process.

45.     Despite FINRA's vast enforcement and regulatory power, FINRA's powers are largely unchecked.

46.     FINRA, its Board, and its executives and officers are entirely insulated from any supervision or control by the President of the United States. FINRA's Board and its executives and officers are not appointed or removable by the President or by the head of any Executive Branch department answerable to the President.

47.     While the NASD was self-regulated by the industry, FINRA's Board is now required to have a majority of non-industry members. The Board is selected by FINRA's members

and can only be removed by a majority vote of FINRA's Board or, in very limited and specific circumstances, the SEC.

48.    FINRA's executives and officers are appointed and can only be removed by the Board.

49.    The SEC may only remove members of the FINRA Board if they have "willfully violated" applicable laws or regulations, "willfully abused" their authority, or "failed to enforce compliance" with applicable laws and regulations "without reasonable justification or excuse." And SEC commissioners themselves cannot be removed by the President at will.

50.    Thus, because the President cannot remove SEC commissioners without cause, and because the SEC cannot remove FINRA Board members without cause, the Board and its appointed executives and officers are unconstitutionally insulated from Presidential control and oversight.

51.    FINRA's acquisition and deployment of core executive power, insulated from Presidential oversight, impermissibly impedes and undermines the President's ability to perform his constitutional duties and prerogatives. As a result, the operation of FINRA, as well as its implementation of responsibilities delegated to it by the SEC and the Maloney Act, violates the Constitution.

## IV.    FINRA's Hierarchy and its In-House Tribunals Violate the Appointments Clause.

52.    Because FINRA and its officers exercise significant authority pursuant to the laws of the United States, FINRA's officers are officers of the United States whose appointment must comply with the Appointments Clause of the United States Constitution.

53.    The Appointments Clause provides, in relevant part, that the President "shall nominate, and by and with the Advice and Consent of the Senate, shall appoint Ambassadors, other public Ministers and Consuls, Judges of the supreme Court, and all other Officers of the United

States, whose Appointments are not herein otherwise provided for, and which shall be established by Law: but the Congress may by Law vest the Appointment of such inferior Officers, as they think proper, in the President alone, in the Courts of Law, or in the Heads of Departments." U.S. CONST. art. II, § 2. cl. 2.

54.     By virtue of the discretion, duties, functions, and independence of the FINRA Board, members of the FINRA Board are principal officers whose appointments must be made by the President with the advice and consent of the Senate as is required in relation to other government agencies. Accordingly, the selection of the FINRA Board by its membership with no input or oversight from the President or the Senate violates the Appointments Clause.

55.     In the alternative, the members of the FINRA Board are inferior officers whose appointments must be made by the President, a court of law, or the head of a department. Because FINRA's board is not appointed by the President, a court of law, or the head of a department of government, the appointment of the FINRA Board violates the Appointments Clause.

56.     Similarly, FINRA employs other executives and officers to operate FINRA and carry out its essential functions. By virtue of their discretion, duties, functions, and independence, FINRA's executives and officers are principal officers, or alternatively, inferior officers subject to the Appointments Clause.

57.     FINRA also utilizes an in-house hearing officers to adjudicate charges leveled against FINRA members by FINRA's staff. These hearing officers' decisions are subject to review by yet another component of the FINRA structure, its own National Adjudicatory Council, and FINRA members cannot seek review outside FINRA or from a court unless they traverse two separate in-house FINRA proceedings.

58.     The members of the National Adjudicatory Council are also appointed by the FINRA Board. FINRA requires a majority of the National Adjudicatory Council to consist of

individuals who have no material business in the industry. The FINRA Board can remove any or all of the members of the National Adjudicatory Council "at any time for refusal, failure, neglect, or inability to discharge the duties of such office, or for any cause affecting the best interests of the National Adjudicatory Council the sufficiency of which the FINRA Board shall be the sole judge." By-Laws of FINRA Regulation, Inc., § 5.8, https://perma.cc/HB8H-KETD.

59.    FINRA hearing officers and the National Adjudicatory Council render decisions that can result not only in substantial penalties but also in the closure of an entire firm or the barring of an individual, impacting the property and livelihood of FINRA members.

60.    FINRA hearing officers have powers akin to Administrative Law Judges. They are empowered to take testimony, conduct trials, rule on the admissibility of evidence, and enforce compliance with discovery orders.

61.    FINRA hearing officers are "officers of the United States" within the meaning of the Appointments Clause. Yet FINRA's hearing officers are chosen by FINRA staff and are not appointed in the manner prescribed by the Appointments Clause. Their appointments, actions, and decisions are therefore unconstitutional and invalid.

