**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

SCOTTSDALE CAPITAL ADVISORS
CORP. *et al.*,

       Plaintiffs,

    v.

FINANCIAL INDUSTRY REGULATORY
AUTHORITY, INC.,

       Defendant,

UNITED STATES OF AMERICA,

       Defendant-Intervenor.

Case No. 1:23-cv-1506-BAH

**THE UNITED STATES OF AMERICA'S FIFTH MEMORANDUM OF LAW**
**IN DEFENSE OF THE CHALLENGED PROVISIONS**
**OF THE FEDERAL SECURITIES LAWS**

## TABLE OF CONTENTS

INTRODUCTION..........................................................................................................1

BACKGROUND ..........................................................................................................1

I.    The History of Self-Regulation in the Securities Industry..................................1

II.   Overview of the Current Statutory Framework ..................................................3

III.  This Litigation....................................................................................................5

ARGUMENT ................................................................................................................8

I.    Plaintiffs' Fifth Amendment and Seventh Amendment claims should be dismissed
      for lack of subject-matter jurisdiction. ..............................................................8

II.   FINRA functions subordinately to the SEC in satisfaction of private-nondelegation
      principles...........................................................................................................16

III.  FINRA does not violate the public-nondelegation doctrine because Congress
      provided an intelligible principle. .....................................................................21

IV.   The processes that govern the hiring and firing of FINRA officials do
      not violate Article II..........................................................................................25

V.    The statutory requirement to become a member of an SRO does not violate the
      First Amendment or the unconstitutional conditions doctrine..........................30

CONCLUSION ............................................................................................................33

## TABLE OF AUTHORITIES

**Cases**                                                                                    **Page(s)**

*A.L.A. Schechter Poultry Corp. v. United States*,
   295 U.S. 495 (1935) ................................................................................................ 22

*Alpine Sec. Corp. v. FINRA*,
   121 F.4th 1314 (D.C. Cir. 2024),
   *stay denied*, No. 24-808, 2025 WL 824410 (U.S. Mar. 14, 2025),
   *cert. denied*, No. 24-904, 2025 WL 1549780 (U.S. June 2, 2025). ................................. *passim*

*Alpine Sec. Corp. v. Nat'l Sec. Clearing Corp.*,
   No. 23-cv-782, 2024 WL 1011863 (D. Utah Mar. 8, 2024) .................................... 15

*Alpine Sec. Corp. v. Nat'l Sec. Clearing Corp.*,
   No. 23-cv-782, 2025 WL 901847 (D. Utah Mar. 25, 2024) ................................... 16

*Am. Mfrs. Mut. Ins. Co. v. Sullivan*,
   526 U.S. 40 (1999) .................................................................................................. 15

*Am. Power & Light Co. v. SEC*,
   329 U.S. 90 (1946) ........................................................................................ 22, 23, 24

*Aslin v. FINRA*,
   704 F.3d 475 (7th Cir. 2013) ................................................................................. 18

*Axon Enter., Inc. v. FTC*,
   598 U.S. 175 (2023) ........................................................................................ *passim*

*Baker v. Carr*,
   369 U.S. 186 (1962) ............................................................................................... 30

*Barkley v. U.S. Marshals Serv. ex rel. Hylton*,
   766 F.3d 25 (D.C. Cir. 2014) ................................................................................ 10

*Belton v. Hatch*,
   17 N.E. 225 (N.Y. 1888) .................................................................................... 2, 26

*Big Time Vapes, Inc. v. FDA*,
   963 F.3d 436 (5th Cir. 2020) ................................................................................. 22

*Black v. SEC*,
   125 F.4th 541 (4th Cir. 2025) ............................................................................... 13

*Blankenship v. FINRA*,
No. 24-cv-3003, 2024 WL 4043442 (E.D. Pa. Sept. 4, 2024),
*appeal docketed*, No. 24-2860 (3d Cir. Oct. 4, 2024) .................................................. 12, 13, 16

*Carter v. Carter Coal Co.*,
298 U.S. 238 (1936) ................................................................................................. 17

*Charles L. Hill, Jr.*,
Exchange Act Release No. 79459, 115 SEC Docket 4003,
2016 WL 7032731 (S.E.C. Dec. 2, 2016) ................................................................. 11

*Chi. & S. Air Lines v. Waterman S. S. Corp.*,
333 U.S. 103 (1948) ................................................................................................. 30

*Clinton v. Jones*,
520 U.S. 681 (1997) ................................................................................................. 30

*Curtis v. Loether*,
415 U.S. 189 (1974) ..................................................................................... 10, 13, 14

*Dalton v. Specter*,
511 U.S. 462 (1994) ................................................................................................. 30

*Elgin v. Dep't of Treasury*,
567 U.S. 1 (2012) ............................................................................................... 11, 13

*English v. District of Columbia*,
717 F.3d 968 (D.C. Cir. 2013) ................................................................................. 10

*Eubank v. Richmond*,
226 U.S. 137 (1912) ................................................................................................. 17

*Express Scripts, Inc. v. FTC*,
No. 24-cv-01549, 2025 WL 521812 (E.D. Mo. Feb. 18, 2025) ................................. 16

*FCC v. Consumers' Rsch.*,
145 S. Ct. 2482 (2025) ................................................................................. 18, 21, 22

*Fed. Power Comm'n v. Hope Nat. Gas Co.*,
320 U.S. 591 (1944) ................................................................................................. 23

*Fiero v. FINRA*,
660 F.3d 569 (2d Cir. 2011) ............................................................................... 25, 26

*File v. Hickey*,
143 S. Ct. 745 (2023) ............................................................................................... 31

*File v. Martin*,
   33 F.4th 385 (7th Cir. 2022) ........................................................................... 31, 32

*Financial Oversight & Management Board for Puerto Rico v. Aurelius Investment, LLC*,
   590 U.S. 448 (2020) ....................................................................................... 27, 28

*First Jersey Sec., Inc. v. Bergen*,
   605 F.2d 690 (3d Cir. 1979) .............................................................................. 9, 19

*Frank P. Quattrone*,
   Exchange Act Release No. 53547, 87 SEC Docket 1847,
   2006 WL 768606 (S.E.C. Mar. 24, 2006) ............................................................... 13

*Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*,
   561 U.S. 477 (2010) ............................................................................ 10, 11, 27, 30

*Granfinanciera, S.A. v. Nordberg*,
   492 U.S. 33 (1989) ................................................................................................. 10

*Gundy v. United States*,
   588 U.S. 128 (2019) ......................................................................................... 22, 23

*Huff and Puffers, LLC v. FDA*,
   No. 8:24-cv-02110-JVS-JDE, 2025 WL 1092696 (C.D. Cal. Feb. 27, 2025) ........ 16

*In re NYSE Specialists Sec. Litig.*,
   503 F.3d 89 (2d Cir. 2007) ................................................................................... 18

*J.W. Hampton, Jr., & Co. v. United States*,
   276 U.S. 394 (1928) .............................................................................................. 22

*Janus v. AFSCME, Council 31*,
   585 U.S. 878 (2018) .............................................................................................. 31

*Jones v. SEC*,
   115 F.3d 1173 (4th Cir. 1997) ............................................................................. 26

*Kaimowitz v. Fla. Bar*,
   996 F.2d 115154 (11th Cir. 199 ........................................................................... 31

*Keller v. State Bar of Cal.*,
   496 U.S. 1 (1990) .................................................................................................. 32

*Lathrop v. Donohue*,
   367 U.S. 820 (1961) .............................................................................................. 31

*Lebron v. National Railroad Passenger Corporation*,
    513 U.S. 374 (1995) ................................................................ 27

*Lemelson v. SEC*,
    No. 24-2415, 2025 WL 1503815 (D.D.C. May 27, 2025) .................. 16

*Lichter v. United States*,
    334 U.S. 742 (1948) ................................................................ 23

*Loving v. United States*,
    517 U.S. 748 (1996) ................................................................ 23

*Lujan v. Defs. of Wildlife*,
    504 U.S. 555 (1992) ................................................................ 30

*Manhattan Cmty. Access Corp. v. Halleck*,
    587 U.S. 802 (2019) ................................................................ 28

*Marbury v. Madison*,
    5 U.S. (1 Cranch) 137 (1803) .............................................. 29, 30

*Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Ware*,
    414 U.S. 117 (1973) .................................................................. 3

*Metcalf & Eddy v. Mitchell*,
    269 U.S. 514 (1926) ................................................................ 25

*Mississippi v. Johnson*,
    71 U.S. (4 Wall.) 475 (1866) .............................................. 29, 30

*Mistretta v. United States*,
    488 U.S. 361 (1989) ................................................................ 22

*Mitchell M. Maynard & Dorice A. Maynard*,
    Investment Advisers Act Release No. 2875,
    2009 WL 1362796 (S.E.C. May 15, 2009) ................................. 11

*Morrison v. Olson*,
    487 U.S. 654 (1988) ................................................................ 30

*Nat'l Ass'n Sec. Dealers, Inc. v. SEC*,
    431 F.3d 803 (D.C. Cir. 2005) ........................................... 5, 9, 13

*Nat'l Broad. Co. v. United States*,
    319 U.S. 190 (1943) ................................................................ 23

*Nat'l Horsemen's Benevolent & Protective Ass'n v. Black*,
    53 F.4th 869 (5th Cir. 2022) ................................................................................. 19

*Nat'l Horsemen's Benevolent & Protective Ass'n v. Black*,
    672 F. Supp. 3d 220 (N.D. Tex. 2023) .................................................................. 19

*NB ex rel. Peacock v. District of Columbia*,
    794 F.3d 31 (D.C. Cir. 2015) ................................................................................ 29

*NCRNC, LLC v. Kennedy*,
    No. 1:25-cv-607, 2025 WL 1549048 (N.D.N.Y. May 30, 2025) ............................ 16

*Nexstar Media, Inc. Grp. v. NLRB*,
    746 F. Supp. 3d 464 (N.D. Ohio 2024) ................................................................. 16

*Oklahoma v. United States*,
    62 F.4th 221 (6th Cir. 2023) *cert. denied*,
    144 S. Ct. 2679 (2024), *reh'g granted, cert. granted, judgment vacated*,
    No. 23-402, 2025 WL 1787679 (U.S. June 30, 2025) ...................................... 1, 19

*Pac. Gas & Elec. Co. v. Pub. Utilities Comm'n of Cal.*,
    475 U.S. 1 (1986) ................................................................................................. 31

*Panama Refin. Co. v. Ryan*,
    293 U.S. 388 (1935) ............................................................................................. 22

*Printz v. United States*,
    521 U.S. 898 (1997) ............................................................................................. 30

*R.H. Johnson & Co. v. SEC*,
    198 F.2d 690 (2d Cir. 1952) ................................................................................. 19

*Reno v. Catholic Soc. Servs., Inc.*,
    509 U.S. 43 (1993) ............................................................................................... 11

*Rumsfeld v. FAIR*,
    547 U.S. 47 (2006) ............................................................................................... 33

*Saad v. SEC*,
    980 F.3d 103 (D.C Cir. 2020) ................................................................................ 1

*Scottsdale Cap. Advisors Corp. v. FINRA*,
    811 F. App'x 667 (D.C. Cir. 2020) ......................................................................... 9

*Scottsdale Cap. Advisors Corp. v. FINRA*,
    844 F.3d 414 (4th Cir. 2016) .................................................................................. 9

*Scottsdale Cap. Advisors Corp.*,
    Exchange Act Release No. 93052, 2021 WL 4242630 (Sept. 17, 2021) .................................... 5

