**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

Scottsdale Capital Advisors Corporation and Alpine Securities Corporation,

*Plaintiffs,*

v.

Financial Industry Regulatory Authority, Inc.,

*Defendant,*

United States of America,

*Intervenor Defendant.*

Case No. 1:23-cv-01506-BAH

**ORAL ARGUMENT REQUESTED**

**PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS PLAINTIFFS' THIRD AMENDED COMPLAINT**

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ........ ii
INTRODUCTION ........ 1
BACKGROUND ........ 2
I. The Securities Industry's History of Self-Regulation. ........ 2
II. FINRA's Structure and Authority. ........ 7
III. This Litigation. ........ 10
LEGAL STANDARD ........ 13
ARGUMENT ........ 13
I. FINRA officials are officers subject to the Appointments Clause. ........ 13
A. FINRA wields significant authority pursuant to the laws of the United States. ........ 16
B. FINRA officials are officers. ........ 19
C. FINRA's and the government's counterarguments lack merit. ........ 22
1. The Appointments Clause applies *especially* because FINRA officials do not occupy positions established by law. ........ 22
2. The Appointments Clause does not exempt nominally private entities. ........ 23
3. FINRA is part of the government. ........ 27
II. FINRA violates the private nondelegation doctrine. ........ 30
III. FINRA Governors are unconstitutionally insulated from presidential control. ........ 34
IV. FINRA wields legislative power in violation of the public nondelegation doctrine. ........ 35
V. FINRA disciplinary proceedings violate the Fifth and Seventh Amendments ........ 37
A. FINRA disciplinary proceedings violate the Fifth Amendment. ........ 37
B. FINRA disciplinary proceedings violate the Seventh Amendment. ........ 40
C. This Court has jurisdiction over Plaintiffs' Fifth and Seventh Amendment claims. ........ 42
VI. The Exchange Act imposes unconstitutional conditions on Plaintiffs' legal right to trade securities ........ 44
CONCLUSION ........ 45

## TABLE OF AUTHORITIES


**Cases** **Page(s)**

*Alpine Sec. Corp. v. FINRA*,
121 F.4th 1314 (D.C. Cir. 2024) ....................2, 4, 11, 12, 13, 17, 18, 21, 25, 31, 32

*Alpine Sec. Corp. v. FINRA*,
145 S. Ct. 2751 (2025)....................13

*Alpine Sec. Corp. v. FINRA*,
No. 23-5129, 2023 WL 4703307 (D.C. Cir. July 5, 2023)....................11, 12

*Ass'n of Am. R.R. v. DOT*,
721 F.3d 666 (D.C. Cir. 2013) ....................30

*Ass'n of Am. Railroads v. DOT,*
821 F.3d 19 (D.C. Cir. 2016) ....................39

*Axon Enter. v. FTC*,
598 U.S. 175 (2023)....................12, 13, 42, 43, 44

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007)....................13

*Belton v. Hatch*,
109 N.Y 593 (N.Y. 1888)....................3, 41

*Birkelbach v. SEC*,
751 F.3d 472 (7th Cir. 2014)....................8

*Blount v. SEC*,
61 F.3d 938 (D.C. Cir. 1995) ....................17, 18, 24

*Blum v. Yaretsky*,
457 U.S. 991 (1982)....................18

*Bowsher v. Synar*,
478 U.S. 714 (1986)....................2, 14

*Brentwood Acad. v. Tennessee Secondary Sch. Athletic Ass'n*,
531 U.S. 288 (2001)....................18

*Buckley v. Valeo*,
424 U.S. 1 (1976)....................14, 32

*Carter v. Carter Coal Co.*,
298 U.S. 238 (1936)....................30, 33, 38

*Credit Suisse First Bos. Corp. v. Grunwald*,
400 F.3d 1119 (9th Cir. 2005) ....................8

*DOT v. Ass'n of Am. Railroads*,
575 U.S. 43 (2015)....................27, 28, 30, 32, 36, 39

*Edmond v. United States*,
520 U.S. 651 (1997)....................14

*Erlinger v. United States*,
602 U.S. 821 (2024)....43

*FCC v. Consumers' Research*,
145 S. Ct. 2482 (2025)....30, 31, 33, 35, 36, 37

*Free Enter. Fund v. PCAOB*,
561 U.S. 477 (2010)....28, 29, 34, 35, 37

*Freytag v. CIR*,
501 U.S. 868 (1991)....20, 21, 25, 40

*Goldberg v. Kelly*,
397 U.S. 254 (1970)....40

*Graman v. NASD*,
No. 97–1556–JR, 1998 WL 294022 (D.D.C. Apr. 27, 1998)....30

*Gundy v. United States*,
588 U.S. 128 (2019)....36

*Hall v. Wisconsin*,
103 U.S. 5 (1880)....26

*Heckler v. Chaney*,
470 U.S. 821 (1985)....32

*In re Aiken Cnty.*,
725 F.3d 255 (D.C. Cir. 2013)....32

*In re Series 7 Broker Qualification Exam Scoring Litig.*,
548 F.3d 110 (D.C. Cir. 2008)....18, 19, 28, 31

*J.W. Hampton, Jr., & Co. v. United States*,
276 U.S. 394 (1928)....35

*Keller v. State Bar of Cal.*,
496 U.S. 1 (1990)....45

*Kim v. FINRA*,
698 F. Supp. 3d 147 (D.D.C. 2023)....29

*Lebron v. Nat'l R.R. Passenger Corp.*,
513 U.S. 374 (1995)....15, 27

*Lucia v. SEC*,
585 U.S. 237 (2018)....14, 19, 20, 24, 25

*Marchiano v. NASD,*
134 F. Supp. 2d 90 (D.D.C. 2001)....29

*Marshall v. Jerrico, Inc.*,
446 U.S. 238 (1980)....21, 32, 33

*McGinn, Smith & Co. v. FINRA*,
786 F. Supp. 2d 139 (D.D.C. 2011)....29

*Morrison v. Olson*,
487 U.S. 654, 727 (1988) ....................................................32

*NASD v. SEC*,
431 F.3d 803 (D.C. Cir. 2005) ....................................................8, 18, 21

*Nat'l Horsemen's Benevolent & Protective Ass'n v. Black*,
107 F.4th 415 (5th Cir. 2024) ....................................................34

*NB ex rel. Peacock v. D.C.*,
794 F.3d 31 (D.C. Cir. 2015) ....................................................18

*NBC v. United States*,
319 U.S. 190 (1943) ....................................................36

*NIFLA v. Becerra*,
585 U.S. 755 (2018) ....................................................45

*North v. Smarsh, Inc.*,
160 F. Supp. 3d 63 (D.D.C. 2015) ....................................................29

*Perry v. Sindermann*,
408 U.S. 593 (1972) ....................................................44

*Pub. Invs. Arb. Bar Ass'n v. SEC*,
771 F.3d 1 (D.C. Cir. 2014) ....................................................29

*Roberts v. U.S. Jaycees*,
468 U.S. 609 (1984) ....................................................44, 45

*Romero v. Colegio De Abogados De Puerto Rico*,
204 F.3d 291 (1st Cir. 2000) ....................................................44

*Saad v. SEC*,
980 F.3d 103 (D.C. Cir. 2020) ....................................................29

*Saliba v. SEC*,
47 F.4th 961 (9th Cir. 2022) ....................................................9, 21

*Schweiker v. McClure*,
456 U.S. 188 (1982) ....................................................40

*Scottsdale Cap. Advisors Corp. v. FINRA*,
678 F. Supp. 3d 88 (D.D.C. 2023) ....................................................11, 24, 31

*SEC v. Jarkesy*,
603 U.S. 109 (2024) ....................................................41

*SEC v. Goble*,
682 F.3d 934 (11th Cir. 2012) ....................................................11

*Seila L. LLC v. CFPB*,
591 U.S. 197 (2020) ....................................................13, 14, 16, 34, 35

*Silver v. NYSE*,
373 U.S. 341 (1963) ....................................................3, 4, 5, 6

*Sparta Surgical Corp. v. NASD*,
159 F.3d 1209 (9th Cir. 1998) ........ 19

*Texas v. Black*,
145 S. Ct. 2835 (2025) ........ 34

*TransUnion LLC v. Ramirez*,
594 U.S. 413 (2021) ........ 32

*Trump v. United States*,
603 U.S. 593 (2024) ........ 22, 23

*Turbeville v. FINRA*,
874 F.3d 1268 (11th Cir. 2017) ........ 9

*United States v. Ackerman*,
831 F.3d 1292 (10th Cir. 2016) ........ 28

*United States v. Arthrex, Inc.*,
594 U.S. 1 (2021) ........ 13, 14, 22, 23, 25

*United States v. Texas*,
599 U.S. 670 (2023) ........ 32

*Weissman v. NASD*,
500 F.3d 1293 (11th Cir. 2007) ........ 16, 19, 31

*Whitman v. Am. Trucking Ass'ns*,
531 U.S. 457 (2001) ........ 36

*Williams v. Pennsylvania*,
579 U.S. 1 (2016) ........ 38, 39

*Withrow v. Larkin*,
421 U.S. 35 (1975) ........ 39

*Young Habliston v. FINRA*,
No. 15-2225, 2017 WL 396580 (D.D.C. Jan. 27, 2017) ........ 29

**Statutes, Rules, & Constitutional Provisions**

15 U.S.C.
§ 78c(a)(26) ........ 2
§ 78*o*(b)(1) ........ 2
§ 78*o*(b)(8) ........ 2, 17
§ 78*o*-3 ........ 18
§ 78*o*-3(b)(5) ........ 28
§ 78*o*-3(b)(6) ........ 7, 17, 27, 36, 45
§ 78*o*-3(b)(7) ........ 8, 9, 17, 27
§ 78*o*-3(h)(1) ........ 8
§ 78*o*-4(b)(1) ........ 17
§ 78s(b)(1) ........ 6, 7
§ 78s(b)(2)(C) ........ 6, 7
§ 78s(b)(2)(C)(i) ........ 33, 36

§ 78s(c) ....... 33
§ 78s(d)(1) ....... 9
§ 78s(e)(1) ....... 9, 20, 31, 42
§ 78s(h)(4) ....... 9, 10, 35
§ 78y(a)(1) ....... 42
§ 78y(a)(3) ....... 42
§ 78ff(a) ....... 17, 18

17 CFR § 201.420 ....... 9

48 Stat. 881 (1934) ....... 4

78 Stat. 565 (1964) ....... 5

FINRA Rule
8210(a) ....... 21
8210(a)(1) ....... 8
8210(a)(2) ....... 8
8210(c) ....... 8
8310 ....... 9
9211(a) ....... 8, 21
9231(a) ....... 8
9231(b) ....... 38
9263 ....... 8
9263(a) ....... 20
9263(b) ....... 20
9268(b) ....... 8, 20
9280(a)(2) ....... 20
9311 ....... 9
9311(b) ....... 11
9351 ....... 9, 22
9360 ....... 38
9370 ....... 8, 9
9556 ....... 11

U.S. CONST.
art. I, § 1 ....... 35
art. II, § 1, cl. 1 ....... 34
art. II, § 2, cl. 2 ....... 14
art. II, § 3 ....... 34
art. VI, cl. 3 ....... 38

**Other Authorities**

2024 FINRA Industry Snapshot, https://perma.cc/DV8W-P2PL ....... 7

Aditya Bamzai, *Tenure of Office and the Treasury: The Constitution and Control over National Financial Policy, 1787 to 1867*, 87 GEO. WASH. L. REV. 1299 (2019) ....... 26

*Application of Scottsdale Capital Advisors Corp., et al.*, Exchange Act Release No. 93052, 2021 WL 4242630 (Sept. 17, 2021) ....... 10

William A. Birdthistle & M. Todd Henderson, *Becoming a Fifth Branch*, 99 CORNELL L. REV. 1, 16 (2013)....................3, 4, 5

FINRA, *By-Laws of the Corporation*....................7, 22

FINRA, *FINRA Board of Governors*, https://perma.cc/82FY-ZKGM....................7

FINRA, *Report on Use of 2024 Fine Monies*, https://perma.cc/ZJ8V-9F7J (May 20, 2025)........41

FINRA, *Statistics*, https://perma.cc/UJN5-652M....................9, 41

Alexander Hamilton, *Final Version of the Second Report on the Further Provision Necessary for Establishing Public Credit (Report on a National Bank)* (Dec. 13, 1790), https://perma.cc/C2HE-ANFL....................26

*In re* NASD, SEC Release No. 37538, 1996 WL 447193 (Aug. 8, 1996)....................6, 7

*Officers of the United States*, 31 Op. O.L.C. 73 (2007)....................25, 26, 27

Hester Peirce, *The Financial Industry Regulatory Authority: Not Self-Regulation After All* (2015), *available at*: https://perma.cc/4T5J-JHF2....................2, 3, 5, 6, 7, 36

Press Release, SEC, *SEC Announces Enforcement Results for Fiscal Year 2024*, https://perma.cc/FG2A-SM8Q....................9

Reply Br. for the U.S, *FCC v. Consumers' Rsch.*, 145 S. Ct. 2482 (2025) (Nos. 24-354, 24-422), 2025 WL 838506....................15, 16, 17, 24

SEC, *Fourth Annual Report of the Securities and Exchange Commission: Fiscal Year Ended June 30, 1938* (Washington, D.C., SEC 1938)....................5

## INTRODUCTION

The Financial Industry Regulatory Authority (FINRA) is a nominally private corporation that acts as a federal agency. FINRA insists that it can wield delegated government power to make, enforce, and adjudicate violations of the securities laws, all free from constitutional constraints. FINRA is wrong. As a rule, the government may not end-run the Constitution by conferring power on private entities or individuals. FINRA demonstrates the importance of this rule, as it has deployed government power against disfavored brokers and dealers without regard for the constitutional constraints designed to prevent abuses. Those constraints, however, must govern FINRA's receipt and deployment of enormous government power.

