**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

<table>
<tr><td>

SCOTTSDALE CAPITAL ADVISORS
CORPORATION and ALPINE SECURITIES
CORPORATION,

   Plaintiffs,

   v.

FINANCIAL INDUSTRY REGULATORY
AUTHORITY, INC.,

   Defendant,

UNITED STATES OF AMERICA,

   Intervenor Defendant.

</td><td>

Civil Action No. 23-1506 (BAH)

Judge Beryl A. Howell

</td></tr>
</table>

**MEMORANDUM OPINION**

Plaintiffs Scottsdale Capital Advisors Corporation ("SCA") and Alpine Securities Corporation ("Alpine"), broker-dealers that are both owned by the same parent holding company, brought this action in 2022 against the Financial Industry Regulatory Authority, Inc. ("FINRA"), a private corporation that regulates broker-dealers to prevent fraud and abuse in the securities industry, alleging that FINRA's "structure and operations" violate numerous provisions of the Constitution. Third Am. Compl. ("TAC") ¶ 1, ECF No. 106; *see also Scottsdale Cap. Advisors Corp. v. Fin. Indus. Regul. Auth., Inc.*, 678 F. Supp. 3d 88, 97 (D.D.C. 2023), *rev'd in part sub nom. Alpine Sec. Corp. v. Fin. Indus. Regul. Auth.*, 121 F.4th 1314 (D.C. Cir. 2024). Pending before the Court is FINRA's motion, supported by the United States government as defendant-intervenor, to dismiss plaintiffs' Third Amended Complaint, pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6). *See* FINRA's Mot. to Dismiss Pls.' Third Am. Compl. & Incorporated Mem. ("FINRA Mem."), ECF No. 107; Gov't's Mem. in Def. of the Challenged

1

Provisions of Fed. Sec. L. ("Gov't's Mem."), ECF No. 108; *see also* Gov't's Not. of Intervention, ECF No. 28 (citing FED. R. CIV. P. 5.1(a), (c) (declaring that in cases that "question the constitutionality of a federal or state statute," . . . "the attorney general may intervene within 60 days")). According to FINRA, "this Court lacks subject matter jurisdiction over Plaintiffs' claims challenging FINRA's disciplinary procedures under the Fifth and Seventh Amendments," and all of plaintiffs' claims "fail as a matter of law," warranting dismissal for failure to state a claim. FINRA Mem. at 1-2. FINRA's dismissal motion is ripe for resolution and, for the reasons discussed below, is granted in full. *See* Pls.' Mem. in Opp'n to Defs.' Mot. to Dismiss ("Pls.' Opp'n"), ECF No. 110; FINRA's Reply in Support of Mot. to Dismiss ("FINRA Reply"), ECF No. 111; FINRA's Not. of Supp. Auth. ("FINRA Supp. Auth. Not."), ECF No. 112; Pls.' Resp. to Not. of Supp. Auth. ("Pls.' Supp. Auth. Resp."), ECF No. 113.

## I.    BACKGROUND

The legal and factual background and procedural history of this case is summarized below, supplementing the description set out in this Court's prior decision, in 2023, denying Alpine's preliminary injunction and TRO motion. *See Scottsdale*, 678 F. Supp. 3d at 94-99.

### A.  Legal Framework

The Securities Exchange Act of 1934 ("the Exchange Act"), as amended in 1938, created a statutory regime "of cooperative self-regulation" of so-called "over-the-counter" securities markets, *i.e.* securities trading taking place outside of an established exchange like the New York Stock Exchange ("NYSE"). *See United States v. Nat'l Ass'n of Sec. Dealers, Inc.*, 422 U.S. 694, 700 n.6 (1975).[1] That scheme permits private entities, known as self-regulatory organizations

---

[1]    The Exchange Act bifurcates the securities industry into transactions on exchanges, such as the NYSE, and transactions not on exchanges. An "exchange" is an "organization, association, or group of persons" that provides a "market place or facilities for bringing together purchasers and sellers of securities," including electronic trading systems. 15 U.S.C. § 78c(a)(1); Chris Brummer, *Stock Exchanges and the New Markets for Securities Laws*, 75 U.

("SROs"), to perform a supervisory role over the securities industry, subject to oversight from the Securities and Exchange Commission ("SEC" or "the Commission").  *See* 15 U.S.C. § 78s (describing the SEC's oversight role over SROs).  Brokers and dealers transacting in the securities industry may not do so without registering with the SEC and joining a national securities association, unless they seek and receive an exception from the SEC or trade only on a registered national securities exchange.  *See id.* § 78o(a)(1), (b)(1).  The only national securities association currently registered with the SEC is FINRA.  *See id.* § 78o-3 (describing the requirements for registration of a national securities association); TAC ¶ 31 (stating that FINRA is the only national securities association).

### 1.  FINRA's Corporate Structure

FINRA is a Delaware not-for-profit corporation and SEC-registered national securities association that conducts business in the District of Columbia.  *See* TAC ¶¶ 21-22.  Following its formation from a 2007 merger between its predecessor, the National Association of Securities Dealers ("NASD"), and the enforcement arm of the NYSE, *id.* ¶ 31; *see also* Order Approving Proposed Rule Change to Amend the By-Laws of NASD, 72 Fed. Reg. 42,169 (Aug. 1, 2007), FINRA is governed by a board of twenty-two members, comprising industry and non-industry members and FINRA's chief executive officer ("CEO"), which board oversees the organization's

---

CHI. L. REV. 1435, 1438 (2008) (discussing transition "from floor trading to electronic trading").  Among other features, exchanges "provide a marketplace where securities can be bought and sold . . . by offering firms the opportunity to list their shares on trading floors or on an electronic trading system operated by the exchange." *Id.* at 1451.  "Members" are "registered broker[s] or dealer[s]," which may be natural persons or firms.  15 U.S.C. § 78c(a)(3)(A).  "Over-the-counter" securities trading is any securities trade that does not happen in an exchange. Stockbrokers may become members of a national securities exchange and trade on that exchange, become a member of a registered securities association and trade outside of exchanges, or both.  *See* 15 U.S.C. § 78o(b)(1)(B).  Both securities exchanges and securities associations are forms of self-regulatory organizations ("SROs"), though the Exchange Act subjects them to different rules reflecting their different structures.  *Compare* 15 U.S.C. § 78f (delineating rules for national securities exchanges), *with id.* § 78o-3 (delineating rules for registered securities associations).  Plaintiffs are broker-dealer firms that wish to trade, at least in part, outside of a registered securities exchange.  TAC ¶¶ 19-20, 25-26.

management and administration, *see* TAC ¶ 34; *Scottsdale*, 678 F. Supp. 3d at 95.  Board members are selected by FINRA's members and are removable only by a majority vote of FINRA's board or, "in very limited and specific circumstances, the SEC," and thus no Board member or the CEO is appointed by the SEC, the U.S. President, Congress, or any other governmental body.  TAC ¶ 47; *see also* 72 Fed. Reg. at 42,170-72.[2]  At the next level of management, FINRA executives are appointed and removed by the board, *see* TAC ¶ 48, with no involvement by the SEC or any other government official or body.  FINRA is funded by membership fees, fines, penalties, and sanctions, *id.* ¶ 32, with its budget set "without any constraint or legislative cap" because FINRA receives no government funding, *id.* ¶ 41; *see also* FINRA By-Laws art. VI § 1 (Power of the Corporation to Fix and Levy Assessments), https://www.finra.org/rules-guidance/rulebooks/corporate-organization/power-corporation-fix-and-levy-assessments [https://perma.cc/PB84-KUXL].   Part of that budget includes salaries for FINRA's executives, as determined by the organization itself.  *See* TAC ¶ 165.

### 2.  FINRA's Rules

FINRA's supervisory duties over its membership—including roughly 3,400 brokerage firms, 150,000 branch offices, and 610,000 individual registered securities representatives—is varied.  *See id.* ¶ 32.  While FINRA promulgates its own rules and standards and enforces compliance with those rules by administering sanctions and barring individuals from FINRA membership, *see id.* ¶¶ 40, 59, this supervisory authority is subject to the SEC's oversight and control, *Turbeville v. FINRA*, 874 F.3d 1268, 1270 (11th Cir. 2017); *Alpine*, 121 F.4th at 1326.  For instance, the SEC may limit, or suspend, FINRA's operations or registration if FINRA violates a

---

[2]    The SEC may "remove from office or censure" a FINRA officer or director upon a finding that the individual in question "has willfully violated [applicable statutory provisions], the rules or regulations thereunder, or the rules of [FINRA], willfully abused his authority, or without reasonable justification or excuse has failed to enforce compliance" with securities laws.  15 U.S.C. § 78s(h)(4).

4

statute or SEC regulation, upon the SEC's determination that such action "is necessary or appropriate in the public interest, for the protection of investors, or otherwise in furtherance of the purposes of [the Exchange Act]." 15 U.S.C. § 78s(h)(1). The SEC also reviews and approves rules proposed by FINRA, *see id.* § 78s(b)-(c), with such approval a prerequisite for nearly all the rules to go into effect, *see id.* § 78s(b)(1).[3] At any time and as "deem[ed] necessary or appropriate[,]" the SEC may also "abrogate, add to, and delete from" any FINRA rule "to insure the fair administration of the self-regulatory organization, to conform its rules to requirements of [the Exchange Act] and the rules and regulations thereunder applicable to such organization, or otherwise in furtherance of the purposes of [the Act]." *Id.* § 78s(c).

### 3. FINRA's Enforcement Regime

Enforcement proceedings result from FINRA's investigation into alleged misconduct by its members, with discretion vested solely in FINRA to initiate investigations and the SEC having "no authority to review FINRA's decision to initiate an enforcement action." Pls.' Opp'n at 31 (emphasis omitted). FINRA's hearings panels may issue sanctions against individuals or entities that violate a FINRA rule, SEC regulation, or statutory provision, with sanctions ranging from revocation or suspension of FINRA membership to fines and orders to cease-and-desist certain

---

[3]     The Exchange Act permits three avenues for promulgation of a FINRA rule without the SEC's express approval: (i) a rule designated by FINRA "as . . . constituting a stated policy, practice, or interpretation with respect to the meaning, administration, or enforcement of an existing [FINRA] rule[;] . . . establishing or changing a due, fee, or other charge imposed by [FINRA;] . . . [or] concerned solely with the administration of [FINRA]," 15 U.S.C. § 78s(b)(3)(A); (ii) a rule that "appears to the [SEC] . . . is necessary for the protection of investors, the maintenance of fair and orderly markets, or the safeguarding of securities or funds[,]" *id.* § 78s(b)(3)(B); and (iii) a rule on which the SEC does not act within a specified time and is therefore "deemed to have been approved[,]" *id.* § 78s(b)(2)(D). In either of the first two scenarios, within 60 days of the proposed rule's filing, the SEC "summarily may temporarily suspend the change in the rules . . . if it appears to the Commission that such action is necessary or appropriate in the public interest, for the protection of investors, or otherwise in furtherance of the purposes of this chapter," *id.* § 78s(b)(3)(C), and hold proceedings to determine whether the proposed rule shall be approved, *see id.* Notably, even rules promulgated without express approval by the SEC are still subject to the SEC's power to "abrogate, add to, and delete from" FINRA's rules for any reason "in furtherance of the purposes of" the Exchange Act, *id.* § 78s(c), and thereby remain subject to SEC supervision. As discussed *infra* in Part I.A.3, the SEC also has review power over any disciplinary sanction issued by FINRA, including any brought under rules promulgated without express SEC approval.

actions. *See* TAC ¶¶ 38, 40; *see also* 15 U.S.C. § 78o-3(b)(7)-(8). Enforcement proceedings begin with FINRA's Department of Enforcement filing a complaint against a targeted member, providing notice of the specific charges. *See* FINRA Rule 9211 (Aug. 3, 2018), https://www.finra.org/rules-guidance/rulebooks/finra-rules/9211 [https://perma.cc/3RM6-F9MF] (Authorization of Complaint). A FINRA hearing panel then conducts an evidentiary hearing, in which FINRA and the member may present evidence and arguments over multiple days. *See* 15 U.S.C. § 78o-3(h)(1); *see also id.* § 78o-3(b)(8) (requiring registered securities associations to employ fair disciplinary procedures); FINRA Rule 9231 (June 4, 2020), https://www.finra.org/rules-guidance/rulebooks/finra-rules/9231 [https://perma.cc/SVL6-8HZ2] (Appointment by the Chief Hearing Officer of Hearing Panel or Extended Hearing Panel or Replacement Hearing Officer). The panel then issues a written statement of decision with findings. *See* 15 U.S.C. § 78o-3(h)(1); *see also* FINRA Rule 9268 (Nov. 2, 2015), https://www.finra.org/rules-guidance/rulebooks/finra-rules/9268 [https://perma.cc/72SL-T7UW] (Decision of Hearing Panel or Extended Hearing Panel).