## V.    FINRA No Longer Functions as a "Self" Regulatory Organization.

62.    FINRA's members have no control over FINRA's operations, have no authority to approve or disapprove of FINRA rule proposals or interpretations, and play no role in the administration of the disciplinary process. Moreover, FINRA has sole and unfettered prosecutorial discretion in deciding which matters to investigate and prosecute.

63.    FINRA's bylaws have been changed to require that the number of public governors must exceed the number of industry governors and critical committees of FINRA must now be comprised of a majority of non-industry representatives.

64.     Thus, despite at times being labeled a "self" regulatory organization, FINRA is not controlled by the industry it purports to self-regulate. *See* David R. Burton, *Reforming FINRA*, Backgrounder No. 3181 at 2, HERITAGE FOUND., Feb. 1, 2017; McLaughlin, *Is FINRA Constitutional?*, 43 SEC. REG. & L. REP. 681 (Mar. 28, 2011) ("far from being 'members' of FINRA comparable to the former owners of seats in the NYSE and their associates, securities firms are today the functional equivalent of regulated entities with little or no input into FINRA's regulatory policy or corporate governance").

65.     As observed by SEC Commissioner Hester Peirce, "FINRA is not a self- regulator. Its members are not regulating themselves; they are being regulated by FINRA, just as they are regulated by the SEC." Hester Peirce, *The Financial Industry Regulatory Authority: Not Self-Regulation After All*, MERCATUS CTR. OF GEORGE MASON UNIV., at 27 (Jan. 2015).

66.     FINRA has transformed from a self-regulatory organization into the front-line enforcement arm of the SEC.

67.     FINRA replaced the NASD and transformed the private regulation of the securities industry from a collaborative, member-run enterprise into a full-fledged enforcement agency in which membership is compelled, external non-industry governance is mandated, and aggressive enforcement and imposition of devastating penalties comparable to those imposed by the SEC are backed by the force of federal law.

68.     Earlier eras of self-regulation are irrelevant in light of FINRA's dramatic historical shift of recent decades.

69.     As SEC Commissioner Pierce emphasized, the member firms over which "FINRA exerts meaningful control … given the statutory requirement for membership" have only a limited ability to influence FINRA:

>      Broker-dealers in the United States are regulated by the Financial Industry Regulatory Authority (FINRA). Although commonly perceived to be a self-

> regulator, FINRA is not accountable to the industry in the way a self-regulator would be. Nor is it accountable to the public, Congress, the president, or the courts. FINRA's structure and monopoly status shield it from close oversight. Consequently, an important part of the securities markets is under the control of a regulator with limited accountability.

Hester Peirce, *The Financial Industry Regulatory Authority: Not Self-Regulation After All*, MERCATUS CTR. OF GEORGE MASON UNIV., Abstract (Jan. 2015).

70.    Former SEC Commissioner Daniel M. Gallagher expressed similar concerns regarding FINRA's lack of influence from its members in combination with its efforts to compete with the SEC in terms of prosecutorial activity:

> This decrease in the "self" aspect of FINRA's self-regulatory function has been accompanied by an exponential increase in its regulatory output. As FINRA acts more and more like a deputy SEC, concerns about its accountability grow more pronounced.

Burton, *Reforming FINRA*, Backgrounder No. 3181 at note 55; *see* Hammond, *Double Deference in Administrative Law*, 116 COLUMBIA L. REV. 1705, 1771 (Nov. 2016) ("the combination of oversight agencies' deference to SROs and judicial deference to oversight agencies undermines both the constitutional and regulatory legitimacy of SROs"). As such, it is clear that FINRA is not controlled by the industry and cannot be properly characterized as a "self" regulator.

## VI.    FINRA Exercises Federal Government Power but Eschews Any Obligation to Adhere to the Constitutional Constraints on Federal Government Power.

71.    While wielding expansive and largely unchecked governmental power, FINRA eschews any obligation to comply with the Constitution.

72.    FINRA wields massive governmental power in the securities industry and pursues actions based on delegated authority from the SEC yet insists that it is not subject to governmental obligations that apply to the very SEC power from which FINRA is delegated.

73.    FINRA claims, for example, that it is not obligated to comply with the Fifth Amendment's guarantee of due process of law or the Seventh Amendment's right to jury trial, and

it is not required to abide by the Administrative Procedure Act, the Equal Access to Justice Act, and countless other laws applicable to government regulators.

74.    FINRA's rules and procedures do not provide its members and regulated parties with the guarantee of due process of law.