*Scottsdale Cap. Advisors Corp. v. FINRA*,
    678 F. Supp. 3d 88 (D.D.C. 2023) ......................................... 26, 28, 31, 32

*SEC v. Jarkesy*,
    603 U.S. 109 (2024) ......................................... 10, 12, 14, 15

*Seila Law LLC v. CFPB*,
    591 U.S. 197 (2020) ......................................... 27

*Silver v. New York Stock Exch.*,
    373 U.S. 341 (1963) ......................................... 2, 26

*Sorrell v. SEC*,
    679 F.2d 1323 (9th Cir. 1982) ......................................... 19

*Springsteen-Abbott v. SEC*,
    989 F.3d 4 (D.C. Cir. 2021) ......................................... 13

*Sunshine Anthracite Coal Co. v. Adkins*,
    310 U.S. 381 (1940) ......................................... *passim*

*Thomas Cusack Co. v. City of Chicago*,
    242 U.S. 526 (1917) ......................................... 17

*Thunder Basin Coal Co. v. Reich*,
    510 U.S. 200 (1994) ......................................... *passim*

*Todd & Co. v. SEC*,
    557 F.2d 1008 (3d Cir. 1977) ......................................... 19

*Turbeville v. FINRA*,
    874 F.3d 1268 (11th Cir. 2017) ......................................... 32

*United States v. Germaine*,
    99 U.S. 508 (1878) ......................................... 25

*United States v. Hartwell*,
    73 U.S. 385 (1867) ......................................... 25

*United States v. NASD*,
    422 U.S. 694 (1975) ......................................... 3

*United States v. Solomon*,
   509 F.2d 863 (2d Cir. 1975) ............................................................................................ 28

*Vape Cent. Grp., LLC v. FDA*,
   No. 24-3354 (RDM), 2025 WL 637416 (D.D.C. Feb. 27, 2025) ..................................... 16

*VHS Acquisition Subsidiary No. 7 v. NLRB*,
   No. 1:24-cv-02577 (TNM), 2024 WL 4817175 (D.D.C. Nov. 17, 2024) .......................... 16

*Waffle House, Inc. v. NLRB*,
   No. 3:24-6751-MGL, 2025 WL 602744 (D.S.C. Feb. 10, 2025) ...................................... 16

*Washington ex rel. Seattle Title Tr. Co. v. Roberge*,
   278 U.S. 116 (1928) ........................................................................................................ 17

*Whitman v. Am. Trucking Ass'ns*,
   531 U.S. 457 (2001) .................................................................................................. 22, 23

*Yakus v. United States*,
   321 U.S. 414 (1944) ........................................................................................................ 23

*YAPP USA Auto. Sys., Inc. v. NLRB*,
   748 F. Supp. 3d 497 (E.D. Mich. Sept. 9, 2024) ............................................................ 16

**United States Constitution**

U.S. Const. art. II ................................................................................................................. 25

U.S. Const. amend. V ............................................................................................................. 9

U.S. Const. amend. VII ........................................................................................................ 10

**Statutes**

15 U.S.C. § 78b ............................................................................................................... 24, 27

15 U.S.C. § 78f ...................................................................................................................... 4

15 U.S.C. § 78j .................................................................................................................... 24

15 U.S.C. § 78o ............................................................................................................... 3, 31

15 U.S.C. § 78o-3 ............................................................................................................ 4, 24

15 U.S.C. § 78s ............................................................................................................... *passim*

15 U.S.C. § 78y ................................................................................................ 5, 9, 11

28 U.S.C. § 1331 ....................................................................................................... 9

28 U.S.C. § 2403 .................................................................................................... 6, 8

**Rules**

Fed. R. Civ. P. 12 .................................................................................................. 8, 9

**Regulations**

17 C.F.R. § 240.19d-1 ............................................................................................... 4

17 C.F.R. § 240.19d-2 ............................................................................................... 5

17 C.F.R. § 240.19d-3 ............................................................................................... 4

17 C.F.R. § 201.401 .................................................................................................. 5

17 C.F.R. § 201.420 .................................................................................................. 4

SEC, Self-Regulatory Organizations; FINRA;
  *Notice of Filing and Immediate Effectiveness of a Proposed Rule Change to Say
  the Effectiveness of Specified Expulsions and FINRA Actions*,
  90 Fed. Reg. 25,689 (June 17, 2025). ................................................................ 5, 21

**Other Authorities**

FINRA Rule 8000 Series .......................................................................................... 18

FINRA Rule 9000 Series .......................................................................................... 18

Hist. Soc'y of Pa., Collection 3070, *Philadelphia Stock Exchange Papers*, 1746-2005 (2006),
  https://perma.cc/KJU3-6JJY. .................................................................................. 1

Marianne K. Smythe, *Government Supervised Self-Regulation in the Securities
  Industry and the Antitrust Laws: Suggestions for an Accommodation*,
  62 N.C. L. Rev. 475 (1984) ..................................................................................... 1

NAC Disciplinary Decision, Compl. No. 2019061232601 (Mar. 25, 2025),
  https://perma.cc/2Q3S-RKEN. ............................................................................ 7, 15

SEC Hist. Soc'y, *The Institution of Experience:
  Self-Regulatory Organizations in the Securities Industry*, 1792-2010,
  https://perma.cc/B7FV-N98H ................................................................................. 2

Stuart Banner, *The Origin of the New York Stock Exchange*, 1791-1860,
    27 J. Legal Stud. 113 (1998) ..................................................................................................... 2

**INTRODUCTION**

The Financial Industry Regulatory Authority (FINRA) "is a Delaware not-for-profit corporation," Third Am. Compl. ("TAC") ¶ 22, ECF No. 106, and "a private self-regulatory organization," *Saad v. SEC*, 980 F.3d 103, 104 (D.C Cir. 2020), which "function[s] subordinately," *Sunshine Anthracite Coal Co. v. Adkins*, 310 U.S. 381, 399 (1940), to the Securities and Exchange Commission (SEC) in overseeing securities markets. "In case after case, the courts have upheld this arrangement, reasoning that the SEC's ultimate control over the rules and their enforcement" is sufficient to satisfy constitutional requirements. *Oklahoma v. United States*, 62 F.4th 221, 229 (6th Cir. 2023) (Sutton, C.J.), *cert. denied*, 144 S. Ct. 2679 (2024), *reh'g granted, cert. granted, judgment vacated*, No. 23-402, 2025 WL 1787679 (U.S. June 30, 2025); *see also id.* at 243 (Cole, J., concurring) (calling the relevant statutory provisions "unquestionably constitutional"). There is no basis to depart from that nationwide consensus here—which the D.C. Circuit has now endorsed, in this very case, in all respects that matter to the current dispute between the parties. *See Alpine Sec. Corp. v. FINRA*, 121 F.4th 1314, 1319 (D.C. Cir. 2024), *stay denied*, No. 24-808, 2025 WL 824410 (U.S. Mar. 14, 2025), *cert. denied*, No. 24-904, 2025 WL 1549780 (U.S. June 2, 2025).

**BACKGROUND**

I.    **The History of Self-Regulation in the Securities Industry**

**a.**    "Self-regulation in the securities industry is nearly as old as the federal government." Marianne K. Smythe, *Government Supervised Self-Regulation in the Securities Industry and the Antitrust Laws: Suggestions for an Accommodation*, 62 N.C. L. Rev. 475, 480 (1984). Since the early 1790s, securities professionals have organized among themselves to form stock exchanges and have agreed to be governed by a self-imposed set of industry rules. *See Alpine Sec. Corp. v. FINRA*, 121 F.4th 1314, 1319 (D.C. Cir. 2024). The first known such agreement led to the founding of the Philadelphia Board of Brokers in 1790, later renamed the Philadelphia Stock Exchange. *See* Hist. Soc'y of Pa. at 1-3, Collection 3070, *Philadelphia Stock Exchange Papers*, 1746-2005 (2006), https://perma.cc/KJU3-6JJY.

Precursors to the New York Stock Exchange were founded shortly thereafter.  In 1791, a group of New York securities brokers "agreed to be governed by a set of 14 rules," including "a nongovernmental method of enforcing contracts" under which "brokers defaulting on contracts were to be barred from participating in any transactions thereafter."  Stuart Banner, *The Origin of the New York Stock Exchange*, 1791-1860, 27 J. Legal Stud. 113, 114-15 (1998).  The next year, in 1792, New York brokers reportedly met under a buttonwood tree on Wall Street and pledged to deal with each other on specified terms.  SEC Hist. Soc'y, *The Institution of Experience: Self-Regulatory Organizations in the Securities Industry*, 1792-2010, https://perma.cc/B7FV-N98H. In 1817, members of that group, and others, formed the New York Stock and Exchange Board, later renamed the New York Stock Exchange.  *Id.*  Members of the Exchange agreed to a constitution that established a set of "seventeen rules that governed trading" and provided for internal disciplinary proceedings and sanctions ranging "from fines to suspension and expulsion" from the Exchange.  *Id.*

For well over a century after these organizations were created, securities exchanges throughout the country operated as private "business club[s]" supervising the conduct of their own members.  *Belton v. Hatch*, 17 N.E. 225, 226 (N.Y. 1888).  The constitution of the New York Stock Exchange, for example, sought to protect its members' business interests by imposing restraints on "reckless or dishonest methods."  *Id.* at 227.  The Exchange's constitution lodged "the powers of [self-]government" in "a [self-]governing committee, whose decision, after the trial of a member for offenses under its laws, [wa]s final."  *Id.* at 226-27.

**b.** In the first decades of the twentieth century, securities exchanges "became a more and more important element in our Nation's economic and financial system," and their "ungoverned self-regulation" became "more and more obviously inadequate, with acceleratingly grave consequences."  *Silver v. New York Stock Exch.*, 373 U.S. 341, 351 (1963).  The stock market crash of 1929, and the Great Depression that followed, convinced Congress that there was a need for "statutory regulation" of the exchanges.  *Id.*  Congress determined that a system of "*[s]upervised self-regulation*" would preserve "the traditional private governance of exchanges" while allowing

2

"the Government to monitor exchange business in the public interest." *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Ware*, 414 U.S. 117, 127-28 (1973) (emphasis added). To that end, the Securities and Exchange Act of 1934 established the Securities and Exchange Commission, required all national stock exchanges "to be registered by the Commission," and granted the SEC power to supervise exchange self-regulation by creating and amending the rules of the exchanges to protect the public. *Id.* at 128-30. Congress thus left with the private exchanges the "initiative and responsibility for" establishing their own rules and disciplining their own members, but, critically, the exchanges would be "subject to appropriate federal regulatory supervision or action." *Id.* at 130-31 (quotations omitted).

In the Maloney Act of 1938, Congress extended federally supervised self-regulation to private "national securities associations" of over-the-counter brokers and dealers, subjecting those private organizations to the same kind of "pervasive supervisory authority [of] the SEC" as the SEC possessed over the stock exchanges. *United States v. NASD*, 422 U.S. 694, 701 n.6, 732-33 (1975). Congress "preserv[ed]" this self-regulatory system over the past century, while amending the securities laws on occasion to "increas[e] government oversight" in the public interest. *Alpine*, 121 F.4th at 1321.

## II.    Overview of the Current Statutory Framework

By statute, any broker or dealer who wishes to effect securities transactions must register with the SEC and become a member of a self-regulatory organization that is registered with the SEC: either a registered national securities exchange or, for over-the-counter transactions conducted off-exchange, a registered national securities association. 15 U.S.C. § 78o(a)(1), (b)(1)(B).