The ways FINRA flouts those constraints are legion: FINRA wields significant executive authority even though none of its officials were properly appointed and none are subject to presidential control. FINRA makes law pursuant to a principle that is far from intelligible. FINRA conducts structurally biased proceedings and fails to honor the jury trial right where required. And even if FINRA were somehow immune from all these constraints because of its status as a putatively private entity, the constitutional calculus would not change. A private entity cannot wield federal power free from federal-government oversight. Yet FINRA investigates and initiates actions to enforce federal law without any federal oversight whatsoever. Lastly, the very notion that brokers and dealers could be compelled to associate with FINRA is itself unconstitutional.

FINRA and the government argue that the stripping away of constitutional safeguards is justified because FINRA is of a piece with a long tradition of securities self-regulation. But FINRA could hardly be less tethered to that tradition. True self-regulatory organizations were built on a voluntary bargain: submit to an organization's rules in exchange for access to some economic benefit. FINRA, by contrast, is built on federal law: submit to FINRA's authority or face a statutory

bar on operating as a securities broker-dealer. FINRA membership is not an option but a requirement. Thus, FINRA has been transformed into an arm of the Securities and Exchange Commission, complete with governmental immunity and all.

In the end, this case turns on the simple principle that Congress cannot outsource around the Constitution. Things might be more efficient if it could, but "[c]onvenience and efficiency are not the primary objectives—or the hallmarks—of democratic government." *Bowsher v. Synar*, 478 U.S. 714, 736 (1986) (quotation marks omitted). FINRA is unconstitutional several times over, and the Court should deny the motion to dismiss.

## BACKGROUND

### I. The Securities Industry's History of Self-Regulation.

The Securities Exchange Act prohibits brokers and dealers from trading securities in critical markets unless they are members of a registered securities association. 15 U.S.C. § 78*o*(b)(8); *see also id*. § 78*o*(b)(1). The SEC has registered only one securities association: the Financial Industry Regulatory Authority (FINRA). That means, with exceptions not relevant here, all brokers and dealers are required by federal law to become FINRA members.

The Exchange Act refers to FINRA as a "self-regulatory organization," or an SRO for short. 15 U.S.C. § 78c(a)(26). SROs are a longstanding feature of the securities industry. *See Alpine Sec. Corp. v. FINRA* (*Alpine I*), 121 F.4th 1314, 1319 (D.C. Cir. 2024). But while federal law still calls FINRA an SRO, that label no longer fits. *See* Hester Peirce, *The Financial Industry Regulatory Authority: Not Self-Regulation After All* at 10–12 (2015), https://perma.cc/7A3C-PBRF. SROs were voluntary associations run by members of the securities industry. FINRA, by contrast, is a mandatory association governed predominantly by independent regulators.

***Exchanges*.** SROs originated as part of stock exchanges. For two centuries, the most

important exchange was the New York Stock Exchange (NYSE). That exchange was founded in 1791 when a group of traders entered into a collective agreement to trade stocks with each other. *See id*. The NYSE furnished a market for its members to buy and sell stocks. To participate in that market, members were required to follow certain rules, which they agreed to in a contractual membership agreement. *See Belton v. Hatch*, 109 N.Y 593, 596 (N.Y. 1888).

Eventually, the NYSE established a board to govern its operations. *See* William A. Birdthistle & M. Todd Henderson, *Becoming a Fifth Branch*, 99 CORNELL L. REV. 1, 16 (2013). The Board was empowered to make rules to govern the exchange and its members, such as a prohibition on doing business in a "reckless and unbusiness-like manner." *Belton*, 109 N.Y. at 595. When a member was accused of violating such a rule, the Board adjudicated the dispute by majority vote. *See* Birdthistle & Henderson, *supra*, at 16. If it found a violation, it sanctioned the wrongdoer, often by suspension or expulsion from the exchange. *See Belton*, 109 N.Y at 595.

Critically, however, the NYSE's authority to impose rules and sanctions was just a product of voluntary agreement. The NYSE furnished a vast and liquid market for securities, and access to that market was valuable. A broker or dealer could obtain access by "consent[ing]," through a contractual membership agreement, to the Board's authority. *Id*. at 597. But a broker or dealer was not required to become a member. And if he did, his only incentive to comply with the Board's rules was to retain the purely private economic benefits that the Board offered—namely, access to its market. Thus, the Board's regulatory authority was in the nature of a "private club[]." *Silver v. NYSE*, 373 U.S. 341, 350–51 (1963). Just as a country club can regulate its golf course by expelling members who violate club rules, the Board could regulate its market by expelling members who violated its rules.

Thus, NYSE membership was in no way a government-enforced condition on trading

securities because the Board had no authority to prevent brokers or dealers from trading securities in markets other than its own. And the vast majority of stock transactions took place in other markets. Specifically, they took place in "over-the-counter" (OTC) markets, which means they did not occur on any exchange but rather through an informal network of brokers and dealers. *See* Birdthistle & Henderson, *supra*, at 15–16. So the NYSE was nothing like FINRA.

***The Exchange Act of 1934*.** The NYSE and other exchanges operated with little federal oversight until the 1930s. *See Alpine I*, 121 F.4th at 1320. But in 1934, Congress passed the Exchange Act, which created the SEC and prohibited a number of actions that Congress deemed harmful. *See* 48 Stat. 881, 885–96 (1934). The Act also required exchanges to register with the SEC and imposed conditions on their registration. *Id*. at 885–86. For example, Section 6 required exchanges to maintain rules governing "just and equitable principles of trade," and to discipline members for violating those rules. *See id*. at 886.

Critically, the Act did nothing to require exchange membership. As before, each exchange usually reserved its market for its members, who agreed through a contractual membership agreement to submit to the exchange's authority. But brokers and dealers could still transact in OTC markets free from any exchange's authority. *See id*. at 895–96. Thus, brokers and dealers had no legal obligation to join an exchange—only economic incentives. The exchanges were still "private clubs," *Silver*, 373 U.S. at 350–51, and still nothing like FINRA.

The exchange was the only meaningful SRO model until 1938. But an exchange has authority only to control access to its own market, which means it has no authority over brokers and dealers who do not participate in that market. By definition, no exchange could impose rules or adjudicate disputes arising from transactions that occurred in OTC markets.

***The Maloney Act*.** In 1938, Congress passed the Maloney Act, 52 Stat. 1070, to create a

new SRO model for those markets: the securities association. The Act provided for the creation and registration of voluntary securities associations. As today, an association could register only if the SEC determined that it met certain requirements. *See* Peirce, *supra*, at 5. The SEC registered the National Association of Securities Dealers (NASD) in 1939, and it was the only registered association.

Like exchanges, NASD was originally a voluntary, membership-based organization. *See* SEC, *Fourth Annual Report of the Securities and Exchange Commission: Fiscal Year Ended June 30, 1938* (1938), at 33 (noting securities associations were to be "voluntary"). To incentivize membership, NASD offered members economic benefits, such as discounts on stock trades with other members. *See* Birdthistle & Henderson, *supra*, at 17. If brokers and dealers wanted those discounts, they had to agree by contract to follow NASD's rules and submit to its disciplinary proceedings. *See id*. Over time, nearly eighty percent of brokers and dealers became NASD members. *See id*.

But the Maloney Act did not require brokers and dealers to join NASD as a condition of trading securities. *See* Peirce, *supra*, at 6. If a broker or dealer chose not to join NASD—or was expelled from it—he forewent only the economic benefits offered by NASD, not the legal right to trade altogether. Thus, like exchanges, the original NASD was a "private club[]" whose authority derived entirely from voluntary exchange. *Silver*, 373 U.S. at 350–51. It was nothing like FINRA.

***<u>The 1983 Amendments</u>.*** In 1960, the SEC suggested that Congress make NASD membership a mandatory condition of transacting in OTC markets. *See* Peirce, *supra*, at 6. Congress declined, but it apparently agreed that OTC markets needed additional oversight. So, it passed the 1964 amendments to the Exchange Act, which gave the SEC authority to require brokers and dealers to register with the SEC. *See* 78 Stat. 565, 570 (1964). The SEC used that authority to

establish the SEC-only (SECO) program, through which it directly supervised brokers and dealers who were not NASD members. *See* Peirce, *supra*, at 6.

For as long as SECO was in place, NASD membership was not compulsory because a broker or dealer could choose direct SEC oversight. At one point, over 600 brokers and dealers participated in SECO. *See* Peirce, *supra*, at 5–7. Thus, even after the 1964 amendments, NASD's authority still derived from voluntary exchange.

That changed in 1983. In that year, Congress and the SEC established the modern framework by abolishing SECO and making membership in a registered securities association a mandatory, government-enforced condition of participation in securities markets. *See* Peirce, *supra*, at 6–7. There is only one securities association registered by the SEC. Until 2007, that was NASD. Then, at the SEC's behest and with its approval, NASD combined with the NYSE's regulatory arm to form FINRA, a "more powerful successor to the NASD." *Id.* at 11. Today, brokers and dealers must—as a matter of federal law—obtain and maintain FINRA membership.

***

These changes transformed securities "self-regulation." True SROs were "private clubs" who derived their authority from purely voluntary bargains. *Silver*, 373 U.S. at 350–51; *see* Mot. to Dismiss Third Am. Compl. ("FINRA Br."), Doc. 107 at 3 (Sept. 2, 2025). FINRA, by contrast, derives its authority from federal law. FINRA membership is a government-enforced condition to participation in critical securities markets, so broker-dealers have no option but to submit to FINRA's authority.

Moreover, while true SROs were governed by members of the securities industry, the majority of FINRA's board today is comprised of "public Governors" who are not securities professionals. *See* p. 7, *infra*. That is by design. For example, in 1996, the SEC ordered the NASD

to change its leadership structure to insulate enforcement decisions from member influence. *In re NASD*, SEC Release No. 37538, 1996 WL 447193 (Aug. 8, 1996). Thus, FINRA is not a "self-regulator" at all but rather an independent one. *See* Peirce, *supra*, at 27 ("FINRA is not a self-regulator."); *see also* TAC ¶¶ 62–70.

In short, FINRA represents a radical break with securities self-regulation. It is in fact a congressionally-deputized independent securities regulator. *See* Third Am. Compl. ("TAC"), Doc. 106, ¶¶ 63–70 (Jul. 18, 2025).

**II. FINRA's Structure and Authority.**

FINRA is organized as a Delaware nonprofit corporation governed by a 22-member Board. *See* FINRA, *FINRA Board of Governors*, https://perma.cc/82FY-ZKGM. The Board contains ten "Industry Governors" who are elected by FINRA members and must be members of the securities industry. *See id*. But it also contains eleven "Public Governors" who are appointed by the Board and who must *not* be members of the securities industry. *See id*. (noting Public Governors must have no "material business relationship with a broker-dealer"). The last Board seat belongs to FINRA's CEO, who is appointed by the Board. *See* FINRA, *By-Laws of the Corporation*, art. VIII § 1, https://perma.cc/HNT9-N9RX; *see also* TAC ¶ 35. Thus, FINRA is controlled by persons outside the securities industry.