The respondent member or the Department of Enforcement may appeal that decision to FINRA's National Adjudicatory Council ("NAC"), which "may affirm, dismiss, modify, or reverse with respect to each finding." FINRA Rule 9311 (April 15, 2021), https://www.finra.org/rules-guidance/rulebooks/finra-rules/9311 [https://perma.cc/9P37-2WPT] (Appeal by Any Party; Cross Appeal). The NAC may also review the panel decision *sua sponte*. *See* FINRA Rule 9312 (Apr. 15, 2021), https://www.finra.org/rules-guidance/rulebooks/finra-rules/9312 [https://perma.cc/74ZK-Q75W] (Review Proceeding Initiated by Adjudicatory Council). Filing an appeal to the NAC automatically stays the panel's decision pending NAC's decision. *See* FINRA Rule 9311. A NAC decision may then be appealed to the SEC, *see* 15 U.S.C. § 78s(d)(2), which conducts *de*

*novo* review and may consider evidence not previously considered by FINRA, *see* Commission Rule of Practice 420, 17 C.F.R. § 201.420. Since June 2, 2025, "expulsions of member firms, cancellations of membership, and denials of applications for continued membership of disqualified member firms shall not become effective until the time for filing an application for review with the SEC has expired and no such application is filed or, if such an application is timely filed, until the SEC completes its review under Exchange Act Section 19." Notice of Filing and Immediate Effectiveness of a Proposed Rule Change to Stay the Effectiveness of Specified Expulsions and FINRA Actions ("Proposed Stay Rule"), 90 Fed. Reg. 25,689, 25,689 (June 17, 2025) (footnote omitted).[4] Other sanctions, such as fines or permanent cease and desist orders, go into effect while the SEC appeal is pending, unless the SEC stays them. *See* FINRA Rule 9360 (June 2, 2025), https://www.finra.org/rules-guidance/rulebooks/finra-rules/9360 [https://perma.cc/5UPT-ELRZ].

Final decisions by the SEC are subject to review by a federal appellate court with the filing of a petition by an aggrieved party, *see* 15 U.S.C. § 78y, but FINRA itself may not seek judicial review of an SEC decision contrary to a FINRA ruling, *see NASD v. SEC*, 431 F.3d 803, 812 (D.C. Cir. 2005).

---

[4]     Prior to this rule change, once a hearing panel's expulsion decision was "affirmed on review by the NAC or the FINRA Board[,] . . . the expulsion [was] effective upon service of the decision of the NAC or Board," Proposed Stay Rule at 25,691, although the SEC could elect to stay the effectiveness of the sanction pending SEC review, *Alpine*, 121 F.4th at 1326 (citing 15 U.S.C. § 78s(d)). This rule change was prompted by the D.C. Circuit's decision, on review of this Court's denial of Alpine's sought injunctive relief halting FINRA's expedited enforcement proceeding against Alpine, to direct a "limited preliminary injunction" enjoining FINRA from expelling Alpine from FINRA membership "either before Alpine has obtained full review by the SEC of the merits of any expulsion decision or before the period for Alpine to seek such review has elapsed." *Alpine*, 121 F.4th at 1319. Though this decision understood that "[r]eview of expulsions imposed through FINRA's expedited proceedings . . . functions differently" because "FINRA's decisions to expel its members in expedited proceedings . . . take effect immediately," *id.* at 1326, this was true of expulsions in both expedited and regular proceedings prior to the rule change, *see* FINRA Rule 9360 (Dec. 15, 2008), https://www.finra.org/rules-guidance/rulebooks/finra-rules/9360 [https://perma.cc/5UPT-ELRZ] ("Versions" sidebar), and the rule has now been modified to include pre-expulsion review by the SEC in both types of proceedings, *see* Proposed Rule Change at 25,691; FINRA Rule 9360 (June 2, 2025).

**B. FINRA's Enforcement Action Against Alpine Prior to Preliminary Injunction**

As noted, plaintiffs are broker-dealers and registered FINRA members, both owned by the same parent holding company. *See* TAC ¶¶ 19-20; *Scottsdale*, 678 F. Supp. 3d at 97.[5] In 2019, after "receiv[ing] complaints from customers of Alpine alleging that the firm charged a significant monthly account fee," allegedly in violation of FINRA's internal rules, FINRA brought an enforcement action against the company ("Initial Enforcement Proceeding"). *Scottsdale*, 678 F. Supp. 3d at 97. In March 2022, a FINRA hearing panel found that Alpine "converted and misused customer funds and securities, engaged in unauthorized trading, charged and paid customers unfair prices in securities transactions, charged customers unreasonable and discriminatory fees, and made an unauthorized capital withdrawal." *Id.* (quoting FINRA Extended Hearing Panel Decision, Disciplinary Proceeding No. 2019061232601 ("March 2022 Panel Decision") at 1, 78 (Mar. 22, 2022), https://www.finra.org/sites/default/files/2022-04/Alpine-Securities-Decision-2019061232 601.pdf [https://perma.cc/QM85-R347]); *see also* TAC ¶ 96. To sanction Alpine's violations, the panel ordered Alpine's expulsion from FINRA's membership, payment of restitution in an amount exceeding $2.3 million, and a permanent cease-and-desist order. TAC ¶ 96; *see also* March 2022 Panel Decision at 2 ("[F]or these violations, we expel the firm, order restitution, and impose a permanent cease and desist order."). Alpine appealed the panel decision to the NAC, which appeal had the effect of staying the expulsion and restitution sanctions, but the cease-and-desist order took immediate effect, in accordance with governing FINRA rules. *See* Pls.' Opp'n at 11; FINRA Rule

---

[5] In addition to the present enforcement actions against Alpine, SCA has previously been subject to FINRA's disciplinary process "for supposed violations of Section 5 of the Securities Act of 1933." TAC ¶ 95. FINRA's enforcement action against SCA began in May 2015 and concluded in September 2021, when the SEC set aside FINRA's findings and the NAC's affirmance that SCA violated the charged statutes. *See id.*; *see also In the Matter of the Application of Scottsdale Capital Advisors Corp.*, Release No. 93052, 2021 WL 4242630, at *9-10 (S.E.C. Sept. 17, 2021).

9311(b) ("Any such appeal, however, will not stay a decision, or that part of a decision, that imposes a permanent cease and desist order.").

A year later, in April 2023, with the NAC appeal still pending, "FINRA initiated an expedited disciplinary proceeding alleging that Alpine violated . . . [FINRA's] earlier" cease-and-desist order from the March 2022 Panel Decision. *See* Pls.' Opp'n at 11. After a months-long investigation, FINRA alleged that Alpine "violated the cease-and-desist order more than 35,000 times by charging over $4 million in unreasonable fees and commissions." *Alpine*, 121 F.4th at 1323. As a result, on April 19, 2023, FINRA's Department of Enforcement initiated an expedited enforcement proceeding ("Expedited Enforcement Proceeding") to expel Alpine from FINRA membership and stop its continued improper conduct, a punishment characterized by plaintiffs as "the corporate death penalty." TAC ¶¶ 100, 103. After FINRA initiated the Expedited Enforcement Proceeding, Alpine moved in its preexisting federal court case in the Middle District of Florida for a preliminary injunction to halt the expedited proceeding, which motion was ultimately resolved after transfer of the case to this Court, as described *infra* in Part I.C.2. The FINRA Hearing Officer assigned to the case opted to delay the hearing in the Expedited Enforcement Proceeding pending resolution of the preliminary injunction motion. *See* Tr. of Hearing on Prelim. Inj. & TRO ("Hr'g Tr.") at 7:13-16 (June 1, 2023), ECF No. 92.

### C. Procedural History

This case has already had a lengthy procedural history, with litigation in two different district courts and a trip to the D.C. Circuit and back, as summarized below.

#### 1. Proceedings in the Middle District of Florida

Plaintiffs filed their initial complaint in the Middle District of Florida, in October 2022, *see* Compl., ECF No. 1, and amended that complaint in February 2023, *see* First Am. Compl., ECF

No. 27.  These initial two versions of the complaint were "not predicated upon a challenge to the application of any particular FINRA rule as applied to Plaintiffs or upon any particular FINRA action taken against Plaintiffs," but rather "challenge[d] the constitutionality of FINRA's structure and its very existence."  Compl. ¶ 3; *see* First Am. Compl. ¶ 26 (similar).  The government subsequently intervened, *see* Gov't's Notice of Intervention, shortly before FINRA moved to dismiss the first amended complaint on March 10, 2023, with the government's support, *see* FINRA's Mot. Dismiss Pls.' Am. Compl., ECF No. 35; Gov't's Mem. in Defense of the Challenged Provisions of the Fed. Sec. L., ECF No. 37.

While that dismissal motion was pending, FINRA initiated the Expedited Enforcement Proceeding against Alpine on April 19, 2023.  *See* TAC ¶ 100.  Plaintiffs filed a second amended complaint on April 28, 2023, adding a challenge to the new Expedited Enforcement Proceeding, *see* Second Am. Compl. ("SAC") ¶¶ 7-11, ECF No. 43, followed a week later by Alpine filing, on May 9, 2023, an emergency motion for a preliminary injunction to halt the Expedited Enforcement Proceeding then scheduled for a hearing on May 31, 2023, *see* Alpine's Emergency Mot. for Preliminary Injunction, ECF No. 45, and FINRA filing a renewed Motion to Dismiss, *see* FINRA's Mot. to Dismiss Pls.' Second Am. Compl., ECF No. 51.  The assigned Judge in the Middle District of Florida held a three-hour hearing on the preliminary injunction motion on May 22, 2023, *see* Min. Entry (May 22, 2023), and, two days later, ordered the transfer of this case to this Court, *see* Order, ECF No. 62, with the two motions pending.  That transfer took effect at mid-day on Friday, May 26, 2023—two business days before the scheduled Expedited Enforcement Proceeding.  *See* Case Transfer, ECF No. 63.

## 2.   TRO and Preliminary Injunction in This Court

Alpine's emergency motion for preliminary injunction and FINRA's motion to dismiss were both denied, without prejudice, because the briefing in support of both motions relied on out-of-circuit, nonbinding case law mostly from the Fifth and Eleventh Circuits that was unhelpful on the truncated timeline demanded by the emergency motion.  *See* Min. Order (May 26, 2023).  On May 30, 2023, Alpine moved for reconsideration and renewed its emergency motion for a preliminary injunction and temporary restraining order, *see* Alpine's Mots. for Reconsideration, ECF No. 65; Alpine's Emergency Mot. for TRO & Prelim. Inj., ECF No. 66, this time supported by adequate briefing, and an expedited briefing schedule was entered, with a hearing held on June 1, 2023, *see* Min. Order (May 30, 2023); Min. Entry (June 1, 2023).

Alpine's motion for injunctive relief to halt the imminent, expedited enforcement proceeding against it was denied, upon finding that Alpine had not shown a likelihood of success on the merits as to any of the claims asserted in its Second Amended Complaint: "separation of powers, Appointments Clause, Fifth Amendment, . . . Seventh Amendment[,]. . . private nondelegation[,] . . . [and] First Amendment claim[s]." *Scottsdale*, 678 F. Supp. 3d at 101-02.  The first issue considered was whether FINRA was a state actor engaged in state action during enforcement proceedings, which Alpine agreed, if answered in the negative, would be dispositive of all of plaintiffs' claims, except the private nondelegation and First Amendment claims.  Hr'g Tr. 22:2-9.  Alpine identified at oral argument "two ways" for an entity to engage in state action—either that the entity "is the government" under *Lebron v. Nat'l R.R. Passenger Corp.*, 513 U.S. 374 (1995), or the entity is not generally part of the government but is "a state actor for purposes of its role" in some particular action that could be attributed to the state.  Hr'g Tr. 26:6-8, 27:4-5.

11

Alpine stopped short of conceding that the *Lebron* test was "clearly not applicable here," but agreed that its "stronger argument is the state action doctrine." *Id.* 26:17-18, 26:23-27:1.

Focusing, therefore, on the "state action" doctrine, whereby actions by private entities "may be fairly treated as that of the State itself," *Scottsdale*, 678 F. Supp. 3d at 102 (quoting *NB ex rel. Peacock v. District of Columbia*, 794 F.3d 31, 43 (D.C. Cir. 2015)), this Court concluded that "[s]ince FINRA is unlikely to be a state actor, plaintiff's separation of powers, Appointment Clause, Fifth Amendment, and Seventh Amendment claims are . . . likely foreclosed." *Id.* at 106. Since "actions of private entities can sometimes be regarded as government action for constitutional purposes," *id.* at 102 (quoting *Lebron*, 513 U.S. at 378), and that "[w]hether an entity is a state actor is largely a 'fact-bound inquiry,'" *id.* (quoting *Lugar v. Edmonson Oil Co., Inc.*, 457 U.S. 922, 939 (1982)), the focus was on whether "'there is such a close nexus between the State and the challenged action that seemingly private behavior may fairly be treated as that of the State itself,'" *id.* (quoting *Peacock*, 794 F.3d at 34).