75.    FINRA exercises sweeping and coercive powers in a discriminatory manner designed to disadvantage market participants who operate in sectors of the markets that FINRA disfavors as a policy matter, particularly those like Plaintiffs whose business focuses on the microcap market.

76.    FINRA is dominated by a handful of large securities brokers. Although FINRA purports to represent different segments of the securities dealer market, its Board of Governors fails to achieve this objective.

77.    FINRA also wields its enforcement authority to target, threaten, and prosecute those private parties who have chosen to challenge FINRA's assertions of authority. *See* James Fallows Tierney, *Reconsidering Securities Bars*, 29 STAN. J.L. BUS. & FIN. 134, 155 (2024) ("In recent years upwards of 85% of FINRA bars have involved what we might consider brokers flouting FINRA's regulatory authority.").

78.    FINRA does not apply the most basic rules of evidence in its proceedings. For example, paid FINRA employees are permitted to recount to a hearing panel layer upon layer of hearsay testimony regarding conversations supposedly had with investors and other regulators.

79.    Those who preside over FINRA's enforcement actions are employees of and paid by FINRA or its affiliated entities and the proceedings fail to provide for any right to a trial by a jury in violation of the Seventh Amendment, even where the allegations sound in fraud or other claims for which a jury trial is afforded under the law.

80.    FINRA's disciplinary proceedings are conducted by its Office of Hearing Officers. Those hearing officers are subject to the pressure and conflict of interest that flows from being employed by one of the two litigants.

81.    Further, FINRA assigns those hearing officers to matters in ways that not only are completely opaque but also fail even to comply with the few protections that are afforded to a respondent under FINRA's own rules.

82.    FINRA also fails to recognize a Fifth Amendment privilege in its proceedings, forcing individuals such as Plaintiffs' officers to answer questions during FINRA proceedings by threatening to bar them from the industry, i.e., deprive them of their livelihood, thereby creating an untenable and illegal scenario in which one constitutional right must be sacrificed to preserve one's livelihood.

83.    And FINRA's purported review process, which again relies on review by individuals paid by FINRA, is so insubstantial that the SEC passed a rule requiring firms to book adverse FINRA awards as a liability despite the pendency of an appeal because the "grounds for revision on appeal are very limited." *See* NASD Notice to Members 00-63.

84.    FINRA holds unfettered power over market participants, yet it fails to abide by the basic constraints and protections that serve to limit agency action and preserve the critical and constitutional rights of those subject to its authority.

85.    As noted in connection with FINRA's efforts to further expand its authority:

FINRA's status as a nongovernmental regulator, however, enables it to avoid the scrutiny and procedural requirements to which a government agency performing the same tasks would be subject. Before FINRA succeeds in further expanding its regulatory footprint by taking on additional responsibilities, policymakers should revisit the long-debated questions about whether self-regulation works in its current manifestation and, if not, what should be done about it. One option would be to acknowledge that FINRA looks a lot like the SEC and accordingly fold FINRA into the SEC. Alternatively, FINRA could be remade into an organization that is run by the industry it regulates. In other words, FINRA could become a true self-regulator. Competing SROs might emerge to tailor regulation to a particular group of firms,

> such as smaller broker-dealers. Another option would be to enhance FINRA's public disclosure and procedural obligations. Procedural requirements should include a clear requirement to conduct and document economic analysis and greater procedural protections in connection with disciplinary actions.

Hester Pierce, *The Financial Industry Regulatory Authority: Not Self-Regulation After All,* MERCATUS CTR. OF GEORGE MASON UNIV., at 27-28 (Jan. 2015) (footnotes omitted).

86.     Worse yet, FINRA has achieved this result all while it enforces federal securities laws and punishes broker-dealers for alleged violations of those laws by, among other things, stripping broker-dealers of their ability to conduct any business.

87.     While FINRA denies any obligation to adhere to the Constitution, it insists that it is entitled not only to exercise governmental power, but also to enjoy the benefits of governmental immunity. FINRA has repeatedly and successfully argued that it is immune from tort suits arising from its prosecutorial, adjudicatory, and enforcement conduct on the ground that it is performing governmental functions. *See In re Series 7 Broker Qualification Exam Scoring Litig.*, 548 F.3d 110, 114 (D.C. Cir. 2008); *Weissman*, 500 F.3d at 1296 ("Because they perform a variety of vital governmental functions . . . SROs are protected by absolute immunity when they perform their statutorily delegated adjudicatory, regulatory, and prosecutorial functions.").