To be registered as a "national securities exchange" or a "national securities association," the exchange or the association's rules must, among other things, be "designed to prevent fraudulent and manipulative acts and practices" and to "promote just and equitable principles of trade," and must provide for "appropriate[] discipline[]" of their broker-dealer members or

associated persons when those members or associated persons violate the association's rules or the federal securities laws.  15 U.S.C. §§ 78f(b)(5)-(6), 78o-3(b)(6)-(7).

Each self-regulatory organization that is registered with the SEC, whether an exchange or securities association, is subject to SEC supervision of the organization's rules and disciplinary processes.  15 U.S.C. § 78s.  The SEC generally reviews proposed rules and approves or rejects them before they take effect, *id.* § 78s(b),[1] and the SEC also has independent authority to "abrogate, add to, and delete from" any rule of a self-regulatory organization as the SEC "deems necessary or appropriate" to further the purposes of the statute, *id.* § 78s(c).

If a self-regulatory organization seeks to discipline a member or associated person for violating the rules, the organization must "bring specific charges, notify such member or person of, and give him an opportunity to defend against, such charges, and keep a record." 15 U.S.C. § 78o-3(h)(1).  Following that disciplinary process, a self-regulatory organization must notify the SEC of "any final disciplinary sanction" against a member or associated person.  *Id.* § 78s(d)(1); 17 C.F.R. § 240.19d-1(c)(1).  The SEC will review the disciplinary decision on application by an aggrieved person and may do so as well "on its own motion."  15 U.S.C. § 78s(d)(2); 17 C.F.R. §§ 201.420(a)(1), 240.19d-3.  The SEC may stay the disciplinary sanction pending Commission

---

[1] There are some exceptions: a FINRA rule may take effect immediately if it constitutes "a stated policy, practice, or interpretation with respect to the meaning, administration, or enforcement of an existing [FINRA] rule"; addresses FINRA dues or fees; or is "concerned solely with the administration of [FINRA]" or related matters. 15 U.S.C. § 78s(b)(3)(A).  The SEC may also immediately put a proposed FINRA rule into effect if it determines that it is "necessary for the protection of investors, the maintenance of fair and orderly markets, or the safeguarding of securities or funds."  *Id.* § 78s(b)(3)(B).  Within a 60-day period thereafter, the SEC may "summarily" suspend any such rule that immediately went into effect if it determines that suspension "is necessary or appropriate in the public interest, for the protection of investors, or otherwise in furtherance of the purposes of this chapter."  *Id.* § 78s(b)(3)(C).  During the suspension period, the SEC approves or disapproves the rule according to the usual process described above.  *Id.*  Finally, in some circumstances, proposed rule changes "shall be deemed to have been approved," if the SEC does not act on the proposal within a specified time.  *Id.* § 78s(b)(2)(D).  Alpine has not alleged that it was subject to discipline for violating a FINRA rule that took effect without approval from the SEC.

review, whether on its own initiative or by application from the person aggrieved. 15 U.S.C. § 78s(d)(2); 17 C.F.R. §§ 201.401(d), 240.19d-2.

The SEC independently determines whether the aggrieved person engaged in the conduct that was the basis for the disciplinary sanction, whether that conduct violated the relevant rules, and whether the application of those rules to the aggrieved person is consistent with the purposes of the Exchange Act, such as protecting the public interest. 15 U.S.C. § 78s(e)(1)(A); *see, e.g.*, *Scottsdale Cap. Advisors Corp.*, Exchange Act Release No. 93052, 2021 WL 4242630, at *7 (Sept. 17, 2021). The SEC may "affirm," "modify," or "set aside" the self-regulatory organization's disciplinary sanction, 15 U.S.C. § 78s(e)(1), as the SEC "deems appropriate," *Nat'l Ass'n Sec. Dealers, Inc. v. SEC*, 431 F.3d 803, 806 (D.C. Cir. 2005). The power to modify a sanction includes the power to "cancel, reduce, or require the remission" of any sanction that, in the SEC's view, "imposes any burden on competition not necessary or appropriate" to further the purposes of the Act, or is "excessive or oppressive." 15 U.S.C. § 78s(e)(2). A person aggrieved by the SEC's final order regarding the self-regulatory organization's disciplinary decision may seek judicial review in the appropriate court of appeals. *Id.* § 78y(a)(1).

## III. This Litigation

Plaintiffs Scottsdale Capital Advisors Corporation and Alpine Securities Corporation are FINRA members. TAC ¶¶ 19-20. Plaintiffs' Third Amended Complaint brings several claims challenging FINRA's structure under the Constitution, advancing several separation-of-powers theories: (1) that FINRA's structure violates Article II (including Article II's Vesting Clause and the Take Care Clause), because removal restrictions limit the ability of the President and the SEC to control FINRA, *see, e.g.*, *id.* ¶¶ 124-40 (Counts I and II); (2) that FINRA violates the Appointments Clause, because it employs officers of the United States who were not appointed consistently with constitutional requirements, *see, e.g.*, *id.* ¶¶ 141-45 (Count III); (3) that FINRA's structure violates the private-nondelegation doctrine, *see, e.g.*, *id.* ¶¶ 146-54 (Count IV); and (4) that the statutory provisions governing FINRA's relationship with the SEC violate the public-

nondelegation doctrine, *see, e.g.*, *id.* ¶¶ 155-62 (Count V). Plaintiffs also bring First, Fifth, and Seventh Amendment claims. *See id.* ¶¶ 163-79.

On February 6, 2023, the United States intervened as of right, for the purpose of defending the constitutionality of the challenged provisions of the federal securities laws, which govern FINRA's relationship with the SEC. Notice, ECF No. 28; *see* 28 U.S.C. § 2403(a). After Plaintiffs amended their complaint twice, Plaintiff Alpine moved for a preliminary injunction on May 9, 2023, seeking to enjoin a then-ongoing FINRA enforcement proceeding against it. Mot. For Prelim. Inj., ECF No. 45. On May 24, 2023, after a hearing, the U.S. District Court for the Middle District of Florida (Scriven, J.) transferred this case to the U.S. District Court for the District of Columbia. Order, ECF No. 62. On May 30, Alpine filed what it captioned as a "renewed" motion for a temporary restraining order or a preliminary injunction, Renewed Mot. for Prelim. Inj., ECF No. 66. On June 7, the Court denied Alpine's requested injunctive relief, Order, ECF No. 87, concluding that Alpine had "failed to show a likelihood of success on the merits of plaintiffs' claims," and that "the balance of equities and public interest disfavor any injunctive relief." Mem. Op. at 13, 29, ECF No. 88.

Alpine appealed the Court's order. A motions panel of the D.C. Circuit "administratively stayed" the administrative enforcement hearing and, on July 5, granted Alpine's emergency motion for an injunction pending appeal. D.C. Cir. Order (July 5, 2023), ECF No. 94. On November 22, 2024, the D.C. Circuit issued an opinion that agreed with portions of this Court's opinion, but ultimately reversed the Court's order only "insofar as it held that FINRA could singlehandedly expel Alpine and thereby exclude it from the securities trading industry, and remand[ing] for the court to enter a limited preliminary injunction enjoining FINRA from giving effect to any expulsion order issued against Alpine until either the SEC reviews the order on the merits or the time for Alpine to seek SEC review lapses." *Alpine*, 121 F.4th at 1337. That decision also dissolved the injunction pending appeal "to the extent [] it enjoins FINRA's expedited proceeding from going forward." *Id.*

On February 24, 2025, in accordance with the D.C. Circuit's decision, this Court entered an order preliminarily enjoining FINRA from expelling Alpine until either the SEC reviews the FINRA expulsion order on the merits or the time for Alpine to seek SEC review of the expulsion order expires.  *See* Order, ECF No. 100.  Plaintiffs and FINRA then requested the Court hold proceedings in abeyance pending the disposition of the Alpine's petition for a writ of certiorari. *See* Joint Status Report, ECF No. 101.  The Supreme Court denied Alpine's petition on June 2, 2025.  *See Alpine Sec. Corp. v. FINRA*, No. 24-904, 2025 WL 1549780 (U.S. June 2, 2025).

On March 25, 2025, FINRA's National Adjudicatory Council ("NAC") affirmed the FINRA Hearing Officer's order expelling Alpine and ordered Alpine to pay restitution to its customers in the amount of $802,678.77.  *See* TAC ¶ 113; *see also* NAC Disciplinary Decision at 100, Compl. No. 2019061232601 (Mar. 25, 2025), *available at* https://perma.cc/2Q3S-RKEN. Alpine has appealed that decision to the SEC.  *See* TAC ¶ 106.  On June 11, 2025, FINRA dismissed with prejudice its expedited proceeding against Alpine.  *Id.* ¶ 107.  On that same day, FINRA amended its rules to automatically stay the effectiveness of expulsions in expedited proceedings until the time for filing an application for review with the SEC has expired or until the SEC completes its review on the merits.  *Id.* ¶ 109; *see also* SEC, Self-Regulatory Organizations; Financial Industry Regulatory Authority, Inc.; Notice of Filing and Immediate Effectiveness of a Proposed Rule Change to Say the Effectiveness of Specified Expulsions and FINRA Actions, 90 Fed. Reg. 25,689 (June 17, 2025).  FINRA's rule change took immediate effect and was not suspended by the SEC.  *See* 15 U.S.C. § 78s(b)(3).[2]

In accordance with the parties' joint scheduling proposal, on July 18, 2025, Plaintiffs filed a Third Amended Complaint.  *See generally* TAC.  On September 2, 2025, FINRA moved to dismiss Plaintiffs' Third Amended Complaint, Mot. to Dismiss, ECF No. 107.  As authorized by

---

[2] Under the amended FINRA rules, expulsions are automatically stayed for firms that have not defaulted and have exhausted their administrative remedies through FINRA's appellate process.  90 Fed. Reg. at 25,691 n.19.

28 U.S.C. § 2403(a), the United States now submits this fifth memorandum of law in defense of the challenged provisions of the federal securities laws.[3]

## ARGUMENT

The challenged provisions of the federal securities laws are constitutional. FINRA's structure violates neither the private-nondelegation doctrine nor the public-nondelegation doctrine because FINRA "function[s] subordinately" to the SEC, *Adkins*, 310 U.S. at 399; it wields no independent lawmaking power, *see, e.g.*, 15 U.S.C. § 78s(b)(1); and it may propose regulations for the SEC's consideration and approval only pursuant to detailed statutory constraints. The processes for selection and removal of FINRA officials do not violate the Appointments Clause or exceed constitutional limits on removal restrictions, because FINRA officials do not occupy continuing offices established by law and do not exercise authority that only the government can constitutionally exercise. And the statutory condition that securities brokers and dealers join an SRO like FINRA to participate in the industry does not implicate any First Amendment right because FINRA does not engage in political or ideological expression.

## I. Plaintiffs' Fifth Amendment and Seventh Amendment claims should be dismissed for lack of subject-matter jurisdiction.

Plaintiffs' Due Process Clause (Count VI) and Seventh Amendment (Count VII) claims both present the same threshold jurisdictional problem. The Exchange Act provides "a detailed structure for reviewing" disciplinary actions by self-regulatory organizations, and Counts VI and VII are each "of the type Congress intended to be reviewed within this statutory structure." *Thunder Basin Coal Co. v. Reich*, 510 U.S. 200, 207, 212 (1994). As for those two claims, then, Plaintiffs must raise them in administrative proceedings and, if still aggrieved, in a petition for review to the appropriate court of appeals. Because Plaintiffs instead filed this collateral challenge, at the wrong time, in the wrong federal court, this Court lacks statutory subject-matter jurisdiction over Plaintiffs' due process and Seventh Amendment claims, and should dismiss them. *See* Fed.