FINRA oversees nearly 3,300 firms with almost 630,000 representatives and over $600 billion in annual revenue. *See* FINRA, *2024 FINRA Industry Snapshot*, https://perma.cc/DV8W-P2PL. FINRA has vast rulemaking power. *See* 15 U.S.C. § 78*o*-3(b)(6). It may promulgate rules covering "all aspects of the securities business." Peirce *supra* at 13; *see* 15 U.S.C. § 78*o*-3(b)(6) (rules are permissible if they are "related to the purposes of" the Exchange Act). Its rules are subject to SEC approval, but the SEC *must* approve any rule that is "consistent with the requirements" of

the Exchange Act. *See id*. § 78s(b)(1), (b)(2)(C). Once approved, FINRA rules carry the force and status of federal law, and they preempt contrary state law. *Birkelbach v. SEC*, 751 F.3d 472, 475 n.2 (7th Cir. 2014); *Credit Suisse First Bos. Corp. v. Grunwald*, 400 F.3d 1119, 1121 (9th Cir. 2005).

FINRA also wields vast enforcement power. FINRA must enforce both its own rules and the Exchange Act and SEC rules. *See* 15 U.S.C. § 78*o*-3(b)(7); *id.* § 78*o*-3(h)(1). It has delegated these powers to its Department of Enforcement (DOE), which may investigate a violation of "any rule, regulation, or statutory provision, including the federal securities laws and the regulations thereunder." FINRA Rule 9211(a). The DOE may "require" brokers and dealers to "provide information orally, in writing, or electronically," or to "testify … under oath or affirmation administered by a court reporter or a notary." *Id*. 8210(a)(1). It may also "inspect and copy the books, records, and accounts" of a member. *Id*. 8210(a)(2). Members who resist information requests face sanctions, which become effective before any SEC review. *See* FINRA Rule 8210(c), 9370. If the DOE thinks a violation occurred, it may seek authorization from FINRA's Office of Disciplinary Affairs (ODA) to initiate an enforcement action. *See id*. 9211(a). No provision of the Exchange Act authorizes the SEC to review FINRA's decision to initiate an enforcement action.

Lastly, FINRA is empowered to conduct adjudications that parallel SEC adjudications. *See NASD v. SEC*, 431 F.3d 803, 806 (D.C. Cir. 2005). Alleged violations are prosecuted before a FINRA hearing panel led by an employee of FINRA's own Office of Hearing Officers joined by two industry panelists. *See* FINRA Rule 9231(a). The Hearing Officer is responsible for procedural rulings, including critical evidentiary decisions. *See id*. 9263. After a hearing that includes testimony, evidence, and argument, the panel issues a written decision including findings of fact, conclusions of law, and "a statement describing any sanction imposed." *Id*. 9268(b). If the panel

finds that a violation occurred, it must impose a "fitting" sanction, such as "expulsion, suspension, limitation of activities, functions, and operations, fine, [or] censure." 15 U.S.C. § 78*o*-3(b)(7); *see also* FINRA Rule 8310. These sanctions—like FINRA Rules—"carry the force of federal law." *Turbeville v. FINRA*, 874 F.3d 1268, 1270 (11th Cir. 2017). Panel decisions must first be appealed to another in house tribunal, the National Adjudicatory Council (NAC), and then to FINRA's Board. *See* FINRA Rules 9311, 9351. Only if a member survives FINRA's investigation, prosecution, and adjudication may it seek SEC review of a "final disciplinary sanction." 15 U.S.C. § 78s(d)(1); *see also* 17 CFR § 201.420; FINRA Rule 9370. SEC review "may consist solely of consideration of the record before" FINRA, 15 U.S.C. § 78s(e)(1), which means Hearing Officers' evidentiary decisions are critically important. Moreover, the SEC regularly defers to FINRA's factual findings. *See Saliba v. SEC*, 47 F.4th 961, 971 (9th Cir. 2022) (collecting authorities for the proposition that SEC "was *required* to give deference to FINRA's credibility findings" (emphasis added)).

FINRA wields all this power aggressively. For example, in 2024, FINRA brought 730 new disciplinary proceedings, barred or suspended 536 individuals, imposed $75.6 million in fines, ordered $24 million in restitution, and suspended or expelled 8 firms. *See* FINRA, *Statistics*, https://perma.cc/UJN5-652M. By comparison, the SEC's Division of Enforcement brought 583 enforcement actions over the same period. Press Release, SEC, *SEC Announces Enforcement Results for Fiscal Year 2024* (Nov. 22, 2024), https://perma.cc/FG2A-SM8Q.

Meanwhile, the SEC has minimal control over who wields FINRA's delegated power. It does not appoint FINRA's Governors or other officials, *see* p. 7, *supra*, and it may remove a FINRA governor only if it finds, after "notice and opportunity for hearing," that the Governor or officer "willfully violated" an applicable law or regulation, "willfully abused his authority," or "failed to

enforce compliance" with an applicable law or regulation "without reasonable justification or excuse," 15 U.S.C. § 78s(h)(4).

**III. This Litigation.**

***Plaintiffs***. Plaintiffs are Scottsdale Capital Advisors Corporation ("SCA") and Alpine Securities Corporation ("Alpine") (collectively "Plaintiffs"). Plaintiffs focus their businesses on microcap stocks, which are stocks with market capitalizations below $250 million. Plaintiffs are FINRA members because federal law requires it, and they are accordingly subject to FINRA's regulatory activities. *See* TAC ¶¶ 19–20. In fact, they have been repeatedly and unfairly targeted by FINRA.

*SCA*. In 2015, FINRA filed a complaint against SCA for supposed violations of Section 5 of the Securities Act of 1933. The DOE conducted a multi-year investigation, culminating in a twelve-day hearing before a FINRA hearing panel. The panel issued a $1.5 million fine to SCA and sanctioned its indirect owner, John Hurry. The NAC affirmed, but the SEC set aside FINRA's order in full. In doing so, the SEC explained that FINRA relied on an improper standard of diligence under Section 5, and that the NAC developed and relied on a novel theory of liability, which deprived Mr. Hurry "of a fair opportunity to rebut the theory under which he was held liable." *Application of Scottsdale Capital Advisors Corp., et al.*, Exchange Act Release No. 93052, 2021 WL 4242630, at *9 (Sept. 17, 2021); *see* TAC ¶ 95. The SEC's decision did not undo the six years SCA and Mr. Hurry spent defending against FINRA's enforcement action or the damage done to the business conducted by the firm.

*Alpine*. In 2019, FINRA brought an enforcement action against Alpine. In that action, a hearing panel issued an initial decision expelling Alpine from the securities industry and fining it $2.3 million. The panel also issued a cease-and-desist order. That order prohibited Alpine from

imposing specific fees on customers and also included an obey-the-law-provision ordering Alpine to follow all FINRA rules. *See id.* ¶ 96; *See SEC v. Goble*, 682 F.3d 934, 949 (11th Cir. 2012) (questioning the enforceability of such "obey-the-law" orders). Alpine appealed to the NAC, which stayed the expulsion order. *See* FINRA Rule 9311(b).

After Alpine filed this action challenging FINRA's constitutionality, FINRA initiated an expedited disciplinary proceeding alleging that Alpine violated FINRA rules and, in turn, its earlier order.[1] *See* TAC ¶ 100. In this expedited proceeding, FINRA sought to permanently expel Alpine from the securities industry. *See id.* ¶ 103. At the time, FINRA rules allowed an expulsion order issued in an expedited proceeding (as opposed to an ordinary proceeding) to take immediate effect, notwithstanding any appeal. *See Alpine I*, 121 F.4th at 1322. Alpine therefore faced the prospect of expulsion from the securities industry without any SEC review. *See id.* at 1323.

***Procedural History***. In the midst of those proceedings, Plaintiffs filed this action in the Middle District of Florida. Doc. 1 (Oct. 12, 2022). The United States intervened. Doc. 28 (Feb. 6, 2023). FINRA then commenced its expedited disciplinary proceeding against Alpine, and Alpine moved for a preliminary injunction to halt that proceeding. Doc. 45 (May 9, 2023). On May 26, 2023, the Middle District of Florida denied that motion without prejudice and transferred the case to this Court. Doc. 63 (May 25, 2023).

Alpine renewed its motion for emergency relief in this Court. Doc. 66 (May 30, 2023). This Court denied Alpine's emergency motion. *See Scottsdale Cap. Advisors Corp. v. FINRA*, 678 F. Supp. 3d 88 (D.D.C. 2023). Alpine moved for an injunction pending appeal to prevent its immediate expulsion, and a D.C. Circuit motions panel granted that request. *See Alpine Sec. Corp.*

---

[1] An expedited proceeding is different from an ordinary enforcement proceeding. It takes place on a faster timeline and involves less internal review and fewer procedural protections. *See* FINRA Rule 9556.

*v. FINRA*, No. 23-5129, 2023 WL 4703307 (D.C. Cir. July 5, 2023).

A merits panel then considered Alpine's appeal, which raised two issues: First, that certain FINRA officials were officers of the United States and were therefore unconstitutionally appointed and unconstitutionally insulated from presidential control. Second, that FINRA sought to expel Alpine from the securities industry without any SEC review, in violation of the private nondelegation doctrine.

The panel agreed with Alpine's private nondelegation challenge. It held that FINRA wields "governmental authority" when it "decide[s] who can trade securities under federal law." *Alpine I*, 121 F.4th at 1325, 1328. It then observed that a delegation of governmental authority to a private entity is constitutional only if the private entity acts as no more than "an aid to an accountable government agency that retains the ultimate authority to approve, disapprove, or modify the private entity's actions and decisions on delegated matters." *Id*. at 1325 (cleaned up). FINRA sought to bar Alpine from trading securities under federal law before the SEC could review the expulsion order, which meant that the SEC did not retain ultimate authority to approve, disapprove, or modify that order. The panel held that was a violation the private nondelegation doctrine. *See id*. at 1328. In a partial dissent, Judge Walker argued that all FINRA's enforcement activities pose a private nondelegation problem—not just expulsion orders issued in expedited proceedings. *See id*. at 1343–45 (Walker, J., concurring in part and dissenting in part). But the majority concluded that was an argument that Alpine had "not advanced." *Id*. at 1328 (majority op.).

The panel then declined to address the merits of Alpine's argument that FINRA officials were officers of the United States because it concluded that Alpine failed to establish a likelihood of irreparable harm on that issue. *See id*. at 1332. While the Supreme Court has held that subjection to an unconstitutionally structured proceeding inflicts an immediate injury, *see Axon Enter. v. FTC*,

598 U.S. 175, 191 (2023), the panel held this injury was not irreparable for purposes of a preliminary injunction, *see Alpine I*, 121 F.4th at 1336. Importantly, the panel "express[ed] no view" about whether this challenge was likely to succeed on the merits. *Id*. at 1337.

Following the D.C. Circuit's decision, the NAC affirmed the expulsion order issued against FINRA in the ordinary proceeding. *See* TAC ¶ 106. Alpine has appealed that decision to the SEC, and that appeal is pending. *Id*. Separately, after pursuing the expedited proceeding against Alpine for more than two years, FINRA abruptly dismissed that proceeding and amended its own rules to align with the D.C. Circuit's decision. *See* TAC ¶ 107.

Thereafter, Alpine filed a petition for certiorari seeking review of the D.C. Circuit's decision, which the Supreme Court denied. *See Alpine Sec. Corp. v. FINRA*, 145 S. Ct. 2751 (2025) (mem). Plaintiffs then filed the operative complaint, raising eight claims. FINRA moved to dismiss all claims, and Plaintiffs lodge this response.

## LEGAL STANDARD

On a motion to dismiss under Rule 12(b)(6), this court must assume all allegations in the complaint are true. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). The question is only whether the complaint contains factual allegations sufficient "to state a claim to relief that is plausible on its face." *Id*. at 570.