This Court concluded that "plaintiff ha[d] not proven the likelihood that FINRA is a state actor," *id.* at 103, citing, first, that "neither an act of Congress nor the SEC created FINRA," "[n]o government entity funds FINRA nor plays any role in the selection of its board members or officers," and FINRA "creates its own rules and standards." *Id.* Moreover, FINRA "perform[s] functions that are neither contemplated nor shared by the SEC," such as "administering broker qualifications examinations," inspecting brokers and dealers," and "enforcing compliance with professional industry standards as well as FINRA's own rules and regulations." *Id.* "[A]ny decision that FINRA makes is not binding on the SEC in any subsequent review." *Id.* In sum, "FINRA is an independent body that assists the SEC by funneling referrals to the federal enforcement agency, using rules and procedures approved by the SEC as sufficient to make the

12

assistance helpful." *Id.* at 104 (citing *Graman v. NASD*, No. 97-cv-1556 (JR), 1998 WL 294022, at *2 (D.D.C. Apr. 27, 1998)).  Second, "no court" has ever held that FINRA is a state actor, and "a multitude of courts nationwide have held the contrary." *Id.*  Finally, finding that FINRA was engaged in state action would have "significant and far-reaching" consequences, affecting the state-action doctrine, the SEC's regulatory role, and FINRA's exposure to litigation.  *Id.* at 105. For all these reasons, Alpine was unlikely to succeed on the merits of its separation of powers, Appointments Clause, Fifth Amendment, and Seventh Amendment claims.

As to Alpine's private nondelegation claim, the Court noted binding applicable precedent that "an agency delegation to a private entity is valid if the agency exercises 'authority and surveillance' over the private actor and 'law-making remain[s] in the hands of the agency and [is] not entrusted to the industry.'" *Id.* (alterations in original) (quoting *Ass'n of Am. R.R. v. U.S. Dep't of Transp.*, 896 F.3d 539, 546 (D.C. Cir. 2018)).[6]  Set against this standard and explaining that FINRA's "authority is subordinate to the SEC's ultimate control and oversight" because "[t]he SEC may suspend or revoke FINRA's registration"; FINRA's "rules are reviewed and approved by the SEC with very limited exceptions"; the "SEC at any time may 'abrogate, add to, and delete from' any FINRA rule"; and "any adjudication by FINRA is subject to *de novo* and *sua sponte* review by the SEC," *id.* at 106-07 (quoting 15 U.S.C. § 78s(b)-(c)), the Court held that Alpine had not shown a likelihood of success as to its private nondelegation claim, *id.* at 107.

Finally, Alpine's First Amendment claim challenging "broker-dealers' 'forced' association with FINRA 'in order to engage in their chosen profession,'" *id.* (quoting SAC ¶ 164)), was also

---

[6]    Although the Second Amended Complaint cited "unconstitutional delegation" as the basis for this claim, the language employed was that generally used to describe the public, not the private, nondelegation doctrine.  *See, e.g.*, SAC ¶ 160 (alleging that the Exchange Act "improperly and unconstitutionally delegates legislative power to an entity outside the Legislative Branch").  Yet, in briefing and at the hearing in support of injunctive relief Alpine instead "focuse[d] on FINRA's alleged violation of the private nondelegation doctrine." *Scottsdale*, 678 F. Supp. 3d at 106; *id.* at 107 n.9 (noting this shift in nondelegation doctrines relied upon by plaintiffs and finding that Alpine had not shown a basis for relief under either the public or private nondelegation doctrines).

found unlikely to succeed on the merits, *id*. at 108.  Though acknowledging that "the First Amendment's protection of freedom of speech also extends to protect '[t]he right to eschew association for expressive purposes,'" *id.* at 107 (alteration in original) (quoting *Janus v. Am. Fed'n of State, Cnty., and Mun. Emps., Council 31*, 585 U.S. 878, 892 (2018)), the Court concluded that "FINRA articulates a significantly compelling interest embodied in the Exchange Act to justify mandatory FINRA membership," namely "'prevent[ing] fraudulent and manipulative acts and practices, . . . foster[ing] cooperation and coordination' among all industry players, and 'remov[ing] impediments to and perfect[ing] the mechanism of a free and open market,'" *id.* at 108 (quoting 15 U.S.C. § 78o-3(b)(6)).

The other three preliminary injunction factors were also considered.  Based on the Supreme Court's pronouncement in *Axon Enterprise, Inc. v. FTC*, which has been decided just before Alpine filed its first preliminary injunction motion, that "being subjected to an adjudicatory process that a plaintiff claims is constitutionally flawed is 'impossible to remedy once the proceeding is over,'" this Court found that Alpine had shown the possibility of irreparable harm without an injunction. *Id.* at 110 (quoting *Axon Enter., Inc. v. FTC*, 598 U.S. 175, 191 (2023)).  Yet, "the balance of equities and public interest disfavor[ed] any injunctive relief" because of FINRA's "overwhelming interest" in "protecting the public from the harms caused by broker-dealers engaging in securities violations," particularly by "an alleged bad actor openly and repeatedly flouting a remedial cease-and-desist order issued by a FINRA panel, allegedly thousands of times, at the expense of customers."  *Id.* at 111.  Thus, "considering these four factors in total, while irreparable harm tip[ped] in Alpine's favor, the other factors strongly weigh[ed] against granting plaintiff's request for equitable relief and so such relief is inappropriate here."  *Id.*  Alpine's motion for a TRO and preliminary injunction was therefore denied.

14

### 3.  Appeal to the D.C. Circuit

Alpine immediately appealed the denial of the TRO and preliminary injunction, and the D.C. Circuit granted its emergency motion for injunction pending appeal, directing FINRA not to continue the Expedited Enforcement Proceeding against Alpine.  *Alpine Sec. Corp. v. FINRA*, No. 23-cv-5129, 2023 WL 4703307, *1 (D.C. Cir. July 5, 2023) (per curiam).  More than a year later, after merits briefing and oral argument, the D.C. Circuit issued an opinion largely affirming this Court's denial of the preliminary injunction.

On appeal, Alpine pressed "two constitutional arguments in the alternative—either (1) FINRA is a private entity that the government has invested with too much power, in violation of the private nondelegation doctrine, or (2) FINRA is a governmental entity, in which case its expedited proceeding violates the Appointments Clause of the Constitution."  *Alpine*, 121 F.4th at 1324; *id.* at 1324 n.2 (noting that Alpine did not raise its Seventh, Fifth, or First Amendment claims on appeal).  Having reviewed the history and structure of FINRA, noting, as this Court had, that FINRA's predecessors' regulation of the securities industry predated any serious government regulation of that industry, *id.* at 1319-22, and that FINRA operated as a private corporation responsible for its own leadership and funding, *id.* at 1318, 1321, the Circuit turned first to Alpine's nondelegation claim.  Seemingly assuming without discussion that FINRA is a private entity subject to the private nondelegation doctrine, the Circuit affirmed this Court's articulation of the private nondelegation doctrine, which requires that "the private entity . . . act only 'as an aid' to an accountable government agency that retains the ultimate authority to "approve[], disapprove[], or modif[y]" the private entity's actions and decisions on delegated matters."  *Id.* at 1325 (alterations in original) (quoting *Sunshine Anthracite Coal Co. v. Adkins*, 310 U.S. 381, 388, 399 (1940)).  The Circuit also agreed that "SEC oversight of FINRA disciplinary actions . . . includes an 'independent

review of the record' to determine whether the FINRA member 'engaged in the conduct FINRA found,' 'whether that conduct violated the rules specified in FINRA's determination,' and whether the discipline otherwise accords with the Exchange Act," and that "the SEC can approve, disapprove, or modify FINRA's actions." *Id.* (quoting *In the Matter of the Application of Devin Lamarr Wicker*, Release No. 100148, 2024 WL 2188603, *7 (S.E.C. May 15, 2024).

In the D.C. Circuit's view, however, "[r]eview of expulsions imposed through FINRA's expedited proceedings . . . functions differently," because "the SEC does not conduct any review of an expulsion order in an expedited proceeding before it goes into effect." *Id.* at 1326. Under FINRA rules as they were then written, "expulsion takes effect immediately upon the issuance and 'prompt' service of FINRA's decision," meaning the SEC could not review the expulsion until "*after* FINRA . . . issued its final decision and imposed any sanction." *Id.* (emphasis in original) (citing FINRA Rules 9260, 9559(o)(5), (q)(4)-(5)). "SEC review of expulsion orders will almost always be too little too late," the Circuit observed, because "expulsion from FINRA effectively amounts to expulsion from the securities industry as a whole," and "[b]arred from pursuing their trade, many expelled FINRA members could be forced out of business before they can obtain SEC review of the merits of FINRA's decision." *Id.* After rejecting the argument that the SEC's authority to stay the effectiveness of an expulsion order constituted sufficient supervision by the SEC, *id.* at 1327, the Circuit concluded that "[t]he result of this regulatory scheme is that FINRA can, without any SEC review of its decision on the merits, effectively decide who can trade securities under federal law," which "falls short of what the private nondelegation doctrine requires: an accountable government actor that 'retains the discretion to approve, disapprove, or modify' FINRA's delegated decisions." *Id.* at 1328 (quoting *Ass'n of Am. R.R. v. Dep't of Transp.*, 721 F.3d 666, 671 (D.C. Cir. 2013), *vacated and remanded on other grounds sub nom. Dep't of*

16

*Transp. v. Ass'n of Am. R.R.*, 575 U.S. 43 (2015)).  Thus, Alpine had "demonstrated a likelihood of success on the merits of its private nondelegation claim to the extent that FINRA can unilaterally expel a member and, in so doing, bar the expelled entity from engaging in stock trading, all without governmental superintendence or control."  *Id.* at 1324.

The D.C. Circuit also concluded that "[t]he remaining preliminary-injunction factors—irreparable harm, the balance of equities, and the public interest—also support Alpine," *id.* at 1329, and that the plaintiffs were therefore entitled to a "limited preliminary injunction" ensuring that FINRA's expulsion order could not go into effect "before Alpine has obtained full review by the SEC of the merits of any expulsion decision or before the period for Alpine to seek such review has elapsed," reversing "only to th[is] extent," *id.* at 1319.  The D.C. Circuit suggested that FINRA could cure this problem by voluntarily "delay[ing] the effectiveness of its expulsion orders in expedited proceedings."  *Id.* at 1331.

The majority on the D.C. Circuit panel rejected the sweeping argument made in dissent that FINRA should be barred "from policing its member's misconduct at all" based on the private nondelegation doctrine.  *Id.* at 1328.  Emphasizing that, in the instant action against Alpine, "FINRA is not enforcing any federal law or SEC regulation" but rather "*its own private rules*," the D.C. Circuit concluded that FINRA's disciplinary proceedings did not themselves violate the private nondelegation doctrine.  *Id.* (emphasis in original).  The dissent argued that "FINRA wields significant executive authority when it investigates, prosecutes, and initially adjudicates allegations against a company required by law to put itself at FINRA's mercy," *id.* at 1338 (Walker, J., concurring in part), but the majority rejected that assertion, pointing out that these activities are "simply . . . FINRA's own internal procedures for investigating member compliance with FINRA's membership rules" and "*predate* any congressional involvement with private securities

17

regulators," meaning that FINRA disciplinary proceedings "are not an authority bestowed by the federal government" at all. *Id.* at 1328 (emphasis in original). In any case, the Circuit noted, the Appointments Clause doctrine, not the private nondelegation doctrine, is "where the Supreme Court has housed the 'significant executive authority' inquiry on which the dissenting opinion relies," making that an inappropriate metric for evaluating Alpine's private nondelegation claim. *Id.* at 1329 (quoting *id.* at 1338 (Walker, J., concurring in part)).

Finally, the D.C. Circuit rejected Alpine's Appointments Clause claim as a basis for a preliminary injunction because, now that the harm of being expelled from the securities industry without SEC review was "no longer pressing," Alpine had not shown irreparable harm. *Id.* at 1332. Alpine asserted that "being forced to litigate before an allegedly unconstitutionally appointed FINRA officer" constituted "per se irreparable harm." *Id.* at 1333 (internal quotation marks omitted) (quoting Alpine's Br.). Circuit precedent, however, foreclosed this argument, dictating that "simply participating in a proceeding conducted by an allegedly unconstitutionally appointed officer is not itself irreparable harm that justifies extraordinary relief." *Id.* at 1333-34 (citing *Deaver v. Seymour*, 822 F.2d 66 (D.C. Cir. 1987); *In re al-Nashiri*, 791 F.3d 71 (D.C. Cir. 2015); *John Doe Co. v. Consumer Fin. Prot. Bureau*, 849 F.3d 1129 (D.C. Cir. 2017)). The D.C. Circuit also rejected the assertion that "*Axon* held that being forced to participate in an unconstitutional agency proceeding necessarily qualifies as irreparable harm supporting the issuance of a preliminary injunction," finding instead that "*Axon* answered a statutory jurisdictional question" about whether district courts had "ordinary jurisdiction," but this "did not speak to what constitutes irreparable harm for purposes of the extraordinary remedy of a preliminary injunction." *Id.* at 1335-36 (citing *Axon*, 598 U.S. at 185-86). The Circuit said that *Axon* was particularly inapplicable to the question of whether Alpine had shown irreparable harm

because "FINRA is not a government agency like those at issue in *Axon*," which was enough of a distinction to counsel against departing from Circuit precedent in this case.