88.     FINRA's claimed position leads to a pernicious result: FINRA asserts it is not exercising federal power subject to constitutional constraints, but it is also not a private actor who may be sued for damages. FINRA would have itself unaccountable and immune at every turn.

89.     Where, as here, Congress has sought to outsource governmental powers to (purportedly) private actors who are supposedly not bound by the Constitution, current Supreme Court justices have found the approach impermissible, stating that the Government must remain accountable to the public and "cannot delegate regulatory authority to a private entity." *Texas v. Comm'r of Internal Revenue*, 142 S. Ct. 1308, 1309 (2022) (Alito, J., joined by Thomas, J. and

Gorsuch J.) (quoting *Dep't of Transp. v. Ass'n of Am. RRs*., 575 U.S. 43, 61 (2015) (Alito, J., concurring)).

**VII.    Plaintiffs, Other Members of the Securities Industry, and the Public Interest Have Been Harmed By FINRA's Unconstitutional Exercise of Federal Power.**

90.    FINRA's failure to abide by fundamental constraints on the delegation and exercise of governmental authority has caused and will continue to cause profound injury to participants in the securities industry, to the markets, and to the investors that FINRA claims to protect.

91.    FINRA's unconstitutional leadership has caused and/or permitted a disintegration of FINRA's self-regulatory status and an escalation of aggressive, arbitrary, and discriminatory actions against certain of its members, resulting in damage to and closure of firms and harm to investors.

92.    Under FINRA's unlawful governance, FINRA has targeted and badgered individuals and entities, including Plaintiffs, operating in the microcap markets.

93.    Thus, through its exercise of policymaking judgment exercised through unfettered prosecutorial discretion, FINRA has choked off one of the few methods of financing for start-up and developing companies.

94.    FINRA has harmed and continues to harm Plaintiffs through its unconstitutional structure and operations, which apply legislative, executive, and adjudicative power against Plaintiffs with the force of federal law.

95.    By way of example, beginning in May 2015, FINRA sought to sanction SCA for supposed violations of Section 5 of the Securities Act of 1933 (the "1933 Act").  Its determined enforcement efforts lasted over five years and included an affirmance by FINRA's NAC, before the matter reached the SEC, in September 2021. The SEC set aside all findings of violations and all sanctions as against all defendants, including the $1.5 million fine FINRA had issued to SCA.

With respect to John Hurry, the indirect owner of SCA, the SEC found that the NAC, in the appeal, developed and relied on a new theory of liability that was "untethered from any alleged violation of Section 5," *In the Matter of the Application of Scottsdale Capital Advisors Corp., et al.*, Exchange Act Release No. 93052, 2021 WL 4242630, at *9, and "deprived [Mr. Hurry] of a fair opportunity to rebut the theory under which he was held liable." *Id.*

96.    FINRA continued to exercise its prosecutorial discretion by bringing another enforcement action against Alpine in 2019. This enforcement action resulted in FINRA's Office of Hearing Officers issuing an Initial Hearing Panel Decision in March 2022 ("Initial Decision"). The Initial Decision ordered Alpine to pay over $2.3 million dollars and ordered Alpine to "cease and desist" from violating FINRA rules. Such non-substantive follow-on orders are sometimes referred to as "obey the law" orders. *See, e.g.*, *SEC v. Goble*, 682 F.3d 934, 949 (11th Cir. 2012) (expressing skepticism over the enforcement of such broad provisions).

97.    Plaintiffs proceeded to file their initial complaint in this action in October 2022.

98.    Since the filing of the initial Complaint in this action, FINRA has taken further actions against both Plaintiffs.

99.    On February 24, 2023, FINRA advised SCA, through a "Wells Notice," that FINRA's Department of Enforcement ("DOE") intended to recommend a disciplinary proceeding based on alleged failures in its anti-money laundering program during a period beginning October 2019, years earlier.  SCA submitted a response to that Wells Notice. For more than two years, FINRA has failed to initiate any proceeding while also failing to withdraw the notice.

100.    On April 19, 2023, FINRA commenced an expedited disciplinary proceeding ("the Expedited Proceeding") against Alpine based on conduct of which FINRA had long been aware and which had been the subject of litigation with FINRA for several years.

101.    In the Expedited Proceeding, FINRA alleged that Alpine violated an obey-the-law order in the Initial Hearing Panel Decision from the separate proceeding.

102.    FINRA sought to impose severe sanctions against Alpine based on Alpine's alleged failure to comply with an obey-the-law order contained in the Initial Hearing Panel Decision. An Initial Hearing Panel Decision does not become final or effective unless and until it is affirmed by FINRA's appellate tribunal, the National Adjudicatory Council ("NAC"). Yet FINRA nevertheless attempted to enforce its proposed punishment for Alpine's alleged failure to follow FINRA's earlier, non-final "obey the law" order.