---

[3] The Court has not scheduled a hearing on FINRA's motion to dismiss. If the Court does hold a hearing, counsel for the United States would intend to participate by presenting "argument on the question of constitutionality," 28 U.S.C. § 2403(a), of the challenged statutory provisions.

R. Civ. P. 12(b)(1), (h)(3).

**a.** Under 28 U.S.C. § 1331, a district court has jurisdiction to hear claims "arising under" federal law. The Supreme Court has long recognized, however, that Congress may establish a "special statutory review scheme" that "divests district courts of their ordinary jurisdiction over the covered cases." *Axon Enter., Inc. v. FTC*, 598 U.S. 175, 185 (2023) (*citing Thunder Basin*, 510 U.S. at 207-12). Such a review scheme is "exclusive" where it applies. *Id.* at 186.

The Exchange Act establishes such a statutory scheme as to review of the disciplinary actions of self-regulatory organizations like FINRA. The Exchange Act expressly allocates the initial resolution of a challenge to a FINRA-imposed disciplinary sanction—including whether FINRA properly applied its own rules or imposed an appropriate sanction—to the SEC. *See* 15 U.S.C. § 78s. The SEC may "affirm," "modify," or "set aside" FINRA's disciplinary sanctions, *id.* § 78s(e)(1), as it "deems appropriate," *Nat'l Ass'n of Sec. Dealers v. SEC*, 431 F.3d 803, 806 (D.C. Cir. 2005). A person aggrieved by the SEC's final order regarding the disciplinary sanction may then seek direct review in an appropriate court of appeals, which shall exercise "exclusive" jurisdiction "to affirm or modify and enforce or to set aside" the SEC's order, "in whole or in part." *See* 15 U.S.C. § 78y(a)(3).

Through these "comprehensive" provisions, Congress "intended to channel objections" to FINRA's disciplinary actions "through the agency and the courts of appeals" and to "preclude federal district-court jurisdiction." *Scottsdale Cap. Advisors Corp. v. FINRA*, 844 F.3d 414, 424 (4th Cir. 2016); *see also Scottsdale Cap. Advisors Corp. v. FINRA*, 811 F. App'x 667, 667-68 (D.C. Cir. 2020) (per curiam); *First Jersey Sec., Inc. v. Bergen*, 605 F.2d 690, 695 (3d Cir. 1979) (recognizing that the Exchange Act establishes a "comprehensive system" for review of disciplinary actions of self-regulatory organizations).

**b.** Where, as here, Congress has established a specialized review scheme, a federal district court may exercise jurisdiction only if the claim at issue is not "of the type Congress intended to be reviewed within [the] statutory structure." *Thunder Basin*, 510 U.S. at 212. The Supreme Court has identified "three considerations . . . to aid in that inquiry," *Axon*, 598 U.S. at 186: (1) whether

preclusion of review would "foreclose all meaningful judicial review"; (2) whether "the suit is 'wholly collateral to [the] statute's review provisions'"; and (3) whether "the claims are 'outside the agency's expertise.'" *Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*, 561 U.S. 477, 489 (2010) (quoting *Thunder Basin*, 510 U.S. at 212-13). Applying those factors here precludes district court jurisdiction over Plaintiffs' due process and Seventh Amendment claims.

**c.** The Due Process Clause of the Fifth Amendment provides that no person shall "be deprived of life, liberty, or property, without due process of law." U.S. Const. amend. V. In considering a procedural-due-process claim, the D.C. Circuit "appl[ies] a familiar two-part inquiry," asking "[1] whether the plaintiffs were deprived of a protected interest, and, if so, [2] whether they received the process they were due." *Barkley v. U.S. Marshals Serv. ex rel. Hylton*, 766 F.3d 25, 31 (D.C. Cir. 2014) (citation modified). "Beyond the basic requirements of notice and an opportunity to be heard, the precise requirements of procedural due process are flexible," *English v. District of Columbia*, 717 F.3d 968, 972 (D.C. Cir. 2013), and thus vary greatly across different regulatory contexts where the Clause applies.

The Seventh Amendment provides that "the right of trial by jury shall be preserved" for "Suits at common law, where the value in controversy shall exceed twenty dollars." U.S. Const. amend. VII. The Seventh Amendment thus "preserve[s] the right to jury trial as it existed in 1791" and applies to "statutory rights that are analogous to common-law causes of action ordinarily decided in English law courts" at the Founding (as opposed to claims in equity and admiralty). *Granfinanciera, S.A. v. Nordberg*, 492 U.S. 33, 42 (1989) (quoting *Curtis v. Loether*, 415 U.S. 189, 193 (1974)); *see SEC v. Jarkesy*, 603 U.S. 109, 122-23 (2024). A claim implicates the Seventh Amendment if it is "legal in nature"—an inquiry that turns on "the cause of action" and "remedy" at issue, with the remedy being the "more important" factor. *Jarkesy*, 603 U.S. at 122-23 (citation omitted). Even if a claim implicates the Seventh Amendment, a jury trial is not required if the matter involves "public rights" as opposed to "private rights" that are "the stuff of the traditional actions at common law tried by the courts at Westminster in 1789." *Id.* at 127-28 (citation omitted).

Plaintiffs' claims that FINRA's disciplinary proceedings run afoul of the Due Process Clause or the Seventh Amendment under the above principles will receive "meaningful judicial review" through the Exchange Act's review scheme. *Thunder Basin*, 510 U.S. at 212-23. Alpine, for instance, already raised due process and Seventh Amendment arguments to FINRA and can raise them to the SEC. *See* 15 U.S.C. § 78s(e)(1). If still aggrieved by the SEC's final order, Alpine may petition for direct review in the court of appeals. *Id.* § 78y(a). The court of appeals may fully address the Seventh Amendment and due process arguments and "affirm," "modify," or "set aside" the SEC's order "in whole or in part." *Id.* § 78y(a)(3).

These claims can thus be meaningfully examined within this review scheme. It is well established that "[r]eview of agency action in a court of appeals can alone 'meaningfully address[]' a party's claims." *Axon*, 598 U.S. at 190 (second alteration in original) (quoting *Thunder Basin*, 510 U.S. at 215); *see also Elgin v. Dep't of Treasury*, 567 U.S. 1, 21 (2012) (the Federal Circuit's authority "to consider and decide [the] petitioners' constitutional claims" under the relevant statutory review scheme provided "meaningful review" of those claims). That is so even where the agency itself lacks the ability to address or remedy the alleged constitutional violation. *See Axon*, 598 U.S. at 190 n.2 (first citing *Elgin*, 567 U.S. at 17; and then citing *Thunder Basin*, 510 U.S. at 215). Though here, the SEC can and often does evaluate constitutional claims like the due process and Seventh Amendment claims that Plaintiffs raise. *E.g.*, *Charles L. Hill, Jr.*, Exchange Act Release No. 79459, 115 SEC Docket 4003, 2016 WL 7032731, at *3 (S.E.C. Dec. 2, 2016) (Seventh Amendment); *Mitchell M. Maynard & Dorice A. Maynard*, Investment Advisers Act Release No. 2875, 2009 WL 1362796, at *8 (S.E.C. May 15, 2009) (due process).

This is not the unusual case in which constitutional claims will evade review if channeled through a statutory review scheme because the challenged agency action will never culminate in a final order that would trigger review under that scheme. *See, e.g.*, *Free Enter. Fund*, 561 U.S. at 490 (concluding that the district court had jurisdiction to review the petitioners' structural constitutional claim because, among other things, the petitioner's challenge concerned agency action that might not result in a reviewable final order); *Reno v. Catholic Soc. Servs., Inc.*, 509

11

U.S. 43, 63 (1993) (concluding that the petitioners' challenge to an agency's "[f]ront-desking" practice did not have to be channeled because the practice would not result in a reviewable order under the scheme).  FINRA disciplinary sanctions  are subject to review by the SEC, and if necessary, the appropriate court of appeals, both of which may evaluate whether a sanction violates the Due Process Clause or the Seventh Amendment.

*Jarkesy*—the Supreme Court's most recent decision on the Seventh Amendment's application to administrative adjudications—itself confirms that the Exchange Act's review scheme provides for meaningful review.  As another district court recently recognized in dismissing a Seventh Amendment challenge to a FINRA disciplinary proceeding, the government's understanding of the Exchange Act "aligns with the procedural pathway taken in *Jarkesy*, where the Seventh Amendment claim was pursued on direct appeal from the SEC to the Fifth Circuit and then to the Supreme Court."  *Blankenship v. FINRA*, No. 24-cv-3003, 2024 WL 4043442, at *2 n.3 (E.D. Pa. Sept. 4, 2024), *appeal docketed*, No. 24-2860 (3d Cir. Oct. 4, 2024); *see Jarkesy*, 603 U.S. at 119.  *Jarkesy* thus confirms that at least Seventh Amendment claims may receive meaningful judicial review through the Exchange Act's framework.  And *Thunder Basin* itself involved the channeling of a due process claim.  510 U.S. at 205.

The remaining *Thunder Basin* factors—whether the asserted claim is "wholly collateral" to the review scheme or outside of the agency's expertise—similarly do not favor district court jurisdiction.  *See* 510 U.S. at 212 (citation modified).  Plaintiffs' due process and Seventh Amendment claims both ultimately turn on the nature of FINRA's procedures and sanctions.  But the proper construction, interpretation, and application of FINRA rules and sanctions are matters that FINRA and the SEC "customarily handle[]" and fall squarely within their area of expertise. *Axon*, 598 U.S. at 186.  Thus, just as the relevant commission in *Thunder Basin* could "br[ing] to bear" its "extensive experience interpreting" the Mine Act to the claims at issue in that case that were held to fall within the exclusive review scheme, 510 U.S. at 214-15 (citation omitted), the due process and Seventh Amendment claims here are "intertwined with or embedded in matters on which" FINRA and the SEC "are expert," *Axon*, 598 U.S. at 195.  In short, unlike the claims in

*Axon*, these claims *do* involve "the sorts of procedural or evidentiary matters an agency often resolves on its way to a merits decision." *Id.* at 193.

Moreover, the SEC can resolve disciplinary hearings in a manner that "may obviate the need" for further review of due process or Seventh Amendment claims. *Elgin*, 567 U.S. at 22-23. Even where FINRA imposes sanctions, the SEC could, for example, choose to forgo sanctions in response to any perceived constitutional obligation. *See Curtis*, 415 U.S. at 198 (noting that "actions seeking only equitable relief" were "unaffected" by the Court's conclusion that a jury trial was required when compensatory damages were sought). Or the SEC could dismiss the charges or decline to impose certain sanctions because the charges and sanctions are unsupported by the facts, are contrary to the public interest, or are subject to dismissal on other securities-law-specific grounds. *See Elgin*, 567 U.S. at 22. Indeed, the SEC regularly exercises its plenary authority to reverse FINRA decisions or set aside FINRA sanctions, as it has done with regards to FINRA proceedings brought against Plaintiff Scottsdale, *see* TAC ¶ 95 ("The SEC set aside all findings of violations and all sanctions against all defendants, including the $1.5 million fine FINRA had issued to SCA."). *See, e.g.*, *Black v. SEC*, 125 F.4th 541, 545 (4th Cir. 2025); *Springsteen-Abbott v. SEC*, 989 F.3d 4, 6 n.1 (D.C. Cir. 2021); *Nat'l Ass'n of Sec. Dealers*, 431 F.3d at 804-05; *Frank P. Quattrone*, Exchange Act Release No. 53547, 87 SEC Docket 1847, 2006 WL 768606, at *6 (S.E.C. Mar. 24, 2006). How that review process will play out here in Alpine's case is currently unknown, because it not only "depends on exactly what happens in the FINRA proceedings, [and] the result of those proceedings," but also, as relevant here, "how the SEC reviews them." *Blankenship*, 2024 WL 4043442, at *2 n.3. The wide range of possibilities underscores Congress's intent to direct these sorts of claims through the Exchange Act's exclusive review scheme. *See Elgin*, 567 U.S. at 22.