## ARGUMENT

### I. FINRA officials are officers subject to the Appointments Clause.

"Under our Constitution, the 'executive Power'—all of it—is 'vested in a President.'" *Seila L. LLC v. CFPB*, 591 U.S. 197, 203 (2020) (quoting U.S. CONST. art. II, § 1, cl. 1). That means the President is "responsible for the actions of the Executive Branch and cannot delegate that ultimate responsibility." *United States v. Arthrex, Inc.*, 594 U.S. 1, 11 (2021) (cleaned up). But since no

single person could run the executive branch alone, "the Framers expected that the President would rely on subordinate officers for assistance." *Seila L.*, 591 U.S. at 204. The Appointments Clause provides that these subordinate officers must be appointed by the President (or a head of department under him). *See* U.S. CONST. art. II, § 2, cl. 2; *see also Lucia v. SEC*, 585 U.S. 237, 244 (2018) (noting these methods of appointment are "exclusive").

This requirement does not reflect a mere concern for "etiquette or protocol." *Buckley v. Valeo*, 424 U.S. 1, 125 (1976) (per curiam). It is rather "among the most significant structural safeguards of the constitutional scheme." *Edmond v. United States*, 520 U.S. 651, 659 (1997). In assigning the appointment power to the President, the Clause "prevents congressional encroachment upon the Executive … Branch[]" by ensuring that the President has power to select those who administer the laws on his behalf. *Id*. And it guarantees that the President will remain accountable for an "appointees' actions because the 'blame of a bad nomination [will] fall upon [him] singly and absolutely.'" *Arthrex*, 594 U.S. at 12 (quoting The Federalist No. 77 (A. Hamilton)). In these ways, the Appointments Clause protects the separation of powers—and liberty in turn. *See Bowsher*, 478 U.S. at 730 ("structural protections against abuse of power [are] critical to preserving liberty").

Under Supreme Court precedent, the term "officer" refers to any person who "exercise[s] significant authority pursuant to the laws of the United States" and has duties that are "continuing and permanent" rather than "occasional or temporary." *Lucia*, 585 U.S. at 245 (cleaned up). An individual who satisfies these criteria is an officer and must therefore be appointed pursuant to the Appointments Clause. It follows that an individual cannot wield significant authority pursuant to the laws of the United States on a continuing basis unless he is properly appointed. *See Arthrex*, 594 U.S. at 23 (holding that an officer may not wield power incompatible with his method of

appointment).

In short, the government has a "solemn obligation[]" to ensure that all individuals who exercise continuing and significant governmental authority are properly appointed. *Lebron v. Nat'l R.R. Passenger Corp.*, 513 U.S. 374, 397 (1995). And it cannot "evade" this obligation by delegating authority to private individuals. *Id*. It has therefore long been understood that when the government delegates significant authority to a nominally private individual, that delegatee is no less subject to the Appointments Clause than a delegatee on the federal payroll. The government (at 27–28) recognizes this. In fact, it recently represented to the Supreme Court of the United States that if "*a private actor*" were empowered "to adopt binding rules governing private conduct on a continuing basis" that actor would be "an officer of the United States subject to the Appointments Clause." *See* Reply Br. for the U.S., *FCC v. Consumers' Rsch*., 145 S. Ct. 2482 (2025) (Nos. 24-354, 24-422), 2025 WL 838506 at *19 (emphasis added).

That resolves this case. The Exchange Act delegates significant authority to FINRA. Indeed, several categories of FINRA officials wield authority sufficient to make them officers subject to the Appointments Clause. Yet none of these officials were properly appointed. *See, e.g.*, TAC ¶¶ 34–38, 48. FINRA and the government respond that FINRA officials may wield such authority because Congress did not create their positions at all, but that only amplifies the Appointments Clause problem. And FINRA's other response—that the Appointments Clause does not apply to persons or entities outside the Federal Government—is meritless. Even the government, which made this same argument earlier in this proceeding, now recognizes as much. *See* Gov't Br. 27–28 (noting the government has "refined" its position to confirm that the *Lebron* test is not dispositive in determining whether an individual is an officer).

**A. FINRA wields significant authority pursuant to the laws of the United States.**

The Exchange Act charges FINRA with a variety of "adjudicatory, regulatory, and prosecutorial functions, including implementing and effectuating compliance with securities laws." *Weissman v. NASD*, 500 F.3d 1293, 1296 (11th Cir. 2007). To ensure that FINRA can perform these functions effectively, the Act vests FINRA with authority that equals or even exceeds that held by many federal agencies. FINRA may: promulgate rules with the force and effect of federal law; investigate members for violations of federal law, including the Exchange Act, SEC rules, and its own rules; unilaterally initiate an enforcement action; conduct adjudications in hearings that parallel SEC adjudications; and issue sanctions with the force and effect of federal law, including fines, or worse: suspension or expulsion from the securities industry. *See* p. 9, *supra*.

All that undoubtedly amounts to significant authority. Indeed, in *Seila Law*, the Supreme Court described the CFPB as "vested with significant executive power." 591 U.S. at 220. It did so because the CFPB "dictate[s] and enforce[s] policy for a vital segment of the economy affecting millions of Americans." *Id*. at 225. And it has potent tools to pursue its objectives: broad discretion to make rules, sweeping investigatory, enforcement, and adjudicatory authority. *Id*. at 206–07. The same is true of FINRA. It dictates and enforces policy for the entire securities industry, which is vital, *see* p. 7, *supra*, and it has sweeping investigatory, enforcement, and adjudicatory authority, *see* pp. 7–9, *supra*. It follows that FINRA, like CFPB, wields significant executive authority.

FINRA also wields this authority pursuant to the laws of the United States. That is because the Exchange Act empowers FINRA to make binding rules governing private conduct, which, as the government has explained, is sufficient to confer officer status. *See* Reply Br. for the U.S. at *19, *FCC v. Consumers' Rsch.*, 145 S. Ct. 2482 (2025) (Nos. 24-354, 24-422) (if "a private actor" were empowered "to adopt binding rules governing private conduct on a continuing basis" that

actor would be "an officer of the United States subject to the Appointments Clause").

This follows from *Blount v. SEC*, 61 F.3d 938 (D.C. Cir. 1995). *Blount* concerned a constitutional challenge to a rule promulgated by the Municipal Securities Rulemaking Board (MSRB), which is an SRO (like FINRA) that is responsible for overseeing municipal securities markets. *See id*. at 941; *see also* 15 U.S.C. § 78*o*-4(b)(1). The MSRB defended against the challenge by arguing that its rules were not subject to the Constitution. According to the MSRB, it was "a private organization" that promulgated merely "private rule[s]." *Blount*, 61 F.3d at 941. The D.C. Circuit disagreed. *See id*. It explained that federal law prohibited a broker or dealer from engaging in interstate trade in municipal securities unless he registered with the MSRB. *Id*. A broker or dealer who violated the challenged rule could be "sanctioned by revocation or suspension of his license to deal in municipal securities." *Id*. And a broker or dealer who persisted in securities dealing after her license was suspended or revoked was subject to criminal penalties. *Id*. Accordingly, the court of appeals concluded that the challenged rule was a "government-enforced condition to any participation in a municipal securities career," which meant it "operate[d] not as a private compact among brokers and dealers but as federal law." *Id*.

All that is true of FINRA. The Exchange Act requires FINRA to promulgate rules and to sanction its members for violations of those rules, the Exchange Act, and SEC rules. *See* 15 U.S.C. § 78*o*–3(b)(6), (7). And it makes FINRA membership a condition of engaging in the securities trade. *See id*. § 78*o*(b)(8). Accordingly, FINRA rules are "government-enforced condition[s]" to participation in that trade. *See also Alpine I*, 121 F.4th at 1328 (noting FINRA decides "who can trade securities under federal law"). A broker or dealer who violates a FINRA rule can be suspended or expelled, and if he then persists in trading securities he is subject to criminal penalties. *See* 15 U.S.C. § 78ff(a) ("Any person who willfully violates any provision of [the

Exchange Act] … shall upon conviction be fined not more than $5,000,000, or imprisoned not more than 20 years, or both.”). That means FINRA rules and sanctions are binding—they “operate[] not as a private compact among brokers and dealers but as federal law.” *Blount*, 61 F.3d at 941.[2]

State-action precedent points in the same direction. A nominally private entity acts as the government if its actions are fairly attributable to the government. *Brentwood Acad. v. Tennessee Secondary Sch. Athletic Ass'n*, 531 U.S. 288, 295 (2001). That standard may be met if the private entity wields “powers that are traditionally the exclusive prerogative of the State,” *Blum v. Yaretsky*, 457 U.S. 991, 1005 (1982), or if the entity “acts as an agent of the government in relevant respects.” *NB ex rel. Peacock v. D.C.*, 794 F.3d 31, 43 (D.C. Cir. 2015). The D.C. Circuit has recognized that FINRA satisfies both tests: It performs traditionally “governmental functions,” such as regulation, adjudication, and prosecution, and it does so as an agent of SEC. *See In re Series 7 Broker Qualification Exam Scoring Litig.*, 548 F.3d 110, 114 (D.C. Cir. 2008) (FINRA's duties are “delegated by the SEC”); *see also NASD*, 431 F.3d at 810 (FINRA was “charged by Congress to serve as the first-level adjudicator in disciplinary actions brought to enforce federal

[2] FINRA halfheartedly contends (at 41–42) that FINRA membership is not really a prerequisite to trading securities, notwithstanding the D.C. Circuit's observation that FINRA decides “who can trade securities under federal law.” *Alpine I*, 121 F.4th at 1328. For support, FINRA asserts that Plaintiffs could: (1) apply for a waiver under 15 U.S.C. § 78*o*(b)(9); (2) form a new securities association; or (3) join an exchange and trade only on that exchange. But option one is no option at all; the D.C. Circuit has already explained Plaintiffs could not obtain a waiver. *See Alpine I*, 121 F.4th at 1328 (“even after this court invited supplemental briefing, the SEC has made no showing that Alpine could obtain such a waiver”). Option two is utterly implausible. Plaintiffs could not simply form a securities association because an association cannot be registered unless the SEC determines that it satisfies stringent requirements. *See* 15 U.S.C. § 78*o*–3. FINRA has not explained how Plaintiffs could possibly satisfy those requirements. Indeed, since the passage of the Maloney Act, the SEC has registered only one securities association. Finally, option three is irrelevant for brokers like Plaintiffs, who deal almost exclusively in stocks not listed on any national exchange.

securities law”). The government responds (at 29) that the Appointments Clause analysis does not turn on whether FINRA is a state actor. But when an entity acting as the government takes action pursuant to an express congressional delegation of power, there can be no doubt that the entity wields authority pursuant to law, which means its high-ranking officials are officers.

That conclusion is reinforced by federal courts’ uniform holdings that FINRA receives the benefit of governmental immunity precisely because it performs governmental functions. Consider for example *In re Series 7*. In that case, the D.C. Circuit recognized that the Exchange Act delegated to FINRA “certain governmental functions”—specifically, “regulatory, adjudicatory, [and] prosecutorial” functions. 548 F.3d at 114. It observed that in the absence of this delegation, these functions would be “handled by the SEC.” *Id*. And it reasoned that, because FINRA performs these functions “under the aegis of the Exchange Act’s delegated authority,” it is “absolutely immune from suit for … improper performance.” *Id.*; *see also, e.g.*, *Weissman*, 500 F.3d at 1296 (FINRA “perform[s] a variety of vital governmental functions” and is “protected by absolute immunity when” it performs these functions); *Sparta Surgical Corp. v. NASD*, 159 F.3d 1209, 1214 (9th Cir. 1998) (granting FINRA “absolute immunity” because it “performs a variety of regulatory functions that would, in other circumstances, be performed by a government agency” (cleaned up)).[3] This governmental immunity confirms what binding precedent holds: FINRA wields its authority pursuant to law.