On remand, after the D.C. Circuit's mandate issued on February 18, 2025, *see* Mandate, ECF No. 99, this Court entered the more limited preliminary injunction mandated by the Circuit, enjoining FINRA from "expelling Alpine Securities Corporation until either the [SEC] reviews the FINRA expulsion order on the merits or the time for Alpine to seek SEC review of the expulsion order expires," Order at 1, ECF No. 100.

### 4. Post-Injunction Proceedings

Shortly thereafter, on March 25, 2025, the NAC affirmed the March 2022 Panel Decision issued against Alpine in the Initial Enforcement Proceeding, including the expulsion order included in that decision, and Alpine "has since appealed" that decision, including the expulsion order, to the SEC. TAC ¶ 106. In June 2025, FINRA "chose to dismiss without prejudice its Expedited Proceeding," which had been initiated to discipline Alpine for violating the cease-and-desist order issued as part of the March 2022 Panel Decision. *Id.* ¶ 107. "On the same day that FINRA dismissed without prejudice its Expedited Proceeding against Alpine, FINRA amended its rules to stay the effectiveness of expulsions in expedited proceedings until the time for filing an application for review with the SEC has expired or until the SEC completes its review." *Id.* ¶ 109; *see also supra* n.4.

In July 2025, plaintiffs filed the operative Third Amended Complaint, which asserts eight claims: Violation of Constitutional Requirements for Presidential Removal, TAC ¶¶ 124-134 (Count I); Violation of the Executive Vesting Clause and the Take Care Clause, TAC ¶¶ 135-140 (Count II); Violation of the Appointments Clause, TAC ¶¶ 141-145 (Count III); Violation of the Private Non-Delegation Doctrine, TAC ¶¶ 146-154 (Count IV); Violation of the Public Non-

Delegation Doctrine, TAC ¶¶ 155-162 (Count V); Violation of the Fifth Amendment's Due Process Clause, TAC ¶¶ 163-169 (Count VI); Violation of the Seventh Amendment, TAC ¶¶ 170-174 (Count VII); and Unconstitutional Conditions, TAC ¶¶ 175-179 (Count VIII).

FINRA has, again, moved to dismiss, pursuant to Federal Rule of Civil Procedure 12(b)(1) and (b)(6), arguing that the Exchange Act deprives this Court of subject matter jurisdiction over plaintiffs' Fifth and Seventh Amendment claims and that plaintiffs failed to state a claim as to any of the eight claims.  *See* FINRA Mem.  Likewise, the U.S. government supports dismissal, similarly arguing that plaintiffs' Fifth and Seventh Amendment claims "should be dismissed for lack of subject-matter jurisdiction," Gov't's Mem. at 8, and defending the constitutionality of provisions of federal law which plaintiffs challenge, *see generally id.*  After briefing was complete, *see* Pls.' Opp'n; FINRA Reply, FINRA filed a notice of supplemental authority regarding *Oklahoma v. United States*, 163 F.4th 294 (6th Cir. 2025), in which the Sixth Circuit upheld the constitutionality of the Horseracing Integrity and Safety Authority over a private nondelegation challenge, *see* FINRA Not. of Supp. Auth., to which plaintiffs responded, *see* Pls.' Resp. to Not. of Supp. Auth.  FINRA's dismissal motion is now ripe for resolution.

## II.    LEGAL STANDARD

"Article III of the Constitution prescribes that '[f]ederal courts are courts of limited subject-matter jurisdiction' and 'ha[ve] the power to decide only those cases over which Congress grants jurisdiction.'"  *Bronner ex rel. Am. Stud. Ass'n v. Duggan*, 962 F.3d 596, 602 (D.C. Cir. 2020) (alterations in original) (quoting *Al-Zahrani v. Rodriguez*, 669 F.3d 315, 317 (D.C. Cir. 2012)); *see also Gunn v. Minton,* 568 U.S. 251, 256 (2013) ("'Federal courts are courts of limited jurisdiction,' possessing 'only that power authorized by Constitution and statute.'" (quoting *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994))).  Federal courts therefore

have a corresponding "independent obligation to ensure that they do not exceed the scope of their jurisdiction." *Henderson ex rel. Henderson v. Shinseki*, 562 U.S. 428, 434 (2011).  Absent subject-matter jurisdiction over a case, the court must dismiss it.  *See Arbaugh v. Y & H Corp.*, 546 U.S. 500, 506-07 (2006) (citing *Kontrick v. Ryan*, 540 U.S. 443, 455 (2004)); FED. R. CIV. P. 12(h)(3).

To survive a motion to dismiss for lack of subject matter jurisdiction, under Federal Rule of Civil Procedure 12(b)(1), the plaintiff bears the burden of demonstrating the court's subject-matter jurisdiction over the claim at issue.  *Arpaio v. Obama*, 797 F.3d 11, 19 (D.C. Cir. 2015). The court resolves jurisdictional questions by accepting as true all uncontroverted material factual allegations contained in the complaint and "constru[ing] the complaint liberally, granting plaintiff[s] the benefit of all inferences that can be derived from the facts alleged." *Hemp Indus. Ass'n v. DEA*, 36 F.4th 278, 281 (D.C. Cir. 2022) (second alteration in original) (internal quotation marks omitted) (quoting *Am. Nat'l Ins. Co. v. FDIC*, 642 F.3d 1137, 1139 (D.C. Cir. 2011)). Inferences drawn by the plaintiffs need not be accepted, however, if those inferences are unsupported by facts alleged in the complaint or amount merely to legal conclusions.  *Id.* at 288 (noting that liberally construing complaint in plaintiffs' favor "does not entail accepting inferences unsupported by facts or legal conclusions cast in the form of factual allegations" (alterations accepted and internal quotation marks omitted)).  The court "may consider materials outside the pleadings" in assessing whether subject matter jurisdiction may be exercised.  *Jerome Stevens Pharm., Inc. v. Food & Drug Admin.*, 402 F.3d 1249, 1253 (D.C. Cir. 2005).

To survive a motion to dismiss under Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face," although the allegations need not be "detailed."  *VoteVets Action Fund v. U.S. Dep't of Veterans Affs.*, 992 F.3d 1097, 1104 (D.C. Cir. 2021) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)).  The alleged

facts must not be "'merely consistent with' a defendant's liability" but rather must "allow[] the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678 (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 557 (2007)).  All factual allegations in the complaint must be accepted as true, "even if doubtful in fact," *Twombly*, 550 U.S. at 555, though the court does "not assume the truth of legal conclusions, nor . . . 'accept inferences that are unsupported by the facts set out in the complaint,'" *Arpaio*, 797 F.3d at 19 (citation omitted) (quoting *Islamic Am. Relief Agency v. Gonzales*, 477 F.3d 728, 732 (D.C. Cir. 2007)).

In assessing the sufficiency of a complaint under Rule 12(b)(6), a court's consideration is limited "to materials properly before it," including, in this Circuit, "'the facts alleged in the complaint, [and] documents attached thereto or incorporated therein.'"  *Page v. Comey*, 137 F.4th 806, 813 (D.C. Cir. 2025) (alteration in original) (quoting *Stewart v. Nat'l Educ. Ass'n*, 471 F.3d 169, 173 (D.C. Cir. 2006); *see also Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007) (noting that, in deciding motion to dismiss, consideration may be given to "documents incorporated into the complaint by reference, and matters of which the court may take judicial notice").

## III.   DISCUSSION

FINRA and the government challenge the exercise of subject-matter jurisdiction over plaintiffs' Fifth and Seventh Amendment Claims (Counts VI and VII, respectively), which challenge is discussed first, followed by discussion of whether FINRA is part of the government or engaged in state action, and, if so, whether the Appointments Clause, presidential removal power, separation-of-powers, and due process right may be invoked against FINRA (Counts I, II, III, and VI, respectively); and, even if neither a government actor or agent, whether FINRA's

22

organizational structure and powers violate the private or public nondelegation doctrines (Counts IV and V, respectively), or the unconstitutional conditions doctrine (Count VIII).  For the reasons described below, subject matter is lacking to review the Seventh Amendment claim, in Count VII, and plaintiffs have failed otherwise to state viable claims, requiring dismissal of the Third Amended Complaint.

### A. Subject Matter Jurisdiction Challenges to Fifth and Seventh Amendment Claims in Counts VI and VII

FINRA and the government urge dismissal of plaintiffs' Fifth and Seventh Amendment claims on the basis that "this Court lacks subject matter jurisdiction" over those claims because "[t]he Exchange Act expressly grants the courts of appeals 'exclusive' 'jurisdiction' to review SEC 'orders' . . . including orders arising from FINRA disciplinary procedures."  FINRA Mem. at 29 (quoting 15 U.S.C. § 78y(a)(1), (3)); Gov't's Mem. at 8.  Under the Exchange Act, SROs such as FINRA are assumed to conduct their own disciplinary proceedings and then, after "impos[ing] any final disciplinary sanction," must "promptly file notice thereof with [the SEC]."  15 U.S.C. § 78s(d)(1).  The SEC may then "affirm, modify, or set aside" FINRA's disciplinary sanctions.  *Id.* § 78s(e)(1).  "A person aggrieved by a final order of the [SEC]," including its affirmation or modification of a FINRA disciplinary sanction, "may obtain review of the order in the United States Courts of Appeals" for the appropriate circuit.  *Id.* § 78y(a)(1).  FINRA argues that these provisions "channel[] claims to the court of appeals after SEC review" and "bar[] district court jurisdiction" to hear plaintiffs' claims.  FINRA Mem. at 29.

"A special statutory review scheme . . . may preclude district courts from exercising jurisdiction over challenges to federal agency action," for example by providing, as in the Exchange Act, for "review in a court of appeals following the agency's own review process," which "divests district courts of their ordinary jurisdiction [under 28 U.S.C. § 1331] over the

23

covered cases." *Axon*, 598 U.S. at 185.  Determining whether the district courts are divested of jurisdiction requires examining whether "such intent is 'fairly discernible in the statutory scheme,'" and whether the claims brought are "of the type Congress intended to be reviewed within [the] statutory structure." *Thunder Basin Coal Co. v. Reich*, 510 U.S. 200, 207-08 (1994) (quoting *Block v. Cmty. Nutrition Inst.*, 467 U.S. 340, 351 (1984)).  To make this determination, the Supreme Court has distilled three factors, "commonly known now as the *Thunder Basin* factors." *Axon*, 598 U.S. at 186.  First, "could precluding district court jurisdiction 'foreclose all meaningful judicial review' of the claim?" *Id.* (quoting *Thunder Basin*, 510 U.S. at 212-13).  Second, "is the claim 'wholly collateral to [the] statute's review provisions'"? *Id.* (alteration in original) (quoting *Thunder Basin*, 510 U.S. at 212).  Third, "is the claim 'outside the agency's expertise'"? *Id.* (quoting *Thunder Basin*, 510 U.S. at 212).  If all three questions are answered in the affirmative, courts "presume that Congress does not intend to limit [district court] jurisdiction." *Free Enter. Fund v. Public Co. Accounting Oversight Bd.*, 561 U.S. 477, 489 (2010).  Applying these factors in other contexts, the Supreme Court has held that district courts may hear challenges to federal officers' removal protections, *Free Enter. Fund*, 561 U.S. at 489, and to "the combination of prosecutorial and adjudicative functions" in a single agency, *Axon*, 598 U.S. at 194.  On the other hand, statutory review regimes have precluded collateral review by district courts of an agency's interpretation and application of a statute's substantive obligations on regulated entities, *Thunder Basin*, 510 U.S. at 204, and to equal protection claims stemming from termination of federal employment, *Elgin v. Dep't of Treasury*, 567 U.S. 1, 21-22 (2012).

FINRA and the government argue that plaintiffs' claims more closely resemble those precluded from district court review in *Thunder Basin* and *Elgin*, and that application of the *Thunder Basin* factors demonstrates that plaintiffs' Fifth and Seventh Amendment claims should

24

be channeled through the statutory review process, FINRA Mem. at 29; Gov't's Mem. at 8, whereas plaintiffs argue that these claims resemble those permitted for district court review in *Axon* and *Free Enterprise Fund*, and thus that the *Thunder Basin* factors favor such review, Pls.' Opp'n at 42-44. As to their Fifth Amendment due process claim, plaintiffs have the better of this dispute, since the specific claim brought challenges the structure of FINRA, rather than the conduct of any specific proceeding, *see* TAC ¶ 165, but FINRA and the government are correct that plaintiffs' Seventh Amendment claim is more appropriately channeled through the Exchange Act's review process.

### 1. Fifth Amendment

To reprise, plaintiffs' Fifth Amendment claim, in Count VI, identifies two sources of due process violations, alleging, first, that "FINRA acts as prosecutor, judge, jury, and executioner," thereby creating "biased" proceedings, *id.*; and, second, that FINRA's structure involves the "wielding of federal regulatory power by private individuals against their economic competitors," since disciplinary hearing panels are composed in part of industry representatives, similarly resulting in "bias[]," *id.* ¶¶ 165, 168.