103.    In addition to a $4 million fine, FINRA attempted to impose on Alpine the corporate death penalty, a permanent and irreversible expulsion of Alpine from the securities industry.

104.    Because FINRA was proceeding through an Expedited Proceeding, FINRA's rules would have deprived Alpine of *any* appellate review prior to potential expulsion from the industry.

105.    Alpine sued and succeeded in securing from the U.S. Court of Appeals for the D.C. Circuit an injunction against FINRA's self-executing power to unilaterally expel Alpine without *any* SEC review.

106.    For three years, including the entire time between Plaintiffs initiating this lawsuit and the U.S. Court of Appeals for the D.C. Circuit enjoining FINRA's self-executing power to unilaterally expel Alpine, the NAC did not issue a decision in its review of the Initial Hearing Panel Decision. On March 25, 2025, the NAC finally ruled, affirming the FINRA Hearing Officer's expulsion order against Alpine. Alpine has since appealed that decision before the SEC.

107.    On June 11, 2025, FINRA chose to dismiss without prejudice its Expedited Proceeding against Alpine.

108.    Nothing prevents FINRA from reinstituting an Expedited Proceeding, or any other enforcement procedure, against Plaintiffs at any point.

109.     On the same day that FINRA dismissed without prejudice its Expedited Proceeding against Alpine, FINRA amended its rules to stay the effectiveness of expulsions in expedited proceedings until the time for filing an application for review with the SEC has expired or until the SEC completes its review.

110.     This FINRA rule change was immediately effective before any SEC review of the rule change. Notice of the FINRA rule change was published in the Federal Register. *See* 90 Fed. Reg. 25,689 (June 2025).

111.     The proposed rule change, as FINRA chose to write it, applied only to expulsion or to sanctions that might result in expulsion.

112.     The March 2025 NAC decision, however, remains in force against Alpine.

113.      The NAC decision orders Alpine to obey FINRA rules, requires Alpine to pay $802,678.77 in "restitution" to its customers, and expels Alpine from FINRA membership and thus from the securities industry, effective if affirmed by the SEC,

114.      Despite the severe penalties that the NAC decision imposed on Alpine, FINRA's Board declined to call the matter for review. Thus, the NAC decision was the final decision of FINRA.

115.      FINRA, as it pursues disciplinary proceedings, fails to provide due process of law, a neutral arbiter or a right to jury guaranteed by the Seventh Amendment, even where the charges sound in fraud.  And FINRA ignores and fails to apply the few protections that are afforded to respondents in their membership agreement, successfully arguing that members cannot enforce the provisions of the membership agreement or FINRA's own rules.

116.      During the over five years of FINRA enforcement proceedings that led to the final NAC decision, neither the President nor the SEC exercised any review of FINRA's prosecutorial decisions in that enforcement action. FINRA's rules and federal law provide no mechanism for

either the President or the SEC to prevent FINRA from bringing an enforcement action against Plaintiffs.

117.    Moreover, FINRA's rules are inconsistent with the protections that would be provided to defendants in federal court and are subject to change at the discretion of FINRA and its officers.

118.    For example, during the proceedings that resulted in the Initial Hearing Panel Decision, the Hearing Panel allowed witnesses to testify remotely despite Alpine's objection to such remote testimony.

119.    Over half a year after the disciplinary hearing began, FINRA's Chief Hearing Officer issued an order requiring the hearing to continue by videoconference. The Chief Hearing Officer claimed authority for this decision based on a temporary FINRA rule amendment that had also been issued months after the disciplinary hearing began.

120.    Alpine requested that the Chief Hearing Officer reconsider her order, but the Chief Hearing Officer denied the motion for reconsideration. As of the same date that the disciplinary hearing resumed by videoconference in September 2021, FINRA permitted arbitration hearings to take place in person.

121.    Plaintiffs' experiences are examples of how FINRA's unjustified actions have and will continue to result in damage and injury to Plaintiffs and other FINRA members including increased regulatory, compliance and legal costs, substantial loss of business and revenue, reputational damage, and millions of dollars in attorneys' fees.

122.    More broadly, FINRA's exercises of federal power have dramatically ratcheted up the regulatory, compliance, and legal costs associated with operation of a member firm. As a result, member firms are prevented from running their businesses in accordance with critical basic

economic principles applicable to pricing and commerce, while the individual rights of market participants are affected as well.