**d.** The Supreme Court's decision in *Axon* only emphasizes the distinction between claims that are subject to channeling (like Plaintiffs' Due Process Clause and Seventh Amendment claims) and those that are not (like Plaintiffs' nondelegation claims).

In *Axon*, the petitioners alleged that the Administrative Law Judges of the SEC and the

Federal Trade Commission (FTC) "could not constitutionally exercise governmental authority because of their dual-layer protection from removal," and that the FTC could not constitutionally undertake any "enforcement actions" because of its "combination of prosecutorial and adjudicative functions."  598 U.S. at 183; *see id.* at 189.  The Supreme Court held that those "sweeping constitutional claims" could be brought in federal district court, notwithstanding the separate statutory review schemes governing each agency.  *Id.* at 189.  The Court emphasized that the claims attacked "the structure or very existence of" the agencies and charged that they were "wielding authority unconstitutionally in all or a broad swath of [their] work."  *Id.*  The claims were therefore untethered to any "specific substantive decision" the agencies might have taken in the petitioners' individual proceedings.  *Id.*

That description may be a good fit for Plaintiffs' nondelegation claims (Count IV and Count V), which attack the "very existence of" FINRA, and "the structure" of its relationship with the SEC.  *See, e.g.*, TAC ¶¶ 150, 159 (challenging FINRA's "exercise[]" of "significant government authority," and in particular, its alleged "exercise of legislative power").  But Plaintiffs' due process and Seventh Amendment claims, by contrast, are unlike the type of "extraordinary" challenge at issue in *Axon*.  598 U.S. at 180.  In bringing those two claims, Plaintiffs do not challenge the "structure" or "very existence" of FINRA or the SEC—only certain procedures that FINRA does (or does not) provide under its current rules.  *See, e.g.*, TAC ¶ 173 (no "right to a trial by jury" in FINRA proceedings); *id.* ¶ 165 ("FINRA's disciplinary proceedings are biased, secretive, and fail to implement rules that maintain the integrity of the proceedings."); *id.* ¶ 166 (FINRA proceedings do not provide "a neutral and detached judge in the first instance").

Moreover, while the petitioners in *Axon* would have had "the same claim" even if they had "*won* before the agency," 598 U.S. at 191, that is not true for Plaintiffs' due process or Seventh Amendment claims.  For example, if no disciplinary sanctions or sanctions that are only equitable in nature are ultimately imposed, the Seventh Amendment would not be implicated at all.  *See Jarkesy*, 603 U.S. at 122 (the amendment "embraces all suits which are not of equity or admiralty jurisdiction" (citation modified)); *Curtis*, 415 U.S. at 198.  Nor would any "process" be "due"

14

under the Due Process Clause, in the absence of an actual deprivation of a cognizable interest in liberty or property.  After all, "[t]he first inquiry in every due process challenge is whether the plaintiff has been deprived of a protected interest in 'property' or 'liberty'" at all—if not, there is no need to "look to see if the [government's] procedures comport with due process."  *Am. Mfrs. Mut. Ins. Co. v. Sullivan*, 526 U.S. 40, 59 (1999).

For similar reasons, Plaintiffs' due process and Seventh Amendment claims do not involve the rare type of "here-and-now injury" for which court of appeals review would necessarily be insufficient after administrative proceedings have concluded.  *See Axon*, 598 U.S. at 191-92 (citation omitted).  For instance, if the Commission issued a final order affirming a disciplinary sanction that Alpine believed infringed its constitutional rights, it may seek review in the court of appeals, and, as in *Jarkesy* itself, the court may vacate any sanction if it agrees with their claims.  *See* 603 U.S. at 119-20.  And in the meantime, per FINRA rules, the restitution award against Alpine is stayed pending SEC review, and further, the NAC decision itself stays the effectiveness of Alpine's expulsion until 90 days after a final order on the merits of Alpine's appeal to the SEC.  *See* NAC Disciplinary Decision at 100 n.218.   That stands in sharp contrast to *Axon*, where the petitioners' structural claims were not directed to any particular "order" or "fine," but rather from having to appear before an "illegitimate decisionmaker" who allegedly lacked any "power to proceed at all," regardless of the underlying dispute at issue, or the procedures used.  598 U.S. at 189-92.

Put simply, unlike the structural constitutional claims raised in *Axon*, Plaintiffs' due process and Seventh Amendment claims do not challenge FINRA's or the SEC's "power generally" or their power to discipline their members.  *See Axon*, 598 U.S. at 193.  They instead challenge something "particular about how that power [is] wielded."  *Id.*  Such a claim bears no resemblance to the "existential" constitutional challenges at issue in *Axon*.  *Id.* at 180; *see also, e.g.*, *Alpine Sec. Corp. v. Nat'l Sec. Clearing Corp.*, No. 23-cv-782, 2024 WL 1011863, at *5 (D. Utah Mar. 8, 2024) ("Like *Free Enterprise Fund*, *Axon Enterprise* neither held nor suggested that *Thunder Basin*'s decision to allow Due Process claims to be channeled through an agency's

15

adjudicatory program (later to be reviewed by federal courts) should be reconsidered.").

For these reasons, it is "unsurprising" that many courts that have considered this question since *Axon* have held that Seventh Amendment and due process claims are "[u]nlike the challenge in *Axon*" and must instead be channeled pursuant to special review schemes. *Vape Cent. Grp., LLC v. FDA*, No. 24-3354 (RDM), 2025 WL 637416, at *6 (D.D.C. Feb. 27, 2025) (Seventh Amendment); *see, e.g.*, *Lemelson v. SEC*, No. 24-2415, 2025 WL 1503815, at *5 (D.D.C. May 27, 2025) ("[T]he Court joins the chorus of post-*Jarkesy* district court opinions holding that the relevant statutory procedures for challenging final administrative orders provides a sufficient opportunity for meaningful review of any Seventh Amendment defense." (citation modified)); *NCRNC, LLC v. Kennedy*, No. 1:25-cv-607, 2025 WL 1549048, at *7-*8 (N.D.N.Y. May 30, 2025) (Seventh Amendment); *Blankenship*, 2024 WL 4043442, at *3 (same); *Huff and Puffers, LLC v. FDA*, No. 8:24-cv-02110-JVS-JDE, 2025 WL 1092696, at *6 (C.D. Cal. Feb. 27, 2025) (same); *Waffle House, Inc. v. NLRB*, No. 3:24-6751-MGL, 2025 WL 602744, at *9 (D.S.C. Feb. 10, 2025) (same); *VHS Acquisition Subsidiary No. 7 v. NLRB*, No. 1:24-cv-02577 (TNM), 2024 WL 4817175, at *3-4 (D.D.C. Nov. 17, 2024) (same); *YAPP USA Auto. Sys., Inc. v. NLRB*, 748 F. Supp. 3d 497, 513 & n.6 (E.D. Mich. Sept. 9, 2024) (same); *Nexstar Media, Inc. Grp. v. NLRB*, 746 F. Supp. 3d 464, 472 (N.D. Ohio 2024) (same);  Alpine Sec. Corp. v. Nat'l Sec. Clearing Corp., No. 23-cv-782, 2025 WL 901847, at*5 (D. Utah Mar. 25, 2024) (due process); *Express Scripts, Inc. v. FTC*, No. 24-cv-01549, 2025 WL 521812, at *7 (E.D. Mo. Feb. 18, 2025) (due process).

This Court should thus dismiss Counts VI and VII for lack of subject-matter jurisdiction.

## II.    FINRA functions subordinately to the SEC in satisfaction of private-nondelegation principles.

Plaintiffs' Count IV alleges that because "FINRA exercises significant government authority," and "largely acts unilaterally and completely independently of any SEC review when it chooses who to target, investigate, and prosecute under its powers to enforce [] federal securities

law," it "violates the private non-delegation doctrine." TAC ¶¶ 150, 152, 154. That claim fails because FINRA "function[s] subordinately" to the SEC. *Adkins*, 310 U.S. at 399.

    **a.** The private-nondelegation doctrine's earliest applications concerned ordinances that allowed homeowners to set zoning requirements for their neighborhoods. *Washington ex rel. Seattle Title Tr. Co. v. Roberge*, 278 U.S. 116, 120-22 (1928); *Thomas Cusack Co. v. City of Chicago*, 242 U.S. 526, 530 (1917); *Eubank v. Richmond*, 226 U.S. 137, 143-44 (1912). Such ordinances were unconstitutional, the Court explained, because they "conferr[ed] the power on some property holders to virtually control and dispose of the property rights of others," without setting any standard to prevent the private property owners from making public policy "solely for their own interest, or even capriciously." *Eubank*, 226 U.S. at 143-44. These ordinances were unlawful where they "gave to [the decision of private entities] the effect of law." *Thomas Cusack Co.*, 242 U.S. at 531. Where government officials were "bound by the decision" of entities who themselves were not "bound by any official duty," the "delegation of power so attempted [was] repugnant to the due process clause of the Fourteenth Amendment." *Roberge*, 278 U.S. at 122.

    The Supreme Court applied that doctrine to the federal government in *Carter v. Carter Coal Co.*, 298 U.S. 238 (1936). In *Carter Coal*, the Court held unlawful a federal statute that allowed the producers of more than two-thirds of the coal in any given district to set wages and hours for all the producers in that district, unconstrained by any public agency review. *Id.* at 281-83. That "obnoxious" delegation "to private persons whose interests may be and often are adverse to the interests of others in the same business," the Court held, was "clearly arbitrary" and "clearly a denial of rights safeguarded by the due process clause of the Fifth Amendment." *Id.* at 311.

    After *Carter Coal*, Congress enacted a new statute under which local boards consisting of private coal producers would be organized under the Bituminous Coal Code and would "operate as an aid to the [National Bituminous Coal] Commission but subject to its pervasive surveillance and authority." *Adkins*, 310 U.S. at 388. The new statute "specifie[d] in detail the methods of [the boards'] organization and operation, the scope of their functions, and the jurisdiction of the Commission over them." *Id.* The Coal Commission was "empowered to fix minimum prices . . .

in accordance with stated standards" following a procedure in which the code boards would "propose minimum prices pursuant to prescribed statutory standards," which "may be approved, disapproved, or modified by the Commission." *Id.*

In reviewing this revised scheme in *Sunshine Anthracite Coal Co. v. Adkins*, the Supreme Court "address[ed] how Government agencies may rely on advice and assistance from private actors." *FCC v. Consumers' Rsch.*, 145 S. Ct. 2482, 2508 (2025) (discussing *Adkins*, 310 U.S. at 388). There, the Court held that no constitutional problem arose from involving private industry in the regulatory scheme because "members of the code function[ed] subordinately to" the agency and were subject to its "authority and surveillance." *Adkins*, 310 U.S. at 399. Thus, the agency, and "not the code authorities, determine[d] the prices," and "[s]ince law-making [was] not entrusted to the industry" the Court held that "this statutory scheme [was] unquestionably valid." *Id.* In its most recent term, the Supreme Court reaffirmed that these remain the applicable principles governing private delegations in *FCC v. Consumers' Research*. 145 S. Ct. at 2508-10.