**B. FINRA officials are officers.**

As explained, an individual is an officer under the Appointments Clause if he “exercise[s] significant authority pursuant to the laws of the United States” on a “continuing and permanent”

[3] All these cases concerned FINRA’s predecessor, NASD. But there is no meaningful difference between the two entities (except that FINRA is more aggressive and more powerful than NASD ever was). So we swap NASD with FINRA for simplicity.

basis. *Lucia*, 585 U.S. at 245 (cleaned up). The Exchange Act vests FINRA with continuing and significant authority, *see* pp. 16–18, *supra*. Several categories of FINRA officials wield authority sufficient to make them officers. Three are illustrative.[4]

Hearing officers. FINRA Hearing Officers are officers under the Appointments Clause. This follows from *Lucia*. In that case, the Supreme Court held that SEC administrative-law judges are officers. *See* 585 U.S. at 249. As relevant here, the Court found that SEC ALJs exercise significant authority because they "have all the authority needed" to conduct adversarial hearings. *Id*. at 248. The Court pointed to four functions in particular: SEC ALJs receive evidence and conduct trials. *Id*. They rule on the admissibility of evidence, which "critically shape[s] the administrative record." *Id*. They enforce compliance with discovery orders "by means as severe as excluding the offender from the hearing." *Id*. And they "issue decisions containing factual findings, legal conclusions, and appropriate remedies." *Id*. at 249. These four functions, the Court held, amount to significant authority.

FINRA Hearing Officers perform the very same functions. They, too, have all the authority needed to conduct adversarial hearings. They receive evidence and conduct trials. *See* FINRA Rule 9263(a) ("The Hearing Officer shall receive relevant evidence"). They rule on the admissibility of evidence, which critically shapes the appellate record. *See id*. at 9263(b); *see also* 15 U.S.C. § 78s(e)(1) (SEC review "may consist solely of consideration of the record before [FINRA]"). They enforce compliance with discovery orders by means as severe as excluding the offender from the hearing. *See* FINRA Rule 9280(a)(2). And they issue decisions containing findings of fact, conclusions of law, and appropriate remedies. *Id*. 9268(b). These decisions are subject to SEC review, but that makes no difference. *See Freytag v. CIR*, 501 U.S. 868, 881 (1991) (holding Tax

---

[4] Neither FINRA nor the government contests that FINRA officials have continuous duties.

Court special trial judges were officers even when their decisions were not final); *see also* p. 25, *infra*. And in all events, the SEC often defers to hearing panels, at least on factual matters. *See* p. 9, *supra* (citing *Saliba*, 47 F.4th at 971).

In short, FINRA Hearing Officers are near-carbon copies of SEC ALJs. *See NASD*, 431 F.3d at 806; *see also Alpine I*, 121 F.4th at 1347 (Walker, J., concurring in part and dissenting in part). And the D.C. Circuit has recognized that FINRA's "disciplinary process essentially supplants a disciplinary action that might otherwise start with a hearing before an ALJ." *NASD*, 431 F.3d at 806. It would therefore make no sense to conclude that SEC ALJs are officers but FINRA Hearing Officers are not.

Heads of the DOE and the ODA. These officials are also officers. FINRA's DOE may unilaterally decide to investigate a violation of "any rule, regulation, or statutory provision, including the federal securities laws and the regulations thereunder." FINRA Rule 9211(a). It may essentially subpoena brokers and dealers by compelling them to "provide information orally, in writing, or electronically," or to "testify … under oath or affirmation administered by a court reporter or a notary," or to open their "books, records, and accounts." *Id*. 8210(a).[5] And the DOE may request authorization from the ODA to initiate an enforcement action. *Id*. 9211(a). For its part, the ODA wields unilateral authority to authorize such an action. *See id*. That is an enormously consequential decision that is within the core of the executive power. *See* p. 32, *infra* (collecting authorities). And that decision "may itself result in significant burdens on a defendant …, even if he is ultimately vindicated in an adjudication." *Marshall v. Jerrico, Inc.*, 446 U.S. 238, 249 (1980).

Governors. FINRA Governors are an *a fortiori* case. The Board presides over everything

[5] FINRA asserts (at 7–8) that it cannot issue formal subpoenas. That is cold comfort for a broker or dealer who faces FINRA sanctions—up to expulsion—for failure to comply with production demand.

FINRA does. *See* FINRA, *By-Laws of the Corporation* art. VII § 1(a), https://perma.cc/J8FG-44M5 (The Board "shall be vested with all powers necessary for the management and administration of [FINRA's] affairs"). For example, FINRA's rulemaking powers are expressly vested in its Board. *See id*. VII § 1(a)(v) ("The Board shall have authority to … establish rules and procedures to be followed by members in connection with the distribution of securities issued by members and affiliates thereof."). As are its disciplinary powers. *See* FINRA Rule 9351 (empowering the Board to "affirm, modify, reverse, increase, or reduce any sanction"). Thus, FINRA's Governors have authority comparable to SEC Commissioners. That is plainly "significant" under the Supreme Court's Appointments Clause precedents.

In sum, many FINRA officials wield significant authority pursuant to the laws of the United States, which means many FINRA officials are officers under the Appointments Clause. And none were properly appointed. That means none of these officials can lawfully wield the significant authority that the Exchange Act vests in them. *See Arthrex*, 594 U.S. at 23.

**C. FINRA's and the government's counterarguments lack merit.**

**1. The Appointments Clause applies *especially* because FINRA officials do not occupy positions established by law.**

FINRA (at 23) and the government (at 25, 28) respond that the Appointments Clause is irrelevant because FINRA officials do not "hold positions established by Law." On their telling, an individual may wield authority free from the strictures of that Clause, just as long as Congress does not expressly create the position by statute. *See* FINRA Br. 23–24.

But that is precisely backwards. One key purpose of the Appointments Clause is to check federal power by ensuring that individuals who wield significant executive authority do so pursuant to an office created by Congress. *See Trump v. United States*, 603 U.S. 593, 648 (2024) (Thomas, J., concurring). Thus, if an individual purports to wield significant executive authority

pursuant to an office that does not exist, the upshot is not that the Appointments Clause is somehow irrelevant; it is rather that the Appointments Clause bars the individual from wielding that significant authority. *See id*. at 643 (Thomas, J., concurring). This response is therefore no cure for FINRA's Appointments Clause problem—it is an additional reason to conclude that there is a constitutional problem with FINRA.

Indeed, this theory contravenes Supreme Court precedent; the Court has made clear that the Appointments Clause is offended when an individual is vested with authority that does not match his method of appointment. Consider *Arthrex*, which involved an Appointments Clause challenge to the adjudicatory authority of Administrative Patent Judges. Congress provided for APJs' appointment as inferior officers. *See* 594 U.S. at 13. But it also vested them with authority to render a final decision on behalf of the United States without review by any principal officer, an authority that can be wielded by only principal officers. *See id*. at 13–14. The Court held this mismatch—inferior-officer appointment with principal-officer authority—gave rise to an Appointments Clause violation. According to the Court, "[o]nly an officer properly appointed to a principal office may issue" wield authority that the Constitution reserves for principal officers. *Id*. at 23.

The same logic applies here. In promulgating rules, and in enforcing those rules, the Exchange Act, and SEC regulations, FINRA officials wield authority that the Constitution reserves for principal officers, or at the very least for inferior officers. Under the Appointments Clause, only a person properly appointed to an office may wield such authority. FINRA officials have not been properly appointed to any office, so they cannot wield officer authority.

**2. The Appointments Clause does not exempt nominally private entities.**

FINRA (at 15–23) also responds that it is a private entity. And it contends that this somehow

categorically exempts it from the Appointments Clause, no matter how significant its authority. Notably, the government (at 27–28) has changed positions and now disagrees with the latter point, as it must, because it has recently argued to the Supreme Court that a private actor empowered to wield significant governmental authority is an officer subject the Appointments Clause. *See* Reply Br. for the U.S. at *19, *Consumers' Rsch.*, 145 S. Ct. 2482 (2025) (Nos. 24-354, 24-422) ("[E]mpowering [a] private actor to adopt binding rules governing private conduct on a continuing basis would make that actor an officer of the United States subject to the Appointments Clause."). The government is right: The Constitution's requirements do not switch on and off based on whether the individual wielding government power has a federal ID badge.

Take *Blount*. As explained, the D.C. Circuit held there that an SRO rule was government action. *See* 61 F.3d at 941. And it did so without considering whether the SRO was a government entity. *See id*. ("put[ting] to one side" that question).[6] What mattered was not that the MSRB was a nominally private actor but rather that its actions "operate[d] … as federal law." *Id*. So too here. Even assuming FINRA is a private entity (and it is not, *see* pp. 27–29, *infra*), that is irrelevant; what matters is that its officials wield significant legal authority. That means they are officers. *See Lucia*, 585 U.S. at 245.

In fact, FINRA's theory would produce troubling results. Suppose Congress delegated to a private individual (call him the "tax czar") continuous power to set the income tax rate for all Americans. Would anyone doubt that this tax czar was an officer? Obviously not. An individual with power to set the income tax rate plainly wields significant legal authority, and so is an officer,

---

[6] This Court's preliminary injunction opinion suggested *Blount* held that the MSRB was a government entity because it was created by an act of Congress. *Scottsdale Cap. Advisors*, 678 F. Supp. 3d at 103. Plaintiffs respectfully submit the fact that Congress created the MSRB was not pertinent to *Blount*'s holding.

no matter who cuts his paycheck.

FINRA may respond that this tax czar would not be an officer because the private nondelegation doctrine would independently require some government official to have authority to revise her assessments. But that is irrelevant; the question whether an individual is an officer does not turn on whether he has power to render a *conclusive* decision on behalf of the government. The Supreme Court said so in *Freytag*. In that case, the Court considered whether the Tax Court's special trial judges were officers. The government argued they were not because "they lack[ed] authority to enter a final decision." 501 U.S. at 881. But the Court disagreed; it reasoned that the government's focus on finality "ignore[d] the significance of the duties and discretion that [STJs] possess." *Id*. So the bare fact that an individual's decisions are subject to revision does not make him any less an officer. Indeed, the authority to issue a final decision determines whether one is a *principal* officer, not whether one is an officer in the first place. *See, e.g.*, *Arthrex*, 594 U.S. at 14.

FINRA's theory would produce other anomalies, too. For example, all agree that SEC ALJs are officers (the Supreme Court said so, *see Lucia*, 585 U.S. at 249). Yet in FINRA's view, its own Hearing Officers—who have all the same powers, *see* pp. 20–21, *supra*; *see also Alpine I*, 121 F.4th at 1347 (Walker, J., concurring in part and dissenting in part)—are not officers simply because the federal government does not formally employ them.

The government now concedes that a private individual who wields government power is an officer under the Appointments Clause. *See* Gov't Br. 27–28. And OLC (until very recently) held—relying on an opinion written by Chief Justice Marshall—that what matters in determining whether an individual is an officer is "the nature of [his] position—its authority and continuance—not its label, and thus not whether Congress placed it within the federal service." *See Officers of the United States*, 31 Op. O.L.C. 73 at *39 (2007); *see also id*. at *20 (citing *United States*

*v. Maurice*, 26 F. Cas. 1211, 1216–20 (Marshall, Circuit Justice, C.C.D. Va. 1823)).

In the face of all that, FINRA contends (at 17–18) that history is on its side. But for support, it points only to the First and Second National Banks. *Id*. at 17. These were private entities whose officials were not appointed pursuant to the Appointments Clause, so FINRA says that must mean the Appointments Clause never applies to private entities. But that syllogism does not work.

It is true that the Banks were private entities, but that is not why their officials were not officers. Their officials were not officers because they did not wield sovereign power, as FINRA's own authorities show. *See* Aditya Bamzai, *Tenure of Office and the Treasury: The Constitution and Control over National Financial Policy, 1787 to 1867*, 87 GEO. WASH. L. REV. 1299, 1385 (2019) (noting Congress "could not have delegated to the Bank a sovereign function") (article cited at FINRA Br. 17). The Banks performed certain important functions by contract, such as serving as the depository for federal revenues. *See* Alexander Hamilton, *Final Version of the Second Report on the Further Provision Necessary for Establishing Public Credit (Report on a National Bank)* (Dec. 13, 1790), https://perma.cc/C2HE-ANFL. But these were not "sovereign" functions. *See* Bamzai, *supra*, at 1353–54.[7] And a contractor who wields no sovereign authority has never been thought to be an officer. *See Officers of the United States*, 31 Op. O.L.C. 73 at *18 (collecting authorities); *see also Hall v. Wisconsin*, 103 U.S. 5, 9 (1880) (holding a contractor was not an officer while noting that he wielded no "portion of the sovereignty").

Courts and legislators have long recognized, however, that a contractor who does wield sovereign authority *is* an officer. *See Officers of the United States*, 31 Op. O.L.C. 73 at *20

[7] The Banks also issued national bank notes, but that was not a sovereign function. All private banks issued notes, just as all modern banks create deposits by making loans. The National Banks' notes were unique only because the Banks were national, not because their issuance was somehow an exercise of government authority pursuant to law. *See* Bamzai, *supra*, at 1354.