The first allegation is identical to a claim in *Axon* that the Supreme Court found to be reviewable by district courts, despite the existence of a statutory review scheme under the Federal Trade Commission Act of 1914, as amended, 15 U.S.C. § 41 *et seq.*, which is similar to the Exchange Act. *Axon*, 598 U.S. at 189. In *Axon*, the Supreme Court held that the plaintiffs' "combination-of-functions claim . . . goes to the core of the FTC's existence, given that the agency indeed houses . . . both prosecutorial and adjudicative activities." *Id.* Since the claim at issue "charge[d] that an agency is wielding authority unconstitutionally in all or a broad swath of its work," review by a district court was appropriate. *Id.*; *see also Axon Enter. Inc. v. FTC*, 452 F.

Supp. 3d 882, 886 (D. Ariz. 2020) (describing plaintiff's claim that "the FTC's combined role of 'prosecutor, judge, and jury' during administrative proceedings violates the Due Process Clause of the Fifth Amendment"). The Supreme Court addressed the *Thunder Basin* factors concluding that all three counseled in favor of district court's jurisdiction over this claim. *Id.* First, "being subjected to unconstitutional agency authority," for instance in the form of an agency unconstitutionally wielding both prosecutorial and adjudicative authority, was "a here-and-now injury" that could not be remedied even if any sanctions ultimately imposed were reversed by judicial review. *Id.* at 191 (internal quotation marks omitted). Second, this claim "challeng[ed] the [FTC's] power to proceed at all, rather than actions taken in the agency proceedings," meaning that the challenge was "collateral to" any specific agency adjudication. *Id.* at 192-93. Finally, the plaintiffs' "constitutional challenge to the combination of prosecutorial and adjudicative functions is . . . distant from the FTC's 'competence and expertise.'" *Id.* at 194 (quoting *Free Enter. Fund*, 561 U.S. at 491).

Here too, plaintiffs argue that "FINRA acts as prosecutor, judge, jury, and executioner," and that such combination of functions violates the Fifth Amendment's guarantee of due process. TAC ¶ 165; *see Axon*, 598 U.S. at 183 (quoting plaintiffs' objection that "the FTC will act as prosecutor, judge, and jury"). Putting the substance of this constitutional critique aside, FINRA points out, "Alpine is currently raising the *same* Fifth . . . Amendment claim[] before the SEC in its appeal of the National Adjudicatory Council's expulsion decision," and plaintiffs are "free to challenge the SEC's approval of any of FINRA's proposed disciplinary-proceeding rules by timely petitioning for review in a court of appeals." FINRA Mem. at 33. Despite the apparent availability of judicial review over these claims via the statutory review process, *Axon* is binding and

26

dispositive here because, in that case, the Supreme Court held that an identical claim was not subject to a nearly identical statutory channeling provision. *See Axon*, 598 U.S. at 189.

The second aspect of plaintiffs' Fifth Amendment due process claim—that FINRA's existence allows the "wielding of federal regulatory power by private individuals against their economic competitors," TAC ¶ 168—sounds in the private nondelegation doctrine. This doctrine bars "legislative delegation" of government powers "to private persons whose interests may be and often are adverse to the interests of others in the same business" as a "denial of rights safeguarded by the due process clause of the Fifth Amendment." *Carter v. Carter Coal Co.*, 298 U.S. 238, 312 (1936) (articulating private nondelegation doctrine). Thus, this part of plaintiffs' Fifth Amendment claim challenges the structure and powers of FINRA, rather than whether additional process was due in any particular proceeding. Under the *Thunder Basin* factors, jurisdiction exists in district courts to adjudicate this portion of the claim as well.

First, plaintiffs may be deprived of meaningful judicial review if this claim is channeled through statutory review processes, because plaintiffs "protest the 'here-and-now' injury of subjection to an unconstitutionally structured decisionmaking process," namely the self-regulation of the securities industry by private entities, and "subjection to that process irrespective of its outcome." *Axon*, 598 U.S. at 192. Second, plaintiffs' Fifth Amendment challenge is not specific to any particular adjudication or dependent on any particular action by FINRA. FINRA asserts otherwise, contending that plaintiffs' allegations "depend on the course of particular FINRA disciplinary proceedings," such as "whether the specific procedures used in those proceedings, including the composition of the Hearing Panel and the procedural rights afforded to the respondent, comport with due process." FINRA Mem. at 33. This characterization misreads this portion of plaintiffs' claim, which is not adjudication-specific. Rather, plaintiffs allege that

27

FINRA's "wielding of federal regulatory power" generally violates due process.  TAC ¶ 168.

Finally, whether this claim is outside the expertise of FINRA or the SEC is a "closer question," *Lemelson v. SEC*, 793 F. Supp. 3d 1, 10 (D.D.C. 2025), since FINRA surely has expertise concerning its own procedures for ensuring impartiality, formulating and applying rules, and other structural factors that might make plaintiffs' due process claim more or less viable, *see Elgin*, 567 U.S. at 22-23 (noting that a "challenged statute may be one that the [agency] regularly construes, and its statutory interpretation could alleviate constitutional concerns").  Nonetheless, here, the other two factors weigh in favor of the ordinary exercise of district court jurisdiction, and FINRA does not have any special expertise in deciding the ultimate Fifth Amendment constitutional question.  Jurisdiction may therefore be exercised over this portion of plaintiffs' due process claim. *See Black v. SEC*, No. 3:23-cv-709 (MEO), 2026 WL 812273 (W.D.N.C.) (reaching same conclusion on private nondelegation due process claim); *cf. Alpine Sec. Corp. v. Nat'l Sec. Clearing Corp.*, No. 2:23-cv-782 (JNP), 2025 WL 901847 (D. Utah Mar. 25, 2025) (holding that due process claim fell outside district court jurisdiction when based on allegation that, in a specific disciplinary proceeding, the plaintiff "was not provided with an impartial hearing because the panel consisted solely of [a different SRO's] board members who, by nature of their board membership, could not provide impartiality").

Thus, both parts of plaintiffs' Fifth Amendment due process claim may be reviewed in this district court.

### 2.  Seventh Amendment

Plaintiffs further allege, as part of their Seventh Amendment claim, that "FINRA prosecutes broker-dealers, like Plaintiffs, in a wide variety of cases including those sounding in fraud and those in which FINRA seeks to impose severe civil penalties," but "[n]onetheless,

broker-dealers subject to these FINRA pseudo-trials are not afforded the right to a trial by jury as guaranteed by the Seventh Amendment." TAC ¶¶ 171, 173. Unlike the due process claim raised by plaintiffs under the Fifth Amendment, which challenges the very structure of FINRA and alleges that this structure permits harmful adjudications before biased tribunals, thereby effectively challenging every FINRA adjudication, plaintiffs' Seventh Amendment claim challenges FINRA adjudication procedures, which do not provide a jury trial, but, since jury trials apply only "if the claim is 'legal in nature,'" taking into consideration both "the cause of action and the remedy it provides," where "money damages are the prototypical common law remedy." *SEC v. Jarkesy*, 603 U.S. 109, 122-23 (2024) (quoting *Granfinanciera, S.A. v. Nordberg*, 492 U.S. 33, 53 (1989)), this claim may arise in only some FINRA proceedings involving such "common law" claims in which monetary sanctions are imposed, not all. Since the applicability of the Seventh Amendment jury trial right will vary depending on the specific claim asserted and sanction meted out by FINRA, and since Seventh Amendment violations may be remedied after the fact by simply vacating the sanction requiring, but issued without, a jury, plaintiffs' Seventh Amendment claims are covered by the Exchange Act's channeling provisions and may not be reviewed here.

Application of the *Thunder Basin* factors makes clear that Congress delimited the permissible avenue of review for plaintiffs' Seventh Amendment claim by designating review of any disciplinary sanction to the SEC, and then to a court of appeals. As to the first factor, denial of district court jurisdiction does not "foreclose all meaningful judicial review" of the jury-trial right claim. *Axon*, 598 U.S. at 186 (cleaned up). "[U]sually," "adequate judicial review does not . . . demand a district court's involvement," since the Exchange Act provides for appeal of SEC decisions to an appellate court. *Id.* at 190. Just so here. If FINRA imposes sanctions that plaintiffs believe may not constitutionally be imposed on them without a jury trial, a clear remedy is

29

provided in the Exchange Act review scheme with an appeal of the sanctions to the SEC and then on to the court of appeals. Should either body agree with plaintiffs that the sanction may not be imposed without a jury trial, the sanction may simply be reversed. "It is well-established that the harm resulting from the denial of a jury trial can be remedied on appeal, even after the case has already been tried—the reviewing court simply orders a new trial." *Ponte v. FDIC*, No. 24-cv-2379 (APM), 2024 WL 4730602, *8 (D.D.C. Oct. 11, 2024) (collecting cases). Plaintiffs' Seventh Amendment claim does not constitute an assertion of a "right[] 'not to stand trial,'" *Axon*, 598 U.S. at 192 (quoting *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985)), but rather an objection to how that trial should be conducted, *see Blankenship v. FINRA*, No. 24-cv-3003, 2024 WL 4043442, *2 (E.D. Pa. Sept. 4, 2024) (rejecting jurisdiction over Seventh Amendment claim because the injury did "not arise merely from [plaintiff's] appearance in FINRA's proceedings" but rather only if FINRA "t[ook] certain allegedly unconstitutional steps to injure him"). This is precisely the sort of objection appropriately considered during appeal under the statutory review regime.

As to the second factor, plaintiffs' claim that FINRA unconstitutionally imposes civil monetary sanctions without a jury trial is not "wholly collateral" to any enforcement proceeding. *Axon*, 598 U.S. at 186 (cleaned up). Entitlement to a jury trial under the Seventh Amendment hinges on whether "the claim is 'legal in nature,'" *Jarkesy*, 603 U.S. at 122-23 (quoting *Granfinanciera*, 492 U.S. at 53), based on both the "cause of action and the remedy it provides," though "the remedy [is] the 'more important' consideration," *id.* (quoting *Tull v. United States*, 481 U.S. 412, 418-21 (1987)). Thus, the applicability of the Seventh Amendment turns on the nature of the claim and specific sanctions issued in any FINRA adjudication and subsequent SEC enforcement action. While plaintiffs assert that some FINRA disciplinary charges "sound in fraud," with the implication that such charges resemble common law civil actions subject to the

jury right, TAC ¶ 115, plaintiffs do not so much as argue that all FINRA sanctions—such as cease-and-desist orders or expulsion from FINRA membership—bear any resemblance to common law remedies. Plaintiffs' entitlement to a jury trial thus depends upon both the specific charges brought and sanction issued and therefore cannot be evaluated until conclusion of the FINRA disciplinary process. Put another way, both the cause of action and the remedy are intimately tied, rather than collateral, to a specific proceeding.

As to the final factor, while FINRA and the SEC may know "nothing special about the" right to a jury trial, *Axon*, 598 U.S. at 194, that *Thunder Basin* factor alone does not mean that plaintiffs may circumvent entirely the statutory scheme constructed by Congress in the Exchange Act. As another Judge on this Court explained, "framing the application of the third *Thunder Basin* factor in [a] limited manner risks creating a far more expansive exception to the statutory review procedures than the Supreme Court has ever embraced," since "most, if not all, questions of constitutional law fall outside the expertise of the administrative agencies." *Vape Cent. Grp., LLC v. FDA*, No. 24-cv-3354 (RDM), 2025 WL 637416, *8 (D.D.C. Feb. 27, 2025). For instance, in *Elgin*, the Supreme Court required an employee to proceed through a statutorily designated administrative process before bringing his Equal Protection claim to a court. *Elgin*, 567 U.S. at 22. As in *Elgin*, plaintiffs here "overlook the many threshold questions that may accompany a constitutional claim and to which [FINRA and the SEC] can apply [their] expertise," including the possibility that these entities might impose sanctions that do not arise at common law, such as expulsion from the securities industry. *Id.* at 22-23. Thus, while neither FINRA nor the SEC may have special expertise in the Seventh Amendment, their expertise is implicated in threshold issues that may affect the application of the Seventh Amendment in a given case.

31

In sum, this Court has no jurisdiction to review plaintiffs' Seventh Amendment claim because jurisdiction is channeled through FINRA's disciplinary procedures, through the SEC, and then to the courts of appeals. Count VII must therefore be dismissed for lack of subject matter jurisdiction.

## B. Legal Framework for Assessing Constitutional Claims Against FINRA

Analysis of plaintiffs' remaining constitutional challenges hinges on whether FINRA is a private or public entity and, if private, whether certain of its actions are effectively federal government actions. For instance, plaintiffs' claims arising under the Appointments Clause and Executive Vesting and Take Care Clauses apply only to government entities, as does their public nondelegation claim. *See* TAC ¶¶ 124-134 (Count I, presidential removal power); *id.* ¶¶ 135-140 (Count II, Executive Vesting and Take Care Clauses); *id.* ¶¶ 141-145 (Count III, Appointments Clause); *id.* ¶¶ 155-162 (Count V, public nondelegation doctrine). Even if not part of the government, FINRA may still be subject to the due process clause if its actions constitute state actions, *id.* ¶¶ 163-169 (Count VI, Fifth Amendment due process), and to the private nondelegation doctrine, *id.* ¶¶ 146-154 (Count IV), and unconstitutional conditions doctrine, *id.* ¶¶ 175-179 (Count VIII). The doctrinal background for determining which set of rules applies is discussed before being applied to plaintiffs' claims against FINRA.