123.    FINRA has arrogated to itself and consolidated powerful forms of prosecutorial and adjudicative federal functions, with FINRA serving as prosecutor, judge, jury and executioner over policy matters critical to the American economy. FINRA's structure and assertions of federal power are unconstitutional.

## COUNT I
### Violation of Constitutional Requirements for Presidential Removal

124.    Plaintiffs reallege each and every paragraph alleged herein and bring this claim on both a facial and as-applied basis.

125.    The Constitution provides that "[t]he executive Power shall be vested in a President of the United States," U.S. CONST. art. II, § 1. These provisions vest all executive power, including the power to enforce the law, in the President of the United States.

126.    Recognizing the impossibility of one person performing all business of the government, the Constitution provides for principal executive officers to assist in these duties.

127.    The President enforces fundamental guarantees of democratic accountability by keeping principal officers accountable through supervision and by removing them from office as necessary.

128.    As set forth above, FINRA officers exercise wide-ranging executive power, including the power to "enforce compliance" with the Exchange Act and the securities laws, to enact wide-ranging rules and regulations, to conduct inspections of brokers and dealers, to conduct investigations and disciplinary proceedings, and to impose sanctions and otherwise to enforce compliance with the Act, the rules of FINRA, professional standards, and the securities laws.

129.    Meanwhile, FINRA's officers exercise significant executive authority while entirely insulated from Presidential supervision or control.

130.    FINRA's Board members are not appointed or removable by the President; rather, members are selected by and can only be removed by a vote of other Board members.

131.    FINRA's executives and officers are also not appointed or removable by the President; rather they are appointed by and can only be removed by the Board.

132.    The SEC is charged with overseeing FINRA, but FINRA's Board, executives, and officers are insulated from the SEC's control. The SEC cannot remove FINRA Board members at will. Instead, the SEC may only remove FINRA's Board members if they have "willfully violated" applicable laws or regulations, "willfully abused" their authority, or "failed to enforce" applicable laws and regulations "without reasonable justification or excuse." 15 U.S.C. § 78s(h)(4)(B). The SEC's other review functions are similarly circumscribed.

133.    The SEC commissioners cannot be removed by the President except for in limited circumstances. SEC commissioners are not subject to at-will removal by the President.

134.    Thus, FINRA's Board members, along with its executives and officers, are afforded multi-level protection from removal thus impeding the President's ability to oversee the officers executing the laws of the United States in violation of the Constitution's separation of powers.

## COUNT II

### Violation of the Executive Vesting Clause and the
### Take Care Clause

135.    Plaintiffs reallege each and every paragraph alleged herein and bring this claim on both a facial and as-applied basis.

136.    The Constitution provides that "[t]he executive Power shall be vested in a President of the United States," U.S. CONST. art. II, § 1, and that "he shall take Care that the Laws be faithfully executed," U.S. CONST. art. II, § 3.

137.    Because FINRA officers exercise significant executive authority but remain insulated entirely from presidential supervision or control, the President has been divested of federal executive power and is prevented from exercising his constitutionally-mandated take care duties under Article II.

138.    Indeed, FINRA purports to enforce the federal laws—including federal statutes, federal agency rules, and its own rules, which have the force and effect of federal law—a classic exercise of federal executive power.

139.    Meanwhile, the President has zero oversight or supervisory power over FINRA. This is not a question of *degree* of supervision, but of whether the President can be divested of significant executive authority to enforce securities laws or is required to take care that the securities laws are faithfully executed in *any* measure.

140.    FINRA's wields its significant executive authority to make critical policymaking judgments—including over fundamental aspects of the United States securities markets, including what types of firms may participate. The American people are constitutionally entitled to review of these judgments through their elected representatives.

25

## COUNT III

### Violation of the Appointments Clause

141.    Plaintiffs reallege each and every paragraph alleged herein and bring this claim on both a facial and as-applied basis.

142.    The Appointments Clause provides, in relevant part, that the President of the United States "shall nominate, and by and with the Advice and Consent of the Senate, shall appoint Ambassadors, other public Ministers and Consuls, Judges of the supreme Court, and all other Officers of the United States, whose Appointments are not herein otherwise provided for, and which shall be established by Law: but the Congress may by Law vest the Appointment of such inferior Officers, as they think proper, in the President alone, in the Courts of Law, or in the Heads of Departments." U.S. CONST. art. II, § 2, cl. 2.

143.    Because FINRA's officers exercise significant federal authority pursuant to the laws of the United States, FINRA's officers are accordingly officers of the United States whose appointments must comply with the Appointments Clause of the United States Constitution.