**b.** Under *Adkins* and *Consumers' Research*, Plaintiffs' claim fails, because FINRA "function[s] subordinately" to the SEC, which wields "authority and surveillance" over FINRA's activities. *Id.*; *see* Mem. Op. at 22 ("SROs' authority is subordinate to the SEC's ultimate control and oversight."). "The SEC . . . retains formidable oversight power[s] to supervise, investigate, and discipline [FINRA] for any possible wrongdoing or regulatory missteps." *In re NYSE Specialists Sec. Litig.*, 503 F.3d 89, 101 (2d Cir. 2007). "[T]he SEC may abrogate, add to, and delete from all FINRA rules as it deems necessary." *Aslin v. FINRA*, 704 F.3d 475, 476 (7th Cir. 2013) (citations omitted) (citing 15 U.S.C. § 78s(b)(1), (c)). This includes FINRA rules governing FINRA's investigation and enforcement powers. *See, e.g.,* FINRA Rule 8000 Series (Investigations and Sanctions); FINRA Rule 9000 Series (Code of Procedure). Moreover, FINRA must notify the SEC of any disciplinary action it takes against a member, which is thereafter subject to *de novo* review by the SEC, acting *sua sponte* or in response to a petition from the aggrieved party. *See* 15 U.S.C. § 78s(d)(1)-(2); *see also* TAC ¶ 95 (explaining the SEC set aside a previous FINRA disciplinary action against Plaintiff Scottsdale Capital Advisors). And the SEC

may suspend or revoke FINRA's registration (and thus its ability to exercise the functions of an SRO under the statute) "if in [the SEC's] opinion such action is necessary or appropriate in the public interest, for the protection of investors, or otherwise in furtherance of the purposes of this chapter." 15 U.S.C. § 78s(h)(1).

"In case after case, the courts have upheld this arrangement, reasoning that the SEC's ultimate control over the rules and their enforcement makes the SROs permissible aides and advisors." *Oklahoma*, 62 F.4th at 229. Indeed, every court of appeals to consider this question has agreed: under *Adkins*, the federal securities laws do not "unconstitutionally delegate[] power to" FINRA (or its predecessor, the NASD) because the statute gives the SEC the power (1) "to approve or disapprove of [its] Rules," and (2) to conduct *de novo* review of "any disciplinary action" after initial adjudication before FINRA. *R.H. Johnson & Co. v. SEC*, 198 F.2d 690, 695 (2d Cir. 1952); *see Todd & Co. v. SEC*, 557 F.2d 1008, 1012-13 (3d Cir. 1977); *First Jersey*, 605 F.2d at 697; *Sorrell v. SEC*, 679 F.2d 1323, 1325-26 (9th Cir. 1982).

Courts reviewing other delegations of power have only underscored the propriety of the SEC-FINRA relationship. For instance, the Fifth Circuit held that that a previous version of the Horseracing Integrity and Safety Act ("HISA") was an unconstitutional delegation to a private entity. *See Nat'l Horsemen's Benevolent & Protective Ass'n v. Black*, 53 F.4th 869 (5th Cir. 2022). But in doing so, the panel explicitly contrasted the statutory provisions challenged there with those that govern the SEC-FINRA relationship. *See id.* at 887. The Fifth Circuit cited as a "key distinction" the fact that "[u]nlike HISA, the Maloney Act empowers the SEC to 'abrogate, add to, and delete from' FINRA rules 'as the [SEC] deems necessary or appropriate.'" *Id.* (quoting 15 U.S.C. § 78s(c)). The court observed that "although FINRA plays an important role in formulating securities industry rules, its role is ultimately 'in aid of' the SEC, which has the final word on the substance of the rules." *Id.* (citing *Adkins*, 310 U.S. at 388); *see also Oklahoma*, 62 F.4th at 232 ("[T]he SEC's modification power . . . explains why every court of appeals to address the validity of such delegations under the Maloney Act . . . has upheld them."); *Nat'l Horsemen's Benevolent & Protective Ass'n v. Black*, 672 F. Supp. 3d 220, 245 (N.D. Tex. 2023) (on remand) ("[T]he

Authority is now on equal footing to FINRA in its role 'in aid of' the federal agency that retains ultimate rulemaking authority.").

    **c.**  The D.C. Circuit's opinion in *Alpine v. FINRA* confirms that the arrangement between the SEC and FINRA conforms with private nondelegation principles in all relevant respects. *Alpine* recognized that FINRA is a "private" entity and that, under the private nondelegation doctrine, a private entity may play a role in administering a federal scheme so long as it acts "'as an aid' to an accountable government agency that retains the ultimate authority to 'approve[], disapprove[], or modif[y]' the private entity's actions and decisions." 121 F.4th at 1325 (quoting *Adkins*, 310 U.S. at 388, 399).  In accordance with those principles, "[t]ypically, SEC oversight of FINRA disciplinary actions involves the SEC 'conduct[ing] its own review' of any final decision or sanction" and approving, disapproving, or modifying FINRA's decision.  *Id.* at 1326 (citation omitted).  The D.C. Circuit held that Alpine was likely to succeed on the merits of its private nondelegation challenge only as to "expulsions imposed through FINRA's expedited proceedings," because those orders "function[] differently" from other forms of FINRA discipline. *Id.*  In contrast to other procedures, expedited expulsions "take effect immediately, before the SEC can review them," and the court explained that "the severe consequences associated with expulsion can make any later review by the SEC a largely academic exercise."  *Id.* at 1326; *see also id.* at 1330-31 ("[M]any types of sanctions imposed by FINRA, short of expulsion, can be undone later. Censures can be rescinded, fines can be returned, and cease-and-desist orders can be lifted.").  The court was accordingly careful to specify that its opinion was "limited to expulsion orders issued in expedited proceedings."  *Id.* at 1330.

    In so holding, the majority in *Alpine* rejected the dissent's approach, which favored granting broader relief on the theory that FINRA is likely unconstitutional more broadly because it exercises "significant executive authority that the Constitution vests in the Executive Branch alone."  *Id.* at 1343 (Walker, J., concurring in the judgment in part and dissenting in part).  But the majority explained that approach incorrectly "melds the private nondelegation doctrine with

Alpine's Appointments Clause arguments" and is "unsupported by a single case from the Supreme Court, this court, or any appellate court." *Id.* at 1329.

Plaintiffs' Third Amended Complaint does not challenge FINRA expulsions imposed through expedited proceedings, nor do Plaintiffs now face FINRA expulsion imposed through expedited proceedings. *See* TAC ¶ 107 ("On June 11, 2025, FINRA chose to dismiss without prejudice its Expedited Proceeding against Alpine."). And the Third Amended Complaint further recognizes that FINRA has "amended its rules to stay the effectiveness of expulsions in expedited proceedings until the time for filing an application for review with the SEC has expired or until the SEC completes its review." *Id.* ¶ 109; *see also* Self-Regulatory Organizations; FINRA; *Notice of Filing and Immediate Effectiveness of a Proposed Rule Change to Say the Effectiveness of Specified Expulsions and FINRA Actions*, 90 Fed. Reg. 25,689 (June 17, 2025). The operative complaint thus does not allege any injury from the constitutional defect that the D.C. Circuit preliminarily identified in *Alpine*, and, following FINRA's rule changes, that defect is not faced by Plaintiffs. Accordingly, Plaintiffs' Third Amended Complaint only brings a nondelegation challenge to FINRA's structure more broadly—a challenge that *Alpine* rejected.

In sum, because FINRA "function[s] subordinately" to the SEC, *Adkins*, 310 U.S. at 399, it does not violate the private-nondelegation doctrine.

## III.    FINRA does not violate the public-nondelegation doctrine because Congress provided an intelligible principle.

Count V of Plaintiffs' Third Amended Complaint alleges that "FINRA improperly and unconstitutionally exercises legislative power" and therefore "violates the public non-delegation doctrine." TAC ¶¶ 158, 162. Plaintiffs' claim should be dismissed, however, because it does not come close to meeting the very high bar for nondelegation claims, as this Court has already correctly concluded. *See* Mem. Op. at 23 n.9.

**a.** While legislative power "belongs to the legislative branch, and to no other," "[a]t the same time, [courts] have recognized that Congress may 'seek[] assistance' from its coordinate branches to secure the 'effect intended by its acts of legislation.'" *Consumers' Rsch.*, 145 S. Ct.

21

at 2496 (quoting *J.W. Hampton, Jr., & Co. v. United States*, 276 U.S. 394, 406 (1928)). "And in particular, Congress may 'vest[] discretion' in executive agencies to implement and apply the laws it has enacted—for example, by deciding on 'the details of [their] execution.'" *Id.* at 2496-97 (quoting *J.W. Hampton, Jr., & Co.*, 276 U.S. at 406). As the Supreme Court recently reaffirmed in *FCC v. Consumers Research*, "[t]o distinguish between the permissible and the impermissible in this sphere, [courts] have long asked whether Congress has set out an 'intelligible principle' to guide what it has given the agency to do." *Id.* at 2497 (quoting *J.W. Hampton, Jr., & Co.*, 276 U.S. at 409). "[I]n examining a statute for the requisite intelligible principle, we have generally assessed whether Congress has made clear both 'the general policy' that the agency must pursue and 'the boundaries of [its] delegated authority.'" *Id.* (quoting *Am. Power & Light Co. v. SEC*, 329 U.S. 90, 105 (1946)). "If Congress has done so—as [courts] have almost always found—then [courts] will not disturb its grant of authority." *Id.*

"Those standards . . . are not demanding." *Gundy v. United States*, 588 U.S. 128, 146 (2019) (plurality op.). Although Congress has delegated authority since "the beginning of the government," the Supreme Court "has found only two delegations to be unconstitutional." *Big Time Vapes, Inc. v. FDA*, 963 F.3d 436, 442, 446 (5th Cir. 2020) (citation omitted). One "provided literally no guidance for the exercise of discretion," and the other "conferred authority to regulate the entire economy on the basis of no more precise a standard than stimulating the economy by assuring 'fair competition.'" *Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 474 (2001) (citing *Panama Refin. Co. v. Ryan*, 293 U.S. 388 (1935), and *A.L.A. Schechter Poultry Corp. v. United States*, 295 U.S. 495 (1935)). By contrast, in the 90 years since those two decisions—both from 1935, and both about the same statute—the Supreme Court has consistently upheld "Congress' ability to delegate power under broad standards," *Mistretta v. United States*, 488 U.S. 361, 373 (1989), and "ha[s] 'almost never felt qualified to second-guess Congress regarding the permissible degree of policy judgment that can be left to those executing or applying the law,'" *Am. Trucking*, 531 U.S. at 474-75 (quoting *Mistretta*, 488 U.S. at 416 (Scalia, J., dissenting)).