("[W]here a mere contractor *did* exercise delegated sovereign authority …, he did hold an office subject to the Appointments Clause." (emphasis in original)) (citing *Maurice*, 26 F. Cas. at 1216–20 (Marshall, Circuit Justice)); *see id*. at *18–20 (collecting authorities). The Banks' officials were not officers because they wielded no sovereign authority. FINRA officials, in contrast, *do* wield sovereign authority. *See* pp. 16–19, *supra*. That means the Banks are no historical precedent.

**3. FINRA is part of the government.**

FINRA's argument is wrong for an additional, independent reason: It is not a private entity. In *Lebron* and *DOT v. Association of American Railroads* (*Amtrak II*), 575 U.S. 43 (2015), the Supreme Court held that Amtrak, though nominally private, was part of the government for constitutional purposes. *See Lebron*, 513 U.S. at 974–75; *Amtrak II*, 575 U.S. at 53. The Court reached that conclusion by considering a "combination" of features, like the purpose behind Amtrak's creation, the statutory mandates to which it was subject, the level of the government's control, and the benefits it conferred on the government. *Amtrak II*, 575 U.S. at 53.

These considerations make clear that FINRA, too, is part of the government. To begin, Congress directed FINRA to pursue "goals defined by statute." *Id*. Specifically, it directed FINRA to promulgate rules to prevent fraud, to create an free and open market for securities, and to protect investors and the public interest. *See* 15 U.S.C. § 78*o*-3(b)(6). And it directed FINRA to discipline individuals for violating FINRA rules, the Exchange Act, and SEC regulations. *Id*. § 78*o*-3(b)(7). Second, FINRA claims that it is subject to pervasive government control. In fact, that is the entire premise of FINRA's private nondelegation argument. *See* FINRA Br. 26 (arguing that FINRA "functions subordinately to the SEC, which has authority and surveillance over its activities." (cleaned up)). Lastly, all FINRA's efforts run to the government's benefit, because if FINRA did not perform these "governmental functions," they "would be handled by SEC." *In re Series 7*, 548

F.3d at 114.

FINRA responds (at 20) that the government did not create FINRA, does not appoint the members of its board, and does not fund or otherwise control it. But *Lebron* and *Amtrak II* did not hold that any of these factors was necessary. Rather, those cases considered a combination of factors, noting especially that Amtrak was required to pursue "broad public objectives." *Amtrak II*, 575 U.S. at 53. So is FINRA.

In the face of this precedent, FINRA notes that the government does not fund FINRA. But that hardly matters because Congress authorized FINRA to collect fees from its members, which operate as their own kind of legally-compelled levy. *See* 15 U.S.C. § 78*o*-3(b)(5). FINRA also notes that Congress did not create FINRA. But if that were dispositive, then Congress could evade the Constitution by simply employing a pre-existing corporation for a public purpose rather than creating a new one. *See United States v. Ackerman*, 831 F.3d 1292, 1299 (10th Cir. 2016) (Gorsuch, J.) (explaining that the question whether an entity is governmental does not turn on whether that entity was "once private"). Lastly, FINRA notes that the government does not appoint the members of FINRA's board. That is entirely circular, because the issue before the Court is whether the Appointments Clause requires the government to appoint FINRA officials. In all events, if that were dispositive, then Congress could always ensure an entity's private status by simply retaining control over it by other means, such as by subjecting (some) of its actions to government approval.

FINRA also argues (at 21) that the Supreme Court recognized its private status in *Free Enterprise Fund v. PCAOB*, 561 U.S. 477 (2010). But the Court did not address FINRA's authority. It only noted in passing dictum (if that) that the Public Accounting Oversight Board (PCAOB) was different from the NYSE. *See id*. at 484. That may be true, but the NYSE is also different from FINRA. The NYSE controls access to its own market, but it does not have *de jure* power to prohibit

a broker or dealer from trading securities in other markets. So the Court's dictum proves little. If anything, it affirmatively contradicts FINRA's argument. The Court said that PCAOB was public because: (1) it had "expansive powers to govern an entire industry," *id*. at 485; (2) "[e]very accounting firm … that participates in auditing public companies under the securities laws must register with the Board, pay it an annual fee, and comply with its rules and oversight," *id*.; and (3) "[t]he Board is charged with enforcing [federal law], the Commission's rules, [and] its own rules," *id*. FINRA is not meaningfully different. *See* pp. 17–18, *supra*.

***

That leaves FINRA's and the government's appeal to the securities industry's history of self-regulation and non-binding opinions. *See* FINRA Br. 21–23; U.S. Fifth Memo. of Law, ("Gov't Br.") at 25–27 (Sept. 16, 2025). But Plaintiffs have already explained that FINRA today is radically different from true SROs. *See* pp. 2–7; *see also* TAC ¶¶ 62–70. And while FINRA's list of claimed authorities is lengthy, few consider FINRA's features or engage in meaningful state-action analysis. *Kim v. FINRA*, 698 F. Supp. 3d 147 (D.D.C. 2023), is representative. It contains no analysis—just a single sentence stating courts have held that FINRA is not a state actor. *See id*. at 161.[8] More importantly, only one of these cases considers *Blount*, which is the controlling precedent.[9] And that case did not even involve FINRA's regulatory authority; it was a challenge brought by investors to FINRA's arbitration fee schedule. *See Graman v. NASD*, No. 97–1556–JR,

[8] *See also, e.g.*, *Saad v. SEC*, 980 F.3d 103, 104 (D.C. Cir. 2020) (asserting that FINRA is private in off-handed dictum); *Pub. Invs. Arb. Bar Ass'n v. SEC*, 771 F.3d 1, 2 (D.C. Cir. 2014) (similar); *Marchiano v. NASD*, 134 F. Supp. 2d 90, 95 (D.D.C. 2001) (no meaningful analysis); *Young Habliston v. FINRA*, No. 15–2225, 2017 WL 396580 (D.D.C. Jan. 27, 2017) (same); *North v. Smarsh, Inc.*, 160 F. Supp. 3d 63 (D.D.C. 2015) (same).

[9] *See, e.g.*, *Kim v. FINRA*, 698 F. Supp. 3d 147 (D.D.C. 2023) (analyzing the state-action question without citing *Blount*); *McGinn, Smith & Co. v. FINRA*, 786 F. Supp. 2d 139, 147 (D.D.C. 2011) (same).

1998 WL 294022, at *1 (D.D.C. Apr. 27, 1998). The court expressly recognized that *Blount* might compel a different result if—as here—the case involved a challenge to FINRA's "core regulatory function." *Id*. at *3. Thus, neither history nor authority supplies a persuasive justification for jettisoning the Constitution's structure. FINRA officials wield significant legal authority, which means they are officers who must be properly appointed.

**II. FINRA violates the private nondelegation doctrine.**

FINRA argues at length that it is a private entity free from the separation-of-powers. Even if that were true (and it is not), it would only shift the source of FINRA's constitutional problem from one set of doctrines to another: the private nondelegation doctrine.

It is a cardinal principle that "[f]ederal lawmakers cannot delegate regulatory authority to a private entity." *Ass'n of Am. R.R. v. DOT* (*Amtrak I*) 721 F.3d 666, 670 (D.C. Cir. 2013), *vacated and remanded on other grounds*, *Amtrak II*, 575 U.S. 43. The Supreme Court recognized this principle in *Carter v. Carter Coal Co.*, 298 U.S. 238 (1936). That case concerned a statute that authorized private coal producers to enact maximum hours and minimum wages for the industry, which took effect without approval by any government official. *Id*. at 282, 284. The Court called this "delegation in its most obnoxious form" because it was made not "to an official or an official body, presumptively disinterested, but to private persons whose interests may be and often are adverse to the interests of others in the same business." *Id*. at 311. And that kind of delegation, the Court held, offends the Constitution. *See id*. at 311–12.

The Court recently reaffirmed this principle in *FCC v. Consumers' Research*, 145 S. Ct. 2482 (2025). That case concerned a statute that empowered the FCC to levy fees on consumers to fund a federal program. In determining the size of those fees, the FCC relied on a private administrator for "advice and assistance." *Id*. at 2508. A plaintiff lodged a private nondelegation

challenge to this arrangement, but the Court rejected it because the administrator was "broadly subordinate to the [FCC]." *Id*. While the administrator "play[ed] an advisory role," its role was constitutional because "the [FCC] alone ha[d] decision-making authority." *Id*.; *see also id*. at 2509 (noting that a delegation to a private entity is constitutional if the entity's "recommendations … *cannot go into effect* without an agency's say-so" (emphasis added)). This analysis reinforces the limited, advisory function that private entities may play in a government regulatory scheme.

The upshot of these cases is that the government may rely on a private entity for assistance, but it may not delegate decision-making authority. As the D.C. Circuit put it in *Alpine I*: A delegation of governmental authority to a private entity is constitutional only if that entity "acts as an aid to an accountable government agency that retains the ultimate authority to approve, disapprove, or modify [its] actions and decisions on delegated matters." 121 F.4th at 1325 (cleaned up).

FINRA flunks that test. The Exchange Act delegates to FINRA responsibility for "vital governmental functions," *Weissman*, 500 F.3d at 1296, such as regulation of the securities industry, along with adjudication and prosecution of violations federal law—including violations of FINRA rules, the Exchange Act, or SEC regulations, *see In re Series 7*, 548 F.3d at 114.

But the Exchange Act does not make FINRA subordinate to the SEC. In fact, it vests FINRA with authority to decide whether to investigate and prosecute alleged violations of federal law, but it gives SEC *no* authority to review FINRA's decision to initiate an enforcement action. *See* 15 U.S.C. § 78s(e)(1) (providing for SEC review of only "final disciplinary sanction[s]"). This Court acknowledged as much in its preliminary-injunction opinion. *See Scottsdale*, 678 F. Supp. 3d at 103 (FINRA "alone determines which cases to investigate and when to file a complaint"). There is little doubt that the decision to investigate and prosecute an alleged violation of federal

law is "action[]" or "decision[]" on a matter delegated to FINRA. *Alpine I*, 121 F.4th at 1325; *cf. Amtrak II*, 575 U.S. at 62 (Alito, J., concurring) ("It raises 'difficult and fundamental questions' about 'the delegation of Executive power' when Congress authorizes citizen suits … to enforce existing law" (cleaned up) (quoting *Friends of the Earth, Inc. v. Laidlaw Environmental Services (TOC), Inc.,* 528 U.S. 167, 197 (2000) (Kennedy, J., concurring)). Yet the SEC retains no "authority to approve, disapprove, or modify" FINRA's prosecutorial decisions. Thus, FINRA may make final decisions on a delegated matter—enforcement of federal law—without *any* review by *any* government official.

The decision to bring an enforcement action—or not—is no paltry decision; it is a quintessentially executive power. Indeed, it is one of the President's "greatest" powers. *In re Aiken Cnty.*, 725 F.3d 255, 264 (D.C. Cir. 2013); *see also TransUnion LLC v. Ramirez*, 594 U.S. 413, 429 (2021); *Heckler v. Chaney*, 470 U.S. 821 (1985); *United States v. Texas*, 599 U.S. 670, 678 (2023); *Buckley*, 424 U.S. at 138. That is in part because a prosecutor has "vast power and … immense discretion." *Morrison v. Olson*, 487 U.S. 654, 727 (1988) (Scalia, J., dissenting). He must pick his cases, and "it follows that he can choose his defendants." *Id*. (quotation marks omitted). And since FINRA rules and the Exchange Act are chock-full of loosely defined prohibitions, *see* pp. 36–37, *infra*, a FINRA prosecutor "stands a fair chance of finding at least a technical violation of some act on the part of almost anyone." *Morrison*, 487 U.S. at 727 (Scalia, J., dissenting) (quotation marks omitted).

While the SEC can reverse a final disciplinary sanction, it need not authorize and cannot halt an enforcement action in the first instance. The decision to bring such an action "may itself result in significant burdens on a defendant"—legal fees, negative publicity, and distraction from core business activities, among other things. *Jerrico*, 446 U.S. at 249. Yet the SEC has no power

to erase those consequences; they may be finally imposed by FINRA, which is dominated not by "presumptively disinterested" federal officials but rather by "private persons whose interests may be and often are adverse to the interests of" those whom they are regulating. *Carter Coal*, 298 U.S. at 311. That violates the private nondelegation doctrine.