The Supreme Court has identified two distinct instances in which a private entity may nonetheless be held accountable for violating constitutional provisions applicable to state action. *See* Hr'g Tr. 26:6-7 (plaintiffs' attorney stating "there are two ways that we can have state action"). First, a "nominally . . . private corporation" may be "part of the Government," *Lebron*, 513 U.S. at 383, 379, and, as such, the Constitution applies to that entity with the result that its officers must be appointed and removable in accordance with Appointments Clause and it actions are bound by

constitutional requirements, *see id.* at 394 ("[W]e conclude that [Amtrak] is an agency or instrumentality of the United States for the purpose of individual rights guaranteed against the Government by the Constitution."); *Ass'n of Am. R.R.*, 575 U.S. at 55 (applying the "structural principles secured by the separation of powers" to Amtrak under the *Lebron* theory (quoting *Bond v. United States*, 564 U.S. 211, 222 (2011)). Under this jurisprudence, "a corporation is 'part of the Government' for constitutional purposes when: '[(1)] the Government creates [the] corporation by special law, [(2)] for the furtherance of governmental objectives, and [(3)] retains for itself permanent authority to appoint a majority of the directors of that corporation.'" *Herron v. Fannie Mae*, 861 F.3d 160, 167 (D.C. Cir. 2017) (alterations in original) (quoting *Lebron*, 513 U.S. at 400).

Second, and separately, under the "state action" doctrine, particular "actions of private entities can sometimes be regarded as governmental action for constitutional purposes," even where the private entity is indisputably *not* a part of the government. *Lebron*, 513 U.S. at 378 (declining to reach the state action issue because finding that Amtrak was "itself a federal entity" foreclosed the need to decide whether any particular action by Amtrak constituted state action by a "private entity"). "As a matter of substantive constitutional law the state-action requirement reflects judicial recognition of the fact that 'most rights secured by the Constitution are protected only against infringement by governments.'" *Lugar v. Edmondson Oil Co., Inc.*, 457 U.S. 922, 936 (1982) (quoting *Flagg Bros. Inc. v. Brooks*, 436 U.S. 149, 156 (1978)). When a private entity deprives another of some right guaranteed by the Constitution, and the government has so involved itself in the private entity's action that the deprivation is "fairly attributable to the state," the private entity's deprivation of another's rights may be subject to the Constitution's protections. *Id.* at 937. Consequently, while a private entity that is not part of the government is not subject to the

33

Appointments Clause and other structural constitutional limitations, this private entity may nonetheless still be subject to other constitutional provisions as to certain actions qualifying as state action. *See, e.g.*, *id.* at 924 (considering whether, under the "state action" doctrine, the Fourteenth Amendment's due process clause could be used to prevent a private oil company from depriving plaintiff of his property); *Edmonson v. Leesville Concrete Co., Inc.*, 500 U.S. 614 (1991) (holding that civil litigants' racially motivated use of peremptory strikes was state action covered by the Fourteenth Amendment); *Peacock*, 794 F.3d 31 (holding that Xerox engaged in state action when administering D.C.'s Medicaid program); *see also Kim v. FINRA*, 698 F. Supp. 3d 147, 163 n.12 (D.D.C. 2023) ("Neither the Court nor the parties could find any case suggesting that Article II's Appointments Clause and removal requirements apply to a private entity that is not the government itself under *Lebron* but merely engages in state action in certain circumstances . . . ."). Confusingly, in applying the state action doctrine, courts sometimes refer to the private entity as a "state actor" for the purposes of the specific challenged action, *see Lugar*, 457 U.S. at 937, but that determination is distinct from a finding, under the *Lebron* test, that an entity is part of the government for all constitutional purposes, *see Lebron*, 513 U.S. at 378 (discussing the state action doctrine but concluding that "[i]t may be unnecessary to traverse that difficult terrain" if the court finds that "Amtrak is not a private entity but Government itself").

Lebron has one more downstream application: The private nondelegation doctrine only applies to entities that are not government actors under *Lebron*. *See Am. Ass'n of R.R.*, 575 U.S. at 55 (finding that Amtrak was part of the government under *Lebron*, reversing the D.C. Circuit's holding to the contrary, and remanding since D.C. Circuit applied private nondelegation doctrine "based on the flawed premise that Amtrak should be treated as a private entity"). This doctrine dictates that the government, whether Congress or the Executive Branch, may not delegate

34

excessive authority to a private entity, and applies regardless of whether the private entity is engaged in specified unconstitutional deprivations of the rights of others under the state action doctrine. *Carter*, 298 U.S. at 311-12. Instead, the private nondelegation doctrine simply asks whether the government has handed over too much of its power to the private entity no matter how that power is wielded.

Side-stepping both the *Lebron* test and the state actor doctrine, plaintiffs attempt to blaze a third path they characterize as the "significant authority" test, Pls.' Opp'n at 16-19, urging that because FINRA "wields significant authority pursuant to the laws of the United States," its structure should be subject to the Constitution's structural provisions, such as the Appointments Clause and removal power, and its actions subject to the Constitution's safeguards for individual rights, without a need for analysis of whether any particular FINRA action constitutes "state action," *id.* at 16, 24. Muddying the doctrinal lines between the *Lebron* test for a government actor, the separate state-action doctrine, and the private nondelegation doctrine, plaintiffs then draw on state-action precedents in an effort to demonstrate that FINRA is a "state actor" for *all purpose*s. *See, e.g., id.* at 18-19 ("State-action precedent points in the same direction" as plaintiffs' proposed "significant authority" test.); *id.* at 37 ("FINRA is a state actor" that must provide "due process and . . . recognize the right to a jury trial . . . .").

Plaintiffs' proposed approach runs contrary to binding precedent that an entity must be part of the government for the Appointments Clause and presidential removal powers to apply, as *Association of American Railroads* makes crystal clear. There, plaintiffs sought to apply structural separation-of-powers principles to Amtrak, a nominally private corporation, but the D.C. Circuit initially concluded that Amtrak, a private corporation established by Congress, was a private entity, and applied the private nondelegation doctrine to conclude that Congress had unconstitutionally

35

delegated regulatory power to that private entity. *Ass'n of Am. R.R.*, 721 F.3d at 677. The Supreme Court reversed, holding that Amtrak was in fact part of the government under the framework laid out in *Lebron*. *Ass'n of Am. Railroads*, 575 U.S. at 55 (2015). Then, and only then, on remand from the Supreme Court, with the binding determination that Amtrak was "part of the government" in hand, did the D.C. Circuit proceed to analyze whether Amtrak's appointed arbitrator was an "officer of the United States" for Appointments Clause purposes. *Ass'n of Am. R.R. v. U.S. Dep't of Transp.*, 821 F.3d 19, 37 (D.C. Cir. 2016).

The *Lebron* test determines whether an entity is part of the government and triggers the separation-of-powers analysis to determine whether the entity is properly subject to presidential appointment, removal, and supervisory powers. If the entity is not part of the government, then the state action or private nondelegation doctrines may apply. Consistent with the analytical framework employed in *Lebron,* considered first is whether FINRA is part of the government. *See infra* Part III.C. Upon determining that FINRA is not part of the government and is a private entity, the Court next assesses whether FINRA engages in state action when bringing disciplinary proceedings against plaintiffs, or exercises improperly delegated authority, *see infra* Parts III.D-.F, followed by discussion of whether plaintiffs' rights are unconstitutionally conditioned on FINRA membership, *see infra* Part III.G.

### C. FINRA's Private Status Precludes Plaintiffs' Presidential Power Claims in Counts I, II, III

The first three counts of the Third Amended Complaint raise challenges under the Appointments Clause, TAC ¶¶ 124-134 (Count I, presidential removal power); *id.* ¶¶ 141-145 (Count III, Appointments Clause), and related constitutional provisions governing presidential powers in the Executive Vesting and Take Care Clauses, *id.* ¶¶ 135-140 (Count II). Under the Appointments Clause, "Officers of the United States" must be appointed by the President with the

36

"the Advice and Consent of the Senate," although "Congress may by Law vest the Appointment of . . . inferior Officers . . . in the President alone, in the Courts of Law, or in the Heads of Departments." U.S. Const. art. II, § 2, cl. 2. Under binding precedent, the president must be "empower[ed]" to keep "executive officers" "accountable . . . by removing them," *Free Enter. Fund*, 561 U.S. at 483, and "the 'executive power'—all of it—is 'vested in a President,' who must 'take Care that the Laws be faithfully executed,'" *Seila L. LLC v. CFPB*, 591 U.S. 197, 203 (2020), but the President's vested authority "only extends as far as the Executive branch," *U.S. Inst. of Peace v. Jackson*, 783 F. Supp. 3d 316, 340 (D.D.C. 2025).

Counts I, II and III are premised on plaintiffs' conclusory assertion that "FINRA's executives and officers are principal officers [of the United States]," TAC ¶ 144, and, consequently, that FINRA is "subject to the Constitution's limits on federal power," *id.* ¶ 15. From this legal conclusion, plaintiffs reason that FINRA officers must (1) be appointed "by the President by and with the advice and consent of the Senate," TAC ¶ 144 (Count III), (2) be subject to presidential "oversight [and] supervisory power," *id.* ¶ 139 (Count II), and (3) be removable by the President, *id.* ¶ 130 (Count I); *see also* Pls.' Opp'n at 37. This argument starts with wishful thinking and then collapses under the weight of spiraling aspiration. Simply put, no FINRA employee or board member is an officer of the United States, so neither the Appointments Clause nor the requirement that the president exercise removal authority over such employees applies, and since FINRA is not a part of the government, much less the Executive Branch, the president has no constitutionally endowed supervisory authority over FINRA.

As noted, in *Lebron*, the Supreme Court laid out a test for determining whether a nominally private organization is "an agency or instrumentality of the United States for the purpose of individual rights guaranteed against the Government by the Constitution," 513 U.S. at 394, and

37

later clarified that the same test applies when analyzing whether "[t]he structural principles secured by the separation of powers" apply to a nominally private entity, *Am. Ass'n of R.R.*, 575 U.S. at 55 (alteration in original). As distilled by the D.C. Circuit, "a corporation is 'part of the Government' for constitutional purposes when: '[(1)] the Government creates [the] corporation by special law, [(2)] for the furtherance of governmental objectives, and [(3)] retains for itself permanent authority to appoint a majority of the directors of that corporation.'" *Herron*, 861 F.3d at 167 (alterations in original) (quoting *Lebron*, 513 U.S. at 400).

Under this standard, the question is not close: FINRA is a private entity, not a "part of the Government" subject to the structural demands of the Constitution. *See Lebron*, 513 U.S. at 400.[7] FINRA is indisputably a private corporation organized under the laws of Delaware. TAC ¶ 22 ("FINRA is a Delaware not-for-profit corporation . . . ."). FINRA's predecessor, the National Association of Securities Dealers, was created in 1939 as a private organization without any government intervention. *Alpine*, 121 F.4th at 1322. In 2007, NASD merged with the enforcement arm of the New York Stock Exchange, another private organization, created in 1817 without government intervention. *Id.* at 1318, 1319-21. Nor does the government "retain," or possess, the authority to appoint *any* of FINRA's directors, *see Lebron*, 513 U.S. at 400, who are elected by FINRA's members (*i.e.*, industry participants) or by FINRA's board, *Alpine*, 121 F.4th at 1339 (Walker, J., concurring in part). While incorporating self-regulatory organizations such as FINRA into the regulatory scheme of the Exchange Act, Congress likely intended to further governmental objectives, but without some showing that the government created or retained control over its

---

[7]     In deciding Alpine's preliminary injunction motion in this case, neither this Court nor the D.C. Circuit expressly analyzed the applicability of the *Lebron* factors to FINRA. *See generally Scottsdale*, 678 F. Supp. 3d 88; *Alpine*, 121 F.4th 1314. As noted, *supra* in Part I.C.2, at the hearing held before this Court on the preliminary injunction motion, Alpine pressed the state action doctrine as its "stronger argument," Hr'g Tr. 26:17-18, 26:25-27:1 (plaintiffs' counsel concession), and that was focus in the decisions that followed.

leadership and management, FINRA cannot be considered part of the government under *Lebron*. *See Kim*, 698 F. Supp. 3d at 161-62 ("*Lebron*'s three-factor test shows that FINRA is likely not a state actor."). This forecloses plaintiffs' arguments under the Appointments Clause, presidential removal power, and Take Care and Vesting Clauses. Counts I, II, and III are accordingly dismissed.