144.    By virtue of their wide-ranging discretion, duties, functions and independence, members of the Board and FINRA's executives and officers are principal officers whose appointments must be made by the President by and with the advice and consent of the Senate. Accordingly, the selection of the FINRA Board by its membership, and the Board's corresponding selection of executives and officers, violates the Appointments Clause.

145.    In the alternative, the members of the FINRA Board and FINRA's executives and officers are inferior officers whose appointments must be made by the President, a court of law, or the head of a department. Because FINRA is not a department within the meaning of the Clause, the appointment of the FINRA Board and FINRA's executives and officers violates the Appointments Clause.

## COUNT IV

### Violation of the Private Non-Delegation Doctrine

146.    Plaintiffs reallege each and every paragraph alleged herein and bring this claim on both a facial and as-applied basis.

147.    Federal power may only be lawfully wielded by the Federal Government, which is constrained by constitutional limitations and democratic accountability.

148.    Although private parties may assist the Federal Government in the exercise of its official duties, such private parties may only serve a subordinate, advisory role and may not themselves exercise federal government power.

149.    Further, private parties assisting the Federal Government with certain ministerial duties must always be subject to sufficient governmental supervision. Such a private party must function subordinately to its supervisory agency and be subject to the agency's authority and surveillance.

150.    Because FINRA exercises significant government authority, no level of after-the-fact supervision can remedy the constitutional violation.

151.    Assuming FINRA's extensive assertions of federal power do not rise to the level of significant authority, FINRA neither functions subordinately to the SEC nor is subject to sufficient authority and surveillance by the SEC.

152.    Most notably, FINRA largely acts unilaterally and completely independently of any SEC review when it chooses who to target, investigate, and prosecute under its powers to enforce the federal securities laws.

153.    What is more, FINRA—a private corporation comprised of private parties, some of whom comprise part of the regulated industry and some of whom do not—has its own interests that are averse to the interests of other private parties subject to the force of FINRA's power.

154.    FINRA violates the private non-delegation doctrine.

## COUNT V

### Violation of the Public Non-Delegation Doctrine

155.    Plaintiffs reallege each and every paragraph alleged herein and bring this claim on both a facial and as-applied basis.

156.    The Constitution provides that "[a]ll legislative Powers herein granted shall be vested in a Congress of the United States." U.S. CONST. art. I, § 1.

157.    FINRA is a private entity outside the Legislative Branch.

158.    By virtue of FINRA's wide-ranging rulemaking authority, FINRA improperly and unconstitutionally exercises legislative power.

159.    Even if FINRA were deemed to be part of the federal government, FINRA's exercise of legislative power would still be unconstitutional because FINRA operates completely independently of both Congress and the President.

160.    The President cannot, in any circumstance, appoint members of the FINRA Board or FINRA's executives and hearing officers.

161.    Moreover, the SEC cannot remove FINRA Board members or hearing officers at will, and the President cannot remove members of the SEC at will.

162.    Thus, FINRA cannot constitutionally exercise *any* legislative authority and violates the public non-delegation doctrine by exercising such federal authority.

## COUNT VI

### Violation of the Fifth Amendment

163.    Plaintiffs reallege each and every paragraph alleged herein and bring this claim on both a facial and as-applied basis.

164.    Due Process of Law requires, among other things, a fair trial in a fair and unbiased tribunal by a fair and unbiased decisionmaker.

165.    FINRA's disciplinary proceedings are biased, secretive, and fail to implement rules that maintain the integrity of the proceedings. FINRA acts as prosecutor, judge, jury, and executioner. FINRA employees are not adequate decisionmakers in cases in which a broker-dealer seeks to challenge FINRA's assertion of federal power—especially where FINRA threatens severe financial penalties which in turn fund FINRA employee salaries.

166.    Regardless of any possibility of later SEC review or re-adjudication, Plaintiffs have not been afforded a neutral and detached judge in the first instance.

167.    By prosecuting broker-dealers like Plaintiffs in such a manner, FINRA violates the Due Process Clause of the Fifth Amendment to the United States Constitution.

168.    So too, the Fifth Amendment's Due Process Clause has long condemned the wielding of federal regulatory power by private individuals against their economic competitors, as FINRA's large-cap benefactors seek to do against Plaintiffs. No industry group—not even one consisting of a majority of the industry—may lawfully wield coercive governmental authority to virtually control and dispose of the property rights of other industry members.

169.    The Due Process Clause operates as a bulwark against FINRA's private capture of governmental power for personal gain.