22

Applying those principles, the Supreme Court has upheld nearly every delegation it has confronted, including delegations:

- to the Federal Communication Commission to regulate broadcast licensing as "public interest, convenience, or necessity" requires, *Nat'l Broad. Co. v. United States*, 319 U.S. 190, 225-26 (1943);

- to the Federal Power Commission to determine "just and reasonable" rates for wholesale sales of natural gas, *Fed. Power Comm'n v. Hope Nat. Gas Co.*, 320 U.S. 591, 600 (1944);

- to the Price Administrator to fix commodity prices that would be "fair and equitable" and would "effectuate the purposes of th[e] [Emergency Price Control Act of 1942]," *Yakus v. United States*, 321 U.S. 414, 420 (1944) (citation omitted);

- to the SEC to prevent unfair or inequitable distribution of voting power among security holders, *Am. Power & Light*, 329 U.S. at 104-05;

- to the Secretary of War to determine and recover "excessive profits" from military contractors, *Lichter v. United States*, 334 U.S. 742, 785-86 (1948) (citation omitted); and

- to the Environmental Protection Agency to set nationwide air-quality standards limiting pollution to the level required "to protect the public health." *Am. Trucking*, 531 U.S. at 472 (quoting 42 U.S.C. § 7409(b)(1)).

**b.** The provisions challenged here fit comfortably within this precedent. As a threshold matter, Congress did not grant FINRA "lawmaking" power at all—that is, FINRA lacks the authority to promulgate general "rule[s] of prospective force." *Loving v. United States*, 517 U.S. 748, 758 (1996); *see also Gundy*, 588 U.S. at 153 (Gorsuch, J., dissenting) (the framers understood "legislative power . . . to mean the power to adopt generally applicable rules of conduct governing future actions by private persons"). Those powers remain firmly vested in the SEC, because no rule proposed by FINRA "shall take effect unless approved by the Commission." 15 U.S.C. § 78s(b)(1); *see also supra* at 4 n.1 (discussing statutory exceptions).

Even if the Court were to conclude that FINRA does exercise some delegated authority (either in the context of its rulemaking or adjudication functions), the exercise of that authority is governed by statutory standards and criteria that easily satisfy the forgiving "intelligible principle" test. Indeed, Plaintiffs never even allege the absence of an intelligible principle, and instead simply

offer conclusory allegations that "FINRA's wide-ranging rulemaking authority" is legislative. TAC ¶ 158. Plaintiffs' other critiques—that "FINRA operates completely independently of both Congress and the President," that the President cannot "appoint members of the FINRA Board of FINRA's executives and hearing officers," and that the "SEC cannot remove FINRA Board members or hearing officers at will, and the President cannot remove members of the SEC at will," TAC ¶¶ 159-61—are all irrelevant to the intelligible-principle inquiry, and instead, improperly import arguments from Plaintiffs' other claims, which are addressed below. But Plaintiffs' allegations do not speak to whether Congress has made clear both the general policy that the SEC and FINRA must pursue and the boundaries of that delegated authority, which is the relevant inquiry under the intelligible-principle test.

Nor could they: both FINRA and the SEC are constrained by detailed provisions of the Securities Act of 1933, the Securities Exchange Act of 1934, and the Maloney Act of 1938. FINRA may propose rules, but the SEC approves FINRA rules only "if it finds that such proposed rule change is consistent with the requirements of this chapter and the rules and regulations issued under this chapter that are applicable to such organization." 15 U.S.C. § 78s(b)(2)(C)(i). And the SEC can also "amend" any FINRA rule, at any time, "to insure the fair administration of the self-regulatory organization" or "to conform its rules to requirements of this chapter." *Id.* § 78s(c). Those cross-references incorporate a long list of specific, detailed delegations—and restrictions on those delegations—governing the SEC's authority "to insure the maintenance of fair and honest markets" in securities, *id.* § 78b, to prohibit "[m]anipulative and deceptive devices" in financial markets, *id.* § 78j, to ensure "the protection of investors," *id.* § 78o-3(a), and so on.

Under binding precedent, these delegations—either in isolation, or when considered in the context of the statutory scheme as a whole—are "constitutionally sufficient," because "Congress clearly delineate[d] the general policy, the public agency which is to apply it, and the boundaries of th[e] delegated authority." *Am. Power & Light*, 329 U.S. at 105; *see also id.* (the "veritable code of rules" for the SEC to follow in enforcing certain provisions of the securities laws "are certainly no less definite in nature than those speaking in other contexts in terms of 'public

interest,' 'just and reasonable rates,' 'unfair methods of competition' or 'relevant factors'" that the Supreme Court has already approved); Mem. Op. at 23 n.9 ("Congress delineated specific objectives that SROs should strive to accomplish, providing an 'intelligible principle' under the public nondelegation doctrine.").  No more is required.

## IV. The processes that govern the hiring and firing of FINRA officials do not violate Article II.

Plaintiffs allege that the manner of selection for members of FINRA's Board of Governors, as well as the selection of certain (unspecified) FINRA "executives and officers," violates the Appointments Clause, TAC ¶¶ 52-61, 141-45, as well as Article II requirements relating to the President's authority to remove federal officers, *id.* ¶¶ 125-34; *see also id.* ¶¶ 136-39 (briefly referencing the Take Care Clause).  All these claims fail because FINRA officials do not occupy continuing offices established by law and do not exercise authority that only the government can constitutionally exercise.

**a.**  As a general matter, the Appointments Clause requires that all "Officers of the United States" be appointed by the President subject to "the Advice and Consent of the Senate," although "Congress may by Law vest the Appointment of . . . inferior Officers . . . in the President alone, in the Courts of Law, or in the Heads of Departments." U.S. Const. art. II, § 2, cl. 2.  "An office is a public station conferred by the appointment of government." *Metcalf & Eddy v. Mitchell*, 269 U.S. 514, 520 (1926); *United States v. Hartwell*, 73 U.S. 385, 393 (1867) ("A government office is different from a government contract.").  And so, by its plain text, the Appointments Clause applies only to offices that are "established by Law."  U.S. Const. art. II, § 2, cl. 2; *see United States v. Germaine*, 99 U.S. 508, 511-12 (1878).

Plaintiffs do not allege that any FINRA official occupies a position "established by law." U.S. Const. art. II, § 2, cl. 2.  Nor could they, as "FINRA is a non-profit Delaware corporation that was formed" by private parties when a predecessor self-regulatory organization, NASD, consolidated its member functions with a component of the New York Stock Exchange. *See Fiero*

*v. FINRA*, 660 F.3d 569, 571 n.1 (2d Cir. 2011).  As set forth above, FINRA is part of a self-regulatory tradition in the securities industry that dates to the Founding.  *See supra* at 1-3.

That history likewise underscores that FINRA officials do not perform functions that only the government can constitutionally perform.  As this Court previously recognized, FINRA "perform[s] functions that are neither contemplated nor shared by the SEC, including, to name a few, administering broker qualifications examinations, . . . conduct[ing] inspections of brokers and dealers, and enforcing compliance with professional industry standards as well as FINRA's own rules and regulations."  *Scottsdale Cap. Advisors Corp. v. FINRA*, 678 F. Supp. 3d 88, 103 (D.D.C. 2023) (citations omitted).  And more generally, private, self-regulatory organizations have, since the Founding, conducted their own proceedings to decide whether a member has violated applicable standards and, if so, whether to discipline the member.  Plaintiffs thus do not (and cannot) dispute that self-disciplinary proceedings, by their very nature, have always occurred in front of the organizations' own "governing committee, whose decision, after the trial of a member for offenses under its laws, is final."  *Belton v. Hatch*, 17 N.E. 225, 227 (N.Y. 1888).  Plaintiffs do not contend that the private officials who conducted self-disciplinary proceedings for the private exchanges in the nineteenth century were Officers of the United States subject to the Appointments Clause.  In enacting the federal securities laws at issue here, Congress maintained the private functions of those organizations while subjecting those functions to government oversight and supervision in the public interest. *See Silver v. New York Stock Exch.*, 373 U.S. 341, 352 (1963).

Thus, to the extent FINRA conducts internal disciplinary proceedings to decide whether to discipline a member or an associated person in the first instance, FINRA performs those functions as "a professional association charged with regulating itself."  *Jones v. SEC*, 115 F.3d 1173, 1182 (4th Cir. 1997).  Reflecting that reality, FINRA has only the power any other private membership has to discipline a firm or securities professional within its self-regulatory purview.  It cannot, for example, issue subpoenas or seek judicial enforcement of any FINRA-assessed sanction.  *See Fiero*, 660 F.3d at 575.  The SEC, by contrast, "reviews [FINRA] action and executes, in the public interest, the securities laws of the United States."  *Jones*, 115 F.3d at 1182.  Congress thereby

ensured that any disciplinary decision would not become final until the SEC has the opportunity to take a full and independent review, with regard to the rights of both broker-dealers and the public interest. *See, e.g.*, 15 U.S.C. §§ 78b, 78s(e)(2).

The history of self-regulation in the securities industry is, moreover, itself constitutionally significant. The Supreme Court emphasized in *Financial Oversight & Management Board for Puerto Rico v. Aurelius Investment, LLC*, 590 U.S. 448, 459, 461 (2020), that Congress's "[l]ongstanding practice" of providing for territorial officers without subjecting those officers to constitutional appointment procedures "supports the inference" that the Appointments Clause does not apply to such officers. Congress's decision to preserve the longstanding tradition of self-regulation in the securities industry, without providing for governmental appointment of the officers of self-regulatory organizations, has a similarly strong "foothold in history or tradition," *Seila Law LLC v. CFPB*, 591 U.S. 197, 222 (2020), and similarly supports the inference that the Appointments Clause does not apply to such private individuals engaging in traditional self-regulation.

**b.** Plaintiffs' invocation of the President's Article II removal power is likewise meritless. The President's removal power ensures that the President is "responsible for the actions of the Executive Branch." *Free Enter. Fund*, 561 U.S. at 496-97, 501 (citation omitted). Plaintiffs urge that because FINRA officials are "principal executive officers," they must be removable by the President, TAC ¶ 126, but that argument rests on the same faulty premises as Plaintiffs' Appointments Clause claim and thus fails for the same reasons.

**c.** Earlier in this litigation, the parties disputed the significance of *Lebron v. National Railroad Passenger Corporation*, 513 U.S. 374 (1995), in which the Supreme Court held that Amtrak was part of the government for purposes of the First Amendment. Although the United States had previously urged that *Lebron* supplied the relevant test and that the Appointments Clause applies only to the appointment of members of the government's workforce, *see, e.g.*, Fourth Mem. of Law of the U.S. at 15-17, ECF No. 95, the government has since refined that position, explaining to the Supreme Court that if Congress were to empower a private individual

27

by law to perform functions that only the government can constitutionally perform, that individual would be "an officer of the United States subject to the Appointments Clause." *See* Reply Br. for the U.S. at *19, *FCC v. Consumers' Rsch.*, Nos. 24-354, 24-422, 2025 WL 838506 (U.S. Mar. 13, 2025).

As discussed above, FINRA officials do not fall within this category because they do not occupy a continuing position "established by law" and do not perform functions that only the government can constitutionally perform. That is the critical point, which this Court already correctly recognized when it explained that "FINRA is a private organization incorporated under the laws of Delaware," which "perform[s] functions that are neither contemplated nor shared by the SEC." *Scottsdale*, 678 F. Supp. 3d at 103. Congress's decision to preserve a private structure (that has existed in the self-regulatory securities scheme since the Founding) and subject it to federal oversight does not transform the private officers of a private company into "Officers of the United States." U.S. Const. art. II, § 2, cl. 2; *see also Aurelius*, 590 U.S. at 459 ("If they are not officers of the United States, but instead are some other type of officer, the Appointments Clause says nothing about them.").