FINRA and the government respond that FINRA does not wield "any delegated regulatory power outside the SEC's ultimate control and oversight." FINRA Br. 26. That is so, they say, because the SEC: must approve, and may amend, FINRA's rules; may examine FINRA to ensure its compliance with federal laws; may review final disciplinary sanctions imposed by FINRA; and may revoke FINRA's registration and, in turn, its ability to enforce its rules. *See* FINRA Br. 26–27; Gov't Br. 18–19. According to FINRA and the government, all this "oversight cabins FINRA's regulatory authority to a constitutionally permissible subordinate role." FINRA Br. 27. These arguments overstate the SEC's authority over FINRA's rules, which is not plenary. The SEC may reject a proposed rule only if it is inconsistent with the requirements of the Exchange Act, *see* 15 U.S.C. § 78s(b)(2)(C)(i), and the SEC may amend FINRA rules for only limited purposes, *see id.* § 78s(c). Those limits alone create a private nondelegation problem. But even putting them to one side, FINRA and the government are wrong.

To begin, it is irrelevant that SEC may revoke FINRA's ability to enforce its rules. In 1936, Congress could have revoked the coal commission's authority to impose binding price and labor codes, yet that did not factor into the Supreme Court's analysis in *Carter Coal*. What matters is that, under the legal framework as it exists, FINRA wields unilateral authority to decide to prosecute an alleged violation of federal law (including FINRA rules). FINRA's prosecutorial decisions are not mere "recommendations," *Consumers' Rsch.*, 145 S. Ct. at 2508, but rather may impose serious consequences. Neither FINRA nor the government points to any mechanism by

which any government official could undo such a decision. They only note that Congress or the SEC could hypothetically change the law to revoke *all* of FINRA's authority. But if that were sufficient, there would be nothing left of the private nondelegation doctrine, because Congress could *always* claw back any authority delegated to a private entity. Further, while FINRA points to dicta from other cases suggesting that FINRA plays a mere advisory role, not one of those cases meaningfully considered FINRA's conclusive authority to initiate an action to enforce a violation of federal law. *See, e.g.*, *Nat'l Horsemen's Benevolent & Protective Ass'n, v. Black,* 107 F.4th 415, 426 (5th Cir. 2024), *cert. granted and judgment vacated sub nom.*, *Texas v. Black,* 145 S. Ct. 2835 (2025) (mem). At the very least, *that* power violates the private nondelegation doctrine.

**III. FINRA Governors are unconstitutionally insulated from presidential control.**

As explained, FINRA wields significant executive power. *See* p. 16, *supra*. The Constitution vests *all* of the executive power in the President, who must "take Care that the Laws be faithfully executed." Art. II, § 1, cl. 1; *id.*, § 3; *see Seila L.*, 591 U.S. at 203. These provisions—the Executive Vesting Clause and the Take Care Clause—empower the President to keep his executive officers accountable, "by removing them from office, if necessary." *Free Enter. Fund.*, 561 U.S. at 483. FINRA's structure flouts this principle.

In *Free Enterprise Fund*, the Supreme Court held that the board members of the PCAOB—an entity identical to FINRA in every relevant respect, *see* p. 29, *supra*—were unconstitutionally insulated from presidential control because they were protected from removal by "dual for-cause" restrictions. 561 U.S. at 492. That holding controls here. FINRA Governors wield powers nearly indistinguishable from PCAOB board members. They can be removed only by the SEC, and only if the SEC finds a willful violation of the law, willful abuse of authority, or unjustified failure to enforce the law. 15 U.S.C. § 78s(h)(4). SEC Commissioners, in turn, can be removed by the

President only for good cause. *Free Enter. Fund*, 561 U.S. at 487, 495. Those dual for-cause restrictions insulate FINRA Governors from presidential control, in violation of Article II.[10]

FINRA responds (at 16) that its Governors are not officers. But that is wrong for reasons already discussed. *See* pp. 19–22, *supra*. The government reiterates that misguided argument and proffers another: that the Take Care Clause is unenforceable in federal court. *See* Gov't Br. 27, 29–30. But the Supreme has adjudicated many disputes arising in part under the Take Care Clause, including *Free Enterprise Fund*. *See* 591 U.S. 492–93. There is no basis for distinguishing that case. Thus, FINRA's structure violates Article II.

**IV. FINRA wields legislative power in violation of the public nondelegation doctrine.**

The Constitution provides: "All legislative Powers herein granted shall be vested in a Congress of the United States." U.S. CONST. art. I, § 1. "Accompanying that assignment of power to Congress is a bar on its further delegation." *Consumers' Rsch.*, 145 S. Ct. at 2496. That means legislative power "belongs to the legislative branch, and to no other." *Id*. The Supreme Court has nonetheless held that Congress may delegate the power to make legislative rules. But it has emphasized that in doing so, Congress must supply "an intelligible principle." *J.W. Hampton, Jr., & Co. v. United States*, 276 U.S. 394, 409 (1928); *see Consumers' Rsch.*, 145 S. Ct. at 2497. Under that standard, a delegation is constitutional only if Congress "make[] clear both the general policy that the agency must pursue and the boundaries of its delegated authority." *Consumers' Rsch.*, 145 S. Ct. at 2497 (cleaned up). While the Supreme Court has approved broad delegations, there is no precedent for the arrangement here.

---

[10] Indeed, even one layer of removal protection for FINRA Governors would be too much, because they are principal officers who wield substantial executive power. *See* p. 16, *supra* (FINRA wields substantial executive power); *Seila L.*, 591 U.S. at 218 (Congress may not restrict the President's power to remove principal officers that wield "substantial executive power").

The degree of discretion that Congress may confer depends on the circumstances. To take one settled example, Congress may confer less discretion when it delegates a power with broad scope, such as the power to take an action that will "affect the entire national economy." *Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 475 (2001). Justices have suggested that other factors are relevant, too. For example, four sitting justices have observed that Congress may delegate *more* discretion respecting "matters already within the scope of" another branch's power, *Gundy v. United States*, 588 U.S. 128, 159 (2019) (Gorsuch, J., dissenting), such as the dispensing of public benefits, *see NBC v. United States*, 319 U.S. 190, 217 (1943). On the other hand, Justice Kavanaugh has observed that Congress may confer *less* discretion upon officials who are not subject to at-will removal by the President. *See Consumers' Rsch.*, 145 S. Ct. at 2511–18 (Kavanaugh, J., concurring). And Justice Alito has observed that Congress may confer *less* discretion upon entities nominally outside the federal government. *See Amtrak II*, 575 U.S. at 57–62 (Alito, J, concurring).

By any measure, the Exchange Act confers upon FINRA too much rulemaking discretion. As explained, the Act vests FINRA with the core legislative power: the power to regulate "all aspects of the securities business," which affects the entire national economy. Peirce *supra* at 13; *see* p. 7, *supra*. FINRA's discretion is limited only to the extent its rules must be "consistent with the requirements of" the Exchange Act." 15 U.S.C. § 78s(b)(2)(C)(i). But that is hardly a limit at all, because FINRA's rules are consistent with the Act's requirements so long as they "relate[] to" its purposes. *Id.* § 78*o*-3(b)(6). And those purposes include vague generalities, such as the promotion of "just and equitable principles of trade"; the perfection of "a free and open market"; and, "in general, [the] protect[ion] [of] investors and the public interest." *Id.* It is difficult to conceive a rule that would not relate to those purposes in *some* way. For example, there is no reason

FINRA could not conclude that it would promote "just and equitable principles of trade" to exclude from the securities industry brokers cited for traffic violations. So the Exchange Act supplies no boundaries at all to cabin FINRA's delegated authority. *See Consumers' Rsch.*, 145 S. Ct. at 2497 (Congress must place "boundaries" on delegated authority).

The government responds (at 23) that FINRA wields no legislative power at all because its rules are subject to SEC approval. But the SEC *must* approve FINRA's rules if they are consistent with the requirements of the Exchange Act. *See* p. 36, *supra*. That means the discretion to make rules is lodged not in the SEC but in FINRA, subject only to the Exchange Act's unintelligible principle. FINRA (at 29) and the government (at 22–25) also respond that the Supreme Court has blessed similarly broad delegations. But Plaintiffs are aware of no case that involved a delegation of (1) core legislative power (2) to a nominally private entity (3) comprised of officials insulated from at-will removal by the President. FINRA has identified no precedent for such an arrangement—judicial or historical—which is a "most telling indication of a severe constitutional problem." *Free Enter. Fund*, 561 U.S. at 505 (quotation marks omitted).

**V. FINRA disciplinary proceedings violate the Fifth and Seventh Amendments.**

FINRA disciplinary proceedings violate the Fifth and Seventh Amendments. FINRA is a state actor: Its rules and sanctions operate as federal law, and it satisfies other state-action tests. *See* pp. 17–19, *supra*. *Contra* FINRA Br. 34–38. FINRA operates in a constitutionally deficient manner because it fails to provide due process and to recognize the right to a jury trial for claims which are akin to common-law fraud. And this Court has jurisdiction over these claims.

**A. FINRA disciplinary proceedings violate the Fifth Amendment.**

FINRA disciplinary proceedings are initiated by private FINRA officials, who can and do exercise their enforcement discretion in a discriminatory manner. *See* TAC ¶ 75. And these

proceedings are adjudicated by panels comprised of a FINRA Hearing Officer and two panelists. *See* FINRA Rule 9231(b). The panelists must be associated with a FINRA member, *see id*., which means they must be brokers or dealers. The panelists, in conjunction with the Hearing Officer, may sanction members of their own industry, and most sanctions take effect before any SEC review. *See* FINRA Rule 9360. Sanctions may be as severe as expulsion, so panelists may put members of their own industry out of business.

That violates the Fifth Amendment. In *Carter Coal*, the Supreme Court held:

> [Regulation] is necessarily a governmental function, since, in the very nature of things, one person may not be intrusted with the power to regulate the business of another, and especially of a competitor. And a statute which attempts to confer such power undertakes an intolerable and unconstitutional interference with personal liberty and private property. The delegation is so clearly arbitrary, and so clearly a denial of rights safeguarded by the due process clause of the Fifth Amendment, that it is unnecessary to do more than refer to decisions of this court which foreclose the question.

298 U.S. at 311. So too here. And even if these panelists harbor no "actual, subjective bias," the question is only whether "the average [adjudicator] in his position is 'likely' to be neutral, or whether there is an unconstitutional 'potential for bias.'" *Williams v. Pennsylvania*, 579 U.S. 1, 8 (2016) (quoting *Caperton v. A.T. Massey Coal Co.*, 556 U.S. 868, 881 (2009)). The opportunity to put a member of one's own industry out of business undoubtedly creates the potential for bias. In all events, FINRA hearing panels *have* shown bias against members like Plaintiffs, whose businesses focus on the microcap markets. *See* TAC ¶¶ 75, 92; *see also* p. 10, *supra* (noting that FINRA improperly sanctioned SCA).

The presence of a Hearing Officer does not cure this problem. The Hearing Officer is not a neutral and detached government official. A government official must take an oath or affirmation to support the Constitution. *See* U.S. CONST. art. VI, cl. 3. This requirement is no mere formality; it signifies that those "who exercise the power of Government are set apart from ordinary citizens."

*Amtrak II*, 575 U.S. at 58 (Alito, J., concurring) (citing *Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 180 (1803)). A FINRA Hearing Officer, in contrast, wields government power even though he is an ordinary citizen who has sworn no oath to uphold the Constitution. Such a person, however upstanding, cannot be "intrusted with the power to regulate the business of another." *Ass'n of Am. Railroads v. DOT,* 821 F.3d 19, 28 (D.C. Cir. 2016); *see also Amtrak II*, 575 U.S. at 57 (Alito, J., concurring) ("There is good reason to think that those who have not sworn an oath cannot exercise significant authority of the United States.").