### D.  Plaintiffs Have Identified No State Action by FINRA To Support Count VI

FINRA's status as a private entity, as explained *supra* in Part III.C, does not preclude plaintiffs from asserting a claim under the Fifth Amendment's due process clause by alleging that FINRA engaged in conduct that deprived them of their rights in a way that is "fairly attributable" to the government and therefore constitutes state action. *Lugar*, 457 U.S. at 937. For a deprivation of rights to be "fairly attributable" to the government, the deprivation must satisfy both aspects of a "two-part approach" established by the Supreme Court. *Id.* "First, the deprivation must be caused by the exercise of some right or privilege created by the State or by a rule of conduct imposed by the state or by a person for whom the State is responsible." *Id.* "Second, the party charged with the deprivation must be a person who may fairly be said to be a state actor. This may be because he is a state official, because he has acted together with or has obtained significant aid from state officials, or because his conduct is otherwise chargeable to the State." *Id.* In other words, the deprivation of rights must (1) be authorized by the laws of the government and (2) have "'something more' which would convert the private party into a state actor" for the purposes of that deprivation of rights. *Id.* at 939; *see also Leesville Concrete*, 500 U.S. at 620 (summarizing and affirming applicability of this test to find that civil party's allegedly racially discriminatory peremptory strike was state action). That "something more" may be, for example, that "the private entity performs a traditional, exclusive public function," "the government compels the private entity to take a particular action," or the "government acts jointly with the private entity," though

39

private action does not qualify as state action simply because the private action "serves the public good or the public interest in some way," nor does "being regulated by the State . . . make one a state actor." *Manhattan Cmty. Access Corp. v. Halleck*, 587 U.S. 802, 809 (2019).

Here, plaintiffs allege, in Count VI, that FINRA's dual role as the entity bringing and adjudicating disciplinary proceedings amounts to a deprivation of their Fifth Amendment due process right not to be tried by an unconstitutionally constituted body, *see* TAC ¶ 165, which the Supreme Court has described as a "here-and-now injury" cognizable under the Constitution, *Axon*, 598 U.S. at 191 (quoting *Seila L.*, 591 U.S. at 212). This allegation falls far short of meeting the requisite test to show that FINRA's disciplinary proceedings are somehow converted into "state action," for reasons already explained in the D.C. Circuit's opinion in *Alpine*.

In *Alpine*, the majority rejected the dissent's assertion that FINRA engages in governmental action when "it investigates, prosecutes, and initially adjudicates allegations against a company required by law to put itself at FINRA's mercy," *id.* at 1338 (Walker, J., concurring in part). These activities are not state action carried out by a private entity but rather "simply . . . FINRA's own internal procedures for investigating member compliance with FINRA's membership rules." *Id.* at 1328 (majority opinion). They "*predate* any congressional involvement with private securities regulators," meaning that FINRA disciplinary proceedings "are not an authority bestowed by the federal government," *id.* (emphasis in original), and accordingly do not satisfy even the first step of the *Lugar* test because they do not involve "the exercise of some right or privilege created by the State," *Lugar*, 457 U.S. at 937.

Certainly, FINRA's expulsion sanctions carry practical repercussions more serious than many private actions because, if upheld by the SEC, expulsion from FINRA can mean expulsion from the securities industry. 15 U.S.C. § 78o(b)(1)(B) (prohibiting registration of brokers and

40

dealers "until such broker or dealer has become a member of a registered securities association," or a national security exchange, or has received an exemption from the SEC); TAC ¶ 8 (noting that FINRA is the only registered securities association). Nonetheless, the FINRA proceeding itself is fundamentally private because any resultant sanctions at most operate as recommendations that are not legally enforceable until either ratified by the SEC or the opportunity for appeal to the SEC is forfeited.

Binding precedent instructs that a private action, which may eventually be ratified and adopted by the government, does not constitute state action. For instance, in *NCAA v. Tarkanian*, the Supreme Court held that the NCAA, a private organization, did not commit state action by requiring as a condition of continued NCAA membership that a public university demote a basketball coach, because the public university was ultimately the entity to engage in the challenged action of demotion. 488 U.S. 179, 194-95 (1988). The Court noted that when a government entity "enforce[s] . . . disciplinary rules . . . adopted *in toto*" as formulated by a private entity, "[i]t does not follow . . . that the [private entity]'s formulation of those disciplinary rules was state action," when the government "retained plenary power to reexamine those standards and, if necessary, to reject them and promulgate its own." *Id.* at 194 (citing *Bates v. State Bar of Ariz.*, 433 U.S. 350, 360 n.12 (1977)).

Here, too, FINRA, a private organization, adopts rules and makes decisions about who may and may not be a member. FINRA cannot "file its own enforcement proceedings in federal court" or even "'bring court actions to collect disciplinary fines it has imposed.'" FINRA Mem. at 8 (quoting *Fiero v. FINRA*, 660 F.3d 569, 571 (2d Cir. 2011)). FINRA does not outlaw certain individuals or entities from participating in the securities market; instead, the SEC wields this power and may do so upon FINRA's recommendation. The SEC retains "plenary power" to modify

both FINRA's generally applicable rules and FINRA's own application of those rules to any given case. *Tarkanian*, 488 U.S. at 194. Thus, while the SEC's actions to confirm, ratify, or enforce FINRA's decisions undoubtedly constitute state action, that does not "transform[]" FINRA's disciplinary proceedings into state action. *Id.*; *cf. Blount v. SEC*, 61 F.3d 938, 939 (D.C. Cir. 1995) (allowing First Amendment challenge to rule initially promulgated by SRO when plaintiff "challenge[d] the SEC's order approving [the new rule]").

Thus, plaintiffs have failed to state a claim that FINRA engaged in state action and is therefore subject to the strictures of the Fifth Amendment's due process clause. Accordingly, Count VI is dismissed.

### E. Count IV's Private Non-Delegation Claim Fails

In Count IV, plaintiffs allege that if FINRA is not a part of the government, then Congress and the SEC have unconstitutionally delegated governmental authority to a private actor, in violation of the private nondelegation doctrine. TAC ¶¶ 146-154. "Federal lawmakers cannot delegate regulatory authority to a private entity." *Ass'n of Am. R.R.*, 721 F.3d at 670, *vacated and remanded on other grounds sub nom. Ass'n of Am. R.R.*, 575 U.S. 43. Fairness concerns underlying the private nondelegation doctrine are particularly acute when a delegation is made to "private persons whose interests may be and often are adverse to the interests of others" regulated under the same scheme. *Carter Coal*, 298 U.S. at 311. Nevertheless, "[a]s long as an agency . . . retains decision-making power, it may enlist private parties to give it recommendations." *FCC v. Consumers' Rsch.*, 606 U.S. 656, 692 (2025). The Supreme Court has repeatedly found to be "'unquestionably valid'" those arrangements where private entities "propose[s]" rules or rates to a government agency for "'approv[al], disapprov[al], or modifi[cation].'" *Id.* (alterations in original) (quoting *Adkins*, 310 U.S. at 388).

42

That type of arrangement is structured so that a private entity is "broadly subordinate" to a federal agency, with the private entity's decisions that sound in federal power incapable of going into effect until aggrieved parties have had a chance to seek "*de novo* review" from the government agency. *Id.* at 692-93. This is precisely the structure of authority between FINRA and the SEC. The SEC may suspend or revoke FINRA's registration if "necessary or appropriate in the public interest, for the protection of investors, or otherwise in furtherance of the purposes of [the Exchange Act]." 15 U.S.C. § 78s(h)(1). While FINRA promulgates its own rules and standards for professional conduct, those rules are reviewed and approved by the SEC with limited exceptions. *See Turbeville*, 874 F.3d at 1270 (describing the SEC's oversight duties); 15 U.S.C. § 78s(b)-(c). The SEC at any time may "abrogate, add to, and delete from" any FINRA rule. *Id.* § 78s(c). Although FINRA may take the first step in investigating and disciplining an entity for violation of its rules, an SEC regulation, or a statutory provision, *id.* § 78o-3(b)(7), any adjudication by FINRA is subject to *de novo* and *sua sponte* review by the SEC, *id.* § 78s(d)(2); Commission Rule of Practice 420, 17 C.F.R. § 201.420. This carefully balanced structure has resulted in a finding that federal securities laws do not amount to an unconstitutional delegation by every court to consider the issue. *See, e.g.*, *Sorrell v. SEC*, 679 F.2d 1323, 1325-26 (9th Cir. 1982); *First Jersey Sec., Inc. v. Bergen*, 605 F.2d 690, 697 (3d Cir. 1979); *Todd & Co. v. SEC*, 557 F.2d 1008, 1012-13 (3d Cir. 1977); *R.H. Johnson v. SEC*, 198 F.2d 690, 695 (2d Cir. 1952).

The D.C. Circuit held in *Alpine* that the private nondelegation doctrine likely requires that the SEC be able to review expulsion decisions before they go into effect, though noting that this determination was "necessarily preliminary." *Alpine*, 121 F.4th at 1330. FINRA's voluntary modification of its rules to delay implementation of expulsion orders until after SEC review remedies any issue that previously existed on this front. *See* Proposed Stay Rule; *see supra* n.4.

43

In so holding the D.C. Circuit emphasized that "[i]n many cases, the lack of pre-enforcement government review is unlikely to violate the Constitution because review can take place after FINRA's sanctions take effect.  That is because many types of sanctions imposed by FINRA, short of expulsion, can be undone later."  *Id.*

Notwithstanding the *Alpine* decision, plaintiffs point to two aspects of FINRA's powers that amount, in their view, to exercises of government power which the SEC allegedly has "*no authority to review.*"  Pls.' Opp'n at 31 (emphasis in original).  Close examination of these examples, however, reveals that they either *are* subject to SEC review or do not constitute the wielding of government power.  First, plaintiffs complain that FINRA has the "authority to decide whether to investigate and prosecute alleged violations of federal law," which the SEC cannot review until a "'final disciplinary sanction'" is issued.  *Id.* (quoting 15 U.S.C. § 78s(e)(1)).  In plaintiffs' view, this constitutes "prosecutorial discretion" and is a "classic exercise of federal executive power."  TAC ¶ 6.  Contrary to plaintiffs' characterization, however, these are not "prosecutorial" decisions, *id.*, but rather decisions about whether to initiate sanctions or removal of a member from the private organization membership of FINRA, *see supra* Part III.D.  Sometimes, those sanctions or removal may be based on what FINRA believes to be a violation of federal law, 15 U.S.C. § 78o-3(b)(6), but that does not change the fundamental character of what FINRA is empowered to do: sanction or remove individuals or companies from its membership, *id.* § 78o-3(g) (header) ("Denial of Membership").  Since FINRA is the only SRO encompassing certain securities businesses, expulsion from FINRA may lead to being barred from that market, given that membership in an SRO is a requirement for participation in that market, with some exceptions.  TAC ¶ 8.  That is why the SEC is empowered, somewhat remarkably, to review the membership decisions of a private organization.  15 U.S.C. § 78s(d)(1).  The SEC's power of

44

review does not change FINRA's initial adjudication, however, into a government prosecution, as evidenced by the fact that FINRA is not empowered to enforce, *i.e.*, prosecute, its rules or orders in court, whereas the SEC is.  15 U.S.C. § 78u(e).  Since the decision to investigate whether an entity should be sanctioned by or expelled from FINRA membership is not an exercise of government power, the private nondelegation doctrine does not apply.

Second, plaintiffs argue that "the SEC may amend FINRA rules for only limited purposes," and that FINRA therefore exercises rulemaking power without sufficient oversight.  Pls.' Opp'n at 33.  Yet, even cursory examination of the statute allowing SEC review of FINRA rules reveals that the SEC may "abrogate, add to, and delete from . . . the rules of a self-regulatory organization . . . as the Commission deems necessary or appropriate to insure the fair administration of the self-regulatory organization, to conform its rules to requirements of this chapter and the rules and regulations thereunder applicable to such organization, or otherwise in furtherance of the purposes of this chapter," including the category of rules that FINRA may "put into effect summarily" without express authorization by the SEC.  15 U.S.C. § 78s(b)(3)(B), (c).  This broadly worded authorization hardly constitutes a significant restriction on the SEC's authority to review FINRA's rules, and, if anything, ensures the SEC has adequate discretionary authority to review FINRA's operational rules to effectuate congressional purposes.  *See Gundy v. United States*, 588 U.S. 128, 135 (2019) (plurality opinion) (noting that Congress must provide an "intelligible principle to guide the delegee's use of discretion").

Plaintiffs point to no governmental power exercised by FINRA that lacks sufficient supervision by the SEC.  At every turn, FINRA is subordinate to the SEC, and many of its actions have no legal effect without the SEC's stamp of approval.  Therefore, plaintiffs' allegations fail under the private nondelegation doctrine, and Count IV is accordingly dismissed.