## COUNT VII
### Violation of the Seventh Amendment

170.    Plaintiffs reallege each and every paragraph alleged herein and bring this claim on both a facial and as-applied basis.

171.    FINRA prosecutes broker-dealers, like Plaintiffs, in a wide variety of cases including those sounding in fraud and those in which FINRA seeks to impose severe civil penalties.

172.    FINRA's adjudicative proceedings are indistinguishable in all relevant respects from Administrative Law Judges in federal agencies like the SEC.

173.    Nonetheless, broker-dealers subject to these FINRA pseudo-trials are not afforded the right to a trial by jury as guaranteed by the Seventh Amendment.

174.    FINRA violates the Seventh Amendment.

## COUNT VIII
### Unconstitutional Conditions

175.    Plaintiffs reallege each and every paragraph alleged herein and bring this claim on both a facial and as-applied basis.

176.    The federal government may not lawfully require a private party to forgo constitutional rights or structural protections in order to receive a benefit bestowed by the government.

177.    Broker-dealers who wish to lawfully participate in the securities industry and engage in their chosen profession are forced to join FINRA by federal law and are thus compelled to subject themselves to FINRA's rules and disciplinary procedures, including forgoing protections derived from the Constitution's rights and structure in exchange for participation in the federal securities markets.

178.    In addition to the unconstitutional conditions of FINRA membership already described herein, securities broker-dealers are also compelled by federal law to associate with FINRA. This compelled association violates First Amendment rights of association. Similarly, broker-dealers are compelled to endorse FINRA messages with which broker-dealers may not agree in violation of the First Amendment's protections against compelled speech.

179.    This forced membership in an unconstitutional body exercising power unconstitutionally constitutes an unconstitutional condition on the receipt of a government benefit.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs pray for the following relief:

1.      An order and judgment pursuant to 28 U.S.C. §§ 2201, 2202 declaring that FINRA is unconstitutionally structured;

2.      An order and judgment pursuant to 28 U.S.C. §§ 2201, 2202 declaring that FINRA unconstitutionally exercises federal power;

3.      An order and judgment pursuant to 28 U.S.C. §§ 2201, 2202 declaring that FINRA, a purportedly private entity, may not lawfully exercise significant federal authority;

4.      An order and judgment pursuant to 28 U.S.C. §§ 2201, 2202 declaring that Plaintiffs need not maintain their memberships in FINRA to lawfully operate as broker-dealers under federal law;

5.      An order and judgment pursuant to 28 U.S.C. §§ 2201, 2202 declaring that *if* FINRA, a purportedly private entity, is permitted to exercise federal executive power at all, it must do so subject to constitutional constraints, including the requirements of presidential removal and supervision, the Appointments Clause, the Take Care Clause, and the Fifth and Seventh Amendments;

6.      An order and judgment pursuant to 28 U.S.C. §§ 2201, 2202 declaring that FINRA, a purportedly private entity, may not exercise federal legislative authority, specifically including, but not limited to, conducting any rulemaking that purports to have the authority of federal law or that determines the rules for any proceeding that purports to enforce federal law;

7.      An order and judgment pursuant to 28 U.S.C. §§ 2201, 2202 declaring that forced participation in FINRA, as currently structured and in light of FINRA's unconstitutional exercises of federal power, constitutes an unconstitutional condition on the receipt of a government benefit;

8.      An order and judgment enjoining FINRA from maintaining unconstitutional governance and continuing its unlawful and unconstitutional operations, specifically including, but not limited to, any pending or future prosecutions against Plaintiffs;

9.      Costs and attorneys' fees pursuant to any applicable statute or authority; and

10.      Such further relief as this Court deems just and appropriate.

Dated: June 18, 2025                                Respectfully submitted,


                                                    */s/David H. Thompson*
Kenneth G. Turkel                                   David H. Thompson
E-mail: kturkel@tcb-law.com                         Brian W. Barnes
David A. Hayes                                      Athanasia O. Livas
E-mail: dhayes@tcb-law.com                          Cooper & Kirk, PLLC
TURKEL CUVA BARRIOS, P.A.                            1523 New Hampshire Ave, N.W.
100 North Tampa Street                              Washington, D.C. 20036
Suite 1900                                          Phone: (202) 220-9649
Tampa, FL  33602                                    dthompson@cooperkirk.com
Phone: (813) 834-9191
                                                    Maranda E. Fritz
                                                    maranda@fritzpc.com
                                                    Maranda E. Fritz PC
                                                    521 Fifth Avenue 17th Floor
                                                    New York, New York 10175
                                                    Phone: (646) 584-8231

                        *Counsel for Plaintiffs*