Plaintiffs have also erred in previously suggesting that the state-action doctrine has relevance here. The state-action doctrine allows courts, in rare cases and "limited" circumstances, to attribute to the government the action of a private entity that is not part of the government. *Manhattan Cmty. Access Corp. v. Halleck*, 587 U.S. 802, 809 (2019). Courts have repeatedly concluded that private self-regulatory organizations supervised by the SEC are not state actors when they investigate and discipline their members or participants. Judge Friendly reached that conclusion in *United States v. Solomon*, 509 F.2d 863 (2d Cir. 1975), for example, in holding that the New York Stock Exchange's investigation into one of its own members was not state action to which the privilege against self-incrimination would attach. That private self-regulatory organization's investigation "was in pursuance of [the Exchange's] own interests and obligations, not as an agent of the SEC," even though that investigation could carry "consequent liability to civil and criminal enforcement proceedings by the Government." *Id.* at 869.

28

More importantly, however, the structural appointment and removal requirements of Article II would not apply to FINRA regardless of whether their actions may or may not be attributable to the government in any particular circumstance. Plaintiffs have often assumed (without explaining why it would be so) that if FINRA, or any other private entities, were deemed to be state actors for purposes of an alleged violation of, for example, the freedom of speech, in a particular circumstance, they would also be deemed Officers of the United States for purposes of the Constitution's structural provisions. Counsel for the United States are aware of no precedent supporting that proposition. *Cf., e.g.*, *NB ex rel. Peacock v. District of Columbia*, 794 F.3d 31, 43 (D.C. Cir. 2015) (holding that the Xerox Corporation was a state actor in the context of its work for the District of Columbia government, but nowhere suggesting that its officers were subject to the Appointments Clause or constitutional restraints on removal restrictions).

**d.** Plaintiffs' Third Amended Complaint also makes a handful of conclusory references to the Take Care Clause, but all of them come in the context of the same Appointments Clause and removal-related arguments already refuted above. *See* TAC ¶¶ 4, 136-39. So the Court can reject any Take Care Clause claim for all the same reasons. In any event, even if Plaintiffs had adequately pleaded some separate claim arising under the Take Care Clause, the Take Care Clause does not provide a private cause of action that is enforceable in federal court.

Through the Take Care Clause, the Constitution vests the President with broad, discretionary authority to "take Care that the Laws be faithfully executed." U.S. Const. art. II, § 3. But that language does not open the door to any plaintiff seeking to challenge the way the President executes the laws. Rather, as the Supreme Court has recognized, the duty of the President when exercising his power to see that the laws are faithfully executed is "purely executive and political," and not subject to judicial direction. *Mississippi v. Johnson*, 71 U.S. (4 Wall.) 475, 499 (1866); *see Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 165-66 (1803) ("[T]he President is invested with certain important political powers, in the exercise of which he is to use his own discretion, and is accountable only to his country in his political character."). To hold otherwise would upset our constitutional scheme of separation of powers and allow judicial superintendence over the exercise

of Executive power that the Clause commits to the President alone.  *Baker v. Carr*, 369 U.S. 186, 217 (1962) (no judicial review where there is "a textually demonstrable constitutional commitment of the issue to a coordinate political department"); *see also Dalton v. Specter*, 511 U.S. 462, 474-75 (1994) (judicial review of discretionary Presidential decisions "is not available"); *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 577 (1992) (expressly "reject[ing]" the notion that "the courts" could supervise the President's duty to "take Care that the Laws be faithfully executed" (quoting U.S. Const. art. II, § 3)); *Marbury*, 5 U.S. (1 Cranch) at 170 ("The province of the court is, solely, to decide on the rights of individuals, not to enquire how the executive, or executive officers, perform duties in which they have a discretion.  Questions, in their nature political, or which are, by the constitution and laws, submitted to the executive, can never be made in this court."); *Chi. & S. Air Lines v. Waterman S. S. Corp.*, 333 U.S. 103, 114 (1948) (refusing to review President's decision that "embod[ied] Presidential discretion as to political matters beyond the competence of the courts to adjudicate"); *Mississippi*, 71 U.S. (4 Wall.) at 499.

Nor does the Take Care Clause provide a basis to review the actions of subordinate Executive Branch officials.  The Clause speaks only to the President, not to his subordinates, and ensures that the President is principally responsible for the actions of the Executive Branch and directly accountable to the people through the political process.  *See Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*, 561 U.S. 477, 492-93 (2010) ("It is his responsibility to take care that the laws be faithfully executed." (emphasis omitted)); *id.* at 495-97; *see also Printz v. United States*, 521 U.S. 898, 922 (1997); *Morrison v. Olson*, 487 U.S. 654, 68-90 (1988); *Clinton v. Jones*, 520 U.S. 681, 712-13 (1997) (Breyer, J., concurring).  So a subordinate Executive officer cannot violate the President's duty to faithfully execute the laws.

## V.    The statutory requirement to become a member of an SRO does not violate the First Amendment or the unconstitutional conditions doctrine.

Count VIII of Plaintiffs' Third Amended Complaint alleges that the statutory requirement to join an SRO like FINRA, as a condition of engaging in the broker-dealer industry, "violates First Amendment rights of association."  TAC ¶ 178.  As this Court has already (preliminarily)

concluded, *Scottsdale*, 678 F. Supp. 3d at 107-08—in a portion of this Court's preliminary-injunction opinion that Plaintiffs did not challenge on appeal—that theory is without merit.

In some circumstances, the Supreme Court has held that "forced associations . . . are impermissible" under the First Amendment where they "burden protected speech." *Pac. Gas & Elec. Co. v. Pub. Utilities Comm'n of Cal.*, 475 U.S. 1, 12 (1986). But the First Amendment does not protect against *any* compelled association—rather, it protects an individual's "right to eschew association *for expressive purposes*." *Janus v. AFSCME, Council 31*, 585 U.S. 878, 892 (2018) (emphasis added).

The statutory requirement that a securities broker or dealer (generally[4]) must become a member of an SRO before effecting securities transactions in interstate commerce does not alone implicate any First Amendment right. Plaintiffs do not assert any "expressive purpose[]" for which they wish to avoid association with FINRA. *Id.* Plaintiffs therefore fail to allege a protected First Amendment interest.

To the extent that the statutory requirements that Plaintiffs challenge may be considered analogous to an attorney's mandatory membership in an integrated state bar, the Supreme Court has concluded that such compelled membership does not on its own violate the First Amendment. *See, e.g.*, *Lathrop v. Donohue*, 367 U.S. 820, 843 (1961) (holding that integrated state bar association may constitutionally require membership and dues); *see also, e.g.*, *File v. Martin*, 33 F.4th 385, 391-92 (7th Cir. 2022) (collecting cases), *cert. denied sub nom. File v. Hickey*, 143 S. Ct. 745 (2023) (holding constitutional the state bar's compulsory membership and mandatory

---

[4] To be clear, Plaintiffs describe this "requirement" in overbroad and imprecise terms. As the D.C. Circuit explained, "membership in a registered securities association like FINRA is *not* mandatory for securities traders that only trade on one exchange." *Alpine*, 121 F.4th at 1331, n.3 (emphasis added) (citing 15 U.S.C. § 78o(b)(1)); *see also* 15 U.S.C. § 78o(b)(9) ("The Commission by rule or order, as it deems consistent with the public interest and the protection of investors, may conditionally or unconditionally exempt from paragraph (8) of this subsection any broker or dealer or class of brokers or dealers specified in such rule or order."). Especially to the extent that Plaintiffs bring a "facial" challenge to the statute, TAC ¶ 175, those statutory caveats significantly undermine their theory. In any event, Plaintiffs' claims would fail even if their description of the statute were accurate, for the reasons explained in this section.

membership dues); *Kaimowitz v. Fla. Bar*, 996 F.2d 1151, 1153-54 (11th Cir. 1993) (same). The First Amendment may be implicated when the state compels payment of membership dues that are used to fund activities that are not "reasonably incurred for the purpose of regulating the . . . profession." *Keller v. State Bar of Cal.*, 496 U.S. 1, 13-14 (1990) (holding that state bar association may constitutionally use mandatory dues to fund activities "germane to th[e] goals" of "regulating the legal profession and improving the quality of legal services"), but there is no suggestion of that here.[5]

To the contrary, Plaintiffs do not even allege that FINRA has engaged in political or ideological expression—much less expressive conduct that is not "germane" to FINRA's purposes of "oversee[ing] and regulat[ing] securities firms who join its membership . . . and individuals associated with those firms." *Turbeville v. FINRA*, 874 F.3d 1268, 1270-71 (11th Cir. 2017). The general requirement that Plaintiffs join an SRO like FINRA (and pay dues as a condition of participating in this industry[6]) thus does not infringe their First Amendment right of association. Even if it did infringe such rights, "the compelling interest in statutorily mandated FINRA membership . . . outweighs any expressive association right." *Scottsdale*, 678 F. Supp. 3d at 108.

Plaintiffs do state, in conclusory fashion and with no explanation, that "broker-dealers are compelled to endorse FINRA messages with which broker-dealers may not agree in violation of the First Amendment's protections against compelled speech." TAC ¶ 178. But the federal securities laws contain no such requirement, nor do Plaintiffs identify the source of that alleged compulsion. In reality, Plaintiffs are free to disagree with any "FINRA messages," and express that disagreement publicly, if they wish to do so.

---

[5] If Plaintiffs contend that the Supreme Court's decision in *Janus* implicitly overturned *Keller* and *Lathrop*, that argument is meritless. At least to the knowledge of counsel for the United States, every appellate court to consider the question since *Janus* has concluded that *Keller* and *Lathrop* remain good law. *See File*, 33 F.4th at 391-92 (collecting cases). And this Court (at least implicitly) came to the same conclusion in its preliminary-injunction opinion, which favorably cited *Keller*. *See Scottsdale*, 678 F. Supp. 3d at 108 n.11.

[6] Plaintiffs' prior complaints alleged that the requirement to pay dues to FINRA raised distinct First Amendment problems. *See, e.g.*, Second Am. Compl. ¶¶ 165-67, ECF No. 43. The Third Amended Complaint appears to abandon that theory.

Finally, tacking on a conclusory reference to the unconstitutional-conditions doctrine does not add anything to Plaintiffs' case.   Under that doctrine, "the government may not deny a benefit to a person on a basis that infringes his constitutionally protected freedom of speech even if he has no entitlement to that benefit."  *Rumsfeld v. FAIR*, 547 U.S. 47, 59 (2006).  But for all the reasons above, the statutes governing FINRA's relationship with the SEC do not violate the First Amendment, nor any other constitutional provision.  And none of the United States's constitutional arguments depend on Plaintiffs' lack of "entitlement" to work as a broker-dealer—instead, Plaintiffs' claims fail because the statutes that govern the relationship between FINRA and the SEC comply with the text and structure of the Constitution.  So Plaintiffs' efforts to refurbish those same arguments (and add a new First Amendment argument) under the rubric of an unconditional-conditions claim, as they do in Count VIII, does not advance their claims.

## **CONCLUSION**

The Court should hold that the challenged provisions of the federal securities laws are constitutional.

Dated: September 16, 2025

Respectfully submitted,

BRETT A. SHUMATE
Assistant Attorney General
Civil Division

CHRISTOPHER HALL
Assistant Branch Director
Federal Programs Branch

*/s/ Stephen M. Pezzi*
STEPHEN M. PEZZI (D.C. Bar. No. 995500)
 Senior Trial Counsel
TAYLOR PITZ
 Trial Attorney
United States Department of Justice
Civil Division, Federal Programs Branch
1100 L Street NW
Washington, DC 20005
Telephone: 202-305-8576
Email: stephen.pezzi@usdoj.gov

*Counsel for the United States of America*