This foundational problem is amplified by other deficiencies. Notably, FINRA combines legislative, executive, and adjudicative power in a single body. *See* TAC ¶ 94, 165. Yet in *Williams*, the Supreme Court held that due process prevented a judge from sitting in a case in which he previously participated as district attorney because "an unconstitutional potential for bias exists when the same person serves as both accuser and adjudicator in a case." 579 U.S. at 8. It is true that in *Withrow v. Larkin*, 421 U.S. 35 (1975), the Court held a federal administrative agency does not violate due process by combining investigative and adjudicative functions "without more." *Id.* at 58. But the Court recognized that special circumstances may demonstrate "that the risk of unfairness is intolerably high." *Id*. And this case presents special circumstances—namely the combination of functions in a private body with adjudicators who are members of the same industry as the accused.

Further, FINRA abjures any evidentiary safeguards. It permits its employee-witnesses to recount to a hearing panel layer upon layer of hearsay testimony regarding conversations supposedly had with investors and other regulators. *See* TAC ¶ 78. This systematic use of dubious hearsay further biases proceedings and deprives members of any chance to confront adverse witnesses. Yet "[i]n almost every setting where important decisions turn on questions of fact, due

process requires an opportunity to confront and cross-examine adverse witnesses." *Goldberg v. Kelly*, 397 U.S. 254, 269 (1970).

FINRA offers just two responses. First, it asserts that adjudicators are presumptively unbiased. For that proposition, it relies on *Schweiker v. McClure*, 456 U.S. 188 (1982), which concerned a due-process challenge to the adjudication of Medicare Part B claims by private insurance carriers. *See id*. at 192. It is true the Court there started with the presumption that the carriers' adjudicators were unbiased. *See id*. at 195. But it did not stop there. It rejected the due-process claim because neither the adjudicators nor their carrier-employees had *any* conflict of interest; both the claims adjudicated and the adjudicators were paid by the Federal Government. *See id*. at 196. That is far different from a FINRA disciplinary proceeding, where industry members have legal authority to put members of their own industry out of business.

FINRA also suggests that there is no due-process problem because the SEC reviews FINRA sanctions. "But this argument ignores the significance of the duties and discretion that" FINRA hearing panels possess. *Cf. Freytag*, 501 U.S. at 881. Those duties are all the more important because hearing panels' decisions are insulated from SEC oversight by the requirement that sanctioned members appeal first to the NAC. Further, in practice, the SEC has concluded that it must defer to FINRA adjudicators in important respects, as Plaintiffs have explained. *See* p. 9, *supra*. That deferential review cannot cure the due-process problem latent in allowing three private citizens—including two from the same industry as the accused—to adjudicate violations of federal law.

**B. FINRA disciplinary proceedings violate the Seventh Amendment.**

FINRA regularly brings actions seeking regulatory fines. In fact, between 2022 and 2024, FINRA imposed $243.2 million in fines against its members. *See* FINRA, *Statistics*,

https://perma.cc/UJN5-652M. And FINRA imposes these fines without affording its members a right to a trial by jury.

These programmatic punitive fines violate the Seventh Amendment. The Supreme Court recently reiterated that "[t]he Seventh Amendment extends to a particular … claim if the claim is legal in nature." *SEC v. Jarkesy*, 603 U.S. 109, 122 (2024). To determine whether a claim is legal (as opposed to equitable), the remedy is most important. *Id*. "A monetary remedy is legal is if it is designed to punish or deter the wrongdoer, or, on the other hand, solely to restore the status quo." *Id*. at 123 (quotation marks omitted). Under that standard, FINRA's fines are legal because they are designed to punish. That is clear because FINRA does not return any money from fines to the putative victims of the alleged misconduct. *See* FINRA, *Report on Use of 2024 Fine Monies*, https://perma.cc/ZJ8V-9F7J (May 30, 2025). "Such a penalty by definition does not restore the status quo and can make no pretense of being equitable." *Jarkesy*, 603 U.S. at 124 (quotation marks omitted).

FINRA contends its regulatory-fine actions are not analogous to any traditional common law action because SRO disciplinary proceedings were not traditionally adjudicated at common law. *See* FINRA Br. 40–42. But that is irrelevant. As explained, true SROs were voluntary membership associations that imposed sanctions pursuant to contractual membership agreements governing participation in the market that the SRO furnished. *See Belton*, 109 N.Y. at 596. To the extent these SROs imposed fines at all, they were essentially club penalties, not regulatory fines. FINRA, in contrast, wields delegated federal power to seek regulatory fines for violations of federal law (including its own rules) across the entire securities industry for claims analogous to common-law fraud. These fines are far more akin to the civil penalties at issue in *Jarkesy* than the club penalties imposed in traditional SRO disciplinary proceedings. That means they implicate the

Seventh Amendment.

**C. This Court has jurisdiction over Plaintiffs' Fifth and Seventh Amendment claims.**

FINRA and the government contend this Court lacks jurisdiction over Plaintiffs' Fifth and Seventh Amendment claims because Congress created a special statutory scheme for FINRA disciplinary proceedings. Under that scheme, a party aggrieved by a FINRA sanction may seek SEC review and, subsequently, review in the courts of appeals. *See* 15 U.S.C. § 78s(e)(1); *id.* § 78y(a)(1), (3). According to FINRA and the government, this scheme preempts district court jurisdiction over Plaintiffs' claims. In support of that argument, they press two points, which Plaintiffs acknowledge: First, that Plaintiffs are pressing similar claims on direct review of a FINRA order. Second, that several courts have dismissed comparable claims on jurisdictional grounds. *See* FINRA Br. 31–33; Gov't Br. 16. But in *Axon*, the Supreme Court held certain claims fall *outside* a special statutory review scheme, which can be interpreted to suggest that such claims cannot be reviewed through a special scheme at all. *See* 598 U.S. at 187–88. To the extent that is true of Plaintiffs' Fifth and Seventh Amendment claims, Plaintiffs press them here.

*Axon* directed courts to evaluate whether a claim falls outside of a special statutory review scheme by reference to whether: (1) a finding of preclusion might foreclose meaningful judicial review; (2) the claims are collateral to the statutory review provisions; and (3) the claims are beyond the expertise of the agency. *Id.* at 186. These are not independent requirements but rather considerations to support an assessment of congressional intent. That means a claim might not be precluded even if "the factors point in different directions." *Id.* In all events, with respect to both Plaintiffs' claims, all three factors militate against preclusion.

*Fifth Amendment*. Plaintiffs' due-process claim is not precluded. A finding of preclusion would foreclose meaningful judicial review. This follows from *Axon*. In that case, the challengers

alleged harm from subjection to an agency adjudication before an unconstitutionally appointed administrative-law judge. *See id*. Or, as the Court described it, from "subjection to an illegitimate proceeding, led by an illegitimate decisionmaker." *Id*. at 191. The Court held that was a "here-and-now injury" that could not be addressed on direct review because "[a] proceeding that has already happened cannot be undone." *Id*. at 191 (quotation marks omitted). Plaintiffs' due-process claim is the same. It alleges that Plaintiffs are harmed by subjection to illegitimate proceedings led by decisionmakers who are illegitimate because they are unduly biased. That, too, is a here-and-now injury that cannot be meaningfully addressed on direct review.

The collateralism factor likewise favors Plaintiffs, as *Axon* shows. There, the Court observed that the challengers' claim was collateral because it did not attack any particular action taken in agency the proceeding but rather the agency's "power to proceed at all." *Id*. at 192. The thrust of Plaintiffs' due-process claim is identical: It challenges not particular actions taken in any FINRA disciplinary proceeding but rather FINRA's structural bias, which implicates its power to adjudicate any proceedings at all. That is collateral; it has "nothing to do" with the matters that a FINRA panel would adjudicate in assessing particular charges against Plaintiffs. *See id*. at 193.

Finally, Plaintiffs' due-process claim is outside SEC's expertise. It raises a "standard question[] of … constitutional law, detached from considerations of agency policy." *Id*. at 194 (quotation marks omitted). And while SEC "knows a good deal about" securities regulation, it knows "nothing special about" due process. *Id*. Thus, all three factors cut against preclusion.

*Seventh Amendment*. Plaintiffs' Seventh Amendment claim is likewise not precluded. The right to a jury trial mitigates the risk of prosecutorial overreach and misconduct. *Cf. Erlinger v. United States*, 602 U.S. 821, 832 (2024). So the fact that FINRA may conduct proceedings for monetary fines before a biased adjudicatory panel—rather than a jury—undoubtedly induces it to

initiate more proceedings than it otherwise would. The costs to Plaintiffs from subjection to these proceedings are "here-and-now" injuries that cannot be remedied on direct review. *Axon*, 598 U.S. at 191. The lack of a jury is also collateral because it implicates the structure of FINRA proceedings and therefore goes to FINRA's "power to proceed at all." *Id*. at 192. And, as explained, while SEC knows much about securities regulation, it has no special knowledge about the Seventh Amendment. *Id*. at 194. Thus, Plaintiffs' Seventh Amendment claim is not precluded.

**VI. The Exchange Act imposes unconstitutional conditions on Plaintiffs' legal right to trade securities.**

FINRA contends (at 41–42) that Plaintiffs waived their constitutional rights by consenting to its disciplinary procedures. But what the government cannot command directly, it cannot produce indirectly by attaching conditions to a benefit or the exercise of a right. *See, e.g.*, *Perry v. Sindermann*, 408 U.S. 593, 597–98 (1972). The government could not directly command Plaintiffs to submit to structurally biased enforcement proceedings adjudicated without a jury because such a command would violate the Fifth and Seventh Amendments. *See* pp. 37–41, *supra*. So the government cannot produce the same result by conditioning Plaintiffs' right to trade securities on their consent to FINRA's unconstitutional procedures. FINRA's only response (at 42–43) is that FINRA membership is not really required. For reasons already explained, that is wrong. *See* p. 18 n.2, *supra*.

The requirement that Plaintiffs maintain FINRA membership is an unconstitutional condition for another reason: it violates the First Amendment, which recognizes a freedom to associate—or not—with particular groups. *See Roberts v. U.S. Jaycees*, 468 U.S. 609, 623 (1984). Compelling an individual to associate with any group burdens that right, even if the group is a professional association. *See Romero v. Colegio De Abogados De Puerto Rico*, 204 F.3d 291, 301 (1st Cir. 2000). Such a burden may be justified only "to serve compelling state interests, unrelated

to the suppression of ideas, that cannot be achieved through means significantly less restrictive of associational freedoms." *Jaycees*, 468 U.S. at 623. Congress required brokers and dealers to join FINRA to further the purposes of the Exchange Act, such as the prevention of fraud. *See, e.g.*, 15 U.S.C. § 78*o*–3(b)(6). But Congress could promote those purposes through means significantly less restrictive of associational freedoms—namely by regulating Plaintiffs directly rather than compelling them to join FINRA. Congress therefore cannot compel Plaintiffs to join FINRA.

FINRA (at 44) and the government (at 31–32) respond that the Supreme Court has held mandatory membership in a union or integrated state bar does not violate the First Amendment. *See Keller v. State Bar of Cal.*, 496 U.S. 1, 13–14 (1990). But in *NIFLA v. Becerra*, 585 U.S. 755 (2018), the Supreme Court recognized that professional speech is fully protected by the First Amendment. *Id*. at 767. It follows that the right of professional association is fully protected, too. To the extent any precedents depart from that principle, their reasoning has been undermined, and Plaintiffs seek to preserve the argument that they should be overruled.

## CONCLUSION

This Court should deny FINRA's motion to dismiss.

Dated: October 17, 2025

Respectfully submitted,

/s/ David H. Thompson
David H. Thompson, Bar No. 450503
Brian W. Barnes, Bar No. 1018419
Athanasia O. Livas, Bar No. 90011199
COOPER & KIRK, PLLC
1523 New Hampshire Ave., N.W.
Washington, D.C. 20036
T: (202) 220-9649
dthompson@cooperkirk.com
bbarnes@cooperkirk.com
alivas@cooperkirk.com

Kenneth G. Turkel (*pro hac vice*)
David A. Hayes (*pro hac vice*)
TURKEL CUVA BARRIOS, P.A.
100 North Tampa Street, Suite 1900 Tampa, FL 33602
T: (813) 834-9191
kturkel@tcb-law.com
dhayes@tcb-law.com

Maranda E. Fritz (*pro hac vice*) MARANDA E. FRITZ PC
521 Fifth Avenue 17th Floor
New York, NY 10175
T: (646) 584-8231
maranda@fritzpc.com

*Counsel for Plaintiffs Scottsdale Capital Advisors Corp. and Alpine Securities Corp.*