### F.  Count V's Public Non-Delegation Claim Fails

Plaintiffs allege, in Count V, that "[b]y virtue of FINRA's wide-ranging rulemaking authority, FINRA improperly and unconstitutionally exercises legislative power," in violation of the public non-delegation doctrine.  TAC ¶ 158.  While Congress "may confer substantial discretion on executive agencies to implement and enforce the laws," *Gundy*, 588 U.S. at 135 (plurality opinion), the public nondelegation doctrine "bars Congress from transferring its legislative power to another branch of Government," *id*. at 132.  "The constitutional question is whether Congress has supplied an intelligible principle to guide the delegee's use of discretion." *Id*. at 135.  Plaintiffs' framing of their claim confusingly mixes the public non-delegation doctrine with their structural separation-of-powers arguments.  *See* TAC ¶¶ 160-161 (noting, in support of public non-delegation claim, that "[t]he President cannot . . . appoint members of the FINRA Board" and that "the SEC cannot remove FINRA Board members or hearing officers at will").  Yet, the public nondelegation doctrine hinges not on the structural concerns referenced by plaintiffs, but on whether Congress's delegation of power to another a federal agency was accompanied by an "intelligible principle to guide the delegee's use of discretion." *Gundy*, 588 U.S. at 135.

As a threshold matter, the parties differ on application of the public nondelegation doctrine to private entities.  For its part, FINRA posits that "FINRA is a *private* entity and therefore is not subject to the *public* nondelegation doctrine," FINRA Mem. at 28 (emphasis in original), while, for their part, plaintiffs and the government both seemingly assume that the public nondelegation doctrine may apply to any entity, public or private, delegated power from Congress, Gov't's Mem. at 21 (discussing public nondelegation without noting that FINRA is a private entity); Pls.' Opp'n at 36 (arguing that the public nondelegation doctrine applies with even more force to private

46

delegees).  As already determined, FINRA is indeed a private entity, *see supra* Part III.C, that engages in private action when conducting its business, *see supra* Part III.D.  FINRA's argument that the public nondelegation doctrine applies only within the government to government entities packs substantial force.   The Supreme Court recently contrasted the public and private nondelegation doctrines, opining that a law violates the public nondelegation doctrine "when it authorizes an *agency* to legislate," and the private nondelegation doctrine "when it allows non-governmental entities to govern," emphasizing that "[t]hose doctrines do not operate on the same axis," since one limits "*executive* legislation" and the other "private governance."  *Consumers' Rsch.*, 606 U.S. at 697 (emphasis added).  This distinction clearly resolves this inter-party dispute by establishing that the public nondelegation doctrine applies only when power is delegated to an "executive" "agency," *id.*, which FINRA is not.  On this ground, Count V may be dismissed.

Moreover, even if the public nondelegation doctrine reaches private entities, the Exchange Act certainly clears the "intelligible principle" bar.  *Gundy*, 588 U.S. at 135.  A statute that contains the necessary "intelligible principle" must include a "general policy" that the delegee must pursue and lay out "boundaries" for the delegee's work.  *Am. Power & Light Co. v. SEC*, 329 U.S. 90, 105 (1946).  Typically, public nondelegation challenges focus on a particular challenged policy or action of the delegee, allowing the Court to home in on the statutory provision relied upon by the delegee for their action, meaning that "a nondelegation inquiry always begins (and often almost ends) with statutory interpretation."  *Gundy*, 588 U.S. at 135.  For instance, courts have upheld delegations as providing sufficient guidance, such as a requirement that an agency "set air quality standards at levels 'requisite to protect the public health,'" *Consumers' Rsch.*, 606 U.S. at 683-84 (quoting *Whitman v. Am. Trucking Ass'n*, 531 U.S. 457, 472 (2001)); that an agency "ensure that corporate structures did not 'unfairly or inequitably distribute voting power' among security

47

holders," *id.* (quoting *Am. Power & Light*, 329 U.S. at 104); and that an agency "regulate broadcast licensing as 'public interest, convenience, or necessity' requires," *IGas Holdings, Inc. v. EPA*, 146 F.4th 1126, 1138 (D.C. Cir. 2025) (quoting *Nat'l Broad. Co. v. United States*, 319 U.S. 190, 225-26 (1943)).

Here, plaintiffs do not challenge any particular FINRA action or even any specific delegation to FINRA, but rather insist that, in general, FINRA possesses "wide-ranging rulemaking authority." TAC ¶ 158. At least at this level of generality, the Exchange Act passes the intelligible principle test with flying colors. As discussed *supra* in Part III.E, FINRA's procedural, operational, and substantive rules and disciplinary actions are all subject to review by the SEC, and many of the statutory provisions delineating FINRA's relationship with the SEC provide substantive guideposts either directly to SROs such as FINRA or to the SEC in its oversight of SROs. *See supra* Part III.E. For instance, an SRO must "assure a fair representation of its members in the selection of its directors and administration of its affairs," 15 U.S.C. § 78o-3(b)(4); ensure that its rules "are designed to prevent fraudulent and manipulative acts and practices, to promote just and equitable principles of trade, to foster cooperation and coordination with persons engaged in regulating, clearing, settling, processing information with respect to, and facilitating transactions in securities, to remove impediments to and perfect the mechanism of a free and open market and a national market system, and, in general, to protect investors and the public interest," *id.* § 78o-3(b)(6); and "provide a fair procedure for the disciplining of members," *id.* § 78o-3(b)(8). These are some of the more general edicts laid out for SROs, with the Exchange Act further directing specific disclosure requirements, kinds of transactions that SROs may and may not permit, and other detailed requirements. *See generally id.* § 78o-3(b).

As described, Congress has "provide[d] detailed guidance" that "list[s] . . . 'principles' on which the [FINRA] 'shall base'" its policies, *Consumers' Rsch.*, 606 U.S. at 667 (quoting 47 U.S.C. § 254(b)), on the condition that failing to do so would make FINRA ineligible to be registered as an SRO, 15 U.S.C. § 78o-3(b) ("An association of brokers and dealers shall not be registered as a national securities association unless the Commission determines that" the organization meets numerous requirements.); *see also Scottsdale*, 678 F. Supp. 3d at 107 n.9 (coming to the same conclusion in deciding motion for preliminary injunction and TRO).  Therefore, plaintiffs have identified no public nondelegation issue, and Count V is dismissed.

### G.  Count VIII's Purported "Unconstitutional Conditions" Claim Fails

Plaintiffs base their final Count VIII on the "unconstitutional conditions" doctrine, under which "the government may not deny a benefit to a person on a basis that infringes his constitutionally protected . . . [rights] even if he has no entitlement to that benefit." *Rumsfeld v. Forum for Acad. & Inst. Rights, Inc.*, 547 U.S. 47, 59 (2006) (omission in original) (quoting *United States v. Am. Library Ass'n, Inc.*, 539 U.S. 194, 210 (2003)); *see Perry v. Sindermann*, 408 U.S. 593, 597 (1972) ("[The government] may not deny a benefit to a person on a basis that infringes his constitutionally protected interests.").  Plaintiffs allege that federal law requires them, on pain of losing their ability to "engage in their chosen profession," TAC ¶ 177, to "submit to structurally biased enforcement proceedings adjudicated without a jury," echoing their Fifth and Seventh Amendment claims, and to associate with a group (*i.e.*, FINRA) in violation of their First Amendment right of association and expression, Pls.' Opp'n at 44.  Each of the constitutional rights plaintiffs believe the Exchange Act requires them to forfeit in order to engage in their profession of choice is addressed *seriatim*.

### 1. Fifth Amendment Due Process Rights

As already explained, *see supra* Part III.D, plaintiffs' Fifth Amendment claim is foreclosed because FINRA's proceedings are not subject to and therefore do not violate the Fifth Amendment's due process requirement. "Absent a finding that [plaintiffs have] such constitutional rights," they "cannot prevail" on their claim that FINRA membership and registration is an "unconstitutional condition[]." *Scahill v. District of Columbia*, 909 F.3d 1177, 1184 (D.C. Cir. 2018). To the extent, therefore, that plaintiffs' unconstitutional conditions claim is predicated on the Fifth Amendment, it is dismissed.

### 2. Seventh Amendment Jury Trial Right

Though subject matter jurisdiction is lacking over plaintiffs' direct Seventh Amendment claim concerning the procedural propriety of disciplinary sanctions issued by FINRA, *see supra* Part III.A.2, not so as to plaintiffs' Seventh Amendment unconstitutional conditions claim, which challenges the constitutionality of requiring FINRA membership and associated participation in FINRA's jury-less proceedings. Setting aside the alternatives available to joining FINRA as a member—*e.g.*, engaging in a different part of the securities industry or different profession, seeking an SEC exemption from SRO membership, 15 U.S.C. § 78o(b)(9), or seeking registration of a new SRO, *id.* § 78o-3—plaintiffs' Seventh Amendment unconstitutional conditions claim fails for the same reason as their direct Fifth Amendment claim fails: FINRA does not engage in state action when deciding whether to remove a member. *See supra* Part III.D.

The U.S. Constitution simply does not require private membership organizations to conduct jury trials before imposing fine penalties on their members. *See Tarkanian*, 488 U.S. at 191 ("Embedded in our Fourteenth Amendment jurisprudence is a dichotomy between state action, which is subject to scrutiny under the Amendment's Due Process Clause, and private conduct,

against which the Amendment affords no shield, no matter how unfair that conduct may be." (footnote omitted)).  Moreover, FINRA cannot enforce its own monetary sanctions in court and must leave such enforcement to the SEC, at which point constitutional protections may come into play.  *See* 15 U.S.C. § 78u(e).  In other words, when the SEC seeks such enforcement of a monetary penalty issued by FINRA, the constitutional question whether a jury trial is required may be appropriately raised, *see e.g.*, *Jarkesy*, 603 U.S. at 115, but not before.  Thus, plaintiffs' have failed adequately to plead that their ability to participate in their profession of choice has somehow been conditioned on their forfeiture of any applicable jury trial rights.

### 3.  First Amendment Claim

As for plaintiffs' First Amendment unconstitutional conditions claim, FINRA argues that plaintiffs have "identified no 'messages' that they were compelled to 'endorse'" as members of FINRA, nor any "constitutionally protected associational interest."  FINRA Mem. at 43 (quoting TAC ¶ 178).  Certainly, the First Amendment's protection of freedom of speech also extends to protect "[t]he right to eschew association for expressive purposes."  *Janus v. Am. Fed'n of State, Cnty., and Mun. Emps., Council 31*, 585 U.S. 878, 892 (2018); *see Roberts v. U.S. Jaycees*, 468 U.S. 609, 623 (1984) ("Freedom of association . . . plainly presupposes a freedom not to associate.").  Freedom of expressive association, however, "is not absolute."  *Boy Scouts of Am. v. Dale*, 530 U.S. 640, 648 (2000).  Rather, the Supreme Court has held that a regulation may override that right when it "serve[s] compelling state interests, unrelated to the suppression of ideas, that cannot be achieved through means significantly less restrictive of associational freedoms."  *Id.* (quoting *Roberts*, 468 U.S. at 623).

Plaintiffs acknowledge that compelled membership in a group may be justified by compelling state interests, and identify that "Congress required brokers and dealers to join FINRA

51

to further the purposes of the Exchange Act, such as the prevention of fraud," but nonetheless contend that "Congress could promote those purposes through means significantly less restrictive of associational freedoms—namely by regulating Plaintiffs directly rather than compelling them to join FINRA." Pls.' Opp'n at 45. This argument flies in the face of "well-established" precedent, acknowledged by plaintiffs, that "mandatory membership in a union or integrated state bar does not violate the First Amendment." *Id.* (citing *Keller v. State Bar of Cal.*, 496 U.S. 1, 13 (1990) ("[T]he compelled association and integrated [legal] bar are justified by the State's interest in regulating the legal profession and improving the quality of legal services.")).

Moreover, the legislative history of multiple statutes that preserved self-governance in the securities industry reveals that Congress had compelling reasons not only for regulating the securities industry, but for specifically regulating this market sector through self-governance. *See, e.g.*, S. REP. NO. 75-1445, at 4 (1938) (explaining that "cooperative regulation" is "distinctly preferable" because self-governance avoids "expenditure of public funds" and "the evils of bureaucracy"); S. REP. NO. 94-75, at 23 (1975) (advocating preservation of self-regulation that "on the whole . . . has worked well").

In a last gasp effort to support their First Amendment unconstitutional conditions claim, plaintiffs assert the conclusory allegation that "broker-dealers are compelled to endorse FINRA messages with which broker-dealers may not agree in violation of the First Amendment's protections against compelled speech." TAC ¶ 178. Indeed, when the government requires individuals to join an association, that association may not spend mandatory membership fees on "ideological activities not 'germane' to the purpose for which compelled association was justified." *Keller*, 496 U.S. at 13. At the same time, however, neither the Third Amended Complaint nor plaintiffs' briefing identifies any actual factual example of messages they have been compelled to

endorse or that FINRA has used their membership fees to support. *See generally* TAC; Pls.' Opp'n Mem. Thus, plaintiffs' claim falls short of adequately pleading that their right to participate in their chosen profession has been conditioned on their forfeiture of any First Amendment rights.

On all fronts, plaintiffs' unconstitutional conditions claim fails as a matter of law, and Count VIII must therefore be dismissed.

## IV.   CONCLUSION

For the reasons explained above, FINRA's Motion to Dismiss, ECF No. 107, is **GRANTED**, and plaintiffs' Third Amended Complaint is **DISMISSED**.

An order consistent with this Memorandum Opinion will be contemporaneously filed.

Date: April 23, 2026

_____
**BERYL A. HOWELL**
United States District Judge